Matthew M. Lavin, Esq. (*pro hac vice*)
mlavin@napolilaw.com
Aaron R. Modiano, Esq. (*pro hac vice*)
amodiano@napolilaw.com
NAPOLI SHKOLNIK, PLLC
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
Telephone: (212) 397-1000
Facsimile: (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
david@dllawgroup.com
Katie J. Spielman, Esq. (CA SBN 252209)
katie@dllawgroup.com
DL LAW GROUP
345 Franklin St.
San Francisco, CA 94102
Telephone: (415) 678-5050
Facsimile: (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RJ, as the representative of her beneficiary son SJ; LW as the representative of her beneficiary spouse MW; and, DS, an individual, on behalf of themselves and all others similarly situated,<br><br>    *Plaintiffs,*<br><br>    vs.<br><br>CIGNA BEHAVIORAL HEALTH, a Minnesota Corporation, and MULTIPLAN, CORP., a Delaware Corporation,<br><br>    *Defendants.* | Case No.: 4:20-cv-02255-EJD<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED FOR ALL ISSUES SO TRIABLE |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Table of Contents

Introduction...........................................................................................................1
Summary of Claims..............................................................................................4
Parties....................................................................................................................5
    *Plaintiffs*......................................................................................................*5*
    *Defendants*..................................................................................................*6*
    *Other Interested Parties*.............................................................................*6*
Jurisdiction and Venue.........................................................................................7
Facts......................................................................................................................8
    *Summary of the Facts*................................................................................*8*
    *Usual, Customary, and Reasonable Rate ("UCR")*.................................*12*
    *Intensive Outpatient Program Treatment*...............................................*13*
    *Federal RICO Allegations*......................................................................*14*
The Ingenix Precursor........................................................................................14
    *The RICO Enterprise*..............................................................................*17*
The Defendants formed a RICO Enterprise to Fraudulently Avoid Paying the Usual,
Customary, and Reasonable (UCR) Rates for Reimbursements for IOP Services....................17
The FAIR Health Database...................................................................................20
The Underpayment Scheme's Mechanics.............................................................23
Claims Submission...............................................................................................28
Rates of Payment..................................................................................................29
Viant's Methodology............................................................................................29
Viant Facility Outpatient Review: "Viant OPR"..................................................30
Standard Analytical Files......................................................................................30
Target Pricing: Meet or Beat................................................................................32
MultiPlan and the Viant Methodology..................................................................33
MultiPlan's Secret Annual Events *Meetings of the Enterprise*...........................34
MultiPlan's Secret Road Shows *Further Meetings of the Enterprise*..................35
The Secret Internal Whitepapers...........................................................................36
The Network Access Agreement............................................................................37
    *RICO Predicate Acts & ERISA Violations*.............................................*37*
        RJ & SJ........................................................................38
        MW & LW......................................................................38
        DS.................................................................................38
    *RICO Proximate Cause*............................................................................*54*
    *General Allegations to All Counts*..........................................................*55*
    *The Direct Harm Caused to the Plaintiffs and Class*..............................*56*
CLASS ACTION ALLEGATIONS........................................................................57
    *The Plaintiff Class*...................................................................................*57*

i

*Rule 23(a)*...............................................................................................*57*

Numerosity  57

Commonality...........................................................................................57

Typicality    .........................................................................................59

Adequacy     ........................................................................................60

*Rule 23(b)*.............................................................................................*60*

Causes of Action ...................................................................................... 61

*COUNT I: Violation of RICO, 18 U.S.C. § 1962(c)*
*(As to Cigna and MultiPlan)*.......................................................*61*

*COUNT II: Violation of RICO Conspiracy, 18 U.S.C. § 1962(d)*
*(As to Cigna and MultiPlan)*.......................................................*65*

*COUNT III: Claim for Underpaid Benefits Under Group Plans Governed by ERISA*
*(As to Cigna)* ..............................................................................*66*

*COUNT IV: Breach of Plan Provisions in Violation of ERISA § 502(a)(1)(B)*
*(As to Cigna)* ..............................................................................*67*

*COUNT V: Violation of Fiduciary Duties of Loyalty and Due Care and Request for*
*Declaratory and Injunctive Relief*
*(As to Cigna)* ..............................................................................*68*

*COUNT VI: Violation of Fiduciary Duties of Loyalty and Due Care and Request for*
*Declaratory and Injunctive Relief*
*(As to MultiPlan)*.........................................................................*70*

JURY TRIAL DEMAND ......................................................................... 71

**FIRST AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, RJ, as the representative of her beneficiary son, SJ; LW as the representative of her beneficiary spouse, MW; and, DS, an individual, on behalf of themselves and all others similarly situated bring this action on behalf of themselves and all other similarly situated individuals against defendants Cigna Behavioral Health, Inc., ("Cigna") and Multiplan, Inc., ("Multiplan") and allege the following:

### Introduction

1.  Plaintiffs, RJ, as the representative of her beneficiary son, SJ; LW as the representative of her beneficiary spouse, MW; and, DS, an individual, on behalf of themselves and all others similarly situated ( Individually "Plaintiff" and collectively, "Plaintiffs") file this class action on behalf of themselves and all those similarly situated (the "Plaintiff Class") who were directly injured by Cigna and MultiPlan's scheme to underpay valid, medically necessary, claims.

2.  Each Plaintiff has received medically necessary behavioral health treatment from an appropriately authorized, licensed, and accredited provider for treating mental health and/or substance use disorders ("MH/SUD").

3.  Each Plaintiff was covered under health insurance either administered or issued by "Cigna."

4.  The Defendant, Cigna Behavioral Health, is one of many "Cigna" Companies. MultiPlan, Inc. is a 'cost management' company. Together, Cigna and MultiPlan have formed an enterprise that furnishes a vehicle to deny proper payment for the IOP treatment services that Plaintiffs and the class received.

5.  Cigna and MultiPlan have also conspired together to withhold proper payment for IOP treatment services from Plaintiffs.

6.  Cigna underpaid all of the claims for medically necessary treatment at issue in this litigation.

7.  Because of this, Plaintiffs have been forced to pay out of pocket for behavioral health services Cigna should have covered.

1

8.      Plaintiffs are financially damaged and seek monetary and injunctive relief.

9.      Cigna is one of the largest health insurers in the United States and also controls a large percentage of the commercial healthcare marketplace throughout the United States, including in the geographic areas where the Plaintiffs reside.

10.     MultiPlan is a private, 'cost-management' company that partners with insurers and plan administrators to reduce the amounts they pay doctors and hospitals.

11.     Together, Cigna and MultiPlan created, developed, managed, and administered the scheme to underpay Plaintiff and the class.

12.     Every claim at issue in this litigation was required to be paid at a percentage of the usual and customary rate ("UCR"); the rate charged by providers similar to those where Plaintiffs were treated in the same geographic area.

13.     Each of the claims at issue in this litigation was underpaid.

14.     The underpayment directly and proximately damaged Plaintiffs who had had to pay out of pocket to cover costs which Cigna should have paid.

15.     The underpayment arose out of the fraudulent scheme of Cigna and MultiPlan.

16.     Cigna and MultiPlan's fraudulent scheme used the wires and mail to fraudulently represent that the claims would be and were paid at the usual and customary rate.

17.     The use of the wires and mail crossed state lines and affected interstate commerce.

18.     Further, the activities of the scheme constitute Federal Health Offenses and when Cigna and MultiPlan then engaged in financial transactions with those proceeds, their actions constituted money-laundering.

19.     This scheme has been ongoing and continuous for more than two years.

20.     Cigna and MultiPlan are co-schemers in this enterprise.

21.     The scheme, its fraudulent methodology, and Multiplan's inherent conflicts with patients and providers has recently gained national attention. On November 11, 2020, Muddy Waters Research LLC, a well-respected securities due diligence research and analysis firm based

in San Francisco, released a market report on Multiplan[1] which caused Multiplan's stock to plunge 28%. The 14-page report, entitled "Multiplan: Private Equity Necrophilia Meets The Great 2020 Money Grab" was based on interviews with former Multiplan executives. This report succinctly addresses many of the same issues as this lawsuit. Of particular relevance to the present litigation are the following excerpts:

> In our view, which we believe is shared in the health insurance industry, MPLN [Multiplan] is not on "right side of healthcare". Rather, **it is a conflicted middleman that actually profits when individual members are regularly stuck with balance bills**. (Pg. 2) (bolding added)

> [C]ustomers [health insurers] described MPLN's fee structure as a "scam", while complaining of persistent member balance billing in claims where MPLN was involved. We learned from two former MPLN executives and a MPLN customer that MPLN's billing model may enable it to get paid more per claim than the healthcare providers whose bills it reprices. We understand that major insurers have forced MPLN to reduce its take rate in recent years, in some cases reportedly cutting MPLN's take rate from 12% to 6% of "savings". MPLN has not disclosed this development in its bullish presentations. (Pg. 3-4) (bolding added)

> The reality is that MPLN's revenue model actively encourages balance billing: Customer relationships that most expose members to balance bills are the "type of revenue-generating customer that MPLN wants", per one former executive. (Pg. 4-5)

> [T]he problem with MPLN is that the company stopped giving customers the level of service that they wanted several years ago, as private equity firms were looting the business for cash. (Pg. 7).

> Though MPLN contends it is "on the right side of healthcare", our discussions with former executives and customers revealed a company whose interests conflict with those of its clients... (Pg. 7).

    22.    Without Court intervention, this scheme will continue and continue to cause damage.

---

[1] https://d.muddywatersresearch.com/content/uploads/2020/11/MW_MPLN_11112020.pdf (last accessed 11/24/2020)

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

23.     This scheme injured the Plaintiffs and the class in their persons and property as Plaintiffs and the class have a well-established property interest in their claims for the authorized, medically necessary services they received.

**Summary of Claims**

24.     This action asserts claims under the Federal Racketeer Influenced and Corrupt Organizations ("RICO") Act, the Employee Retirement Income Security Act of 1974 ("ERISA"), and seeks monetary, injunctive, and declaratory relief.

25.     Plaintiffs' federal RICO action is brought pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

26.     Plaintiffs' ERISA claims are brought pursuant to 29 U.S.C. § 1132(a)(1) and 29 U.S.C. § 1132(a)(3).

27.     Together, and as explained more fully in the following sections, Cigna and MultiPlan have formed a RICO enterprise (the "Enterprise").

28.     The Enterprise is an ongoing, informal organization with the common purpose of engaging in the fraudulent scheme to underpay patients' claims for services rendered by MH/SUD providers who do not participate in Cigna's network.

29.     The Enterprise also has the common purpose of committing Federal Health Offenses.

30.     The Enterprise functions as a continuing unit and it came into being on or about January 1, 2015.

31.     The Enterprise furnishes the vehicle through which the acts of racketeering activity are committed.

32.     The acts of racketeering activity, as detailed in later sections, are the development and implementation of the scheme to defraud and use of mail and interstate wire communications in furtherance of that scheme.

33.     Pursuant to the scheme, Defendants sought, and did, under-reimburse Plaintiffs' claims for medically necessary IOP services provided to them. Plaintiffs paid the under-

reimbursed amount out of their own pockets to the treatment providers, the injuring Plaintiffs in their person and property.

34.     The acts of racketeering activity, as detailed in later sections, also include the laundering of monetary instruments when Cigna and MultiPlan engaged in financial activities using the proceeds of funds obtained through the Enterprise's commission of Federal Health Offenses.

35.     The relationships between Cigna and MultiPlan are not merely standard, commercial, contracts; instead, Cigna and MultiPlan exploit their contractual arrangements to provide false legitimacy and cover to their racketeering activity.

36.     The Enterprise has operated continually since 2015 as reflected in the thousands of underpaid claims at issue in this litigation and in the tens of thousands, or more, of underpaid out-of-network IOP claims in California and across the country.

37.     Plaintiffs' ERISA claims rely upon the same facts as Plaintiffs' federal RICO claims.

### Parties

#### *Plaintiffs*

38.     Plaintiff, RJ, is a pseudonym for a participant in an employee benefits plan subject to E.R.I.S.A which is sponsored and funded by Inuit, Inc. RJ is the parent of her beneficiary son, SJ, who is a behavioral health patient. The identities of both, and of all Plaintiffs in this action, are protected in this filing pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), *codified at* 42 U.S.C. §§ 1320(d)(6), *et seq*.

39.     Plaintiff, LW, participant in an employee benefits plan subject to E.R.I.S.A which is sponsored and funded by International Paper Co.  LW is the spouse of plan beneficiary, MW, who is a behavioral health patient.

40.     Plaintiff, DS, is a participant in an employee benefits plan subject to E.R.I.S.A which is sponsored and funded by Impossible Foods, Inc. DS is a behavioral health patient.

5

*Defendants*

41.     Defendant Cigna Behavioral Health, Inc. is a Minnesota corporation with its principal place of business at 11095 Viking Drive, Suite 350, Eden Prairie, MN 55344.

42.     Cigna Behavioral Health manages behavioral health services for Cigna Corporation. It is responsible for administration and payment of claims for behavioral services covered under health plans sponsored or administered by Cigna Corporation or its many wholly owned and controlled subsidiaries, including Cigna Behavioral Health. None of the subsidiary companies are independent, rather they all act in concert to maximize profits for the shareholders of Cigna Corporation.

43.     Defendant MultiPlan, Corp. is a Delaware Corporation with its business address located at 115 5th Avenue, New York, NY 10003. Viant, Inc., is a Nevada corporation and wholly owned subsidiary of MultiPlan. MultiPlan has several wholly owned and controlled subsidiaries, including Viant, all of which act in concert to maximize profits for MultiPlan. MultiPlan, Inc. is a subsidiary of MultiPlan Corp., incorporated in the state of Delaware.

*Other Interested Parties*

44.     Intuit, Inc. (Intuit) is a Delaware corporation with its principal place of business at 2632 Marine Way, Mountain View, CA, in Santa Clara County.  Intuit employees over 9,400 people in the United States. Intuit is a software company that designs and distributes popular accounting products such as QuickBooks, Turbo Tax and Credit Karma.

45.     Intuit sponsors an employer funded health plan for its employees. The Intuit plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Health benefits under the Inuit plan are administered by Cigna.

46.     International Paper is an American pulp and paper company, the largest such company in the world. It has approximately 56,000 employees, and is headquartered in Memphis, Tennessee.

47.     International Paper, Inc. sponsors an employer funded health plan for its employees. The International Paper plan is subject to the Employee Retirement Income Security

6

Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Health benefits under the International Paper plan are administered by Cigna.

48.     Impossible Foods, Inc. sponsors an employer funded health plan for its employees. The International Paper plan is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Health benefits under the Impossible Foods plan are administered by Cigna.

**Jurisdiction and Venue**

49.     At least one Plaintiff is diverse from the Defendants and the amount in controversy exceeds $5,000,000. Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) as the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action where at least one member of a class of plaintiffs is a citizen of a State different from any Defendant.

50.     The claims asserted involve matters of interstate and national interest, and the claims at issue arise under federal law.

51.     This court has personal jurisdiction over Defendants because Cigna and/or its subsidiaries maintain offices and transact business across the State of California, including at corporate offices within this jurisdiction. Cigna transacts business in California in such volume that it is at home in this jurisdiction, and subject to the personal jurisdiction of this court.

52.     This court has personal jurisdiction over MultiPlan because MultiPlan and/or its subsidiaries transact business so frequently and with such regularity in Northern California that they avail themselves to the protections of California's laws, are at home in this jurisdiction, and subject to the personal jurisdiction of this court.

53.     This Court is the proper venue for this action pursuant to 28 U.S.C. § 1391(b) and 18 U.S.C. § 1965: a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this Judicial District and one or more of the Defendants conducts a substantial amount of business in this Judicial District.

## Facts

### *Summary of the Facts*

54.     Plaintiffs sought treatment for behavioral health disorders, including for mental health and substance use disorders, from licensed, accredited, out-of-network treatment providers.

55.     Plaintiffs received this treatment from the providers.

56.     Plaintiffs were all members of active health insurance policies offering out of network benefits which Cigna either sold and underwrote or administered on behalf of employers.

57.     Plaintiffs' claims for the out-of-network treatment they received were timely and appropriately submitted to Cigna.

58.     None of the claims were denied; however, every claim was underpaid by Cigna.

59.     The Plaintiffs paid the underpayment amounts to their treatment providers from their own funds and resources.

60.     Cigna was required to pay each and every of these claims at the usual, customary, and reasonable rate. That is, it was required to pay an amount based on the competitive fees of similar MH/SUD treatment providers in the same geographic area. This rate is also referred to as "UCR" in this complaint.

61.     All of the MH/SUD treatment provided to Plaintiffs was medically necessary.

62.     Claims for all of the MH/SUD treatment were timely and appropriately submitted to Cigna.

63.     None of the claims were denied and all of the claims were under-paid.

64.     Cigna was required to pay for Plaintiffs' treatment based on the usual, customary, and reasonable rate ("UCR"). UCR is a commonly accepted term in the healthcare industry and means generally, the competitive rate charged by similar providers of the same specialty in the same geographic area.

65.     For all of the claims at issue, the UCR rate is what Cigna was required to reimburse as the "Maximum Reimbursable Charge" ("MRC").

66.     Cigna administered health insurance plans are subcategorized as either MRC I, or MRC II. Plaintiff's plan, and the plans of the class members are MRC I plans. The MRC I methodology is at issue in this litigation.

67.     For each of the claims at issue here, Cigna reported, in both plan language and on telephonic verification of benefits, that it would reimburse patients and/or their assignees at the UCR rate for MRC I policies, a term that Plaintiffs understood to mean the same as or substantially similar to the following statement published by Cigna on its own website:

> [A] data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the billed charges made by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data. For example, if the plan sponsor has selected the 80th percentile, then any portion of a charge that is in excess of the 80th percentile of charges billed for the particular service in the same relative geographic area (as determined using the FAIR Health, Inc. data) will not be considered in determining reimbursement and the patient will be fully responsible for such excess.[2]

68.     To the extent that any patients or class members have MRC II plans, the claims at issue are required to be reimbursed using the MRC I methodology.

69.     Medicare does not provide benefits for mental health treatment of substance use disorders. Hence, the claims at issue in this matter have no schedule of charges published for them by the Center for Medicare and Medicaid Services ("CMS").  They are simply not covered services under Medicare.  Medicare does not reimburse the types of claims at issue. In such a situation, Cigna's MRC II policy states:

> [W]here a Medicare based amount is not available (e.g., a certain type of health care professional or procedure is not covered by Medicare or charges relate to covered services for which Medicare has not established a reimbursement rate), the MRC is determined based on the lesser of: the health care professional or facility's normal charge for a similar service or supply; or the MRC Option I methodology based on the 80th percentile of billed charges[3].

---

[2]https://my.cigna.com/public/legal_disclaimer.html (last visited April 14, 2021)

[3]https://static.cigna.com/assets/chcp/resourceLibrary/clinicalReimbursementPayment/medicalClinicalReimburseOutOfNetwork.html (last visited March 9, 2020)

70.     Thus, all claims at issue were required to be paid using the MRC I methodology.

71.     All of the MH/SUD treatments provided to Plaintiffs were medically necessary.

72.     The FAIR Health database, described in more detail in the following sections, allows the public, including Plaintiffs, plans, and others, to estimate the UCR for treatment in a specific geographical area.

73.     Claims for all of the MH/SUD treatment were timely and appropriately submitted to Cigna.

74.     None of the claims were denied and all of the claims were under-paid.

75.     For many years, until on or about 2015, Cigna was legally required to use the FAIR Health database to calculate UCR in its payment of claims for reasons discussed in more detail below.

76.     The significant differences between the publicly available FAIR Health estimates and actual payments provide compelling evidence that the Plaintiffs' claims were not paid based on the UCR.

77.     Patients, such as Plaintiffs, rely on their health insurance to properly pay claims for treatment that they receive. The full costs of MH/SUD treatment can be substantial and patients depend on their health insurance to shoulder their portion of the cost.

78.     Such is the case with the claims at issue in this litigation.

79.     For all the claims here, the Plaintiffs' claims were paid by Cigna at less than the UCR based amount they were promised and was promised to their MH/SUD providers.

80.     After Plaintiffs received MH/SUD treatment, their providers' billing departments transcribed their medical charts into standardized billing codes, created invoices with standard charges, medical coding, patient demographics, and submitted the invoices electronically to Cigna via interstate wire communications.

81.     Detailed examples for each Plaintiff are provided in following sections.

82.     Every claim at issue was approved for payment, hence this case is about the rate of payment, not the right to payment, which was already conceded by Cigna when it underpaid the claim.

83. Every claim at issue received an underpayment. Examples of underpayments to each Plaintiff are set forth in the following sections.

84. Instead of paying a "reasonable" rate for Plaintiffs' claims, the Defendants utilized Viant's methodology to fabricate a fraudulent UCR rate and withhold a substantial part of the payment owed for Plaintiffs' claims.

85. Both Cigna and MultiPlan had management and control over how Viant's methodology was employed to underpay the claims as set forth in more detail in the following sections.

86. Every claim at issue was paid at a rate well below the UCR in violation of plan terms.

87. The federal RICO enterprise formed between Cigna and MultiPlan used Viant's methodology to justify the fraudulent withholding of most of the payment owed on each and every claim at issue, thereby directly and proximately injuring Plaintiffs in their person and property.

88. Cigna and MultiPlan exercised management and control over the enterprise as set forth in more detail in the following sections.

89. Defendants used the enterprise to fraudulently represent to Plaintiffs and others that the rate paid was the UCR rate, using the wires for telephone calls and other communications and the mail by sending explanation of benefits ("EOBs") and additional letters to the Plaintiffs with both Cigna and Viant on the letterhead.

90. Cigna and MultiPlan engaged in financial transactions when they distributed the proceeds obtained by the Enterprise and represented them as legitimate 'savings' to Plaintiffs, providers, plans, and others.

91. It was represented to Plaintiffs that their claims were paid based on the UCR rate, as required according to their plans, that the rate was commensurate with the rates paid similar providers in the same geographic area, and that their MH/SUD providers charged more than similar providers in the same geographic area.

92.     Multiple acts of racketeering activity were committed by Defendants against each of the Plaintiffs as set forth in more detail in the following sections.

93.     Cigna and MultiPlan both profited from their participation in the enterprise.

94.     Specifically, the members of the enterprise retained some or all of the amount by which the Plaintiffs' and others' claims were underpaid.

95.     The purpose of the enterprise was for Defendants to profit from the underpayments on these claims.

96.     The Defendants acted in concert to achieve this and the enterprise was under their common control as set forth in detail in the following sections.

97.     The rate generated by Viant's methodology is significantly less than the UCR amount.

98.     Cigna and MultiPlan retained the difference between these two amounts, at the direct expense of the Plaintiffs who paid this amount to their providers.

*Usual, Customary, and Reasonable Rate ("UCR")*

99.     For every claim at issue, Plaintiffs' claims were required to be paid at the usual, customary, and reasonable rate, the UCR.

100.    UCR rates are a fixture of the managed care payment system in the United States. When doctors, hospitals or other healthcare providers are out of network and do not have contracts with health insurance companies, claims for their out-of-network services are usually required to be paid at UCR rates.

101.    The Centers for Medicare Services (CMS), defines UCR as: "[t]he amount paid for a medical service in a geographic area based on what providers in the area usually charge for the same or similar medical service."[4]

102.    Consumers choose to pay more in the form of higher premiums because they value the ability to receive treatment from out-of-network providers.

---

[4] Healthcare.gov "Usual Customary or Reasonable"
https://www.healthcare.gov/glossary/UCR-usual-customary-and-reasonable/ (accessed March 20, 2020)

103.    Insurance consumers and healthcare providers depend on insurers' good faith calculation of UCR rates. Insurance consumers depend on the ability to determine their expected out-of-pocket costs when choosing an out-of-network provider. Out-of-network providers depend on the ability to determine their expected payment from the patient and their insurer.

104.    Where, as here, a scheme exists to fraudulently misrepresent the UCR, patients, such as Plaintiffs, bear the burden when they pay their providers the amount of the underpayment. Plaintiffs have been damaged in the amounts of the underpayment that they paid to their providers for the MH/SUD services they received. Specifically, Plaintiffs' claims for intensive outpatient program treatment ("IOP") were substantially underpaid.

*Intensive Outpatient Program Treatment*

105.    Intensive Outpatient Programs ("IOPs") are an important tool in traditional behavioral health treatment. IOP is a non-residential, semi-structured level of care that is typically rendered pursuant to a schedule that allows patients to reintegrate into society by returning to work, school, and other functions of daily life. Often, IOP programs are designed to be a support system for patients reintegrating into society from higher, more structured levels of care, such as residential inpatient treatment and partial hospitalization programs.

106.    IOP is a step-down level of care. Typically, a patient transitions to the IOP level of care after spending a month or more at higher, more structured levels of care such as detoxification, residential inpatient treatment, and partial hospitalization program treatment.

107.    Cigna describes Intensive Outpatient Program (IOP) services as those rendered in a structured treatment that teach individuals how to manage stress and cope with emotional and behavioral issue, including include group, individual, and family therapy. According to Cigna, IOP treatment involves frequent visits (usually three to five days per week), takes about three to four hours of treatment per day, and often lasts four to six weeks. Cigna states that IOP treatment is structured so patients can continue with their normal daily routines and provides support from the program and social support from other people in the program.[5]

---

[5] *See:* Cigna.com "Levels of Mental Health Care" https://www.cigna.com/individuals-

108.    The American Society of Addiction Medicine (ASAM) classifies IOP as ASAM Level of Care 2.1. Services may be delivered in any appropriate setting that meets state licensure or certification requirements.

109.    According to ASAM, IOP care is rendered by a team of appropriately credentialed addiction treatment professionals including counselors, psychologists, social workers, addiction-credentialed physicians, and program staff, many of whom have cross-training to aid in interpreting mental disorders and deliver intensive outpatient services. Services are typically offered for at least 9 hours per week.

110.    The goal of IOP treatment is to provide a support system including medical, psychological, psychiatric, laboratory, and toxicology. Elements of IOP treatment include counseling, educational groups, occupational and recreational therapy, psychotherapy, Medication Assisted Treatment ("MAT"), motivational interviewing, enhancement and engagement strategies, family therapy, or other skilled treatment services.[6]

*Federal RICO Allegations*

111.    The racketeering acts taken by the Defendants' federal RICO enterprise have their origin in Cigna's past use of the illegal Ingenix scheme.

The Ingenix Precursor

112.    The enterprise formed between Cigna and MultiPlan seeks to reproduce the Ingenix scheme that resulted in the largest settlements the healthcare industry had ever seen. In that scam, insurers like Cigna contracted with Ingenix, using their systems and databases, to determine reimbursement rates that were found to be well below UCR and used deeply flawed methodologies.

---

families/health-wellness/mental-health-care, (Last accessed March 19, 2020)

[6] *See* Medicaid Innovation Accelerator Program, Overview of Substance Use Disorder (SUD) Care Clinical Guidelines: A Resource for States Developing SUD Delivery System Reforms, pp 7-8, April 2017

113.    This time around, instead of using Ingenix's flawed and biased databases, Cigna has employed MultiPlan to play the role of Ingenix and in so doing they have created a federal RICO enterprise.

114.    The New York Attorney General's investigation into Ingenix "uncovered a fraudulent and conflict-of-interest ridden reimbursement system affecting millions of patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."[7]

115.    In 2009 United Healthcare and its affiliates paid $400 million to settle cases arising from the same conduct. Three hundred fifty million dollars was paid to settle a class action against those entities. Another fifty million dollars was paid for the establishment of the FAIR Health database and website.

116.    The settlement agreement dictated that Cigna and other insurers use FAIR Health as the basis for determining allowed amounts for covered out-of-network treatment.[8] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[9]

117.    Also in 2009, the Office of the Attorney General for the State of New York announced the results of its investigation into Ingenix in a landmark agreement entitled "Assurance of Discontinuance Under Executive Law § 63(15)" ("Assurance Order"). According to the Assurance Order, the payment rates compiled by Ingenix were based on a "conflict of interest." As the Attorney General concluded that the system "meant to reimburse consumers

---

[7] Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges, NY AG Press Release, October 27, 2009. https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-reform-consumer (last visited September 16, 2020).

[8] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiff*, January 14, 2009, Pg. 14, term no. 4.4: https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[9] *Id*.

fairly as a reflection of the market is[,] instead[,] wholly owned and operated by the [insurance] industry" who have an "incentive to manipulate the data they submit to Ingenix so as to depress reimbursement rates they determine using the Ingenix schedules, given their own reimbursement obligations toward consumers."

118.     The rates generated by Ingenix were inadequate because: 1) Ingenix did not audit the data provided by insurers to make sure that the charges properly reflect what providers actually charged in the marketplace; 2) Ingenix used statistically invalid "edits" to exclude a disproportionate amount of high charges from its UCR calculations; and 3) Ingenix "lumped" charges for the same service together regardless of whether the service was provided by a certified specialist with many years of experience or a less experienced provider such that the aggregate UCR rate calculated by the database was artificially low.

119.     Although this matter did not ultimately go to a jury, the allegations clearly show that this conduct was intentional.

120.     The Assurance Order required the insurance industry to cease using the Ingenix database and create a "new, independent database, not controlled by any insurer, to be used for determining fair and accurate reimbursement rates." The Assurance Order also established a "Healthcare Information Transparency Website" to inform and educate the public about reimbursement rates.

121.     This "new" database was funded by United ($50 million), Aetna ($20 million), Wellpoint ($10 million), Cigna ($10 million), MVP Health Care Inc. ($535,000), Independent Health ($475,000), and HealthNow ($212,500). Out of this settlement, the independent not-for-profit "FAIR Health, Inc." (which stands for "Fair and Independent Research") was created.

122.     Unfortunately, for healthcare providers and the insurance buying public, Cigna's legal obligations to utilize Fair Health and pay out of network claims at a fair rate predicated upon UCR terminated five years after the creation of Fair Health on or about 2015.

123.     Not long after the termination of its obligations to utilize FAIR Health, Cigna reverted to its old tricks. Free of the terms of the settlement and a court order requiring it pay out of network healthcare providers using a UCR rate, Cigna sought out the services of a third party,

MultiPlan, to perpetrate the same fraud. That is what this case is about, at its essence: the substitution of Multiplan and Viant for Ingenix.

124.    The present litigation differs from the prior litigation in that the methodology employed by MultiPlan through Viant now plays the role formerly filled by the Ingenix databases.[10] By incorporating MultiPlan and Viant's methodology into the fraud, Cigna's attempt to avoid liability has instead created a RICO enterprise.

*The RICO Enterprise*

The Defendants formed a RICO Enterprise to Fraudulently Avoid Paying the Usual, Customary, and Reasonable (UCR) Rates for Reimbursements for IOP Services

125.    It is well established that "RICO is widely regarded as a broad statute; indeed, RICO's text itself 'provides that its terms are to be "liberally construed to effectuate its remedial purposes.""" *Boyle v. United States*, 556 U.S. 938, 944 (2009).[11] RICO's breadth of language and construction is particularly evident in the enterprise concept. Included within the definition of enterprise is "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added).

126.    Defendants, Cigna and MultiPlan, have associated to form an ongoing informal organization, with the common purpose of engaging in a course of conduct, including the development and implementation of a scheme to fraudulently underpay out-of-network IOP services.

127.    Defendants joined together to create and exploit a false and fraudulently manipulated database as an excuse for under-reimbursing Plaintiffs for services provided, to the Defendants' financial benefit.

---

[10] See "Attorney General Cuomo Announces Historic Nationwide Health Insurance Reform; Ends Practice Of Manipulating Rates To Overcharge Patients By Hundreds Of Millions Of Dollars" (Jan. 13, 2009), available at https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-health-insurance-reform-ends (last accessed June 19, 2020)

[11] *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 497 (1985) ("RICO is to be read broadly.").

128.   The presence or absence of a commercial contract between Cigna and MultiPlan is irrelevant.

129.   An association does not stop becoming an association because the relationships between its members are documented in a contract, nor does anything in the definition of enterprise insulate from liability those whose common purpose includes some legal activity. RICO's definition of enterprise "include[s] both legitimate and illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *United States v. Turkette*, 452 U.S. 576, 580-81 (1981). *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its consequences.") (internal citation omitted).

130.   The enterprise between Cigna and MultiPlan is the vehicle for the illegal, racketeering activity of mail and wire fraud. Examples of these activities performed at the direction of both Defendants are set forth in the following sections for every Plaintiff.

131.   The Defendants share a common purpose in performing these activities, to gain financial benefits as the direct result of the fraudulent scheme.

132.   Both Defendants worked together to develop the false and fraudulent UCR rates that were applied to out-of-network IOP claims.

133.   This is clearly set forth in use and development of internal non-public "Whitepapers" described in the following sections. The Whitepapers provided the roadmap that Cigna and MultiPlan jointly developed to produce specific, fraudulent, UCR rates.

134.   Cigna determined the fraudulent rates for under-payment that would be presented as UCR, showing its management over the enterprise, and MultiPlan developed the methodology employed through Viant to achieve Cigna's low rates, without regard to actual usual and customary rates.

135.   Cigna's management of the enterprise is also shown by the fraudulent information Cigna provided when it verified each Plaintiffs' out-of-network rates to their treatment providers.

136. Cigna "verified" that it would pay the UCR reasonable rate for services knowing that it would never do so. Cigna's communication of these same fraudulent representations over the wires and by the mail also show its management over the enterprise.

137. Cigna's issuing of the actual under-payment for the Plaintiffs' and other IOP claims shows its management over the scheme.

138. Cigna and MultiPlan's correspondence sent to Plaintiffs with both of their names in the letterhead, containing multiple, demonstrably false representations, show their joint management of the scheme.

139. For all of these under-payments, Cigna compensates MultiPlan based on the amount by which the claims are underpaid.

140. Plaintiffs and other IOP patients have a property interest in their claims and the right to be repaid in the amount they paid to their providers that should have been paid by Cigna.

141. Underpaying the claims by fraudulent means deprives Plaintiffs and other patients of their property.

142. Cigna and MultiPlan have profited and continue to profit from this fraud.

143. The Enterprise is the vehicle for Defendants' fraudulent acts of racketeering activity.

144. Cigna profits by fraudulently retaining money that should be paid for IOP treatment.

145. MultiPlan profits when Cigna pays it for successfully implementing Viant's fraudulent methodology.

146. MultiPlan and Cigna represent these illegal underpayments as legitimate 'savings' to Patients, providers, plans, and others.

147. MultiPlan and Cigna both engage in financial transactions with proceeds from the enterprise.

148. MultiPlan's implementation of Viant's methodology to further the fraudulent scheme and further the purpose of the enterprise shows MultiPlan's management over the enterprise.

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

149.    Further, there are relationships among the entities associated with the enterprise.

150.    Cigna contracts with MultiPlan to provide a fig leaf of legitimacy to their activities.

151.    Cigna and MultiPlan coordinate their efforts in undertaking the racketeering activities.

152.    Cigna and MultiPlan share the money obtained from Plaintiffs and other victims of the scheme.

153.    The relationships between Cigna and MultiPlan are sufficient to permit them to pursue the enterprise's purpose.

154.    The enterprise functions as a continuing unit. These relationships between Cigna and MultiPlan continue to the present and the enterprise continues to pursue its purpose.

<u>The FAIR Health Database</u>

155.    Cigna could have avoided this litigation if they had employed an actual UCR methodology in determining out-of-network IOP rates when reimbursing Plaintiffs' claims as the 'MRC'.

156.    The creation of the FAIR Health database was intended to provide one such methodology. At the time of its creation, New York Attorney General Andrew Cuomo believed that the FAIR Health database would solve the inherent conflicts of interest that plagued the Ingenix databases.

157.    The FAIR Health database claims "to provide reliable information about healthcare costs because each year health insurers around the country send [it] over a billion healthcare bills, which are added to FAIR Health's database of more than 31 billion claims."[12] No providers submit pricing information, only insurers do so. FAIR Health claims that it then uses "information from those claims to estimate what providers charge, and what insurers pay,

_____

[12] FAIR Health Consumer, "About FAIR Health," accessed at
https://www.fairhealthconsumer.org/#about, last accessed June 19, 2020

for providing healthcare to patients."[13] New York, Connecticut and many other states use the FAIR Health database as a guidepost for healthcare consumer protection.

158.    The purpose and intent behind the establishment of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments, as was done using Ingenix.

159.    As set forth earlier, Cigna had utilized the Ingenix databases to significantly under reimburse valid claims. This is the exact same conduct Cigna and MultiPlan are accused of committing in this complaint.

160.    The FAIR Health database is, in fact, often used by private health insurers to calculate the UCR for specific procedures and determine the amount to pay to out-of-network providers. *See, for example, Samaan v. Aetna Life Ins. Co.*, No. 217CV01690DSFAGRX, 2020 WL 4934363, at *2 (C.D. Cal. Aug. 21, 2020) ("[Aetna] determined the "reasonable and customary" amount to be paid under the Plan by using the 80th percentile of payment level for a particular zip code as provided by FAIR Health.")

161.    Cigna was required to use FAIR Health's UCR methodology until the expiry of the settlement agreement with the New York Attorney General.[14] Cigna began using FAIR Health in 2011 and did so, as required, until 2015.[15] The Settlement Agreement stated UCR was equivalent to "reasonable and customary," "average," or "prevailing" charges.[16]

162.    When the FAIR Health requirement expired in or about 2015, Cigna began planning to resurrect the fraudulent scheme by forming an enterprise with MultiPlan wherein

---

[13] *Id*.

[14] *Settlement Agreement Between United Healthcare Corporation et. al. Settling Plaintiffs*, January 14, 2009:
https://www.mssny.org/App_Themes/MSSNY/pdf/Practice_Resources_Class_
Action_Settlements_United_Healthcare-Ingenix_United_Healthcare-
Ingenix_Settlementpdf.pdf (last accessed July 2, 2020).

[15] Id.

[16] *Id*.

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

MultiPlan assumed the functions previously performed by Ingenix, with its wholly owned subsidiary Viant's methodology standing in for the Ingenix databases.

163.    As Plaintiffs billed less for IOP treatment than the similar providers in the same geographic area, the Plaintiffs UCR rate is equal to 100% of that providers' billed charges. The FAIR Health benchmark amounts allow providers such as those who provided treatment to Plaintiffs and the class to compare their billed charges to the billed charges of other, similar providers in the same geographic area. When billed charges are less than the FAIR Health benchmark amounts, the patient will expect to be reimbursed at 100% of billed charges / 100% of their out-of-pocket expenses. When a provider's charges exceed the FAIR Health benchmark, the patient can estimate what they will be reimbursed based on the appropriate FAIR Health benchmark.

164.    The goal of the FAIR Health Database is to prevent insurers from using skewed methodologies to calculate payments. Defendants' methodology produced rates that are a fraction of of the FAIR Health benchmark. Plaintiffs do not assert that FAIR Health is the only possible method for determining UCR; rather, it is an accepted method for determining UCR. That Defendants' scheme generates rates of 12% of the comparable FAIR Health benchmark for Plaintiffs' claims shows that Defendants' payment rate is not reflective of UCR as illustrated below:



* FAIR Health 80th Percentile payment data for code H0015 and each Plaintiffs' Provider zip-code was accessed at https://www.fairhealthconsumer.org/medical/zip (last accessed June 18th, 2020).

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

165.    Cigna and MultiPlan's employees responsible for Outpatient Review (OPR) had FAIR Health data loaded onto their virtual "Toolbox" in their in-house claims routing system known colloquially at Multiplan and Viant as "FRED", and they could have properly applied FAIR Health benchmark pricing at any time, but they consciously chose not to do so. Instead, they employed a fraudulent, underpayment scheme that damaged providers and Plaintiffs in their persons and property.

166.    Cigna represents to the general public that where payment for out-of-network services is provided, that for claims such as Plaintiffs', "a data base compiled by FAIR Health, Inc. (an independent non-profit company) is used to determine the billed charges made by health care professionals or facilities in the same geographic area for the same procedure codes using data. The maximum reimbursable amount is then determined by applying a percentile (typically the 70th or 80th percentile) of billed charges, based upon the FAIR Health, Inc. data."[17]

167.    As described more fully in the following sections, this statement is demonstrably false.

### The Underpayment Scheme's Mechanics

168.    Instead of reimbursing IOP claims, including Plaintiffs', at UCR rates, Cigna deployed a scheme to underpay claims for its own benefit, and for the benefit of its associates, forming an enterprise with MultiPlan to reap profits from underpaying claims.

169.    MultiPlan aided and abetted Cigna in developing and deploying this scheme.

170.    MultiPlan knew that Cigna would and did use the mail and wires in interstate communications and that such communications would be fraudulent as more fully set out throughout the Complaint.

171.    MultiPlan aided and abetted Cigna in these fraudulent, interstate communications using the mail and wires through its role in the RICO Enterprise.

172.    MultiPlan knew that such mail fraud had been and was being committed in furtherance of the scheme to defraud.

---

[17] https://my.cigna.com/public/legal_disclaimer.html (last visited 12/9/2020)

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

173.     MultiPlan and Cigna were co-schemers in the RICO Enterprise.

174.     MultiPlan and Cigna committed Federal Health Offenses through the RICO Enterprise.

175.     MultiPlan and Cigna laundered monetary instruments with monies obtained through the commission of Federal Health Offenses.

176.     This scheme injured not only Plaintiffs but all patients whose plans covered out-of-network providers of IOP services.

177.     The goals of Cigna's scheme were to pocket the difference between the fair and reasonable price of healthcare (the UCR) and the underpaid amount; for Cigna to retain funds that should have been paid for IOP claims; to eliminate competition between contracting and non-contracting IOP providers; to push non-contracting providers into unfavorable contracts with Cigna; and to avoid liability for the scheme (the "underpayment scheme").

178.     Cigna conspired with MultiPlan Inc. to perpetrate the underpayment scheme.

179.     MultiPlan Inc. promotes itself across the health insurance industry as an unregulated cost management company. MultiPlan offers a menu of services for "cost control." Some of the above services are legitimate, but others are fraudulent.

180.     MultiPlan offers a host of mechanisms for "cost control." It has an internal engine, known within the company as FRED. FRED takes inputs from the claims Cigna forwards to it, and routes them to the chosen repricing tool. Publicly, MultiPlan's Viant summarizes its methodology as follows: a tool to evaluate "outpatient claims for opportunities to reduce the charges to levels that are usually charged by the provider and customarily charged by similar providers in the area for equivalent services" based on "on payer-established parameters."[18]

181.     In reality, however, MultiPlan's Viant calculations and methodology are not completely or even partially transparent: *i.e.*, they are deliberately opaque. Viant uses a complex methodology implemented by a proprietary software engine designed to cull the lowest possible

---

[18]MultiPlan Payer Resource Center: "Viant Facility Usual & Customary Review" https://www.multiplan.com/payers/resourcecenter/salescenter/pdfs/MKT5101_Viant_Facility_UC_Review.pdf. Last accessed September 21, 2020.

number from a flawed, proprietary database of healthcare claims data that is wholly unrepresentative of amounts actually charged by or paid to similar medical providers in Plaintiffs' surrounding area.

182.  Despite having access to the largest database of provider data in the country, FAIR Health, at the click of button, the Viant calculations and methodology do not utilize the FAIR Health database's charge data.

183.  Viant does not utilize the FAIR Health data because, as the database is widely accessible, as designed, doing so would make the fraudulent manipulations readily apparent.

184.  Instead, Viant utilizes a much less robust and more easily manipulated data set in its underpayment methodology.

185.  Viant's methodology operates by culling data from a "Outpatient Standard Analytical File" ("SAF"). An SAF is composed of data that are collected from Medicare Part B providers for services rendered to Medicare beneficiaries by the Department of Health and Human Services (DHHs) / Centers for Medicaid and Medicaid Services (CMS).

186.  Using a SAF from CMS to fabricate a UCR rate is improper for numerous reasons. First, the patient demographics of Medicare patients will differ significantly from and not be representative of the patient demographics in the commercial market. Second, the MH/SUD facilities that provide IOP treatment to patients with commercial insurance will not be 'similar' to those that may provide IOP treatment to a Medicare beneficiary. Facilities providing IOP treatment to a Medicare beneficiary have no reasonable expectation that they will be paid for IOP treatment as Medicare does not provide coverage for IOP treatment.

187.  These expectations and agreements are set forth in greater detail as to each Plaintiff in the following sections. Facilities providing IOP treatment to patients with commercial insurance expect to be paid by the payer for the IOP treatment they provide. Further, the facilities submitting Medicare claims will be institutional providers such as hospitals and home health agencies that are licensed to accept Medicare. IOP treatment providers are not licensed to accept Medicare and cannot be licensed to accept Medicare for IOP treatment because Medicare does not reimburse IOP treatment. Mental health facilities and treatment providers have different

licenses than do medical and surgical facilities and providers. Third, the SAF does not provide rates based on the provider's geographic location; instead, it provides a *national* number. Geographic location is an essential component of the UCR rate.

188.   The claims information in the SAF does not include the provider's charge data, the claims data only includes the amounts paid on the claim. As IOP claims are not covered or paid under Medicare, the SAF file will not show any payments for IOP treatment and thus be completely unsuitable for determining appropriate IOP rates.

189.   IOP treatment falls under HCPCS[19] codes H0015, "Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment, counseling; crisis intervention, and activity therapies or education" or H2036 "Alcohol and/or other drug treatment program, per diem."[20]

190.   The SAF data are particularly ill-suited and susceptible to manipulation for IOP treatment because HCPCS codes H0015 and H2036 are not services covered or paid for by Medicare/CMS and therefore there is no reliable, representative data for H0015 or H2036 in the SAF. Any data for H0015 or H2036 that are present will not be representative samples because it will only reflect H0015 or H2036 claims for Medicare beneficiaries and no H0015 or H2036 claims are covered by Medicare.

191.   As such, the SAF, comprised of data from providers treating Medicare beneficiaries will not provide an accurate representation of IOP providers as the HCPCS code applicable to IOP treatment is not eligible to be paid by Medicare.

---

[19] "HCPCS is a collection of standardized codes that represent medical procedures, supplies, products and  services. The codes are used to facilitate the processing of health insurance claims by Medicare and other insurers." *HCPCS (HCPCS - Healthcare Common Procedure Coding System) – Synopsis*, https://www.nlm.nih.gov/research/umls/sourcereleasedocs/current/HCPCS/index.html (last visited September 23, 2020).

[20] https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/Alpha-Numeric-HCPCS-Items/2020-Alpha-Numeric-HCPCS-File (last visited September 23, 2020)

192.    As the SAF contains no charge data for services that Medicare does not cover, the SAF has no data about the IOP services at issue in this case.

193.    Instead of using FAIR Health that does contain actual data for HCPCS H0015 and H2036, the Viant methodology "crosswalks" the healthcare claims. "Crosswalking" is technical jargon for the process of using rates for one service to come up with or fill-in rates for another service.

194.    FRED uses crosswalking to fill gaps when it does not have enough data to come up with a valid output number. This is the act opposite of using a UCR calculation, such as FAIR Health, which would be based on actual data from actual providers, something both MultiPlan and Cigna have at their literal fingertips if they were to choose to use it.

195.    The Viant methodology's crosswalking, reflects a subjective decision that is directed by Cigna and implemented by MultiPlan. The crosswalking is not subject to independent review, scrutiny, or oversight.

196.    The crosswalking is wholly unnecessary given the presence of FAIR Health and the other data available to Cigna and Viant.

197.    MultiPlan does not disclose or even admit to the data "proxies" it uses in Viant's methodology.

198.    The "proxies" are selected by MultiPlan based on direction given by Cigna and used by the Viant methodology to provide fraudulently low payment amounts.

199.    The direction given by Cigna and implementation undertaken by MultiPlan shows that both Cigna and MultiPlan exercised management and direction over the RICO enterprise.

200.    MultiPlan, as payment for access to the Viant methodology, receives a percentage of the difference between a fair and reasonable rate (the UCR) and the artificially low number Viant delivers as a rate of payment.

201.    For all of the claims here, Cigna conspired with MultiPlan to utilize Viant to generate and pay artificially depressed rates with no resemblance to the methodology Cigna

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

claimed to have used in mailed correspondence, electronic correspondence, its published media, and telephone conversations with Plaintiffs and/or their representatives.

202. Plaintiffs were harmed in their person and property by Defendants' scheme. They paid the underpayment amount to their IOP treatment providers when that amount should have been paid by Cigna, and they were lied to by the Defendants who told them that the rates being paid were consistent with an objective calculation of usual, customary, and reasonable rates, and that it was their providers who were charging substantially more than other, similar providers in the same geographic area.

203. Plaintiffs bring this suit to recover their damages for these payments they made that they should not have been obligated to make, to enjoin Defendants from continuing their fraud, and to ensure appropriate damages are levied against Defendants for their racketeering enterprise such that the verdict shall be precautionary for all payers contemplating using the false and fraudulent pricing tool.

<u>Claims Submission</u>

204. The Plaintiffs' claims were all submitted to Cigna following substantially similar processes. The claims submission process operated as follows: the providers' billing departments translated patients' medical charts into standardized billing codes, created invoices with standard charges, coding and patient demographics, and submitted the invoices electronically to Cigna.

205. The invoices were all submitted using standardized claims forms UB-04 forms. Every claim at issue in this case was submitted directly to Cigna through an electronic clearinghouse to the unique Cigna Payer ID.

206. The claims were submitted both electronically using an Electronic Data Interchange ("EDI") process, by facsimile, or by mail.

207. After receiving the claims, they were processed, approved for payment, the payment amount was determined, and the claims were paid with accompanying notes about how much the patient owed and Cigna's explanation for the amount it paid. Additionally, the patients received correspondence from Cigna and MultiPlan stating that their providers' billed charges exceeded the UCR/MRC and that the patients could owe their providers the difference. Cigna

used MultiPlan's Viant methodology in a scheme to underpay Plaintiffs' claims for their own benefit.

Rates of Payment

208.    When Cigna processed the claims at issue in this case, it had to decide how much it would pay for services.

209.    Instead of deciding how much to pay internally, and despite having hundreds of millions of lines of claim data and years of claims history to reference, a database of payment information it paid to create, and its own in-house data analytics company, Cigna outsourced the task of claims pricing.

210.    Cigna knew that it was required to pay Plaintiffs' out-of-network IOP claims based on rates equivalent to amounts charged for similar services by similar providers in patients' treating providers' geographic areas.

211.    However, instead of using the FAIR Health Database or its own internal data, Cigna used MultiPlan to produce rates. The lower the rate that MultiPlan produced, the more money MultiPlan was paid.

212.    MultiPlan offered a menu of pricing tools that it knew would be used to produce fraudulently depressed payment rates for the UCR for IOP services.

213.    For all of the claims at issue here, Cigna and MultiPlan agreed to use the Viant methodology instead of one of MultiPlan's other, legitimate services.

214.    Cigna deliberately avoided using MultiPlan's legitimate services because those services priced claims at rates higher than what Cigna wanted pay. Cigna opted to use Viant's methodology because it knew, based on meetings between Cigna and MultiPlan, that the payment rates Viant's methodology would produce would be artificially low.

Viant's Methodology

215.    The following summary represents a high-level overview of the Viant methodology for pricing claims:

216.    The pricing process starts with Cigna forwarding a claim to MultiPlan. At its sole discretion, Cigna chooses which claims to price internally, which claims to send for one of

29

MultiPlan's other, legitimate, pricing services, and which claims to price through Viant. Cigna sends claim information to MultiPlan via a software "electronic data interchange" program ( "EDI"). The EDI process allowed Cigna to communicate several critical inputs to MultiPlan:

- Claims Information (Policy Type, Charge Amount, CPT/HCPCS Codes)
- Designated Repricing Tool (Data iSight, Negotiations, Viant, Rental Networks, or some combination of those tools)
- The Benchmark "target price" for the claim (i.e., the benchmark price that determined MultiPlan's compensation); or
- The percentile (usually 60% or 40%) of the manipulated, "crosswalked" SAF database to use to set a benchmark rate (explained below).

217.    Once MultiPlan received information from Cigna, it started the repricing process by sending Cigna's inputs through its "Claims Savings Engine" known internally as FRED which routed the claim to Viant.

218.    At issue here are only claims sent to Viant for repricing.

<u>Viant Facility Outpatient Review: "Viant OPR"</u>

219.    The Viant Outpatient Review or "Viant OPR" is the methodology that was employed to provide the false appearance of legitimacy to the underpayment amount.

220.    Viant OPR compared the claims sent to it with "similar" claims in the SAF. The fatal flaw however, as set forth above, was that the SAF contained no "similar" claims.

<u>Standard Analytical Files</u>

221.    The backbone of the Viant OPR tool is the "Standard Analytical File" or "SAF." The SAF is a collection of the claims data from every claim submitted to Medicare during a several year period, anonymized then condensed into a single database.

222.    Within that database are amounts that every hospital and facility charged for the services they provided to Medicare beneficiaries. Viant's OPR uses the amounts those Medicare facilities charge to determine its rates.

223.    The SAF does not contain any charge information from intensive outpatient substance use providers, like those whose claims are at issue here.

224.    The SAF does not contain any charge data for non-participating providers. Those two gaps in the SAF file make the Viant OPR system unsuitable for repricing the claims at issue here, because there was no data in the database for Viant to manipulate, and because a database that includes only Medicare participating providers is categorically faulty when the database is used to price claims for Medicare non-participating providers.

225.    When the Viant OPR engine did not have any data from the SAF to reprice claims, Viant's software engineers, in effect, made it up.

226.    Software engineers, not clinicians, would decide on services that were "close-enough" to the billed services, and then use the "close-enough" services' rates to reprice claims.

227.    The process of finding the "close-enough" service was known internally at MultiPlan as "Crosswalking." Crosswalking was undisclosed, inaccurate, and inappropriate for services that Medicare does not cover.

228.    Even when Viant made-up a rate, that still wasn't good enough. Viant would still apply the percentile chosen by Cigna (usually 60% or 40%) to lower the rate even more.

229.    Viant never disclosed how or why it chose the specific services it did that were "close enough" to IOP services.

230.    When Viant chose what services were "close enough" to IOP, it also used a nation-wide median rate.

231.    As such, that meant that Viant did not adjust the rate based on geographic inputs. Every time Viant claimed that geography was a factor in pricing of the IOP services for claims such as Plaintiffs', it was lying.

232.    Every time MultiPlan made a representation that the Viant OPR rates it paid were based on those of similar IOP providers in a similar geographic area, it was lying, because the services were not the same.

233.    MultiPlan had complete control over the technical methodology of the Viant tool, how it implemented the inputs and changes requested by Cigna, and how it used its control to manipulate and misrepresent rates for its own benefit, for the purpose of making as much money as possible.

<u>Target Pricing: Meet or Beat</u>

234.    Further, Cigna sent MultiPlan a "target rate" for each claim at issue in this litigation. The "target rate" is Cigna's arbitrarily selected rate for IOP treatment.

235.    The target rate became the *de facto* UCR / benchmark amount to be paid for the IOP claim. Within MultiPlan this was known as a "meet or beat" price. In all cases, Cigna had complete control over the Target Price and MultiPlan had complete control over its use in the Viant methodology. The following flow chart summarizes the process Defendants use to illegally price the claims:



*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

236.    Cigna sent MultiPlan the target rate for each claim at issue in this litigation.

237.    The Viant methodology's imperative was to beat Cigna's Target Price. MultiPlan was compensated based on if and by how much it could undershoot that benchmark. Typically, MultiPlan pocketed at least 4% of the "savings" amount, or the difference between the Target Price and the amount a provider was actually paid.

238.    The dollar amount that Cigna ultimately paid for the claims in this case was the lowest of three numbers: Target Price, Billed Amount, or Viant produced rate. In every case, the compensation structure agreed upon between MultiPlan and Cigna incentivized artificially low rate and, invariably, the application of the Viant produced rate. Once the Viant methodology yielded its supposedly data-backed rate, it returned the rate information to Cigna via the EDI. Cigna or its subsidiary then issued under-payment to the Plaintiffs' providers for their claims at the rate "derived" from the Viant methodology.

239.    While Cigna would represent, among other things, that the Viant methodology derived rate was comparable to, and based on, what similar providers in in the same geographic area charged or accepted for the same or similar services, in fact the purpose of the scheme was to produce a rate that was neither reasonable nor customary.

<u>MultiPlan and the Viant Methodology</u>

240.    MultiPlan actively offered the Viant methodology to Cigna as a product capable of underpaying claims with minimal provider pushback. MultiPlan knew and explained to Cigna that the Viant methodology could provide the appearance of legitimacy and offer cover for the fraudulent underpayment of IOP claims.

241.    Cigna believed that the "independent" Viant methodology could shield it from liability as compared to what had happened with Ingenix even though the scheme was the same. MultiPlan and Cigna worked out the details of their racketeering activities and created their enterprise to carry out their racketeering activities through, among other things, in person meetings and events and documents called Whitepapers.

MultiPlan's Secret Annual Events

*Meetings of the Enterprise*

242.    MultiPlan secretly discussed the Viant OPR Review methodology with Cigna at annual events hosted by the Client Advisory Board of MultiPlan ("CAB"). The "CAB" consists of the senior marketing individuals at MultiPlan including Susan Mohler, MultiPlan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics.

243.    At these events, Cigna and MultiPlan and Multiplan's other customers would come together, at various locations around the country, to discuss, among other topics, the Viant repricing scheme and how to make more money off it.

244.    These secret meetings established a forum for Cigna and others to engage in Enterprises with MultiPlan to suppress the rates paid to healthcare providers.

245.    During these events, MultiPlan presented slide shows outlining the profits or "savings" that could made using Viant methodology.

246.    The Viant methodology is specifically designed to be adapted and customized based on input and direction from the insurer and these events and the Road Shows described below allowed Cigna and its competitors to discuss the customizations they wanted in the pricing with MultiPlan, directly.

247.    Both Cigna and MultiPlan had management and oversight of the RICO enterprise that they formed to use Viant's methodology in their racketeering activities.

248.    The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf.

249.    The CAB emphasized that MultiPlan's healthcare repricing tools were unregulated.

250.    The absence of regulation allowed Cigna and MultiPlan to jointly develop the underpayment scheme unfettered.

251.   Cigna partnered with MultiPlan to use the Viant methodology so that the "UCR" rate produced through Viant's methodology could be presented as "independent" and "defensible," permitting Cigna and other insurers to abdicate their responsibility for the derived rates. All of this was hyperbole meant to hide the fraud.

252.   MultiPlan emphasized to Cigna at these meetings that if they were ever subject to pushback or scrutiny about their UCR rates, they needed only to point to the unregulated Viant methodology and assert that they relied on Viant's use of mysterious "objective" and "data-backed" pricing methodology, the details of which, of course, were never revealed.

253.   Strategies were discussed for how to handle situations where dissatisfied patients and/or providers pushed back or challenged the amount. In such situations, the Viant methodology and rate was deceitfully presented to them as a "fair" and "transparent" justification for the underpayment.

254.   MultiPlan and Cigna depended on keeping the actual terms and methodology of Viant secret.

<u>MultiPlan's Secret Road Shows</u>

*Further Meetings of the Enterprise*

255.   MultiPlan's executives including representatives Sandy Slovack, Monica Armstrong, Kevin Williams, Angela Robarge, Susan Mohler and Dale White, MultiPlan's Executive Vice President of Sales, also brought secret "Road Shows" or client status updates mixed with sales pitches directly to Cigna and presented PowerPoint slideshows detailing the profits that could and were being realized using the Viant pricing methodologies.

256.   During the Road Shows and in subsequent interactions, Multiplan executives produced detailed descriptions of Viant's methodology including savings reports and discount reports and sought input from Cigna on how it would like its claims routed through the myriad MultiPlan payment engines, including Viant OPR, to achieve the most profits for Cigna.

257.   Representatives from Multiplan and Cigna regularly compared their underpayments to Fair Health benchmark rates to demonstrate internally how much they were

getting away with.  At no times was actual plan language seriously considered in the payment of this Viant re-priced claims.

258.    Representatives of Cigna and MultiPlan discussed the OPR Review pricing methodology in detail at these Road Shows and other ways to illegally lower the rates paid for healthcare services to patients with Cigna representatives such as Rebecca Paradise, the Vice President of Out of Network Payment Strategies at Cigna.

259.    The Whitepapers are essential to the implementation of the scheme and formation of the enterprise between Cigna and MultiPlan to carry out their racketeering and other illegal activities and were developed through the collaboration of Cigna and MultiPlan.

<u>The Secret Internal Whitepapers</u>

MultiPlan's marketing and sales departments, including Sandy Slovack, Monica Armstrong, Kevin Williams, Angela Robarge, Susan Mohler and Dale White provided Cigna with these internal non-public Whitepapers. The Whitepapers were created by the Multiplan marketing department and Multiplan's data engineers.

260.    Whitepapers are secret internal documents that explain, in detail, exactly how the Viant methodology could be implemented to output literally any payment price Cigna wanted and achieve for any result, regardless of what the language of the patients' health plan actually was.

261.    Executives from Cigna including Michael Batastoni, Director of Contracting, Non-Par Cost Containment at CIGNA Healthcare and Mario Vangeli, Vice President-National Ancillary Contracting, Strategy and Solutions at CIGNA, reviewed, commented, and provided feedback on MultiPlan's Whitepapers in order to structure Cigna's relationship with MultiPlan and implement the Viant methodology to underpay claims that were required to be paid at the UCR in whatever manner would make the most money for Cigna and Multiplan.

262.    Cigna's representatives provided direction to MultiPlan such that MultiPlan would revise its Whitepapers to ensure that the Viant methodology would underpay claims in violation of plan language such as those of the Plaintiff.

36

263.   The Whitepapers explain that Cigna would set performance standards which were defined by Target Prices. MultiPlan would use Viant to derive a price under the Target Price. Cigna would pay MultiPlan a percentage of the "savings" generated by use of the Viant methodology. The Whitepapers also explain that Cigna could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at.

264.   As such, these jointly developed Whitepapers provide a partial blueprint of the Enterprise, the vehicle that would be used to carry out the fraudulent racketeering acts that directly damaged Plaintiffs through the underpayment of valid, medically necessary IOP claims.

The Network Access Agreement

265.   The National Network Access Agreement ("Agreement") is a written contract between Cigna and MultiPlan the sets out how Cigna and MultiPlan will profit from the proceeds of the Viant underpayments.

266.   Michael Batastoni of Cigna and Monica Armstrong of Multiplan were custodians of this Agreement.

267.   Exhibits and Amendments to this Agreement detail the fee and incentive structure between the parties and how Cigna compensates MultiPlan for access to the Viant methodology.  It also discusses how MultiPlan receives a percentage of the margin between the target rate and the artificially low number Viant delivers as a rate of payment.

268.   Although a benign legal contract between business on its face, the Agreement actually serves as convenient cover and a vehicle for the parties to share the ill-gotten gains of the Viant pricing methodology.

*RICO Predicate Acts & ERISA Violations*

269.   As demonstrated for each Plaintiff below, there were multiple acts of racketeering activity directed at each of the Plaintiffs and each of the Plaintiffs was directly and proximately injured as a result of the Defendants' racketeering activities.

RJ & SJ

270.    At all relevant times, SJ is the son of RJ, and an adult beneficiary of health benefits under his mother's employer plan through Intuit. RJ was the financially responsible party for her son, and financed his treatment at Summit Estate.

271.    At all relevant times, RJ was a full-time employee of Intuit and a participant in an employer funded benefits plan offered by Intuit and subject to ERISA.

272.    At all relevant times, health benefits for RJ's Intuit benefits plan were administered by Cigna.

273.    At all relevant times, SJ was a beneficiary of the Intuit benefits plan administered by Cigna.

274.    At all relevant times, SJ was actively enrolled in a Cigna PPO plan which offered out of network benefits for behavioral health services, including IOP treatment.

275.    In 2019, SJ was diagnosed with a severe substance use disorder, including abuse of intravenous opioids. Soon thereafter, SJ sought treatment at Summit Estate, Inc. ("Summit Estate"), a duly licensed and accredited out of network behavioral health provider located in Los Gatos, CA, in Santa Clara County.

276.    The Cigna PPO Plan in effect at the time of his treatment provides that the "Maximum Reimbursable Charge" or MRC-1 for IOP services provided by an out-of-network provider are the lower of the provider's billed charges or at the 80th percentile of charges of similar providers for the same service in the same geographic area where the services were received.

277.    Summit Estate is an out-of-network provider with Cigna.

278.    On March 4, 2019, prior to admitting to treatment, to ascertain the precise financial responsibility SJ would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Creyna Franco, of Summit Estate, called Cigna on at 800-244-6224, the number listed on the back of SJ's insurance card. During this call, Cigna's representative, Anna, verified that SJ had active benefits for out of network behavioral health treatment, that's his benefits paid according to MRC-1 terms and represented that the plan would

38

pay 80th percentile of a rate based on UCR, e.g., 80th percentile of charges for similar services in the same geographic area. Anna gave the reference #5005 to verify the call and the statements made during it.

279. Summit Estate's charge for IOP services is $2,156 per diem.

280. The Fair Health 80th percentile of IOP services in Summit Estate's zip code is $2,576 per diem.

281. Based upon Cigna's many assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, SJ decided to attend treatment at Summit Estate and paid, in full and up front, all out of pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available. But Cigna did not pay the rate set forth in the Plan and that had been confirmed on the verification call.

282. Between 4/22/2019 and 5/31/2019, SJ received IOP behavioral health treatment services at Summit Estate.

283. After SJ received treatment, Summit Estate submitted timely invoices to Cigna seeking payment pursuant to the terms stated on the verification call of SJ's employee benefit plan. Suddenly and without warning, Cigna caused those claims to be sent to MultiPlan for repricing using the Viant methodology. As a result of Viant's repricing, Cigna allowed only $6,225.12 of $51,175.00 billed to Cigna for SJ's IOP services, or 12% of the billed charges. The allowed amount includes SJ's out of pocket payments, in addition to Cigna's payments.

284. Because of Cigna and MultiPlan, SJ has been denied the full benefits available under his benefit plan and has been damaged in the amount paid out of pocket for treatment services that should have been paid by Cigna.

285. For example, Summit Estate submitted to Cigna a claim for IOP services rendered to SJ on April 22, 2019. The claim was in the amount of $2,156.25. That claim should have been reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees for similar services in the same geographic region.

286.    However, Cigna, through MultiPlan's Viant, imposed a $1,896.87 reduction below what the Intuit Plan required to be reimbursed, and paid only $259.38 on the claim. The explanation of benefits "EOB" issued by Cigna indicates disallowed charge amount is $1,865.13 and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan other than the below.

287.    The EOB contained a purposefully vague and misleading remark reading: "A0 – HEALTH CARE PROFESSIONAL: WE REDUCED THE ALLOWED AMOUNT BASED ON VIANT'S FACILITY BILL REVIEW PROGRAM. IF YOU HAVE QUESTIONS ABOUT THIS DISCOUNTT CONTACT VIANT AT 866.233.0121."

288.    The only information provided by Cigna in the remittance advice to the provider regarding the underpaid reimbursement amount are the remark codes of "CO-45" and "N381." Remark code CO-45 reads: "Contractual obligations. The patient may not be billed for this amount. Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. Note: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payment or contractual reductions) that have resulted from prior payer(s) adjudication. (Use only with Group Codes PR or CO depending upon liability)" and remark code "N381" reads: "Alert: Consult our contractual agreement for restrictions/billing/payment information related to these charges."

289.    SJ was also sent correspondence on letterhead with both Viant and Cigna stating, "If you get a bill from a provider for more than the "What I Owe" amount the Cigna EOB, please call Cigna Customer Service at the number on your ID care. We will work with Viant on your behalf to attempt to reduce your expenses from this out-of-network provider."

290.    After treatment was provided and underpayments were being made, Summit Estate again confirmed these benefits on 3 more occasions with Cigna.  On November 1, 2019 "Vince" of Cigna who was called at 1-800-244-6224 also verified these benefits and gave the reference #3658.  On the same date, "Jaime" (who indicated he was located "onshore") was also called at 1-800-244-6224 and gave verification #9636.  Finally, also on November 1, 2019, "Reed W." of Cigna (who indicated he worked in Behavioral Health Provider Services) was

called at 1-800-433-5768 and verified the same benefits above and gave his name, Reed W, as the reference.

291.    At no time during the verification and authorization processes was Plaintiff or his provider told that exactly how Viant would be used to reprice Plaintiff's claims. As such, Cigna misled Summit Estate, and hence SJ and RJ, about the hidden Multiplan methodology that has no relationship to the Plaintiff's actual benefit plan. In fact, none of the information that Plaintiff and his provider were told was used by MultiPlan when it calculates prices. As set forth throughout this complaint, the data that MultiPlan through Viant use to price these claims is <u>not</u> based on true UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from data it purchases from Medicare.

292.    <u>Importantly, for the higher levels of services provided to this Plaintiff by their provider, including residential inpatient treatment and partial hospitalization, Cigna paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, 80th percentile of UCR, a rate equal to 85% of Summit Estate's billed charges. This incongruity highlights the fraud present in the payment of IOP claims.</u>

293.    Also significant is the fact that after multiple appeals by both RJ and Summit Estate to Cigna, Viant and to the plan sponsor, Intuit, Cigna sent partial additional payments for some of the dates of service.

294.    These additional partial payments, including one for the April 22, 2019 claim referenced above, averaged $491.53 and were sent for some dates of service, but even with the additional payments, RJ and SJ were still left with a balance of $1,405.34 for each day of IOP treatment.  For many days, Cigna sent no additional payments.

295.    IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to Cigna on which it loses money, Cigna used a completely different

methodology, the one that it had secretly formulated with MultiPlan. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method Cigna and MultiPlan were going to use to price the claim.

296.    At no time material to this action did the Plaintiff negotiate with Cigna, MultiPlan, or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by Cigna's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, Cigna and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

297.    The Plaintiff has been directly harmed by this underpayment.

298.    RJ has paid balance bills to Summit Estate totaling more than **$36,303.16**.

299.    Cigna and MultiPlan's use of Viant to underprice the claim deprived RJ and SJ of property – money – that RJ paid to the provider that should have been paid by Cigna to the provider for this claim. Moreover, this money had already been paid to Cigna through the RJ's insurance premiums which were deducted from her paycheck. The profit or 'margin' from this underpayment was shared by Cigna and MultiPlan as they collected fees from the Intuit benefit plan.

300.    SJ, and RJ and Summit estate on behalf of SJ have made numerous, more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

301.    SJ and RJ have been forced to make payments to Summit Estate for amounts that should have been covered by Cigna.

302.    SJ would not have sought treatment for behavioral health if SJ had known that the benefits would be repriced by MultiPlan using Viant.

<u>MW & LW</u>

303.    At all relevant times, MW is the adult dependent of LW, and an adult beneficiary of health benefits under LW's employer plan through International Paper.

304.    At all relevant times, LW was a full-time employee of International Paper and a participant in an employer funded benefits plan offered by Intuit and subject to ERISA.

305.    At all relevant times, health benefits for LW's International Paper benefits plan were administered by Cigna.

306.    At all relevant times, MW was a beneficiary of the International Paper benefits plan administered by Cigna.

307.    At all relevant times, MW was actively enrolled in a Cigna Open Access Plus Plan, a PPO plan which offered out of network benefits for behavioral health services, including IOP treatment.

308.    In 2019, MW was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder." Soon thereafter, MW sought treatment at Summit Estate, Inc. ("Summit Estate"), a duly licensed and accredited out of network behavioral health provider located in Los Gatos, CA, in Santa Clara County.

309.    Summit Estate is an out-of-network provider with Cigna.

310.    On February 27, 2019, prior to admitting to treatment, to ascertain the precise financial responsibility MW would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Creyna Franco of Summit Estate called Cigna at 1-800-244-6224, the number listed on the back of MW's insurance card. During this call, Cigna's representative, "Abby", verified that MW had active benefits for out of network behavioral health treatment and represented that the plan was an MRC-2 policy which would pay 150% of the Medicare schedule rate for all services.  As there is no Medicare schedule rate for the substance use disorder services MW was to receive from Summit Estate, it was customary and understood by all parties that payment according to the plan would default to either 1) the lesser of Summit Estate's normal charge for a similar service or supply; or 2) 80th percentile of the healthcare charges made by similar providers in the same geographic area, i.e. the Fair Health 80th percentile benchmark.  At the end of the call, "Abby" gave the reference #6629.

311.    Summit Estate's charge for IOP services is $2,156 per diem.

312.    The Fair Health 80th percentile of IOP services in Summit Estate's zip code is $2,576 per diem.

313.    Based upon Cigna's assurances and the parties' understanding regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, MW decided to attend treatment at Summit Estate and paid all out-of-pocket cost sharing expenses, such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available.

314.    Between 3/28/2019 and 7/31/2019, MW received IOP behavioral health treatment services from Summit Estate.

315.    After MW received treatment, Summit Estate submitted timely invoices to Cigna seeking payment pursuant to the terms stated on the verification call of MW's employee benefit plan. Cigna caused those claims to be sent to MultiPlan for repricing using the Viant methodology. As a result of Viant's repricing, Cigna allowed only $4,752.80 of $43,125.00 billed to Cigna for MW's IOP services, or 12% of the billed charges. The allowed amount includes MW's out of pocket payments, in addition to Cigna's payments.

316.    Importantly, for MW's IOP claims from 4/8/2019 through 6/13/2019, MW's claims for the same treatment were initially repriced by Viant at $237.64 per diem; however, when the repricing was contested and appealed by Summit Estate, these claims were then repriced by Zelis, another third party repricer, to $1,832.81 per diem, 85% of Summit Estate's billed charges. Neither Cigna nor MultiPlan has offered any explanation as to why the Viant UCR is 13% of the Zelis UCR for the same services provided to the same patient by the same provider at the same location.

317.    Because of Cigna and MultiPlan, MW has been denied the full benefits available under his benefit plan and has been damaged in the amount paid out of pocket for treatment services that should have been paid by Cigna.

318.    For example, MW submitted a claim for IOP services received from Summit Estate on April 4, 2019 to Cigna in the amount of $2,156.25. That claim should have been

reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees for similar services in the same geographic region.

319.    Cigna, through MultiPlan's Viant, imposed a $1,865.13 reduction below what the International Paper Plan required to be reimbursed, and paid only $259.38 on the claim. The EOB issued by Cigna indicates disallowed charge amount is $1,865.13 and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan.

320.    The only information provided by Cigna in the remittance advices sent with the underpayments are the remark codes of "CO-45" and "N381." Remark code CO-45 reads: "Contractual obligations. The patient may not be billed for this amount. Charge exceeds fee schedule/maximum allowable or contracted/legislated fee arrangement. Note: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payment or contractual reductions) that have resulted from prior payer(s) adjudication. (Use only with Group Codes PR or CO depending upon liability)" and remark code "N381" reads: "Alert: Consult our contractual agreement for restrictions/billing/payment information related to these charges."

321.    MW was also sent correspondence on letterhead bearing both the Viant and Cigna logos stating, "If you get a bill from a provider for more than the "What I Owe" amount the Cigna EOB, please call Cigna Customer Service at the number on your ID card. We will work with Viant on your behalf to attempt to reduce your expenses from this out-of-network provider." These letters were intended to cover the scheme and place the blame for the underpayment on Summit Estate, a provider whose rates were actually *below* 80th percentile of UCR.

322.    At no time during the verification and authorization processes was MW or his provider told that exactly how Viant would be used to reprice MW's claims. As such, Cigna misled Summit Estate, and hence MW, about the hidden Multiplan methodology that has no relationship to the Plaintiff's actual benefit plan. In fact, none of the information that Plaintiff and his provider were told was used by MultiPlan when it calculates prices. As set forth throughout this complaint, the data that MultiPlan through Viant use to price these claims is <u>not</u>

based on relevant Medicare rates or UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from incomplete data it purchases from CMS, which does not even contain a Medicare rate for these particular IOP services.

323.   Significantly, for the higher levels of services provided to MW by Summit Estate, including residential inpatient treatment and partial hospitalization, Cigna paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, at or above 80th percentile of a rate based on UCR which equaled 85% of the billed charges. This incongruity highlights the fraud present in the payment of IOP claims.

324.   Further, as mentioned above, when the same IOP services to this same patient by the same provider at the same location billed the same way to Cigna was repriced by Zelis, the Zelis UCR was $1,832.81 while the Viant UCR was $237.64.

325.   IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment. Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to Cigna on which it loses money, Cigna used a completely different methodology, the one that it had secretly formulated with MultiPlan and one which Cigna profits from. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method Cigna and MultiPlan were going to use to price these IOP claims.

326.   At no time material to this action did the Plaintiff negotiate with Cigna, MultiPlan, or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by Cigna's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, Cigna and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider.

327.   DS has been directly harmed by this underpayment.

328.    Due directly to Cigna's underpayments MW is now financially responsible for a balance owed of **$38,372.20** owed to Summit Estate.

329.    Cigna and MultiPlan's use of Viant to underprice the claim has placed MW in debt and deprived him of property – money – that MW has to pay Summit Estate but which should have been paid by Cigna for this claim. Moreover, this money had already been paid to Cigna through MW's insurance premiums, which were deducted from LW's paycheck and paid to Cigna. The profit or 'margin' from this underpayment was shared by Cigna and MultiPlan, who paid themselves fees from the International Paper Plan.

330.    MW, and Summit Estate on behalf of MW, have made numerous, more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available.

331.    MW would not have sought treatment for behavioral health if MW had known that the benefits would be underpaid by MultiPlan using Viant.

332.    The underpayments, although issued by Cigna, also constitute predicate acts by both Defendants as they worked together as co-schemers as part of the scheme to defraud, to create, misrepresent, and pay a fraudulent UCR, to knowingly and intentionally not pay the amounts they were legally required to pay.

333.    To keep this fraud hidden, by issuing the letters referenced above, MW and other patients are discouraged from contacting their employers who issued the plan or their providers and are instead redirected to the enterprise and directed to let the enterprise handle the matter. This is the "liability shield" in action that MultiPlan promised to its Enterprise co-conspirator Cigna.

### DS

334.    At all relevant times, DS was a full-time employee of Impossible Foods, Inc. and a participant in an employer funded benefits plan offered by Impossible Foods, Inc. which is subject to ERISA.

335.    At all relevant times, health benefits for DS's Impossible Foods benefits plan were administered by Cigna.

47

336.    At all relevant times, DS was a beneficiary of the Impossible Foods benefits plan administered by Cigna.

337.    At all relevant times, DS was actively enrolled in a Cigna Open Access Plan, a PPO plan which offered out of network benefits for behavioral health services, including substance use disorder IOP treatment.

338.    In 2019, DS was diagnosed with ICD-10 Code F.10.20, or "Alcohol Use Disorder." Soon thereafter, DS sought treatment at Summit Estate, Inc. ("Summit Estate"), a duly licensed and accredited out of network behavioral health provider located in Los Gatos, CA, in Santa Clara County.

339.    Summit Estate is an out-of-network provider with Cigna.

340.    On August 22, 2019, prior to admitting to treatment, to ascertain the precise financial responsibility DS would bear and decide whether treatment was financially feasible under the terms of the benefits plan, Creyna Franco of Summit Estate called Cigna on at 1-866-494-2111, the number listed on the back of DS's insurance card. During this call, Cigna's representative. "Mykal", verified that DS had active benefits for out of network behavioral health treatment and represented that the plan was an MRC 2 policy which would pay 110% of the Medicare schedule rate for all services.  As there is no Medicare schedule rate for the substance use disorder services DS was to receive from Summit Estate, it was customary and understood by all parties that payment according to the plan would default to either 1) the lesser of Summit Estate's normal charge for a similar service or supply; or 2) 80th percentile of the healthcare charges made by similar providers in the same geographic area, i.e. the Fair Health 80th percentile benchmark.  At the end of the call, "Mykal" gave reference #8185 to verify the call.

341.    Summit Estate's charge for IOP services is $2,156 per diem.

342.    The Fair Health 80th percentile of IOP services in Summit Estate's zip code is $2,576 per diem.

343.    Based upon Cigna's assurances regarding the expected rate of reimbursement and authorizations, and with an understanding of the plain terms of the employer benefit plan, DS decided to attend treatment at Summit Estate and paid all out-of-pocket cost sharing expenses,

48

such as the deductible and co-insurance, in order to take full advantage of the maximum benefit available.

344.    For IOP services, Cigna did not pay the rate set forth in the Plan. Cigna did not pay according to CMS rates (because there were none for these services), it did not pay the provider's full billed charges, nor did it pay 80th percentile of UCR.  Instead, it routed the claims to Multiplan's Viant tool to be arbitrarily re-priced.

345.    Between 9/20/2019 and 11/26/2019, DS received IOP behavioral health treatment services at Summit Estate.

346.    After DS received treatment, Summit Estate submitted timely invoices to Cigna seeking payment pursuant to the terms stated on the verification call of DS's employee benefit plan. Cigna caused those claims to be sent to MultiPlan for repricing using the Viant methodology. As a result of Viant's repricing, Cigna allowed only $7,300.42 of $60,375.00 billed to Cigna for DS's IOP services, or 12% of the billed charges. The allowed amount includes DS's out of pocket payments, in addition to Cigna's payments.

347.    Because of Cigna and MultiPlan, DS has been denied the full benefits available under his benefit plan and has been damaged in the amount paid out of pocket for treatment services that should have been paid by Cigna.

348.    For example, DS submitted a claim for IOP services received from Summit Estate on September 20, 2019 to Cigna in the amount of $2,156.25. That claim should have been reimbursed under the plan terms at $2,156.25, as that amount is less than the 80th percentile of the fees for similar services in the same geographic region.

349.    Cigna, through MultiPlan's Viant, imposed a $1,896.87 reduction below what the Impossible Foods Plan required to be reimbursed, and paid only $259.38 on the claim. The EOB issued by Cigna indicates disallowed charge amount is $1,865.13, and offers no explanation for the gross departure from the out-of-network reimbursement methodology required by the Plan.

350.    The only information provided by Cigna in the remittance advices sent with the underpayments are the remark codes of "CO-45" and "N381." Remark code CO-45 reads: "Contractual obligations. The patient may not be billed for this amount. Charge exceeds fee

schedule/maximum allowable or contracted/legislated fee arrangement. Note: This adjustment amount cannot equal the total service or claim charge amount; and must not duplicate provider adjustment amounts (payment or contractual reductions) that have resulted from prior payer(s) adjudication. (Use only with Group Codes PR or CO depending upon liability)" and remark code "N381" reads: "Alert: Consult our contractual agreement for restrictions/billing/payment information related to these charges."

351. DS was also sent correspondence on letterhead bearing both the Viant and Cigna logos stating, "If you get a bill from a provider for more than the "What I Owe" amount the Cigna EOB, please call Cigna Customer Service at the number on your ID card. We will work with Viant on your behalf to attempt to reduce your expenses from this out-of-network provider." These letters were intended to cover the scheme and place the blame for the underpayment on Summit Estate, a provider whose rates were actually *below* 80th percentile of UCR.

352. At no time during the verification and authorization processes was DS or his provider told that exactly how Viant would be used to reprice DS's claims. As such, Cigna misled Summit Estate, and hence DS, about the hidden Multiplan methodology that has no relationship to the Plaintiff's actual benefit plan. In fact, none of the information that Plaintiff and his provider were told was used by MultiPlan when it calculates prices. As set forth throughout this complaint, the data that MultiPlan through Viant use to price these claims is not based on relevant Medicare rates or UCR calculations related to similar providers in a similar geographic area, but on a secret, artificially low national number it has manipulated and adjusted from incomplete data it purchases from CMS, which does not even contain a Medicare rate for these particular services.

353. Importantly, for the higher levels of services provided to DS by Summit Estate, including residential inpatient treatment and partial hospitalization, Cigna paid the claims precisely as it had promised on the verification call and contained in the Plaintiff's benefit plan, or 80th percentile or more of UCR, and amount equal to 85% of Summit Estate's billed charges. This incongruity highlights the fraud present in the payment of these IOP claims.

354. IOP care is considered a 'step-down' or less intensive level after a patient has been stabilized at higher, more restrictive in-patient levels of behavioral health treatment.

Patients typically transfer to IOP care after a month or more of higher levels of treatment. Yet, for IOP treatment, one of the most the most common services billed across behavioral healthcare and a "loss leader" service to Cigna on which it loses money, Cigna used a completely different methodology, the one that it had secretly formulated with MultiPlan and one which Cigna profits from. The Plaintiff can ill afford and would not have sought treatment with this provider if it had known the true method Cigna and MultiPlan were going to use to price these IOP claims.

355.    At no time material to this action did the Plaintiff negotiate with Cigna, MultiPlan, or Viant or agree to alter plan terms, consent to a discounted rate for IOP services, or to be bound by Cigna's, MultiPlan's or Viant's undisclosed payment policies, pricing methodologies or rate schedules with respect to any of the services the Plaintiff received from this provider. Notwithstanding the absence of any such agreement, Cigna and MultiPlan have unilaterally applied an unlawful discount to the rate they have paid for the Plaintiff's IOP services from this provider. DS has been directly harmed by this underpayment. Due directly to Cigna's underpayments DS is now financially responsible for a balance owed of **$37,932.62** owed to Summit Estate.

356.    Cigna and MultiPlan's use of Viant to underprice the claim has placed DS in debt and deprived him of property – money – that DS has to pay Summit Estate but which should have been paid by Cigna for this claim. Moreover, this money had already been paid to Cigna through the Plaintiff's insurance premiums, which are deducted from his paycheck. The profit or 'margin' from this underpayment was shared by Cigna and MultiPlan, who paid themselves fees from the Impossible Foods Plan.

357.    DS, and Summit Estate on behalf of DS, have made numerous, more than two, efforts to appeal and negotiate the underpaid amounts, exhausting all administrative remedies available. DS would not have sought treatment for behavioral health if DS had known that the benefits would be underpaid by MultiPlan using Viant. The underpayments, although issued by Cigna, also constitute predicate acts by both Defendants as they worked together as co-schemers as part of the scheme to defraud, to create, misrepresent, and pay a fraudulent UCR, to knowingly and intentionally not pay the amounts they were legally required to pay.

358.     To keep this fraud hidden, by issuing the letters referenced above, DS and other patients are discouraged from contacting their employers who issued the plan or their providers, and are instead redirected to the enterprise and directed to let the enterprise handle the matter. This is the "liability shield" in action that MultiPlan promised to its Enterprise co-conspirator Cigna.

<u>The 'Out-of-Network' ("OON") Letters</u>

359.     Among the clearest indications of the joint management and control of the enterprise is found in the OON letters, such as the following example, received by SJ, that was sent to each patient by the Defendants:

   

1105 West 2400 South • Salt Lake City, UT 84119

Date: 05/21/2019



Reference number: ▮▮▮
**Provider: SUMMIT ESTATE RECOVERY CENTER**
**From Service Dates: 04/22/2019**
**To Service Dates: 04/22/2019**
**Billed amount: $2,156.25**

**This is not a bill. This is important information about your out-of-network claim.**

Dear ▮▮▮.

On 04/22/2019, you received care from a provider who isn't part of your Cigna® network.* You should be getting an Explanation of Benefits (EOB) about this visit soon, if you haven't gotten one by now. Please read it with care.  This letter gives more information about that EOB and out-of-network charges.

**We can work with out-of-network providers to lower what you may owe.**

Out-of-network providers don't have a contract with Cigna. This means the providers decide how much to bill for their services. When you go out-of-network, you pay the difference between the most your plan will allow and what the provider billed for the care you received.

To help lower out-of-network charges, Cigna has contracted with Viant to negotiate on your behalf.

**What does this mean for you?**

 • If you get a bill from a provider for more than the "What I Owe" amount the Cigna EOB, please call Cigna Customer
   Service at the number on your ID card. We will work with Viant on your behalf to attempt to reduce your expenses from
   this out-of-network provider.

 • After Viant negotiates with the provider, you may get an updated EOB with a different "What I Owe" amount owed. You
   will be responsible for paying that amount, if your provider bills you for it.

 • If an agreement can't be reached, the provider may bill you for any amount that's above the maximum reimbursable
   amount allowed under your plan. For more information about the maximum reimbursable amount allowed, see your plan
   benefits booklet.

**We're here to help.**

Call us. We're available 24/7/365. Our number is on your ID card. If you have a hearing or speech impairment and use Telecommunications Relay Services (TRS) or a Text Telephone (TTY), dial 711 to connect with a TRS operator. Translation services are available at no cost to you in 140 languages. Para información en Español, por favor llame al número telefónico que aparece en su tarjeta o al 1.800.244.6224 (Customer Service) y pida hablar con un representante que hable Español.

Sincerely,
Cigna Customer Service

50233301

* You may have chosen to use this out-of-network provider or you may not recognize the provider's name. That could be the case, for example, if you received these services while in a hospital or at an emergency room.

Viant Inc Interest is it a network one with privacy standards regarding payments, transactions, and healthcare operations. Viant is not financially obligated for any payments to the provider or patient. Privacy laws limit who Viant may speak with about this claim. You persons who can assist Viant should be the patient, the patient's parent or legal guardian, or a duly authorized representative.

This letter may contain confidential information. It reads it only for the use of the person(s) named above. If you are not the intended recipient, you are hereby advised that to any disclosure, copying, distribution, or taking any action in reliance of the contents of this information is prohibited. If you have received this letter in error, please notify Viant immediately at 800-594-6330 to arrange for its return. Thank you.

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT

360.     These letters have been sent continuously and systematically for more than two years.

361.     These letters were sent across state lines.

362.     The exemplar above was sent to RJ who received a total of at least twenty-seven r of these letters

363.     Each Plaintiff received two or more of these letters.

364.     This letter has been sent to thousands of to IOP patients insured by Cigna.

365.     The letterhead represents both Cigna and MultiPlan's wholly owned and controlled subsidiary Viant.

366.     As they jointly appear on the letterhead, this is a strong admission that both Defendants jointly managed the affairs and were co-schemers of the Enterprise.

367.     These deceptive and fraudulent letters are among the racketeering predicate acts committed by the Enterprise.

368.     The letter represents that the providers will be paid the 'maximum reimbursable amount allowed under your plan' if the provider does not agree to Viant's rate.

369.     The plans require payment be made based on competitive fees in the same geographic area for both MRC-I and MRC-II plans for IOP treatment.

370.     As set out in above, the maximum reimbursable rate was never paid to Plaintiffs or their providers.

371.     This letter is an admission of fraud by Cigna and MultiPlan.

372.     The OON letters constitute predicate acts of mail fraud for purposes of RICO.

373.     Defendants committed wire or mail fraud each and every time a faulty or inadequate payment was mailed or transmitted to Plaintiffs or their agents.

374.     Defendants worked in concert pursuant to a scheme whereby Defendants knowingly and intentionally did not pay Plaintiffs' claims at the reimbursement rate required by the terms of the Plaintiffs' plans. Therefore, Defendants were intentionally defrauding Plaintiffs of amounts due to them for their claims.

375.     As stated succinctly by the Fifth Circuit, completion of the scheme must "depend in some way on the information or documents that passed through the mail." *United States v. Tencer*, 107 F.3d 1120, 1125 (5th Cir.1997). The scheme used the OON letters to maintain the fraud. As stated by the Supreme Court, "one 'causes' the mails to be used where he does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended." *United States v. Maze*, 414 U.S. 395, 399, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (internal citations and quotation marks omitted).As a member of the RICO Enterprise set forth, Defendant Multiplan knew or should have known that the mail and wires, including the OON letters and fraudulent reimbursement rates, would be conveyed through the mail and wires. As such, it is irrelevant whether Multiplan actually communicated with Plaintiffs as they knew or should have known that the acts that they took in furtherance of the scheme would lead to multiple interstate communications that included their fraudulent reimbursement rates and other misrepresentations as alleged throughout.

376.     The OON letters are part of the overall scheme to defraud; they reflect that Defendants worked together, further the illegal objective of the Enterprise, and thus constitute predicate acts of racketeering activity by both Defendants.

377.     The underpayments made to Plaintiffs, although issued by Cigna, also constitute predicate acts by both Defendants as they worked together as part of the scheme to defraud, to create, misrepresent, and pay a fraudulent UCR, to knowingly and intentionally not pay the amounts they were legally required to pay.

378.     To keep this fraud hidden, the patients are discouraged from contacting their employers who issued the plan, their providers or even Cigna and are instead redirected to the enterprise and directed to let the enterprise handle the matter. This is the "liability shield" in action that MultiPlan promised to its Enterprise co-conspirator and co-schemer Cigna.

*RICO Proximate Cause*

379.     Every Plaintiff has been directly injured by Defendants' scheme.

380.     The objective of the scheme is to formulate a fraudulent basis for under reimbursing the Plaintiffs and IOP claims across the country.

54

381.   In implementing this scheme, Defendants have underpaid Plaintiffs' and thousands of other's IOP claims.

382.   They have done so on a systematic basis as part of their regular way of doing business and will continue to do so until the legal process forces them to stop.

383.   Plaintiffs and other IOP patients have been directly and proximately injured by Defendants' fraudulent conduct.

384.   Plaintiffs' injuries are not just the foreseeable and natural consequence of Defendants' scheme, they are a clear objective of the scheme.

385.   The Continuing Nationwide Pattern and Other Victims Affected

386.   This Complaint sets forth the manner in which the Enterprise was the vehicle for Plaintiffs' injuries; however, the Enterprise causes damages beyond those done to Plaintiffs that they seek to recover.

387.   The Enterprise also damages the Plaintiffs' and other IOP patients' employers

388.   These damages are separate from the damages to Plaintiffs and other IOP patients.

389.   The Enterprise is used to damage the person and property of patients' employers because it takes the full amount of an IOP providers billed charges from the employer for the IOP claim but does not remit the full amount taken to the IOP provider. Instead, the IOP provider receives an amount that is well below their billed charges and the difference is retained by the Enterprise as their profit.

*General Allegations to All Counts*

390.   For decades, commercial payors, including Cigna, have purported to reimburse for out-of-network services according to the UCR rates. Reimbursement at UCR rates is so well-established that some states, including California, require certain health plans to reimburse out-of-network services at rates using criteria that parallel the industry-standard for determining UCR. *See, e.g.*, 28 C.C.R. § 1300.71(a)(3)(B) (referring to prevailing provider rates **charged** in the general geographic area in which the services were rendered); Fla. Stat. Ann. § 641.513(5) (referring to "usual and customary provider **charges**" for similar services in the community where the services were provided). Because the industry standard traditionally has been for

55

payment according to the UCR, out-of-network providers and their patients reasonably expect claims to be paid based on UCR.

391.    This understanding and usage was further confirmed during the initial VOB and authorization calls between Plaintiffs' providers and Cigna.

392.    In correspondence received by Plaintiffs, both from Cigna and MultiPlan, as set forth in greater detail below, the Defendants fraudulently represented that the underpayment amount was based on UCR rates.

393.    This representation was deliberate and false.

394.    It is arbitrary, capricious, improper, and a breach of plan terms for Cigna to pay rates other than a true UCR arrived at under a fair methodology.

*The Direct Harm Caused to the Plaintiffs and Class*

395.    All the IOP claims of the Plaintiffs and the class at issue here were underpaid. These are all claims for which out-of-network rates for IOPs are meant to be paid at amounts based on the UCR rate.

396.    Cigna has systematically underpaid the Plaintiffs' and the class' IOP claims since the beginning of the claims period for the present litigation.

397.    Cigna intentionally led Plaintiffs and the Class as well as their treating providers and plans to believe that rates were determined based on a UCR rate.

398.    As alleged above, when Plaintiffs' providers contacted Cigna to verify out-of-network rates during the pre-admission VOB calls, Cigna routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by MultiPlan through Viant.

399.    Plaintiffs then relied upon Cigna to issue payment to their providers for IOP services at the UCR rate.

400.    Underpayment of Plaintiffs' and other patients' out-of-network IOP claims, directly and proximately Plaintiffs and other patients to then pay the amount underpaid to their providers is a deprivation of their property interest and direct damage to them.

## CLASS ACTION ALLEGATIONS

### *The Plaintiff Class*

401.    Plaintiffs bring this action on behalf of themselves and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure. The requirements of subparts 23(a) and (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure are satisfied in this case.

402.    Plaintiffs bring this class action on behalf of the Plaintiff Class, defined as:

403.    Any member, dependent, participant, beneficiary, or assignee of a health benefit plan either administered or insured by Cigna whose claims for out-of-network behavioral health treatment, including mental health and/or substance use disorder, were underpaid and/or repriced by Defendants.

### *Rule 23(a)*

### Numerosity

404.    This putative plaintiff class includes hundreds of thousands and possibly, millions, of mental health and substance use disorder treatment patients throughout the Cigna States and is therefore so large as to make joinder of all members impracticable within the meaning of Rule 23(a)(1) of the Federal Rules of Civil Procedure.

### Commonality

405.    Pursuant to Rule 23(a)(2) of the Federal Rules of Civil Procedure, there are questions of law or fact common to all class members, including, but not limited to, the following:

      a.    Whether the Defendants have underpaid the Plaintiff Class for out-of-network mental health and substance use disorder services based upon improper methodologies for pricing claims;

      b.    Whether the Defendants have breached their fiduciary duties to the Plaintiff class;

      c.    Whether Defendants have violated R.I.C.O.

      d.    Whether Defendants have formed an illegal Enterprise;

      e.    Whether the Enterprise has committed predicate acts;

f.   Whether the Enterprise has caused injury to the Plaintiff Class;

g.   Whether Defendants made false representations to the Plaintiff Class as to how claims for out-of-network mental health and substance use disorder services would be paid;

h.   Whether the Defendants falsely representing the method that was used to pay the claims for out-of-network mental health and substance use disorder services at the time such claims were paid;

i.   Whether the Defendants falsely represented the method that was used to pay the claims for out-of-network mental health and substance use disorder at the time such claims were appealed;

j.   Whether the Defendants falsely represented that the Plaintiff class owed providers amounts which should have been paid by the Defendants, and are not the financial liability of the Plaintiff class;

k.   Whether the improper methodologies and systematic misrepresentations employed by the Defendants made it futile to appeal the claims;

l.   Whether Defendants underpayment constituted as adverse benefit determination;

m.  Whether interest should be added to the payment of unpaid benefits;

n.   Whether Defendants conduct violates the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA);

o.   Whether Defendants conduct violates the California Mental Health Parity Act;

p.   Whether Cigna's conduct violated their fiduciary duties and/or duty of faith and fair dealing to the Patient Class in employing MultiPlan to reprice claims;

q.   Whether Cigna MultiPlan falsely represented to the Patient Class that they represented them.

r.   Whether MultiPlan was the 'agent' of any member of the Patient Class who received IOP mental health and substance use disorder services from providers;

s.   What process and data MultiPlan used in payment determinations;

t.  Whether Cigna and MultiPlan made fraudulent to representations to the Patient Class regarding their IOP mental health and substance use disorder claims;

u.  Whether Cigna was obligated to pay the claims under the terms of the insurance policies;

v.  Whether Cigna revealed the involvement or probable involvement of MultiPlan in claims handling, processing, and/or payment determinations prior to the Patient Class receiving IOP treatment;

w.  Whether MultiPlan received any appeals from the Plaintiff Class or anyone acting on their behalf following benefit determinations;

x.  Defendants' processes for handling appeals following benefit determinations;

y.  What level of treatment was provided to the Plaintiff Class;

z.  What payments were made for the Plaintiff Class' claims;

aa. Whether MultiPlan's Viant methodology adequately and/or accurately determines benefit amounts;

bb. Whether MultiPlan's Viant pricing data accurately reflect the relevant UCR in the relevant geographical area and/or Medicare schedules of charges;

cc. Whether MultiPlan's Viant's repricing actions constitute inappropriate kickbacks

dd. Whether pricing practices comported with the terms of the Patient Class' health benefits and insurance plans;

ee. Whether MultiPlan was given the members' health benefits and insurance plans.

ff.  Whether MultiPlan utilized the members' health benefit and insurance plans in determining payment amounts;

gg. Whether Cigna delayed processing appeals;

hh. Whether MultiPlan's prospective involvement was disclosed in member's benefit plans;

ii.  Whether Cigna and Multiplan breached their fiduciary duties pricing claims;

## Typicality

59

406.    The claims of Plaintiffs are typical of the claims of the defined plaintiff class, within the meaning of Rule 23(a)(3) of the Federal Rules of Civil Procedure, and are based on and arise out of the same uniform and standard illegal practices of the Defendants, as alleged herein by the Plaintiffs. The proposed class representatives state claims for which relief can be granted that are typical of the claims of absent class members. If litigated individually, the claims of each class member would require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

<u>Adequacy</u>

407.    Plaintiffs are committed to pursuing this action and are prepared to serve the proposed class in a representative capacity with all of the obligations and duties material thereto. They will fairly and adequately represent the interests of the members of the proposed class within the meaning of Rule 23(a)(4) of the Federal Rules of Civil Procedure, and will not have any interests adverse to, or that directly and irrevocably conflict with, the interests of the other class members.

408.    Plaintiffs have retained competent counsel, extremely experienced in class action litigation, which will adequately prosecute this action, and will assert, protect and otherwise well represent the named Class representatives and absent class members.

***Rule 23(b)***

409.    The prosecution of separate actions by individual class members would create a risk of adjudication with respect to individual class members that would, as a practical matter, be dispositive of the interests of other members of the class who are not parties to this action, or could substantially impair or impede their ability to protect their interests. Fed. R. Civ. P. 23(b)(1)(B).

410.    The prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible rights within the Plaintiff Class. Fed. R. Civ. P. 23(b)(1)(A).

411.    The Defendants' actions are generally applicable to the class as a whole, and Plaintiffs seek equitable remedies with respect to the class as a whole, within the meaning of Rule 23(b)(2) of the Federal Rules of Civil Procedure.

412.    The common questions of law and fact enumerated above predominate over individual questions, and a class action is a superior method for the fair and efficient adjudication of this controversy, within the meaning of Rule 23(b)(3) of the Federal Rules of Civil Procedure. Common or general proof will be used for each member of the class to establish each element of their claims, as identified above. Additionally, proceeding as a class action is superior to other available methods of adjudication. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

### Causes of Action

*COUNT I: Violation of RICO, 18 U.S.C. § 1962(c)*

*(As to Cigna and MultiPlan)*

413.    The Plaintiffs re-allege and restate the facts set forth above as if they were fully set forth herein.

414.    The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

415.    Cigna and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

416.    Cigna and MultiPlan conspired and schemed to develop and use a database and pricing tool, Viant, to generate the lowest possible reimbursement rates for the out-of-network IOP claims at issue, which employed data that did not represent the customary rates of similar IOP providers in the same geographic area as required by Plaintiffs' plans.

417.    The Defendants engaged in this scheme for the purpose of keeping the difference between the artificially low amounts that Cigna reimbursed for the IOP claims at issue and the amount at which the claims should have been reimbursed if the plan requirements had actually been followed by defendants in reimbursing the claims.

418.    Defendants engaged in this scheme and employed the scheme to underpay claims in the same manner regardless of the Plaintiffs' plan terms.

419.    Cigna sent various forms of communication to plaintiffs over interstate mail and wires as part of the scheme, such as VOB calls, EOBs, and other correspondence, which were misleading because they did not disclose that Defendants had not and/or would not use a methodology for reimbursing the claims for IOP services at issue that was consistent with the plan requirements.

420.    Plaintiffs were injured by this scheme because they were forced to pay the difference between the billed amount for the IOP services and the artificially low amounts that Cigna reimbursed.

421.    The billed amounts for the IOP services that Plaintiffs received were lower than the usual and customary rates of similar IOP providers in the same geographic region; because their plans required reimbursement of out-of-network IOP services based on the customary rates of similar IOP providers in the geographic region, their plans should have covered most, if not all, of the billed amounts.

422.    MultiPlan is liable, by virtue of being Cigna's co-schemer, for the fraudulent communications that Cigna sent to Plaintiffs by interstate mail and wires as part of Cigna and MultiPlan's scheme.

423.    MultiPlan knowingly participated in and directed Defendants' alleged scheme with the intent to defraud and under-reimburse Plaintiffs.

424.    The Ninth Circuit has recognized that a pattern of racketeering activity involving mail or wire fraud can be established under a "co-schemer" theory of liability where a RICO Section 1962(c) claim is predicated on a mail or wire fraud scheme that involves two or more participants. Because the element of "scheme to defraud" required to state a claim for wire fraud or mail fraud is treated similarly to a conspiracy, "[a] knowing participant in a scheme to defraud is vicariously liable for substantive acts of mail fraud or wire fraud committed by co-schemers." *United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002).

425.     As set forth above, since at least January 1, 2015, Cigna and MultiPlan have been and continue to be, a part of an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4).

426.     The Enterprise is comprised of at least Cigna and MultiPlan.

427.     The Enterprise was and is engaged in activities that span multiple states and affect interstate commerce.

428.     Each of Cigna and MultiPlan have an existence separate and distinct from the Enterprise, in addition to directly participating and acting as a part of the Enterprise.

429.     Each Cigna Defendant and MultiPlan exercise management and/or control over the affairs of the Enterprise.

430.     Cigna and MultiPlan utilize the Viant methodology to obtain fraudulent rates that are then communicated out across state lines using the mail and wires as set forth above.

431.     The Enterprise had, and continue to have, the common and continuing purpose of dramatically underpaying Plaintiffs and other patients' out-of-network IOP claims in order unlawfully obtain and keep the difference between the appropriate and reasonable amount and the underpaid amount for their own benefit and the benefit of the Enterprise.

432.     As set forth above, Cigna and MultiPlan have, since at least January 1, 2015, been, and continue to be, engaged in a scheme to defraud the Plaintiffs and other patients by committing a series of unlawful acts which constitute predicate racketeering acts under 18 U.S.C. §§ 1961(1)(B) and 1962(c), involving multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

433.     Plaintiffs' mail and wire fraud allegations as to both Defendants as Plaintiffs have alleged that the mail and wires were used by Defendants as a part of an overall plan to defraud. For in "cases in which the plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, the communications need not have contained false or misleading information themselves. In such cases, a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)." *In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (internal citations omitted).

434.    Plaintiffs have provided a detailed description of the underlying scheme, the participation of both Defendants, and the connection of the use of mail and wire communications. As such, sufficient predicate acts are pled as to both Defendants.

435.    Further, when evaluating a detailed fraudulent scheme, as alleged *supra*, although Plaintiffs have alleged, in detail, specific use of the mail and wires, still, it is "reasonable to infer that mail and/or telephone communications were used in furtherance of the defendants' scheme." *Beth Israel Med. Ctr. v. Smith*, 576 F. Supp. 1061, 1071 (S.D.N.Y. 1983).

436.    Defendant MultiPlan's actions, as asserted above, in its participation in the sending fraudulent and deceptive correspondence and in the payment amount constitute necessary predicate acts of racketeering as they are interstate acts of mail and wire fraud.

437.    MultiPlan has also committed the necessary predicate acts of racketeering through its aiding and abetting of mail and wire fraud. Aiding and abetting mail and wire fraud constitutes a predicate act under RICO. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *12 (N.D. Cal. Oct. 30, 2017); *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 132, 141 (D. Conn. 2014); *Fireman's Fund Ins. Co. v. Plaza Oldsmobile Ltd.*, 600 F. Supp. 1452, 1457 (E.D.N.Y. 1985).

438.    As set out in *In re Volkswagen* cited above, MultiPlan's aiding and abetting constitutes RICO predicate acts by MultiPlan.

439.    Aiding and abetting "comprehends all assistance rendered by words, acts, encouragement, support, or presence." *Reves v. Ernst & Young*, 507 U.S. 170 (1993). Aiding and abetting under 18 U.S.C. § 2 is a RICO predicate act. Under 18 U.S.C. § 2 the defendant is only required to "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *Nye & Nissen*, 336 U.S. 613, 619 (1949) *quoting* L. Hand, J., *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938).

440.    As alleged *supra* MultiPlan has participated in the RICO Enterprise and has acted in such a manner and the intention that the Enterprise succeed.

441.     As a direct and proximate result of Cigna and MultiPlan's violations of 18 U.S.C. § 1962(c), the Plaintiffs were injured, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

*COUNT II: Violation of RICO Conspiracy, 18 U.S.C. § 1962(d)*

*(As to Cigna and MultiPlan)*

442.     The Plaintiffs reassert and realleges the facts set forth above as if fully set forth herein.

443.     The Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

444.     Cigna and MultiPlan are each a "person" within the meaning of 18 U.S.C. § 1961(3).

445.     As set forth above, since at least January 1, 2015, the Defendants have been, and continue to be, part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least Cigna and MultiPlan.

446.     Cigna and MultiPlan were, and continue to be, associated with the Enterprise and knowingly conspired, within the meaning of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c) by conducting and participating, directly or indirectly, in the management, overseeing, and conduct in the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1962(c), including multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, in order to defraud the Plaintiffs and other patients of their obligation and duty to pay usual and customary rates for the out-of-network IOP services they received.

447.     As a direct and proximate result of the RICO Defendants' violations of 18 U.S.C. § 1962(d), the Plaintiffs were injured, suffering financial losses within the meaning of 18 U.S.C. § 1964(c).

*COUNT III: Claim for Underpaid Benefits Under Group Plans Governed by ERISA*

*(As to Cigna)*

448.   The factual allegations above are hereby repeated as if fully set forth herein.

449.   Cigna violated its legal obligations under ERISA-governed plans and federal common law each time it made the benefit reductions that resulted in the underpayment of the claims at issue.

450.   These underpayments are adverse benefit determinations and are violations of ERISA § 502(a)(l)(B), 29 U.S.C. § 1132(a)(l)(B).

451.   In certain employer-funded plans, which are sometimes designated Administrative Services Only or "ASO," Cigna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to the payment of benefits.

452.   Where Cigna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Cigna is liable for underpaid benefits to Plaintiff and members of the class in both fully insured health plans, where benefits are paid from Cigna's assets, and in employer-funded ASO ERISA health plans.

453.   Cigna further violated its obligations under ERISA when it failed to comply with applicable state laws that require Cigna to pay provider charges using the appropriate methodologies.

454.   Cigna's omissions and lack of disclosure to the Plaintiffs and the Class, its members, violated its legal obligations.

455.   Cigna violated obligations each time it engaged in conduct that discouraged or penalized its members' use of out-of-network providers, such as by making illegal benefit reductions and adverse benefit determinations.

456.   Cigna, as the party which exercised all discretionary authority and control over the administration of the plan of each Plaintiff and Class member including the management and disposition of benefits under the terms of the plan, owed a fiduciary duty to Plaintiffs and the Class.

457.    Cigna breached its fiduciary duties to Plaintiffs and the Class by failing to pay proper out-of-network benefits without justification. Cigna therefore owes, and should be ordered to pay, the benefits that were illegally underpaid based on the policies detailed herein

458.    Plaintiffs, on their own behalf and on behalf of the members of the Class seek underpaid benefits, recalculated deductible and coinsurance amounts and interest back to the date their claims were originally submitted to Cigna.

459.    Plaintiffs request attorneys' fees, costs, prejudgment interest and other appropriate relief against Cigna.

*COUNT IV: Breach of Plan Provisions in Violation of ERISA § 502(a)(1)(B)*

*(As to Cigna)*

460.    The factual allegations above are hereby repeated as if fully set forth herein.

461.    Cigna breached its plan provisions for benefits by underpaying UCR and other out-of-network reimbursement amounts covered by ERISA healthcare plans to providers in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B).

462.    Cigna's breaches included, among other things, the misuse of the Viant methodology to improperly calculate UCR and reduce other benefits paid to providers for out-of-network IOP services.

463.    Under the terms of its health plans, Cigna administers benefits and is a fiduciary.

464.    In certain employer-funded plans which are sometimes designated ASO, Cigna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion (hereinafter "discretion") with regard to the payment of benefits.

465.    Where Cigna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Cigna is liable for underpaid benefits in both fully insured health plans, where benefits are paid from Cigna's assets, and in employer funded ASO ERISA health plans.

466.    Cigna is liable to the Plaintiffs and the Class as they have overpaid in the amount that Cigna was obligated to pay to providers.

467.     Pursuant to 29 U.S.C. § 1132(a)(l)(B), Plaintiffs and the Class are entitled to recovery for underpaid benefits and declaratory relief relating to Cigna's violation of the terms of its health care plans.

*COUNT V: Violation of Fiduciary Duties of Loyalty and Due Care and Request for Declaratory and Injunctive Relief*

*(As to Cigna)*

468.     The above allegations are hereby repeated as if fully set forth herein.

469.     Cigna acted as a "fiduciary" to Plaintiffs and the Class as such term is understood under 29 U.S.C. § 1002(21)(A).

470.     As an ERISA fiduciary, Cigna owed, and owes, its Members in ERISA plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent administrator would use in the conduct of a like enterprise.

471.     Further, ERISA fiduciaries must act in accordance with the documents and instruments governing the group plan. 29 U.S.C. § 1104(a)(l)(B) and (D).

472.     In failing to act prudently, and in failing to act in accordance with the documents and instruments governing the plan, Cigna violated its fiduciary duty of care.

473.     As an ERISA fiduciary, Cigna owed and owes its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit it at the expense of its Members under 29 U.S.C. § 1106. Cigna cannot, for example, make benefit determinations for the purpose of saving money at the expense of its Members.

474.     Cigna violated its fiduciary duties of loyalty and due care by, inter alia, making out-of-network benefit reductions and adverse benefit determinations that were not authorized by the plan documents and were also misrepresented on EOBs sent to the Plaintiffs and the Class, causing Plaintiffs and the Class to incur, and pay out of pocket for treatment services that should have been paid by Cigna.

475. In certain self-insured plans, which are sometimes designated ASO, Cigna makes the final decision on benefit appeals and/or has been given authority, responsibility and discretion with regard to benefits.

476. Where Cigna acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Cigna is liable for underpaid benefits to Plaintiffs and the Class in both fully insured health plans, where benefits are paid from Cigna's assets, and in employer-funded ERISA health plans.

477. Cigna breached its fiduciary duties by sending noncompliant EOBs and other communications to Plaintiffs and the Class.

478. In addition, Cigna violated (and continues to violate) its fiduciary duty of loyalty by failing to inform Plaintiffs and the Class of material information, including but not limited to flaws in the data and methodology used to determine UCR reimbursement, namely, the UCR reimbursement does not actually reflect a true and accurate UCR.

479. In fact, by using the U.S. mails and interstate wire facilities, Cigna made representations about UCR and payments for IOP services that it knew were untrue. Cigna knew that both it and MultiPlan made arbitrary and capricious decisions as to "UCR" that did not reflect a true and accurate UCR with Cigna providing financial incentives to MultiPlan that allowed Cigna to pay less than the UCR in violation of the plan terms.

480. In relying on improper pricing methods, which were noncompliant with its contractual obligations and invalid to make UCR determinations, and in applying, *inter alia*, a third-party repricing agent, MultiPlan's Viant, that was not authorized and nowhere disclosed to Plaintiffs and the Class in their plan documents, Cigna violated its fiduciary obligations to Plaintiffs and the Class.

481. Plaintiffs and the Class are entitled to assert a claim for relief for Cigna's violation of its fiduciary duties under 29 U.S.C. § 1132(a)(3), including injunctive and declaratory relief, and Cigna's removal as a breaching fiduciary.

*COUNT VI: Violation of Fiduciary Duties of Loyalty and Due Care and Request for*
*Declaratory and Injunctive Relief*
*(As to MultiPlan)*

482.     The above allegations are hereby repeated as if fully set forth herein.

483.     29 U.S.C. § 1132(a)(3) states that a civil action may be brought by a "participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or the terms of the plan."

484.     MultiPlan exercised control over plan assets and exercised discretion over distribution of plan funds.

485.     MultiPlan, as a functional claims administrator, is a fiduciary and owes fiduciary duties to Plan participants and beneficiaries, including Plaintiffs. Under 29 U.S.C. § 1104(a), MultiPlan is required to discharge its duties with care, skill, prudence, and diligence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use under 29 U.S.C. § 1104(a). Under ERISA, MultiPlan is required to act in the best interests of Plan participants.

486.     Under 29 U.S.C. § 1104(a), MultiPlan, as a functional claims administrator and Plan fiduciary, owed Plaintiffs a fiduciary duty to discharge its duties for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.

487.     Under 29 U.S.C. § 1104(a), MultiPlan, as a functional claims administrator and Plan fiduciary, owed Plaintiffs a fiduciary duty to discharge its duties in accordance with the documents and instruments governing the Plan.

488.     Plaintiffs are entitled to injunctive and/or mandamus relief under 29 U.S.C. § 1132(a)(2)-(3). They are entitled to enjoin any act or practice by MultiPlan that violates ERISA or the Plan, and/or they are entitled to seek other appropriate equitable relief that is traditionally available in equity.

489.    MultiPlan breached its fiduciary duties to Plaintiffs by, among other things, refusing to properly determine appropriate reimbursement for Plaintiffs claims for medically necessary IOP treatment.

490.    MultiPlan breached its fiduciary duties by employing a cursory, incomplete and/or biased reimbursement methodology through the use of the Viant methodology.

491.    MultiPlan breached its fiduciary duties to Plaintiffs by failing to utilize an adequate and appropriate database in determinations as to the UCR reimbursement amount in that the database did not contain similar, representative charges of similar providers of similar services in the same geographic area as Plaintiffs' providers.

492.    Plaintiffs relied on MuliPlan to their detriment. Plaintiffs were actually harmed by MultiPlan's failure to discharge its duties with the care, skill, prudence, and diligence of a prudent person acting in a like capacity and familiar with such matters.

493.    As a consequence of MultiPlan's breach of its fiduciary duties, Plaintiffs have incurred legal fees and other costs associated with the investigation of this claim and the prosecution of this action.

494.    Plaintiffs are entitled to surcharge relief as a result of MultiPlan's breach of fiduciary duties.

495.    Pursuant to 29 U.S.C. § 1132(g), Plaintiffs are entitled to recover their attorneys' fees and costs incurred herein from MultiPlan.

## JURY TRIAL DEMAND

Plaintiffs, on their own behalf and on behalf of the Class, demand a jury trial for all claims so triable.

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment against the Defendants as follows:

1.    Ordering Defendants to reimburse Plaintiffs claims in accordance with the plan benefits.

2.    Certifying the Class and their claims, as set forth in this Complaint, for class treatment;

3.   Appointing the Plaintiffs as Class Representatives for the Class;

4.   Designating the law firm of Napoli Shkolnik, PLLC, as counsel for the Class;

5.   For general, special, restitutionary and compensatory damages in an amount according to proof.

6.   For treble damages for those claims arising under the Federal RICO Act;

7.   For prejudgment interest on amounts benefits wrongfully withheld.

8.   Injunctive and equitable relief enjoining Defendants from the conduct alleged herein and/or other appropriate equitable relief;

9.   Declaring that Cigna's payments were improper underpayments,

10.  Declaring that Cigna's payment methodologies were and are improper;

11.  Declaring that MultiPlan's benefit determination and negotiation methodologies are improper;

12.  Declaring that Cigna and MultiPlan have engaged in an illegal, prohibited, RICO enterprise;

13.  Ordering Cigna to reprocess all underpaid claims using an appropriate methodology;

14.  Ordering Cigna and MultiPlan to provide transparency as to the methodology applied in reprocessing claims and that the methodology be approved by the Court;

15.  Ordering Cigna to pay benefits in accordance with the plan terms;

16.  For attorney's fees and costs pursuant to statute;

17.  and such other and further relief as the Court may deem appropriate, including but not limited to awarding a surcharge, disgorging Defendants unjust enrichments from their wrongful conduct.

**[SIGNATURE PAGE FOLLOWS]**

1

Dated April 30, 2021                           NAPOLI SHKOLNIK PLLC

2

                                               */s/ Matthew M. Lavin*
3
                                               Matthew M. Lavin
4                                              Aaron R. Modiano

5

6                                              DL LAW GROUP

7                                              */s/ David M. Lilienstein*
                                               David M. Lilienstein
8                                              Katie J. Spielman

9                                              *Attorneys for Plaintiff*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*R.J. v. Cigna, et al.* – FIRST AMENDED CLASS ACTION COMPLAINT