Matthew M. Lavin, Esq. (*pro hac vice*)
Aaron R. Modiano, Esq. (*pro hac vice*)
**NAPOLI SHKOLNIK PLLC**
5757 W. Century Boulevard, Suite 680
Los Angeles, CA 90045
(212) 397-1000 / Fax (646) 843-7603

David M. Lilienstein, Esq. (CA SBN 218923)
Katie J. Spielman, Esq. (CA SBN 252209)
**DL LAW GROUP**
345 Franklin Street
San Francisco, CA 94102
(415) 678-5050 / Fax (415) 358-8484

*Attorneys for Plaintiffs and Putative Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RJ, as the representative of her beneficiary son, SJ, LW as the representative of her beneficiary spouse, MW; and, DS an individual, on behalf of and all other similarly situated,<br><br>*Plaintiff,*<br><br>vs.<br><br>CIGNA BEHAVIORAL HEALTH, INC., and MULTIPLAN, INC.,<br><br>*Defendants.* | Case No.: 4:20-CV-02255-EJD<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO MULTIPLAN INC.'S MOTION TO DISMISS**<br><br>Complaint Filed: April 2, 2020<br>FAC Filed:      April 30, 2021<br>Trial Date:      None Set<br><br>Hearing Date:   August 12, 2021<br>Hearing Time:   9:00 a.m.<br>Courtroom:      4-5th Floor |

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ...................................................................................................... i

**TABLE OF AUTHORITIES** ................................................................................................ ii

**STATEMENT OF ISSUES TO BE DECIDED** .................................................................. 1

**PLAINTIFF'S POINTS AND AUTHORITIES** ................................................................... 1

    A.    Introduction. ................................................................................................... 1

    B.    Plaintiffs' RICO §§ 1962(c)&(d) Claims Should Not Be Dismissed. ................................... 2

        1.    Plaintiffs' RICO Claims of Mail and Wire Fraud Satisfy the Pleading Requirements of Rule 9(b) ................................... 2

    C.    Plaintiffs' Have Met The Pleading and 'Plausability' Requirements Under Rule 8(a) ......... 4

    D.    Plaintiffs Plausibly Allege the Existence of an Enterprise ..................................................... 8

        2.    Plaintiffs Have Alleged RICO Standing and Proximate Causation ................................. 11

    E.    Plaintiffs Have Appropriately Pled Their Claims For Equitable Relief ............................... 15

**Conclusion** ............................................................................................................................ 20

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Bridge v. Phoenix Bond & Indem. Co.*,
   553 U.S. 639 (2008) .......................................................................................... 5, 6, 7

4

*Eclectic Properties E., LLC v. Marcus & Millichap Co.*,

5

   751 F.3d 990 (9th Cir. 2014) ................................................................................ 11

6

*Friedman v. 24 Hour Fitness USA, Inc.*,
   580 F. Supp. 2d 985 (C.D. Cal. 2008) ................................................................. 11

7

*Gonzales v. Lloyds TSB Bank, PLC*,

8

   532 F. Supp. 2d 1200 (C.D. Cal. 2006) ................................................................. 9

9

*Hammerschmidt v. United States*,
   265 U.S. 182 (1924) ............................................................................................... 4

10

*Hinton v. Trans Union, LLC*,

11

   654 F. Supp. 2d 440 (E.D. Va. 2009), *aff'd*, 382 F. App'x 256 (4th Cir. 2010) .............. 1

12

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) ............................................................................................... 5

13

*Horman v. United States*,

14

   116 F. 350 (6th Cir. 1902) ..................................................................................... 4

15

*In re Managed Care Litigation*,
   298 F. Supp. 2d 1259 (S.D. Fla. 2003) ................................................................. 3

16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,

17

   2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ...................................................... 10

18

*Kelly v. United States*,
   140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020) .......................................................... 3

19

*Kowalski v. Anova Food, LLC*,

20

   958 F. Supp. 2d 1147 (D. Haw. 2013) .................................................................. 2

21

*Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*,
   425 F. Supp. 2d 352 (W.D.N.Y. 2006) ................................................................. 1

22

*McNally v. United States*,

23

   483 U.S. 350 (1987) ............................................................................................... 3

24

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) ..................................................................................... 4

25

*Nye & Nissen*,

26

   336 U.S. 613 (1949) ............................................................................................. 10

27

*Paroline v. United States*,
   572 U.S. 434 (2014) ............................................................................................... 5

28

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ........................................................................................... 3, 4

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)......................................................................................................... 3

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)....................................................................................................... 10

*Rosemond v. United States*,
   572 U.S. 65 (2014)......................................................................................................... 10

*Strobel v. Morgan Stanley Dean Witter*,
   2007 WL 1053454 (S.D. Cal. Apr. 10, 2007)................................................................. 2

*United States v. Feldman*,
   853 F.2d 648 (9th Cir. 1988) ....................................................................................... 11

*United States v. Peoni*,
   100 F.2d 401 (2d Cir. 1938)......................................................................................... 10

*United States v. Simon*,
   2016 WL 3597579 (N.D. Ind. July 5, 2016) .................................................................. 3

*Wallace v. Midwest Fin. & Mortg. Servs., Inc.*,
   714 F.3d 414 (6th Cir. 2013) ......................................................................................... 6

*Woodard v. Labrada*,
   2016 WL 3436434 (C.D. Cal. May 12, 2016) ............................................................... 9

**Statutes**

18 U.S.C. § 1962(c) ......................................................................................................... 1, 6

18 U.S.C. § 1964(c) ......................................................................................................... 5, 6

**Rules**

Fed. R. Civ. P. 10(c) ............................................................................................................ 1

Fed. R. Civ. P. 60 ................................................................................................................ 1

Fed. R. Civ. P. 9(b) ............................................................................................................. 5

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided by the Court are whether Plaintiffs:

1. have plausibly alleged causes of action under RICO 18 U.S.C. § 1962(c) and (d) against MultiPlan;

2. whether Plaintiffs have stated a claim against MultiPlan under ERISA, 29 U.S.C. § 1132(a)(3);

3. whether Plaintiffs have pled their claims with the particularity required under Fed. R. Civ. P. 9(b) when required to do so; and,

4. whether Plaintiffs claims not subject to Fed. R. Civ. P. 9(b) are properly pled under Fed. R. Civ. P. 8(a).

## PLAINTIFF'S POINTS AND AUTHORITIES

### A.  Introduction.

Plaintiffs' First Amended Complaint ("FAC") concerns a fraud created by Cigna and Multiplan to underpay certain types of healthcare claims. Cigna and MultiPlan fraudulently portray the underpayments as representative of prevailing market rates (FAC ¶¶15-20). They are not. The underpayments equate to a fraction of the prevailing usual, customary, and reasonable market rates for the healthcare services received by Plaintiffs. This scheme has enriched Cigna and Multiplan at the expense of patients who are left on the hook to make up the difference between their healthcare providers' charges and these low payments. (FAC ¶59). This scheme has been ongoing since at least 2015 (FAC ¶30).

MultiPlan's assertion that "despite more than 70 pages and nearly 500 paragraphs of allegations, the FAC is completely bereft of any of the details this Court found missing from Plaintiffs' initial Class Action Complaint" (Def. Mot. p 1) is little more than puffery as in *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566 (N.D. Cal. Dec. 18, 2020) & 2021 WL 930624 (N.D. Cal. Mar. 11, 2021), Judge Gonzalez-Rogers found a similar complaint with similar allegations against United Behavioral Health and MultiPlan brought by similar Plaintiffs properly alleged claims against both United and MultiPlan under RICO 18 U.S.C. § 1962(c) and (d) and ERISA, 29 U.S.C. § 1132(a)(3) properly alleged.

**B.  Plaintiffs' RICO §§ 1962(c)&(d) Claims Should Not Be Dismissed.**

*1.    Plaintiffs' RICO Claims of Mail and Wire Fraud Satisfy the Pleading Requirements of Rule 9(b)*

Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail. Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). This standard is met. Much of Defendant's attack on the fraud claims is predicated on fundamentally misunderstanding the fraud alleged in Plaintiffs' Complaint. The Complaint goes into great detail identifying the dates, content, and other information of the misrepresentations made to Plaintiffs by Defendants in addition to the activity that directed and implemented the illegal Viant methodology, including the names of employees of Defendants that Plaintiffs have been able to discover thus far. Defendants know exactly the factual basis for the fraud causes of action asserted against them and those causes of action are factually and legally supported by the allegations in the Complaint.

Many of the same arguments made by Multiplan are those raised by Cigna (ECF 76) and Plaintiffs reassert their responses to them as if they were set forth herein. Multiplan's argument that Plaintiffs FAC is "devoid of specific factual details" (Def. Mot. p 6) demonstrate a failure to have actually processed the FAC. Plaintiffs' allegations are more than sufficient to enable Multiplan to prepare their answer and defense. *Neubronner* 6 F.3d at 672. Multiplan's actions are specifically addressed in the following:

Plaintiffs name specific individuals from Multiplan that participated in the fraud:

Susan Mohler, Multiplan's Vice President of Marketing, and Dale White, the Executive Vice President of Sales, Bruce Singleton, Senior Vice President of Network Strategy Network and Michael McEttrick, the Vice President Healthcare Economics. (FAC ¶ 242)

Sandy Slovack, Monica Armstrong, Kevin Williams, Angela Robarge, Susan Mohler and Dale White (FAC ¶ 255)

Plaintiffs have asserted what these actors did:

At these events, Cigna and MultiPlan and Multiplan's other customers would come together, at various locations around the country, to discuss, among other topics, the Viant repricing scheme and how to make more money off it. These secret meetings established a forum for Cigna and others to engage in Enterprises with MultiPlan to suppress the rates paid to healthcare providers. During these events, MultiPlan presented slide shows outlining the profits or "savings" that could made using Viant methodology. (FAC ¶¶ 243-5).

The CAB emphasized the "liability shield" provided by Viant methodology and the ability of the insurer to direct underpayments from behind the fig leaf. The CAB emphasized that Multiplan's healthcare repricing tools were unregulated.(FAC ¶ 248-9)

The Whitepapers explain that Cigna would set performance standards which were defined by Target Prices. Multiplan would use Viant to derive a price under the Target Price. Cigna would pay Multiplan a percentage of the "savings" generated by use of the Viant methodology. The Whitepapers also explain that Cigna could represent "savings" to its customers that were not the actual amounts it paid the healthcare services at. (FAC ¶ 263)

Plaintiffs' have also alleged specific content:

Multiplan emphasized to Cigna at these meetings that if they were ever subject to pushback or scrutiny about their UCR rates, they needed only to point to the unregulated Viant methodology and assert that they relied on Viant's use of mysterious "objective" and "data-backed" pricing methodology, the details of which, of course, were never revealed. Strategies were discussed for how to handle situations where dissatisfied providers, such as the Plaintiffs in this case,  pushed back or challenged the amount, the Viant methodology and rate was deceitfully presented as a "fair" and "transparent" justification for the underpayment. (FAC ¶¶ 252-3)

During the Road Shows and in subsequent interactions, The CAB produced detailed descriptions of Viant's methodology through internal non-public "Whitepapers" and sought input from Cigna on how it would like its claims routed through the myriad Multiplan payment engines, including Viant OPR, to achieve the most profits for Cigna. (FAC ¶¶ 256-7)

All of these allegations are *in addition to* the fact that the patients received PAD letters from Cigna and Multiplan stating that their providers' billed charges exceeded the UCR and that the patients could owe their providers the difference. Cigna used Multiplan's Viant methodology in a scheme to underpay Plaintiffs' claims for Defendants' benefit. (FAC ¶211). As to the PAD letters, Plaintiffs have specifically alleged:

Each Plaintiff received two or more of these letters. This letter has been sent to thousands of to IOP patients insured by Cigna. The letterhead represents both Cigna and MultiPlan's wholly owned and controlled subsidiary Viant. As they jointly appear on the letterhead, this is a strong admission that both Defendants jointly managed the affairs and were co-schemers of the Enterprise. These deceptive and fraudulent letters are among the racketeering predicate acts

committed by the Enterprise. The letter represents that the providers will be paid the 'maximum reimbursable amount allowed under your plan' if the provider does not agree to Viant's rate. The plans require payment be made based on competitive fees in the same geographic area for both MRC-I and MRC-II plans for IOP treatment. As set out in above, the maximum reimbursable rate was never paid to Plaintiffs or their providers. This letter is an admission of fraud by Cigna and MultiPlan. (FAC ¶¶363-371)

Further, Plaintiffs have identified the predicate acts of racketeering activity: as to *RJ & SJ* FAC ¶¶270-302, as to *MW and LW* FAC ¶¶303-333, as to *DS* FAC ¶¶ 334-339, as to *RH* FAC ¶¶ 340-358, the fraudulent and deceptive Patient Advocacy Department ("PAD") letters that crossed state lines (FAC ¶¶359-378) and has alleged for each of the three Plaintiffs/patients that VOB calls took place took place between the provider, Summit Estate, and Cigna prior to be admitted to treatment and that claims would be paid based on a percentile of UCR (FAC ¶¶278, 310, 340). In *LD,* Judge Gonzalez-Rogers held that the VOB communications prior to receiving treatment satisfied the reliance requirement and were pled with the required specificity under Rule 9(b) holding:

> Although plaintiffs have not averred any other details of these VOB calls, such as the names of the persons who participated in such calls or the dates of the calls, the Court finds that **plaintiffs have alleged sufficient factual matter as to the circumstances constituting fraud so that United "can prepare an adequate answer from the allegations."** *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (citation and internal quotation marks omitted). Accordingly, plaintiffs have satisfied the element of pattern of racketeering with respect to United.
>
> *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at *14 (N.D. Cal. Dec. 18, 2020)

These allegations are more than sufficient to permit Multiplan to prepare an adequate answer and defense and, as such, the requirements of Rule 9(b) are met.

**C.  Plaintiffs' Have Met The Pleading and 'Plausability' Requirements Under Rule 8(a)**

Plaintiffs' claims are more than plausible as required by *Twombly/Iqbal.* Plaintiffs have alleged that the rates paid when Multiplan's Viant methodology becomes involved are far below the competitive marketplace price for IOP services in Silicon Valley. It will be plaintiffs' obligation to prove that allegation is true, but on a motion to dismiss Plaintiffs need only meet the plausibility standard set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Plaintiffs have more than plausibly alleged that the Multiplan's Viant methodology does not produce UCR in the relevant zip code and, Plaintiffs will prove that that a UCR based on available data is similar to FAIR Health in at least four ways. The first is economic pricing and payment data for the area, which is readily and publicly available from FAIR Health, among other sources. Second, through evidence that Cigna has paid claims at the 80th percentile of FAIR Health in the past and present under plans with the exact same language as that found in Plaintiffs' plans.

Indeed, as alleged in the FAC, the named Plaintiffs completed out of network treatment at higher levels of care provided by the same providers before stepping down to the IOP level of care. Those higher levels of care – residential treatment and partial hospitalization – were reimbursed by Cigna based on UCR. *Id*. Third, Cigna's own website states that it pays out of network claims based on UCR using Fair Health or comparable, usually at the 80th or 70th percentile[1]. Fourth, Cigna has Administrative Services Agreements with the plan sponsors, in which the plan sponsor elects a certain percentile, which in almost all cases is either the 70th or 80th percentile of UCR, for the reimbursement of OON claims.

Multiplan argues that Plaintiffs' claims fail to meet the *Iqbal*/*Twombly* plausibility standards because alleging the Viant methodology is "designed and implemented to hold down excessive health care costs for the benefit of plan sponsors, plan participants, and society as a whole…nothing in Plaintiffs' recitation of purported meetings between Multiplan and Cigna, or the purported exchange of information in whitepapers and other communications, presents a plausible case of wrongdoing." (Def Mot. p 8-9) is essentially a restatement of the fraud that Plaintiffs' seek to redress, not an argument against plausibility.

Multiplan provides no "obvious alternative explanation" as to why claims were paid at rates that are a fraction of UCR / FAIR Health, claims paid by Cigna that were not processed using the Viant methodology, and well below SCA's that were agreed to by these very same Plaintiffs. Multiplan provides no explanation as to why Plaintiffs received PAD letters with Viant on the letterhead that directed Plaintiffs to call Viant at a provided toll-free number. Multiplan provides no

---

[1] *See* https://www.uhc.com/legal/information-on-payment-of-out-of-network-benefits ("Affiliates of UnitedHealth Group frequently use the 80th percentile of the FAIR Health Benchmark Databases to calculate how much money to pay for out-of-network services of health care professionals . . . .")

RJ, *et al*. v. CIGNA, *et al*. - PLAINTIFFS' OPPOSITION TO MULTIPLAN'S MOTION TO DISMISS FAC
4:20-CV-02255-EJD

such alternative explanation because there is none. Plaintiffs have more than plausibly alleged that the Viant methodology does not produce a UCR in the relevant zip code and, through discovery, Plaintiffs will prove that that a UCR based on available does in fact mean the resemble the 80th percentile of UCR / FAIR Health in at least two ways: 1) with economic data and price data for the area, and 2) by showing that past payments from payers such as Cigna and others cannot reasonably be extrapolated to the rates produced by the Viant methodology.

Further, Judge Gonzalez-Rogers addressed the arguments raised by MultiPlan on similar pleadings in *LD* addressing similar arguments holding as to the 'plausability' of Plaintiffs' allegations:

> Here, plaintiffs allege that "Plaintiffs and the Class have been harmed, and are likely to be harmed in the future, by Defendants' actions and are entitled to appropriate equitable relief." FAC ¶ 525; see also FAC ¶ 20 ("Without Court intervention, [defendants'] scheme will continue and continue to cause damage."). These allegations, which are not subject to the pleading standards of *Iqbal* and *Twombly*, are sufficient for the Court to infer at this juncture that plaintiffs have standing to seek injunctive relief given that the nature of the harm is ongoing. *See Maya v. Centex Corp.*, 658 F.3d 1060, 1067-68 (9th Cir. 2011) (holding that *Twombly* and *Iqbal* do not apply when determining whether a plaintiff has Article III standing, as "*Twombly* and *Iqbal* are ill-suited to application in the constitutional standing context because in determining whether plaintiff states a claim under 12(b)(6), the court necessarily assesses the merits of plaintiff's case. But the threshold question of whether plaintiff has standing (and the court has jurisdiction) is distinct from the merits of his claim[.]").

> *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at *7 (N.D. Cal. Dec. 18, 2020)

> Plaintiffs have plausibly alleged that someone in the chain of causation relied on United's alleged misrepresentations. Plaintiffs allege that, "when Plaintiffs' providers contacted United to verify out-of-network rates during the pre-admission VOB calls, United routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by MultiPlan through Viant." FAC ¶¶ 430-31. Plaintiffs further allege that, based on these alleged representations by United to their providers, they expected that their claims for IOP services would be reimbursed based on the UCR rate pursuant to their plans. *Id.* These allegations are sufficient to satisfy RICO's proximate cause requirement. *See Painters*, 943 F.3d at 1260 (holding that "it is sufficient to satisfy RICO's proximate cause requirement that Painters Fund alleged that prescribing physicians (also third parties, but not intervening causes) relied on Defendants' misrepresentations and omissions").

> Accordingly, the Court concludes that plaintiffs have RICO standing.

*LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at *11 (N.D. Cal. Dec. 18, 2020)

Defendants' argument that this was merely a routine contractual relationship with a goal of cost-containment is premature. The Court does not rule on the merits but on the plausibility of the allegations. Here, the FAC raises a plausible inference that the contractual relationship between defendants was used as a cover for their scheme to profit from the fraud at plaintiffs' expense. *See, e.g.*, FAC ¶ 21 (alleging that the Viant database and pricing tool was intended to "provide the appearance of legitimacy and offer cover for the fraudulent underpayment of IOP claims"). This distinguishes the allegations here from the allegations in the cases upon which defendants rely.[9] That a legitimate contractual relationship between the defendants exists does not undermine plaintiffs' plausible allegations that defendants also engaged in an enterprise to defraud them and used the contractual relationship as a cover. *See Painters*, 943 F.3d at 1248 ("Although the RICO statute was originally enacted to combat organized crime, 'it has become a tool for everyday fraud cases brought against respected and legitimate enterprises.' ") (citation omitted).

Accordingly, the Court concludes that plaintiffs have plausibly alleged that defendants were engaged in an enterprise.

*LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at *12–13 (N.D. Cal. Dec. 18, 2020)

MultiPlan argues that plaintiffs' allegations that it participated in the alleged scheme are conclusory and insufficient to state a claim under Section 1962(c). The Court disagrees. MultiPlan fails to take into account the new allegations that plaintiffs added to the SAC *in combination* with the other allegations that are not new and that the Court analyzed in its order of December 18, 2020. When construing *all* of plaintiffs' allegations in the light most favorable to plaintiffs, as the Court must at this juncture, the averments contain sufficient factual matter to satisfy *Iqbqal's* pleading requirements as to the claim at issue.

*LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2021 WL 930624, at *7 (N.D. Cal. Mar. 11, 2021)

MultiPlan next contends that it cannot be liable under Section 1962(c) based on the "co-schemer" theory of liability because its involvement in the alleged scheme to defraud plaintiffs began only after United allegedly had already made fraudulent misrepresentations to plaintiffs' provider during VOB calls. This argument is unconvincing, as it ignores that plaintiffs plausibly allege that the scope of the alleged scheme encompassed the VOB calls in question, and that Multiplan participated in and directed the scheme as a whole, not just certain portions of it. That Viant (MultiPlan's subsidiary) allegedly began to handle claims for IOP services only after United had already made alleged misrepresentations during VOB calls does not alter the fact that plaintiffs plausibly allege that MultiPlan knowingly participated and directed the scheme which, again, encompassed the VOB calls in question as well as other conduct in

1
2

furtherance of the scheme that took place before and after Viant began to handle IOP claims.

3
4

*LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2021 WL 930624, at *7 (N.D. Cal. Mar. 11, 2021)

5
6

As set out above, Plaintiffs' allegations more than meet the 'plausibility' requirements for purposes of pleading. Just as Judge

7
8
9
10

**The FAC raises the inference that Cigna and MultiPlan each had some part in directing the alleged enterprise's affairs.** Plaintiffs aver that Cigna and MultiPlan collaborated to develop and use on an ongoing basis the Viant database and pricing tool to under-reimburse the IOP claims at issue, and that they did so for the purpose of advancing the enterprise's goal of defrauding plaintiffs and profiting from the under-reimbursement of the IOP claims.
(Dkt. 73, Pg. 20-21, Ln 22-1) (emphasis added)

11
12

As such, Plaintiffs did not have any need to amend the allegations as to MultiPlan's direction of the enterprise's affairs.

13

**D. Plaintiffs Plausibly Allege the Existence of an Enterprise**

14
15
16
17
18
19
20
21
22
23
24
25
26

RICO is generally regarded as a broad statute and, indeed, RICO's text "provides that its terms are to be "liberally construed to effectuate its remedial purposes."" *Boyle v. United States*, 556 U.S. 938, 944 (2009), *quoting* Pub. L. No. § 904(a), 84 Stat. 922, 947 (1970). RICO's breadth of language and construction is particularly evident in the enterprise concept. *Boyle*, 556 U.S. at 949. Included within the definition of enterprise is "**any** union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). The Supreme Court has emphasized that the "term 'any' ensures that the definition has a wide reach and the very concept of an association in fact is expansive") *Boyle*, 556 U.S. at 944 (internal citation omitted). Thus, an association-in-fact enterprise may be *any* group of persons associated together for a common purpose of engaging in a course of conduct. *Boyle*, 556 U.S. at 946. Multiplan raises many of the same arguments as those asserted by United (Dkt. 66) and Plaintiffs reincorporate the arguments asserted there as if fully set forth herein without repeating them here. Plaintiffs have amply set forth allegations showing far more than a mere commercial contract and a clear pattern of racketeering activity.

27
28

Despite Multiplan's assertion that "all of Multiplan's actions are attributable to its performance under the Network Access Agreement with Cigna" (Def Mot. p 11), the presence or

1   absence of a commercial contract between Cigna and Multiplan is irrelevant. An association does not

2   stop becoming an association because the relationships between its members are documented in a

3   contract, nor does anything in the definition of enterprise insulate from liability those whose common

4   purpose includes some legal activity. RICO's definition of enterprise "include[s] both legitimate and

5   illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does

6   legitimate ones." *Turkette*, 452 U.S. at 580-81 (1981). *See also, Sedima, S.P.R.L. v. Imrex Co., Inc.*,

7   473 U.S. 479, 499 (1985) ("Yet Congress wanted to reach both 'legitimate' and 'illegitimate'

8   enterprises. The former enjoy neither an inherent capacity for criminal activity nor immunity from its

9   consequences.") (internal citation omitted).

10       The enterprise between Cigna and Multiplan is the vehicle for the illegal, racketeering activity

11   of mail and wire fraud. Plaintiffs have alleged a solid basis for their belief that the rates paid to them

12   are a fraction of what they should be (FAC ¶¶125-167); they set forth the mechanics of the scheme

13   (FAC ¶¶168-203); the claims submission process (FAC ¶¶204-207); the purpose of the

14   underpayments (FAC ¶¶125-154); how Multiplan and Cigna utilized the distorted Viant methodology

15   of distorted databases and inappropriate "target" pricing ((FAC ¶¶215-241), and how all of this was

16   developed, implemented, and managed by the Defendants (FAC ¶¶242-268).

17       The FAC alleges a common unlawful purpose amongst the members of the enterprise to avoid

18   paying the required usual and customary reimbursement rates for the services in question. This

19   common purpose is achieved by manipulating reimbursement rates through a false and fraudulent

20   database. The fraudulent reimbursement rates are developed jointly by Multiplan and Cigna. Indeed,

21   the rates are what the Cigna has directed Multiplan to "target." Defendants know that the rates they

22   are using are not based on objective, reliable data.

23       Had Plaintiffs here not been victimized by the RICO enterprise, they would not have had to

24   pay balance bills out of their own pockets (FAC ¶¶59, 281, 313, 343). Further, claims paid by Cigna

25   and priced by Viant/Multiplan were **$1,600 *less* than what Cigna paid to Summit Estate when**

26   **claims were not processed through Viant** and, instead, were priced by Zelis, a third-party repricer

27   not affiliated with MultiPlan (FAC ¶316). Thus, it is more than plausible that Defendants' RICO

28   enterprise caused Plaintiffs to suffer large balance bills and damages. The surprise rates priced by

Viant were *anything but* a competitive fee.

If the reimbursement rates were above-board, Defendants would not be paying several vastly different rates and claim them all to be MRC. Nor would a reliable pricing program produce wildly different reimbursements for the same services provided so close in time. Likewise, comparison of the reimbursement paid by Defendants against the FAIR Health Benchmark (FAC ¶¶155-167), confirms that Plaintiffs claims were grossly underpaid.

A common purpose of making money does not insulate members of an enterprise from liability where their methods are illegitimate. The common purpose of making money <u>by fraud</u> is sufficient to find a RICO enterprise. *See, for example, Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1212 (11th Cir. 2020) (collecting cases). *Weiner v. Ocwen Fin. Corp*., 2015 WL 4599427, at *10 (E.D. Cal. July 29, 2015). Because the complaint clearly alleges that the members of the enterprise stand to gain sufficient financial benefits from their scheme to avoid paying Plaintiffs what they are owed, Plaintiffs have properly alleged a "common purpose" for the purposes of RICO. *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 941 (N.D. Cal. 2013) ("Plaintiffs have also explicitly alleged that the enterprise members, including the vendors and brokers, "devised a scheme to defraud borrowers and obtain money from them by means of false pretenses."")

### *1. Plaintiffs Have Alleged Racketeering Activity and Predicate Acts with Particularity*

Rule 9(b) does not require a plaintiff to be omniscient or to provide every conceivable detail. Rather, "[a] pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993) (internal quotations and citations omitted). Plaintiffs have met that standard.

Plaintiffs have identified the predicate acts of racketeering activity: as to *RJ & SJ* FAC ¶¶270-302, as to *MW and LW* FAC ¶¶303-333, as to *DS* FAC ¶¶ 334-339, as to *RH* FAC ¶¶ 340-358, the fraudulent and deceptive Patient Advocacy Department ("PAD") letters that crossed state lines (FAC ¶¶359-378) and has alleged for each of the three Plaintiffs/patients that VOB calls took place took place between the provider, Summit Estate, and Cigna prior to be admitted to treatment and that claims would be paid based on a percentile of UCR (FAC ¶¶278, 310, 340). In *LD,* the court held that

the VOB communications prior to receiving treatment satisfied the reliance requirement. *LD* at \*3 *citing Bridge*, 553 U.S. at 658. The *LD* court continued:

> Although plaintiffs have not averred any other details of these VOB calls, such as the names of the persons who participated in such calls or the dates of the calls, the Court finds that **plaintiffs have alleged sufficient factual matter as to the circumstances constituting fraud so that United "can prepare an adequate answer from the allegations."** *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (citation and internal quotation marks omitted). Accordingly, plaintiffs have satisfied the element of pattern of racketeering with respect to United. *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at \*14 (N.D. Cal. Dec. 18, 2020)

Defendant's attempts to distinguish *LD* fail and Plaintiffs have sufficiently alleged multiple predicate acts of racketeering that constitute a pattern of racketeering activity.

### 2.    Plaintiffs Have Alleged RICO Standing and Proximate Causation

The mail and wire fraud statutes protect property rights. *See, generally, Kelly v. United States*, 140 S. Ct. 1565, 206 L. Ed. 2d 882 (2020); *McNally v. United States*, 483 U.S. 350, 356 (1987). Plaintiffs' right to be paid for the unnecessary out-of-pocket expenses they incurred is a property right. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property"). Just as this Court found that a consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, *see Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936 (N.D. Cal. 2013), unwarranted, out-of-pocket, expenses likewise constitute the wrongful deprivation of money. Plaintiffs do not assert that their plans absolve them from *all* out-of-pocket expenses; instead, Plaintiffs seek to recover those out-of-pocket expenses that were incurred as the direct and consequential result of Defendants' underpayment of their claims. Further, the incurring of debt as a direct consequence of racketeering activity also constitutes a direct, RICO injury. *See, for example, Rodriguez v. McKinney*, 878 F. Supp. 744, 748 (E.D. Pa. 1995) ("In assuming liability for tuition debts, plaintiffs experienced an immediate, cognizable injury." [collecting cases]).

Plaintiffs' property is the object of the Defendants' scheme to defraud. *Pasquantino*, 544 U.S. at 355. Cigna has joined together with Multiplan to reproduce the Ingenix scheme that led Cigna to pay $400 million in settlements in 2009. They have joined together to interpose false and fraudulent data as an excuse to avoid paying their obligations to Plaintiffs and others in full to their direct financial benefit. (FAC ¶¶ 111-137). As set forth below, this scheme meets all of RICO's requirements.

It has long been the law that "[i]f the scheme or artifice in its necessary consequence is one which is calculated to injure another, to deprive him of his property wrongfully, then it is to defraud within the meaning of the statute." *Horman v. United States,* 116 F. 350, 352-53 (6th Cir. 1902). Every claim at issue has been adjudicated medically necessary and allowed as payable by the Cigna. (FAC¶ 1-2, 6, 21, 29, 53-56). What is at issue is not the Plaintiffs' right to have their claims paid; but rather, Plaintiffs have incurred unnecessary out-of-pocket expenses and seek to recover those as the direct result of Cigna's underpayments.

Cigna's statement that, "Plaintiffs cannot plausibly plead reliance on VOB calls. This is an issue that the defendants in *LD* did not appear to raise, so the *LD* court did consider, but it is dispositive" (Def. Mot. p. 10) is contradicted by the *LD* court's holding. The court held:

> **That plaintiffs do not allege first-party reliance does not alter this conclusion.**
> "[T]he Supreme Court has explained that if there is a direct relationship between a defendant's wrongful conduct and a plaintiff's alleged injury, a RICO plaintiff who did not directly rely on the defendant's omission or misrepresentation can still satisfy the requirement of proximate causation of damages," because "a person may be injured 'by reason of' another person's fraud even if the injured party did not rely on any misrepresentation." *Painters*, 943 F.3d at 1259 (quoting *Bridge*, 553 U.S. at 648-49, 128 S.Ct. 2131). **"All that is required of [a plaintiff] at th[e pleading] stage is to allege that someone in the chain of causation relied on Defendants' alleged misrepresentations[.]"** *Id.* at 1260.
>
> *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at *11 (N.D. Cal. Dec. 18, 2020) (emphasis added).

Defendant's citation to the out-of-circuit, unpublished *Taylor Grp. v. ANR Storage Co.*, 24 F. App'x 319 (6th Cir. 2001) ignores the *LD* holding above and controlling precedent set out therein of the Ninth Circuit's decision in *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda*

1    *Pharms. Co. Ltd.*, 943 F.3d 1243 (9th Cir. 2019) and the Supreme Court's decision in *Bridge v.*

2    *Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). The *LD* court continued:

> **Plaintiffs have plausibly alleged that someone in the chain of causation relied on United's alleged misrepresentations.** Plaintiffs allege that, "when Plaintiffs' providers contacted United to verify out-of-network rates during the pre-admission VOB calls, United routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by MultiPlan through Viant." FAC ¶¶ 430-31. Plaintiffs further allege that, based on these alleged representations by United to their providers, they expected that their claims for IOP services would be reimbursed based on the UCR rate pursuant to their plans. *Id.* These allegations are sufficient to satisfy RICO's proximate cause requirement. *See Painters*, 943 F.3d at 1260 (holding that **"it is sufficient to satisfy RICO's proximate cause requirement that Painters Fund alleged that prescribing physicians (also third parties, but not intervening causes) relied on Defendants' misrepresentations and omissions").**
>
> **Accordingly, the Court concludes that plaintiffs have RICO standing.**

11   *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2020 WL 7432566, at *11–12

12   (N.D. Cal. Dec. 18, 2020) (emphasis added).

14        In their complaint, Plaintiffs have alleged the following, consistent with the allegations that

15   the *LD* court found sufficient:

> Cigna intentionally led Plaintiffs and the Class as well as their treating providers and plans to believe that rates were determined based on a UCR rate. As alleged above, when Plaintiffs' providers contacted Cigna to verify out-of-network rates during the pre-admission VOB calls, Cigna routinely represented that rates were available at a UCR rate and never stated that the claims would be subject to repricing by MultiPlan through Viant. (FAC ¶¶397-8)

20        The *LD* court's following, March 11, 2021 order reaffirmed the above and held:

> In its order of December 18, 2020, **the Court held that plaintiffs had sufficiently alleged the requisite third-party reliance on United's alleged misrepresentations to satisfy the requirement of proximate cause to state a claim under RICO.** Docket No. 73 at 18-19. Accordingly, the Court need not revisit this issue in determining the present motion to dismiss notwithstanding MultiPlan's argument that plaintiffs have not alleged facts to satisfy the proximate cause requirement for stating a RICO claim by showing reliance on alleged misrepresentations. **As will be discussed below, MultiPlan can be held liable for United's alleged misrepresentations upon which plaintiffs' provider relied.**

27   *LD v. United Behav. Health*, No. 4:20-CV-02254 YGR, 2021 WL 930624, at *5 fn7

28   (N.D. Cal. Mar. 11, 2021) (emphasis added).

1    As such, and for the same reasons set forth above, Plaintiffs have satisfied RICO's

2    proximate cause requirement.

3    Multiplan's argument that Plaintiffs have not suffered an injury and their citations to

4    *Gilbert v. Bank of America*, 2014 WL 12644028, *4 (N.D. Cal. Sept. 23, 2014) and *Diaz v.*

5    *Gates*, 420 F.3d 897, 900 (9th Cir. 2005) and that "it is not enough for Plaintiffs to simply assert

6    that they overpaid for services; instead, they are required to plead a causal link between an

7    alleged injury to business or property and Multiplan's alleged predicate acts of racketeering —

8    *i.e.*, the PAD letters — which they have totally failed to do" (Dkt. 65 Pg. 13-14) fundamentally

9    misrepresents the FAC and the proximate cause required by RICO.

10    Defendants' challenge to proximate causation rest on the assumption that reliance is

11    required in all mail and wire fraud cases. That assumption is incorrect and specifically refuted

12    by the Supreme Court. *Bridge* held that reliance is (1) not an element of mail fraud itself, 553

13    U.S. at 648-50, (2) not an element of 18 U.S.C. § 1962(c), *id.*, (3) and is not required by 18

14    U.S.C. § 1964(c). *Id. at 654-58*. Simply put, if a plaintiff's injuries are directly caused by the

15    violator, its conduct cannot be barred from recovery by a reliance requirement that is not to be

16    found in the mail or wire fraud statutes or in RICO itself.

17    *Bridge* unequivocally holds that <u>directness</u> does not contain within it a requirement of

18    <u>reliance</u>: "the mere fact that the predicate acts underlying a particular RICO violation happen to

19    be fraud offenses does not mean that reliance, an element of common-law fraud, is also

20    incorporated as an element of a civil RICO claim." 553 U.S. at 653, quoting *Anza*, 547 U.S. at

21    476 (Thomas, J. concurring in part and dissenting in part). Removing any doubt, *Bridge* specifies

22    that "One can conduct the affairs of a qualifying enterprise through a pattern of . . . [racketeering

23    activity indictable as mail fraud] without anyone relying on a fraudulent misrepresentation."

24    *Bridge*, 553 U.S. at 649. In other words, while reliance *may* serve as a proxy for legal and factual

25    causation, *it is not* a condition of their existence.  553 U.S. at 649 ("one can conduct the affairs

26    of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent

27    misrepresentation."). "For RICO purposes, reliance and proximate cause remain distinct—if

28    frequently overlapping—concepts. While reliance is 'often used to prove . . . the element of

1   causation,' that does not mean it is the only way to do so." *Wallace v. Midwest Fin. & Mortg.*

2   *Servs., Inc.*, 714 F.3d 414, 420 (6th Cir. 2013) (internal quotations omitted). Or, as *Bridge* put

3   it, "the fact that proof of reliance is often used to prove an element of the plaintiff's cause of

4   action, such as the element of causation, does not transform reliance itself into an element of the

5   cause of action." 553 U.S. at 659 (citation omitted). The unavoidable conclusion is that reliance

6   does not matter if facts plausibly showing direct injury are alleged. *See also*, *Wallace*, 714 F.3d

7   at 420 ("A plaintiff need only show use of the mail in furtherance of a scheme to defraud and an

8   injury proximately caused by that scheme."). Plaintiffs have done so here.

9       As in *Bridge*, Plaintiffs' injuries are "a foreseeable and natural consequence" of

10  Defendants' scheme. 553 U.S. at 658. And, as in *Bridge*, there are no independent factors that

11  could account for plaintiffs' injury and no risk of duplicative recoveries by plaintiffs removed at

12  different levels of injury from the violation. Because none of the harm for which Plaintiffs seek

13  to recover was first visited upon a third person, their claims do not require the court to go beyond

14  the first step in regard to damages. Similarly, there are no more immediate victims who are better

15  situated or motivated to sue than Plaintiffs. Because no one other than Plaintiffs is entitled to

16  claim reimbursement for that underpaid care, no one else has a better incentive to vindicate the

17  law as a private attorney general. *Bridge*, 553 U.S. at 658.

18      This Court in a prior RICO action stated, "[a] consumer who has been overcharged can

19  claim injury to property under RICO based on a wrongful deprivation of money, which is a form

20  of property." *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 936 (N.D. Cal. 2013). The same

21  rationale applies to Plaintiffs who were wrongfully deprived of money when they incurred out-

22  of-pocket expenses that were the direct and consequential results of United's illegal

23  underpayment.

24      **E.  Plaintiffs Have Appropriately Pled Their Claims For Equitable Relief.**

25      Multiplan also seeks dismissal of Plaintiffs' ERISA §502(a)(3) cause of action, for its

26  violations of fiduciary duties of loyalty and due care, and request for declaratory and injunctive relief.

27  (Multiplan mistakenly refers to this as the seventh cause of action, when in fact it is the sixth cause

28  of action in Plaintiff's First Amended Complaint, Doc. No. 63.).

Multiplan's attack on Plaintiffs' ERISA cause of action rehashes issues already rejected in the Court's prior Order Granting in Part and Denying in part Defendants' motion to Dismiss (Doc. No. 60). For example, Multiplan concedes that its alleged role in the overall underpayment scheme makes it an ERISA fiduciary, but again contends there is no underlying breach of its fiduciary duties. The Court already rejected this position. See Doc. No. 60, p.11 ll. 12-14 (rejecting Viant's position that "the complaint fails to plead facts to establish . . . any underlying breach of fiduciary duties). There is nothing in the First Amended Complaint that impacts the analysis on Multiplan's alleged fiduciary duty breaches. To the contrary, as discussed, *supra*, the FAC provides substantially more detail concerning Multiplan's participation, along with CIGNA, in the alleged scheme to underpay valid, medically necessary mental health claims.

To be clear, Plaintiff's First Amended Complaint again alleges Multiplan's fiduciary status, its discretionary actions, and its control over plan assets. See, e.g. FAC, Doc. No. 63, ¶¶483-487. There is nothing in the First Amended Complaint that impacts the analysis on Multiplan's alleged fiduciary duty breaches. To the contrary, as discussed, *supra*, the FAC provides substantially more detail concerning Multiplan's participation, along with CIGNA, in the alleged scheme to underpay valid, medically necessary mental health claims. Indeed, Plaintiff need not allege that Viant was a named fiduciary, since this Court has already confirmed that it was acting in a fiduciary capacity. Viant's related contention, that it will prove it was not really acting as a fiduciary, is of course an issue for later in this litigation.

Multiplan also attacks—again—Plaintiffs' prayer for relief. Multiplan accuses Plaintiffs of seeking monetary relief thinly disguised as equitable relief. As countless courts have determined, this position has no support under ERISA. Section 1132(a)(3) states, "[a] civil action may be brought ... by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." To the extent Plaintiffs bring a cause of action against Cigna under ERISA §1132(a)(1)(B), and, separately against Multiplan under ERISA §1132(a)(3), the Ninth Circuit has recognized that a claim for benefits under Section 1132(a)(1)(B) and a claim for equitable relief under Section

1132(a)(3) "can proceed simultaneously if they plead distinct remedies." *Moyle v. Liberty Mut. Retirement Benefit Plan*, 823 F.3d 948, 961 (9th Cir. 2016). Plaintiffs herein reject the position that they are seeking the same forms of relief, and the Court need look no further than the seventeen different types of relief sought in this putative class action to understand the vacuity of Multiplan's position. This includes a declaration that "Multiplan's benefit determination and negotiation methodologies are improper." Doc. 63, p. 72, ll. 11-12.

The relief Plaintiffs seek in their (a)(3) claims differs from that sought in their (a)(1)(B) claims on other bases. For example, Plaintiffs seek to enjoin Cigna and Multiplan from continuing to engage in the practice of repricing and grossly underpaying for out of network behavioral health care, in violation of the terms of the Plans. Id. at ll. 7-8.[2]

To the extent Multiplan either has contended or continues to assert that the monies it paid out were in any way competitive with what is usual and customary for the specific geographic region at issue, Plaintiffs seek a reformation of the allegedly supporting Plan term(s). In *Cigna Corp. v. Amara*, 563 U.S. 421 (2011), the Court held that ERISA § 502(a)(3) offered equitable relief in the form of plan reformation, even though the plaintiffs therein also claimed benefit relief under § 502(a)(1)(B).

The *Amara* plaintiffs advanced simultaneous claims under (a)(1)(B) for benefits, and for reformation of the plan terms under (a)(3). The Court held that plan reformation was available to the *Amara* plaintiffs under (a)(3) as an equitable remedy, and that "once the plan was reformed under § [502](a)(3) to reflect the terms of the old plan, it could be enforced under § [502](a)(1)(B)." The Court in *Amara* also held that the "appropriate equitable relief" available under § 502(a)(3) refers to "those categories of relief that, traditionally speaking (i.e., prior to the merger of law and equity) 'were *typically* available in equity.'" *Amara* at 439. The Court held that "affirmative and negative injunctions obviously fall within [the category of equitable relief.]" *Id.* at 440.

Plaintiffs also seek an order requiring Cigna and Multiplan to reprocess the claims they illegally underpaid and to provide transparency as to any methodology they apply to the reprocessing

---

[2] Multiplan somehow contends that Plaintiffs do not allege how it damaged them. Plaintiffs FAC is replete with allegations describing how "conflicted middlemen" like Multiplan profit from "scam" fee structures, leaving individual plan members "stuck with balance bills." FAC, Doc. 63, ¶21. See also, e.g., FAC, ¶¶ 8, 10, 14, 126-133, 180-203.

of those claims. See FAC, Doc. No. 63, p.75. Finally, Plaintiffs seek an award of surcharge and disgorgement of ill-gotten profits from Multiplan and Cigna resulting from the improper claims repricing. *Id*. These latter remedies are unquestionably distinct from monetary damages that could also be available under other ERISA sections—and are just as unquestionably proper.  The Ninth Circuit holding *Moyle, supra,* in 2016 adopted the Eight Circuit's reading of *Amara*, which "permits plaintiffs to present § [502](a)(1)(B) and § [502](a)(3) as alternative — rather than duplicative — theories of liability." The court held that "[t]his approach is an accurate application of *Amara* in light of *Varity* because it allows plaintiffs to plead alternate theories of relief without obtaining double recoveries." *Id.* at 961.

Moreover, this is the pleadings stage of this litigation, and it is entirely possible that Plaintiffs will seek additional forms of relief, potentially monetary and non-monetary, once more facts underlying the alleged unlawful scheme at issue herein are uncovered.  Indeed, the court in Moyle noted that this reading was not only consistent with *Amara* and *Varity*, but also the Federal Rules of Civil Procedure, which require that "[a] pleading that states a claim for relief must contain ... a demand for the relief sought, *which may include relief in the alternative* or different types of relief." Fed. R. Civ. P. 8(a)(3) (emphasis added). Moreover, the Court held that "allowing plaintiffs to seek relief under both § [502](a)(1)(B) and § [502](a)(3) is consistent with ERISA's intended purpose of protecting participants' and beneficiaries' interests." *Id.* at 962.

*Berman v. Microchip Technology Inc*., 2018 WL 732667 (N.D.Cal. Feb. 28, 2018) supports Plaintiffs' position because that court affirmed simultaneous claims under ERISA §§502(a)1)(B) and (a)(3). That court also affirmed that the plaintiffs did state claims for injunctive relief, surcharge, and equitable estoppel.  To the extent that Court rejected as duplicative the plaintiffs' request for injunctive relief in the form of "continuing to deny Plan benefits to eligible employees" this issue is not dispositive herein. For example, as stated elsewhere in this Opposition, Plaintiffs seek multiple forms of declaratory relief, including declarations that the health care payments at issue herein were improper underpayments and that Cigna and Multiplan's  payment methodologies were and are improper." FAC, *supra*, at p. 75.  Plaintiffs also seek an order that Cigna reprocess all underpaid claims using an appropriate methodology. Id.

1    *Herzfeld v. Teva Pharmaceuticals USA, Inc. Omnibus Welfare Plan*, 2020 WL 1864851

2    (C.D. Cal. Apr. 14, 2020) is not determinative.  That action involved the denial of a medical device

3    to treat elbows and wrists, called a MyoPro.  The insured requested an external review, which upheld

4    the denial.  The plaintiff sued the third-party external reviewer, and it was in this context that fiduciary

5    status and standing issues arose. The court held that the third-party reviewer exercised discretionary

6    authority over the plan or its assets and therefore was acting as a fiduciary. This conclusion is

7    consistent with the Court's prior determination that Multiplan was an ERISA fiduciary in its treatment

8    / payment of Plaintiffs' claims. To the extent that the court in *Herzfeld* concluded that the plaintiff

9    failed to provide specificity regarding how the third-party reviewer participated in the claim denial,

10   Plaintiff's detailed, 72-page complaint sets forth in substantial detail Multiplan's role in the

11   underpayment scheme herein at issue.

12       *In re Computer Science Corp. ERISA Litigation*, 635 F.Supp.2d 1128 (C.D. Cal. July 13,

13   2009) is inapposite for the simple reason that it involved a summary judgment motion, not a motion

14   to dismiss. That court engaged in a factual analysis to determine the damage caused by the defendant's

15   alleged misrepresentations.  If Plaintiffs' allegations herein are accepted as true, there is no question

16   regarding the harm caused by Multiplan and Cigna.  By the time motions for summary judgment are

17   at issue, Plaintiffs will be able to provide evidence supporting these allegations.

18       As a backup position, Multiplan contends that Plaintiffs' (a)(3) claims should be dismissed

19   because they lack standing and do not allege any facts to support a "real and immediate" threat of

20   future injury." Doc. 76 at p. 19, l. 17.  Such arguments have no basis in the law.  First, to the extent

21   that certain Plaintiffs are still employed and are still covered participants under the respective Plans,

22   they are either still in recovery and actively receiving outpatient services now and for the foreseeable

23   future or are continually at risk of relapse.  Relapse is, regrettably, a common experience in the course

24   of substance use recovery, making high likely that at least some Plaintiffs will require IOP treatment

25   in the future.  Second, ERISA does not require that relief sought under (a)(3) be solely prospective in

26   nature.  Plaintiffs seek both prospective and retrospective relief in connection with their (a)(3) claims.

27       The Supreme Court decision in *Thole v. U.S. Bank, N.A.*, 140 Sup. Ct. 1615 (2020), relied on

28   by Defendant, is inapposite. *Thole* involved defined-benefit pension benefits that the plaintiffs were

entitled to and were in fact receiving. The plaintiffs alleged that the pension assets were poorly invested, resulting is a substantial loss to the plan as a whole. The court found no Article III standing on the basis that the plaintiffs were still receiving their pensions, would continue to receive their benefits, and that the benefits would remain unchanged regardless of any alleged fund mismanagement.

Here the situation is entirely different. Defendants' intentional, and substantial claims underpayment left Plaintiffs and putative class members either thousands of dollars out-of-pocket, or with thousands of dollars of unpaid bills. This is precisely the type of "concrete, particularized, and actual or imminent" injury in fact that was lacking in *Thole*. 140 S.Ct. at p. 1618.  For the same reason, Defendant's reliance on *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) does not support Defendant's position.

In sum, Multiplan's attack on Plaintiffs' standing fails.

**Conclusion**

By reason of the foregoing, it is respectfully submitted that the motion to dismiss should be denied. If the court is inclined to sustain any part of the motion, Plaintiffs respectfully request leave to cure any deficiencies and amend the pleading.

Respectfully Submitted,


Dated: June 30, 2021                    **NAPOLI SHKOLNIK PLLC**

                                         /s/ Matthew M. Lavin
                                        Matthew M. Lavin
                                        Aaron R. Modiano

                                        **DL LAW GROUP**
                                         /s/ David M. Lilienstein
                                        David M. Lilienstein
                                        Katie J. Spielman

                                        *Attorneys for Plaintiffs*
                                        *And the Putative Class*