# EXHIBIT 8

Redacted

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RJ, et al. | Case No: 5:20-cv-02255-EJD |
| Plaintiffs, | |
| vs. | |
| CIGNA HEALTH AND LIFE INSURANCE COMPANY, et al. | |
| Defendants. | |

**Declaration of Sean M. May, Ph.D.**

March 27, 2023

**CONFIDENTIAL**

## <u>TABLE OF CONTENTS</u>

I. Introduction ............................................................................................................ 1

II. Summary of Opinions ............................................................................................ 3

III. The Role of Health Plans in Controlling Health Care Costs ................................ 9

IV. The Viant OPR Database and Out-of-Network Transactions for IOP Services ....... 16

    A. Cost Containment Repricing Transactions ........................................................ 17

    B. Maximum Reimbursable Charge Benefit Caps .................................................. 22

        1. MRC1 Benefit Caps ...................................................................................... 22

        2. MRC2 Benefit Caps ...................................................................................... 27

V. Individualized Inquiry Would Be Required to Calculate the Difference Between What Members of the Putative Class Paid and What They Should Have Paid ....... 31

    A. Balance Billing Affects Whether a Participant Would Have Paid More or the Same Amount Under Plaintiffs' Presumed Approach ...................................... 32

    B. Individualized Inquiry Is Necessary to Determine How Much Members of the Proposed Class Would Have Paid ..................................................................... 35

        1. Deductible Transactions without Balance Billing ....................................... 35

        2. Deductible Transactions with Balance Billing ............................................ 37

        3. Coinsurance Transactions without Balance Billing .................................... 38

    C. Balance Billing May Lead Members of the Putative Class to Have Differing Incentives Regarding their MRC1 Benefit Caps .............................................. 39

    D. The Prevalence of Balance Billing .................................................................... 45

VI. Members of the Putative Class Differ in How the Viant OPR Database Was Used to Adjudicate Transactions for IOP Services ............................................................... 49

    A. Cost Containment Repricing Transactions ........................................................ 50

    B. Benefit Caps for Out-of-Network IOP Services ................................................ 52

        1. MRC1 Plans .................................................................................................. 53

        2. MRC2 Plans .................................................................................................. 55

    C. Summary of Out-of-Network Transactions for IOP Services ........................... 57

VII. Neither Plaintiffs Nor Their Experts Have Identified an Alternative to the Viant OPR Database ............................................................................................................ 63

    A. FAIR Health ....................................................................................................... 64

    B. Methods Based on CHLIC's Transaction Data .................................................. 66

VIII. Conclusion ............................................................................................................. 73

## I. INTRODUCTION

1.     I am a vice president of Charles River Associates ("CRA"), an economics consulting firm headquartered in Boston, Massachusetts. I received my Ph.D. in economics from the Massachusetts Institute of Technology in 2000 and my Bachelor of Science degree in mathematics from Queen's University in 1996. My fields of specialization in economics include industrial organization and econometrics.

2.     For more than twenty years, my professional career has involved the application of these fields of economics to the health care industry, including work related to health services companies and pharmacy benefit managers; hospitals, outpatient facilities, home health care providers, and health systems; physicians and health care professionals; and pharmaceutical companies. I have consulted with clients in the health care industry in connection with proceedings before state and federal government agencies, including state departments of insurance, the U.S. Department of Justice ("DOJ"), the Federal Trade Commission ("FTC"), and federal and state courts. In these proceedings, I have worked on behalf of private plaintiffs and defendants, the DOJ, the FTC, state attorneys general, and the Canadian Competition Bureau. I have also conducted policy research for the American Hospital Association and America's Health Insurance Plans.

3.     I have written several articles related to issues in health care economics. I have given presentations sponsored by the FTC, the ABA Section of Antitrust Law, the New York State Bar Association Antitrust Section, the Dallas Bar Association, the Fordham University Competition Law Institute, the American Hospital Association, the American Medical Association, and at the Antitrust in Health Care meetings co-sponsored by the American Health Lawyers Association, the ABA Section of Antitrust Law, and the ABA Health Law Section. I was also a member of the Law360 Health Editorial Advisory Board. A copy of my curriculum vitae, which describes my qualifications, education, and publications, is attached to this declaration as Appendix 1.

4.     I was retained by Cigna Health and Life Insurance Company ("CHLIC") in connection with putative class action litigation concerning CHLIC client plans' use of the Viant OPR database to adjudicate out-of-network transactions for intensive outpatient therapy substance use disorder

1

services ("IOP Services").[1] Plaintiffs allege that use of the Viant OPR database to adjudicate these transactions was improper and resulted in payment for some transactions that was too low. Plaintiffs seek to certify a class comprised of "[a]ny member of a health benefit plan administered or issued by [CHLIC] and governed by [the Employment Retirement Income Security Act], where the member's plan utilized Cigna's 'Maximum Reimbursable Charge' program for out-of-network benefits and whose claim(s) for intensive outpatient services billed with [Healthcare Common Procedure Coding System or "HCPCS" code] H0015 and/or revenue code 0906 were priced by MultiPlan's Viant methodology, during the class period January 1, 2015 to the present."[2] Throughout this declaration, consistent with Plaintiffs' experts, I use the term "IOP Services" to refer to substance use disorder treatment services that were billed using either (i) HCPCS code H0015 or (ii) revenue code 0906 and no HCPCS code.[3]

5.      Counsel for CHLIC has asked me to respond to the opinions offered by Ron Luke, J.D., Ph.D. and Brian Piper, Ph.D., who were retained by counsel for Plaintiffs, including by providing background on economic concepts relevant to how plans cover and reimburse out-of-network services.[4] ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████,[5] ████████████████████████████████████████████████

███████████████████████████████████,[6] ██████████████████

███████████████████████████████████████████████████████████

---

[1] First Amended Class Action Complaint, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (April 30, 2021) [hereinafter COMPLAINT].

[2] Plaintiffs Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (January 17, 2023) [hereinafter CLASS CERT. MOTION] at 1-2.

[3] Deposition of Brian Douglas Piper, Ph.D. (March 14, 2023) at 128. The data produced by CHLIC include facility transactions with dates of service between January 1, 2016 and September 30, 2021 containing revenue code 0906 and/or HCPCS codes H2036 or H0015 where the Viant OPR database was used to determine a repricing offer amount or a Maximum Reimbursable Charge amount. The data also include transactions that were ultimately adjudicated through OPR "secondary closure" or at a Maximum Reimbursable Charge when the Viant OPR-based repricing offer was rejected.

[4] Analysis of Underpayment of HCPCS Code H0015 by Cigna, Prepared by Ron Luke, J.D., Ph.D. and Brian Piper, Ph.D., Research and Planning Consultants, LP, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (January 16, 2023) [hereinafter RPC REPORT].

[5] *Id.*, ¶¶ 11-16.

[6] *Id.*, ¶¶ 16-32.



6.      The opinions I express in this declaration are based on analyses that either I have done directly or staff at CRA have done under my direction. CRA is currently being compensated for my work in this matter at my rate of $950 per hour and for the work of other staff members at hourly rates that range between $388 and $849 per hour. No payments to CRA are contingent upon the outcome of this case or upon the nature of my opinions. I reserve the right to amend or supplement this declaration if additional documents or information become available or as otherwise may be necessary or appropriate. The materials I relied on in forming my opinions are cited throughout my declaration.

## II.      SUMMARY OF OPINIONS

7.      Health plans defray the costs of health care services for participants in the plan. These participants are responsible for paying a portion of plan premiums in addition to copayments, coinsurance, or deductibles. In addition to offering participants access to a network of health care providers, many health plans provide coverage for services from out-of-network or non-contracted providers. Out-of-network providers do not have contracts that specify in advance the discounted rates at which they will be reimbursed for their services, but instead charge the plan their undiscounted billed charges for their services. Providers' billed charges represent the maximum amount that the provider could be reimbursed for the service, but they do not reflect the market value of health care services. In addition to paying premiums and plan cost-sharing amounts, when participants receive services from out-of-network providers the participant may also be billed for

---

[7] *Id.*, ¶¶ 33-47.

[8] *Id.*, ¶ 48.

the difference between the amount covered by their plan and the amount charged by their provider.[9]

8.      Many plans that cover out-of-network services limit the amount they pay for those services. This is important because health plan premiums increase as expenditures on benefits increase, and economic analyses have found that workers bear most of the increase in the cost of health insurance premiums through reduced wages—either directly or indirectly through increased required contribution to health insurance premiums—or reduced hours. To control expenditures on out-of-network services, CHLIC client plans may offer the provider an amount less than the provider's billed charges. If the provider does not accept that amount as payment in full, the plan will cover the provider's billed charges up to the plan's Maximum Reimbursable Charge benefit cap. CHLIC client plans typically use one of two methods for determining the Maximum Reimbursable Charge. For MRC1 plans, the Maximum Reimbursable Charge is determined using a database of provider charge percentiles. For MRC2 plans, the Maximum Reimbursable Charge is determined using a multiple of a Medicare-like fee schedule.

9.      The Viant OPR database is used to determine the allowed amounts for out-of-network IOP Services in CHLIC client plans in two different ways. First, the Viant OPR database is used to determine "repricing" offer amounts under cost containment methods. These methods are designed to lower the cost of out-of-network services while protecting participants from balance billing. Among the transactions data produced by CHLIC, there are 240 thousand transactions for out-of-network IOP Services adjudicated using repricing offers based on the Viant OPR database.[10,11]

---

[9] "Balance billing" refers to the situation where a plan participant is charged the difference between the amount covered by their plan and the amount charged by their out-of-network health care provider.

[10] I understand that Plaintiffs' proposed class period in this matter extends from January 1, 2015 to the present. (CLASS CERT. MOTION at 1-2.) However, the transaction data produced by CHLIC covers the period from January 1, 2016 to September 30, 2021. As such, the analyses discussed in my report reflect data for this shorter period.

   Throughout my report, I count each claim line associated with IOP Services as a "transaction." For analyses in my declaration related to billed charge and allowed amounts for IOP Services, I restrict those analyses to transactions with unit counts of one, which comprise more than 98 percent of the transactions for IOP Services produced by CHLIC.

[11] ████████████████████████████████████████████████████████████████████████████████████

Second, the Viant OPR database is used to determine the Maximum Reimbursable Charge for IOP Services in MRC1 plans. Among the transaction data produced by CHLIC, there are 17 thousand transactions for out-of-network IOP Services adjudicated at the MRC1 benefit cap. The Viant OPR database is not used to determine the Maximum Reimbursable Charge for IOP Services in MRC2 plans; instead, MRC2 plans determine the Maximum Reimbursable Charge for IOP Services using the fee schedule amounts that CHLIC calculates based on Medicare-like rates for partial hospitalization behavioral health services.

10.     For repricing transactions, the provider may choose to reject the pricing recommendation made using the Viant OPR database. In those situations, the participant is told to contact CHLIC if the provider balance bills them. There are 26 thousand transactions for out-of-network IOP Services that were initially repriced using the Viant OPR database and then subsequently subject to "secondary closure" where the provider agreed to accept a higher amount.[12] On average, the allowed amount for these secondary closure transactions is ███ greater than the original repricing offer based on the Viant OPR database, although this varies across transactions (including among transactions associated with the same provider). These figures demonstrate that for repricing transactions initially adjudicated using the Viant OPR database, CHLIC commonly increased the allowed amount for IOP Services in response to a request from the participant. The secondary closure transactions also show that out-of-network providers agreed to amounts that were substantially less than their billed charges for out-of-network IOP Services.

11.     Plaintiffs' experts do not propose a method for calculating damages on a class-wide basis, nor in my opinion could they do so in a way that uniformly affected, let alone benefitted, all members of the proposed class. I assume that their approach would be to calculate the difference

---

[12] For secondary closure transactions, following an inquiry from a participant who was balance billed, MultiPlan attempts to reach an agreement with the out-of-network provider by offering an amount that is higher than the initial repricing offer. If the provider accepts this higher amount, the provider agrees not to balance bill the member.

between (1) what each member of the proposed class paid for out-of-network IOP Services that were adjudicated using the Viant OPR database and (2) what that member would have paid had the allowed amounts for their transactions been determined using an alternative database (which Plaintiffs' experts do not identify) of charge percentiles. However, under Plaintiffs' presumed approach, calculating the difference between what members of the proposed class paid and what they should have paid depends on whether those members were balance billed by their providers. This is an inherently individualized inquiry that cannot be performed on a class-wide basis because to my knowledge there is no comprehensive source of information on the incidence of balance billing on a transaction-by-transaction basis.

12.     Participants benefit from lower allowed amounts for out-of-network IOP Services if they are not balance billed by their providers. This is because a lower allowed amount reduces the participant's deductible payment or coinsurance payment. For some transactions where the participant has not yet met their deductible and is balance billed, they would pay the same amount regardless of how the Maximum Reimbursable Charge or allowed amount for the transaction is determined. That is, some participants may pay less or the same amount if the Viant OPR database were replaced with an alternative database of Plaintiffs' design. Even if it were possible to establish which providers balance billed members, members of the proposed class might have divergent financial interests regarding whether to use the Viant OPR database or an alternative to calculate their plans' Maximum Reimbursable Charge.

13.     Despite the lack of class-wide information on the incidence of balance billing for each transaction potentially at issue in this matter, ███████████████████████████████████ ██████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████ The relative prevalence of secondary closure for repricing transactions is also informative regarding the incidence of balance billing. If a provider rejects the repriced amount and balance bills the participant, secondary closure increases the allowed amount for the transaction with the goal of securing an agreement from the provider not to balance bill the patient. There are 240 thousand repricing transactions in the transaction data produced by CHLIC, but there are only 26 thousand transactions that were subject to secondary

closure.[13] Because each secondary closure transaction was initially repriced using the Viant OPR database, it follows that secondary closure (*i.e.*, transactions where the member was balanced billed and contacted CHLIC) was sought on less than ten percent of repricing transactions. This suggests that plan participants were balance billed for a minority of transactions for out-of-network IOP Services paid at plans' Maximum Reimbursable Charge benefit cap.

14.     The different methods for adjudicating out-of-network transactions for IOP Services have implications for which participants might be members of the proposed class and how those members would have been financially affected by plans' use of an alternative to the Viant OPR database. The Viant OPR database is used to determine benefit caps for IOP Services in MRC1 plans, but it is not used to determine benefit caps for IOP Services in MRC2 plans. Because of this, although participants in MRC1 plans whose transactions for IOP Services were adjudicated at their plans' benefit caps may be members of the proposed class, participants in MRC2 plans whose transactions were adjudicated at their plans' benefit caps would not be.

15.     Calculating how much participants with MRC1 benefit cap transactions would have paid under Plaintiffs' presumed approach involves, among other things, developing an alternative to the Viant OPR database of charge percentiles; calculating what participants would have paid in coinsurance and deductibles using an alternative database; imputing whether participants would have met their deductibles or out-of-pocket maximums using an alternative database; and determining whether participants were balance billed by their providers. But Plaintiffs' experts do not address any of these considerations in their report. In addition, among transactions that were adjudicated at plans' MRC1 benefit caps, variation in plan language (including changes in language over time or variation in language across plans), the method used by MultiPlan to calculate the percentiles in the Viant OPR database, the availability of alternative databases of charge percentiles (*e.g.*, FAIR Health), or the language used on explanation of benefits forms received by plan participants may require different analyses.

16.     Most transactions potentially at issue in this matter are for IOP Services where repricing offers were made using the Viant OPR database. If participants with repricing transactions are not

---

[13] There are also 279 transactions adjudicated at plans' Maximum Reimbursable Charge benefit caps where a repricing offer was previously made based on the Viant OPR database.

balance billed, they likely would pay more out of pocket under Plaintiffs' presumed but untested approach (*i.e.*, an alternative method in which the percentiles in the Viant OPR database were replaced by higher amounts). These members would not be financially harmed by CHLIC's use of the Viant OPR database. If the participant is balance billed and secondary closure results in an agreement with the provider, the allowed amount for the secondary closure transaction would be determined in negotiations with the provider rather than with the Viant OPR database (*i.e.*, the participant would not be a member of the proposed class). For these transactions, the provider would agree to refrain from balance billing the participant. If the secondary closure did not result in an agreement with the provider, the allowed amount for the transaction would be determined by the plan's Maximum Reimbursable Charge benefit cap rather than as a repricing transaction.

17.      Although Plaintiffs allege that the use of the Viant OPR database to adjudicate transactions for out-of-network IOP Service resulted in reimbursement for some transactions that was too low, neither Plaintiffs nor their experts have identified an alternative to that database. Because Plaintiffs have not identified an alternative database, it is not possible to assess whether members of the proposed class would have paid more, less, or the same for IOP Services or whether there may be disagreement among class members as to which alternative database to use. Plaintiffs have previously described the FAIR Health database as an alternative that could have been used instead of the Viant OPR database. However, the FAIR Health database did not include charge percentiles for IOP Services during most of the Plaintiffs' proposed class period. And even when the FAIR Health database includes percentiles for IOP Services, Plaintiffs' experts have previously argued that the FAIR Health database is itself flawed.

18.      There are several methodological issues to address if Plaintiffs were to create their own alternative database of charge percentiles. While Plaintiffs' experts' firm, Research and Planning Consultants, LP ("RPC"), has discussed these issues in publications that are unrelated to this case, they are not discussed by Plaintiffs' experts in their class certification expert report. The issues that RPC has enumerated in other contexts include: (1) whether to calculate nationwide percentiles or percentiles at the local level, and how to define local geographies; (2) whether to calculate percentiles of provider-level or transaction-level data; (3) what time period of transaction data to consider when calculating percentiles; and (4) whether to require a minimum number of transactions, charges, or other data points in order to calculate percentiles for a given service or geography over a certain time period. For many of these methodological choices, there may be

divergent interests among members of the proposed class as to which method results in those members paying the lowest amount for out-of-network IOP Services. In at least some scenarios, the methods that RPC has described in publications regarding databases for adjudicating out-of-network transactions would result in some members of the proposed class paying more for their out-of-network IOP Services.

### III.   THE ROLE OF HEALTH PLANS IN CONTROLLING HEALTH CARE COSTS

19.    CHLIC is a health services company that, among other things, assists its clients (*e.g.*, employers or employer-based groups such as trade associations and unions) in offering group health plans. Employees are offered the option to enroll in these plans as a benefit of employment, and plan premiums are shared by the plan sponsor (the employer) and the participants (the employees and their dependents).[14]

20.    Health plans defray the costs of health care services for participants in the plan. Covered benefits may include inpatient and outpatient hospital care, primary care and specialist physicians' services, diagnostic imaging and laboratory services, prescription drugs, and so on. Many health plans issued or administered by CHLIC include behavioral health services as covered benefits, including the types of IOP Services at issue in this matter. In addition to paying plan premiums, participants may also be responsible for copayments, coinsurance, or deductibles. In some instances, participants may also be responsible for the difference between the amount covered by the plan and the amount billed by an out-of-network health care provider.

21.    Among the transactions potentially at issue in this matter, 83 percent are for IOP Services provided to participants in administrative services only ("ASO" or "self-funded") plans, *i.e.*, plans in which CHLIC's clients assumed financial responsibility for paying for benefits covered by the plan. For ASO plans, CHLIC provides administrative services such as processing health care transactions and health care provider contracting pursuant to an ASO agreement, but the costs of any benefits owed to plan participants are passed on directly to the client rather than being paid out of CHLIC's funds. The remaining 17 percent of transactions potentially at issue are for IOP

---

[14] Throughout my report I use the word "premiums" as a shorthand to refer to both insurance premiums paid to the health services company for fully insured health plans and the service fees paid by the plan sponsor and participants for self-insured health plans (*i.e.*, administrative services only plans).

Services provided to plan participants enrolled in CHLIC fully insured plans. For these fully insured plans, CHLIC collects premiums from its clients and plan participants and assumes financial responsibility for paying benefits covered by the plan.

22.     Health services companies, including CHLIC, provide plan benefit design options to their clients that allow those clients to offer participants affordable health plans with desirable benefits packages, including access to a network of health care providers. Providing participants with access to a network of health care providers plays an important role in managing expenditures on health care services. In-network providers have contracts with CHLIC and, under the terms of those contracts, agree to render services to plan participants at discounted rates. In return, participants are encouraged to seek care from in-network health care providers.

23.     Although the lower costs associated with restricted provider networks are attractive to health plan sponsors and participants, some consumers may value greater choice of health care providers.[15] Many health plans—including the plans that cover the IOP Services at issue in this litigation—provide coverage for health care services from out-of-network providers. Out-of-network providers do not have network participation agreements that specify in advance the discounted rates at which they will be reimbursed for services that participants receive. Rather, out-of-network health care providers choose the billed charges for their services, which are set unilaterally rather than as the result of a negotiation between the provider and the health services company. Providers' billed charges represent the maximum amount that the provider could be reimbursed for the service, but billed charges do not reflect the market value of health care services and providers often agree to be reimbursed only a fraction of their billed charges for out-of-network services.

24.     For example, many out-of-network transactions for IOP Services were initially adjudicated using repricing offers based on the Viant OPR database, but the allowed amounts for these transactions were later increased under CHLIC's secondary closure policy. For these secondary closure transactions, the out-of-network provider agreed to accept the higher allowed amount as payment in full for the IOP Services (*i.e.*, the provider agreed not to balance bill the

---

[15] *See*, for example, Katherine Ho, "The Welfare Effects of Restricted Hospital Choice in the US Medical Care Market," *Journal of Applied Econometrics*, vol. 21 (2006).

participant for the difference between the provider's billed charges and the secondary closure amount).[16] While these transactions are not at issue in this matter because they were not priced using the Viant OPR database, between 2016 and 2021 there were 25,702 secondary closure transactions for IOP Services reflected in the transaction data produced by CHLIC. Among these transactions, out-of-network providers agreed to accept an average of approximately ███████ of their billed charges as payment in full for the IOP Services they provided.

25.     Because health care providers' billed charges are set unilaterally and are not linked to the market value of their services,[17] billed charges for IOP Services have increased faster than measures of inflation in the cost of health care services. Between 2016 and 2020, the average billed charge for HCPCS code H0015 recorded in CHLIC's transaction data increased by almost six percent per year.[18] By comparison, over this period the Consumer Price Index ("CPI") for medical care and for outpatient hospital services both increased by three percent per year, and the CPI for physicians' services and for "services for other medical professionals" both increased by less than two percent per year.[19]

26.     Many CHLIC client plans that offer coverage for out-of-network services limit the amount they reimburse providers. That is, rather than paying a provider's unilaterally determined billed charges, the plan may offer the provider a lesser amount that the provider could accept as payment in full (*i.e.*, the provider aggress to not balance bill the member). If the provider does not accept

---

[16] See, for example, the secondary closure agreement produced as CIG_RJ_CLMS00000427 ("Provider agrees not to balance bill patient or the patient's family (except for deductibles, coinsurance, and non-covered items, if applicable)."). The document indicates that this transaction was assigned "███████████." Records corresponding to this transaction can be found in the CHLIC transaction data based on searching for this account number in the "prov_patnt_num" field. The CHLIC transaction data show that this transaction was originally associated with an OPR Repricing offer of ██████. This provider subsequently agreed to a secondary closure amount of ████, which precluded the provider from balance billing the participant.

[17] Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 203-204 ("█████████████████████████████████████████████████████████████████████████████████████████).

[18] For the purpose of this discussion, I have included both out-of-network transactions for IOP Services where the allowed amount was determined using the Viant OPR database (either because the transaction was adjudicated at the plan's MRC1 benefit cap or as a "repricing" transaction under CHLIC's cost-containment methods) or where the transaction was adjudicated at the plan's MRC2 benefit cap after a "repricing" amount was rejected. (*See* §IV.A, *infra*.) Transactions priced using CHLIC's MRC2 fee schedule are not, however, adjudicated based on Viant OPR pricing.

[19] Calculated as the compound annual growth rates between January 2016 and January 2021 for CPI series CUSR0000SAM, CUSR0000SS5703, CUSR0000SEMC04, and CUSR0000SEMC01.

that amount as payment in full, the plan will cover the provider's billed charges up to a maximum amount (often referred to as the "Maximum Reimbursable Charge" or "MRC" benefit cap that is described in plan documents). In some cases, the plan participant may then be balance billed for the difference between the provider's billed charges and the plan's Maximum Reimbursable Charge.

27.    CHLIC client plans typically use one of two methods for determining the Maximum Reimbursable Charge.

- While plan language may vary, some plans describe that the Maximum Reimbursable Charge is an amount that is no higher than the provider's "normal charge" or "an Employer-selected percentage of a fee schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market."[20] CHLIC refers to these plans as "MRC2" plans. So for example, under an MRC2 plan, if the fee schedule amount that CHLIC determines based on its Medicare-like method was $1,000 and the plan sponsor chose a multiplier of 110 percent, the Maximum Reimbursable Charge for that service would be no higher than $1,100 (= $1,000 × 110 percent). Sixty-six percent of the transactions potentially at issue in this matter were associated with health plans where the plan sponsor selected an MRC2 benefit cap.[21]

---

[20] CIG_RJ00000577-646 at 633-634. I understand it is CHLIC's position that a provider's "normal charge" is limited to the amount that the provider obligates the patient to pay (*e.g.*, to the extent that an out-of-network provider does not balance bill a CHLIC client plan participant, any charges exceeding the allowed amount would not be included in the provider's normal charge). *See Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, 138 (D.N.J. 2011) ("The amount billed by a Nonpar on any given Cigna plan member's particular service could, for example, far exceed that provider's 'normal' charge if the provider has a practice of charging his non-insured patients a lower fee than insured patients for the same service or if the provider has a practice of forgiving or 'writing off' the unreimbursed balances of his insured patients, as the Nonpar who rendered services to the Nelsons did with regard to the portion of the bill not covered by the Cigna ONET benefit payment.").

[21] For transactions processed on CHLIC's Facets system, the transaction data do not indicate whether the transaction is associated with an MRC1 or MRC2 plan. Therefore, I exclude transactions processed on CHLIC's Facets system from this calculation.

- "MRC1" plans use databases of provider charge percentiles that CHLIC selects to determine the Maximum Reimbursable Charge.[22] These databases contain estimates of percentiles of the distribution of providers' charges by procedure code and by geographic region. The plan sponsor may use different percentiles (*e.g.*, the 70th, 80th, or 90th percentile) to determine the Maximum Reimbursable Charge in its plan.

For both MRC1 and MRC2 plans, if a provider's billed charge is higher than the Maximum Reimbursable Charge, the plan will cover no more than the Maximum Reimbursable Charge. In Section IV, I briefly describe the methods (including the Maximum Reimbursable Charge) used by plans issued or administered by CHLIC to determine the allowed amount for out-of-network IOP Services.

28.     As expenditures on benefits increase, so do health plan premiums. These expenditures account for most plan expenses: An analysis conducted by the Centers for Medicare & Medicaid Services ("CMS") found that 90 percent of premiums for private health insurance in 2021 were used to pay for health care services received by plan members.[23] (The remaining 10 percent of health plan premiums do not inure to health services companies as profits since those companies are also required to cover their administrative and other costs.) As a general matter of economics, increased costs are passed on to consumers in the form of higher prices, with the precise magnitude of the increase in prices resulting from an increase in costs known as the "pass-through rate." Health services companies like CHLIC play an important role in managing participants' health care expenditures and controlling increases in plan premiums.

29.     The pass-through of costs is particularly evident for self-insured health plans. In such plans, CHLIC will receive and process transactions, but the plan sponsor—often an employer—is ultimately responsible for paying those transactions. Because the plan sponsor reimburses providers for services received by participants in self-insured plans, any increase in expenditures

---

[22] The $p$th percentile of a distribution is a number, $\xi$, such that at least $p$ percent of the values in the distribution are less than or equal to $\xi$ and at least $100\text{-}p$ percent of the values in the distribution are greater than or equal to $\xi$. (*See* Robert V. Hogg and Allen T. Craig, *Introduction to Mathematical Statistics* (fifth edition), Upper Saddle River: Prentice Hall (1995) at 44.) For example, the 80th percentile of a distribution that consisted of the numbers 1 to 10 (each occurring with a probability of one tenth) could be any number between 8 and 9 (including the endpoints).

[23] Centers for Medicare & Medicaid Services, National Health Expenditure Accounts, Table 20, *available at* https://www.cms.gov/files/zip/nhe-tables.zip.

on those services is passed directly on to the plan sponsor and participants (rather than potentially being absorbed by CHLIC). For fully insured plans, the premiums for the plan are established at the beginning of the plan year and are not subsequently adjusted during the plan year. However, this does not mean that participants are unaffected by increases in expenditures on health care services. Premiums for fully insured plans are typically determined on an annual basis, and transactions for services provided to participants in the previous year can affect premiums for the plan in subsequent years.[24]

30.     The relationship between health plan premiums and expenditures on health care services is evident in longitudinal data compiled by CMS on premiums and health care service expenditures.[25] Two features of these data are noteworthy. First, as shown by the line in Figure 1 below, almost all premiums collected by health plans are used to pay for health care services received by participants. As I noted above, in 2021 90 percent of health plan premiums were used to pay participants' transactions. Second, CMS's data show that expenditures on health care services increased substantially between 2012 and 2021 and plan premiums increased at almost the same rate. Expenditures on health care services increased by an average annual rate of 4.5 percent over this period, while health plan premiums increased by an average annual rate of 4.2 percent (*i.e.*, slightly less than the rate of increase of health care costs). These data show, therefore, that health care expenditures are the primary determinant of health plan premiums, and as those expenditures increase so do premiums.

---

[24] *See* Peter R. Kongstvedt, ed., *The Managed Health Care Handbook* (Fourth Edition), Gaithersburg: Aspen Publishers (2001), Chapter 49.

[25] Centers for Medicare & Medicaid Services, National Health Expenditure Accounts, Table 20, *available at* https://www.cms.gov/files/zip/nhe-tables.zip.



**Figure 1: Private Health Insurance Benefits and Premiums, 2012 to 2021**

31.     Given the correlation between health care expenditures and health plan premiums, a related question is the incidence of increases in employer-sponsored health plan premiums on plan sponsors and employees. This question has been answered in several economic studies, which show that both plan sponsors and employees bear the costs of higher premiums, although the preponderance of evidence suggests that these costs are borne primarily by employees.[26] These studies are based on models that recognize that the incidence of higher premiums depends on elasticities of labor supply and demand, regulatory and institutional constraints on wages (*e.g.*, minimum wages), and the value that workers place on health insurance. The studies also recognize that workers consider their total compensation (*i.e.*, wages plus non-wage benefits) in evaluating alternative employment opportunities and how many hours to work at the prevailing level of compensation. Economic analyses generally find that workers bear most of the increase in the cost

---

[26] *See* Jonathan T. Kolstad and Amanda E. Kowalski. "Mandate-based health reform and the labor market: Evidence from the Massachusetts reform." *Journal of Health Economics* (2016); Priyanka Anand. "Health Insurance Costs and Employee Compensation: Evidence from the National Compensation Survey." *Health Economics* (2017); Katherine Baicker and Amitabh Chandra. "The Labor Market Effects of Rising Health Insurance Premiums." *Journal of Labor Economics* (2006); and Jonathan Gruber. "The Incidence of Mandated Maternity Benefits." *American Economic Review* (1994).

of health insurance premiums through reduced wages—either directly or indirectly through increased required contribution to health insurance premiums—or hours.[27]

32.    With this background on health plans, the methods that health plans use to control plan participants' expenditures on covered services, and the relationship between health care costs, premiums, and wages in mind, in the next section I discuss how the Viant OPR database was used by CHLIC client plans to adjudicate out-of-network transactions for IOP Services.

### IV.    THE VIANT OPR DATABASE AND OUT-OF-NETWORK TRANSACTIONS FOR IOP SERVICES

33.    Plans that cover out-of-network services may limit the amounts they pay providers for those services; CHLIC client plans use several methods to determine allowed amounts for out-of-network IOP Services, including methods that use the Viant OPR database. In this section, I provide an overview of those methods and describe the two different ways that the Viant OPR database is used to determine the allowed amounts for out-of-network IOP Services. First, the Viant OPR database is used to determine "repricing" offer amounts under cost containment methods that CHLIC makes available to plan sponsors. If a provider rejects the repricing offer amount and balance bills the plan participant, secondary closure may be used to increase the allowed amount for the transaction with the goal of securing an agreement from the provider not to balance bill the patient. Second, the Viant OPR database is used to determine the Maximum Reimbursable Charge for IOP Services in MRC1 plans. Unlike repriced transactions, transactions adjudicated at plan Maximum Reimbursable Charge benefit caps do not protect the plan participant from being balance billed. (The Viant OPR database is not used to determine the Maximum Reimbursable Charge for IOP Services in MRC2 plans; instead, MRC2 plans calculate the Maximum Reimbursable Charge for IOP Services using the fee schedule amounts that CHLIC calculated based on Medicare rates for partial hospitalization behavioral health services.)

---

[27] For example, Anand (2017) assessed the relationship between the rising costs of employer-sponsored insurance and worker compensation between 2003 and 2010, analyzing separately the effects on wages, non-health fringe benefits, and worker contributions to health plan premiums. The author finds that total hourly compensation decreases by $0.52 for every $1 increase in the cost of employer-sponsored insurance, with almost all the decrease attributable to higher worker contributions to health plans, while hourly wages and non-health benefits remain relatively unchanged.

### A. Cost Containment Repricing Transactions

34.     CHLIC's cost-containment methods reduce the cost of out-of-network services received by plan members by offering amounts to out-of-network providers that are less than providers' billed charges, which the provider may accept as payment in full for its services. Unlike the Maximum Reimbursable Charge, these cost containment methods are intended to protect plan participants from balance billing. Under CHLIC's cost containment method, CHLIC may allow an amount that exceeds the plan's Maximum Reimbursable Charge benefit cap, which means that the plan may pay more for the transaction in exchange for lowering the overall cost of the transaction and, importantly, saving the plan participant from receiving a balance bill.

35.     Each out-of-network transaction that is submitted to a plan that has elected to use CHLIC's cost containment methods is assigned a "target price," which is a negotiating ceiling to be used by CHLIC's vendors in pricing out-of-network transactions. If one of CHLIC's cost containment vendors can achieve a reimbursement rate that is at or below this target price, CHLIC may rely on that vendor's method to adjudicate the transaction.

36.     The cost containment methods offered by CHLIC include:

- Network Savings Program: Plans offered by CHLIC clients that use the Network Savings Program include a MultiPlan logo on the participants' CHLIC identification cards. This indicates that the account has access to the MultiPlan wrap network and that the plan may, at its option, choose to access the MultiPlan wrap network rate to adjudicate an out-of-network transaction.

- Bill Negotiation Services: Third-party vendors attempt to negotiate transaction-specific discounts directly with out-of-network providers. This may involve three different methods:

    o   Non-logo Network Pricing: This refers to the use of supplemental networks maintained by vendors (*e.g.*, Zelis) to access discounted rates with out-of-network programs.

    o   Signed Agreements: Third-party vendors may try to reach a signed agreement with providers on a transaction-by-transaction basis.

    o   Repricing: This refers to the use of databases and benchmarks maintained by third-party vendors to make pricing recommendations. For IOP Services, repricing offers could be based on the Viant OPR database, although other methods may also be used.[28]

37.    The allowed amount for a transaction adjudicated using the Network Savings Program or Bill Negotiation Services represents an amount that is agreed to by a third party, such as Zelis or MultiPlan, and the out-of-network provider. In these situations, that allowed amount represents payment in full for the services and the participant should not be balance billed for the difference between the allowed amount and the provider's billed charges. To be clear, other than potentially for repriced transactions (and transactions adjudicated at plan MRC1 benefit caps, discussed in a later section) the allowed amounts for out-of-network IOP Services are not based on the Viant OPR database.

38.    For repricing transactions—where the Viant OPR database is used to determine an offer amount for IOP Services—a provider may choose to reject the pricing recommendation made under the plan's approach. In those situations, the participant is told to contact CHLIC if the provider balance bills them. An excerpt from a letter sent to a participant whose out-of-network transaction was repriced using the Viant OPR database is shown in Figure 2.

---

[28] CIG_RJ00029068-073 at 071.

**Figure 2: Viant OPR Repricing Letter Sent to Participant[29]**



39.     The CHLIC transaction data can be used to identify repricing transactions for out-of-network IOP Services that (1) were originally adjudicated using an offer from the Viant OPR database and (2) were subsequently allowed at higher amounts after the participant contacted CHLIC regarding a balance bill. Among the transactions potentially at issue in this litigation, there are 240 thousand transactions for out-of-network IOP Services where the transaction was repriced with the Viant OPR database. There are also 26 thousand transactions for out-of-network IOP Services that were initially repriced but subsequently subject to secondary closure where Viant and the provider reached an agreement.[30] On average, the allowed amounts for these secondary

---

closure transactions are ███ greater than the original OPR repricing offer, but these secondary closure amounts are still less than providers' billed charges.

40.     These figures are noteworthy for at least two reasons. First, a significant number of out-of-network transactions for IOP Services that were initially repriced using the Viant OPR database were subject to secondary closure in response to an inquiry regarding balance billing. This demonstrates that for repricing transactions, it was common for the plan to increase the allowed amount in response to an inquiry from the participant. Second, although the allowed amounts for transactions subject to secondary closure were higher than for transactions repriced using the Viant OPR database, the secondary closure transactions show that out-of-network providers agreed to amounts that were less than their billed charges for out-of-network IOP Services.

41.     Figure 3 shows examples of transactions for out-of-network IOP Services that were initially repriced using the Viant OPR database but subsequently subject to secondary closure.

- For transaction 1, the provider's billed charge is ████ and the Viant OPR repricing amount is ████. The provider is paid ████ more in secondary closure (████ or approximately ████ of the provider's billed charge).

- Transactions 2 and 3 are associated with the same provider in March and June 2017. For both transactions, the provider's billed charge is ████; the Viant OPR repricing amount is ████ for transaction 2 and ████ for transaction 3. Both transactions are subject to secondary closure, with the provider being paid ████ for the first transaction and ████ for the second.

- Transactions 4-6 are associated with the same provider in April, May, and July 2018. All three transactions are initially repriced at ████ but subsequently subject to secondary closure where the provider is paid ████. However, for transactions 4 and 5, the provider's billed charge is ████, while for transaction 6 (later in the same calendar year) the provider's billed charge increases to ████. Despite the increase in the provider's billed charges, it is paid the same amount (████) in secondary closure.

- Transactions 7 and 8 are associated with two different providers in 2018. In both cases, each provider's billed charge is ████ and the Viant OPR repricing amount was approximately ████. Both transactions are subsequently subject to secondary closure, with

the providers agreeing to allowed amounts that were substantially higher than the initial repricing amount. However, for transaction 7 the provider is paid █████ (███████ of the provider's billed charge) and for transaction 8 the provider is paid █████ (████ of the provider's billed charge).

**Figure 3: Secondary Closure Transactions for IOP Services**

| Trans. Number | Provider Name | Date of Service | Billed Charge | Viant OPR Repricing Allowed Amount | Secondary Closure Allowed Amount |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |

42.  To summarize, the secondary closure of out-of-network transactions for IOP Services that were initially repriced using the Viant OPR database is common, although there is substantial variation in the amount that providers were paid in secondary closure. For some of these transactions, the amount paid to the provider is not substantially higher than the initial repricing amount. In other cases, the same provider in the same year might be paid different amounts for IOP Services with the same billed charge, or the same provider in the same year might be paid the same amount for IOP Services with different billed charges. Some secondary closure transactions result in substantial increases in the allowed amounts for IOP Services; however, for those transactions the amounts that providers are paid can differ even if the billed charges and initial repricing amounts for the services are similar.

43.  While the secondary closure of repriced transactions for IOP Services was common, some providers did not balance bill participants even when the provider was presumably aware that balance billing might increase the allowed amounts for the transactions. One such example is shown in Figure 4 below. All thirteen transactions reflected in the figure are for IOP Services provided by ████████████ in November and December 2019, and the billed charge is ████ in each transaction. Transaction 1 in the figure was initially repriced using the Viant OPR database but is subsequently subject to secondary closure. ██████████████ is paid █████ in secondary closure.

44.     Following transaction 1, there are twelve additional transactions for IOP Services provided by ███████████████ in the remainder of calendar year 2019 (*i.e.*, dates of service following the transaction that was subject to secondary closure). However, although transaction 1 is subject to secondary closure, transactions 2-13 are repriced using the Viant OPR database with the allowed amounts ranging between ██████ and ██████. None of these twelve transactions is subject to secondary closure in response to a request from the participants. While these twelve transactions are adjudicated with the Viant OPR database rather than with a signed agreement (*e.g.*, secondary closure), ███████████████'s acceptance of ████████ in secondary closure for an earlier transaction suggests that it is unlikely to have pursued balance bills for its full ██████ charge from each plan participant.

**Figure 4: Secondary Closure and Repricing Transactions for** ████████████████

| Trans. Number | Provider Name [1] | Date of Service [2] | Transaction Type [3] | Billed Charge [4] | Allowed Amount [5] |
|---|---|---|---|---|---|
| 1 | | | | | |
| 2 | | | | | |
| 3 | | | | | |
| 4 | | | | | |
| 5 | | | | | |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |
| 13 | | | | | |

## B.  Maximum Reimbursable Charge Benefit Caps

### 1.  MRC1 Benefit Caps

45.      MRC1 plans cover an out-of-network provider's billed charges up to an amount that is not higher than the plan's Maximum Reimbursable Charge, which is based on a database of charge percentiles selected by CHLIC. For example, the 2018 plan documents for a plan offered by Intuit Inc., which covered Plaintiff RJ, define the plan's Maximum Reimbursable Charge for medical services as:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> • the provider's normal charge for a similar service or supply; or

- a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.

The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[31]

The Schedule in the 2018 plan documents shows that Intuit Inc. chose the 80th percentile in calculating the Maximum Reimbursable Charge.[32]

46.     The 2019 plan documents for a plan offered by Intuit Inc. use a different definition of the Maximum Reimbursable Charge for medical services:

The Maximum Reimbursable Charge for covered services for Open Access Plus is determined based on the lesser of:

- the provider's normal charge for a similar service or supply; or

- a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.

The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[33]

---

[31] CIG_RJ00000029-90 at 85.

[32] *Id.* at 42.

[33] CIG_RJ00691297-358 at 353.

The Schedule in the 2019 plan documents shows that Intuit Inc. chose the 80th percentile in calculating the Maximum Reimbursable Charge.[34]

47.     The 2022 plan documents for a plan offered by Intuit Inc. use a third definition of the Maximum Reimbursable Charge for medical services:

> The Maximum Reimbursable Charge for covered services for Open Access Plus is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply;
>
> - the amount agreed to by the Out-of-Network provider and Cigna; or
>
> - a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.
>
> The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.
>
> The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[35]

The Schedule in the 2022 plan documents shows that Intuit Inc. chose the 80th percentile in calculating the Maximum Reimbursable Charge.[36]

48.     For all three plans, the "database selected by Cigna" to determine the Maximum Reimbursable Charge for IOP Services is the Viant OPR database, although the method used by MultiPlan to calculate the charge percentiles published in the Viant OPR database differed over the course of the proposed class period. ████████████████████████████████████

---

[34] *Id.* at 310.

[35] CIG_RJ00972085-152 at 147-148.

[36] *Id.* at 098.



49.	APCs are codes used by Medicare in determining reimbursement amounts for outpatient services. As described by the federal Medicare Payment Advisory Commission, APCs are assigned "on the basis of clinical and cost similarity" and a provider receives the same Medicare reimbursement amount for all services assigned to the same APC.[39] IOP Services are not separately covered by Medicare and so are not assigned by CMS to a particular APC code.[40] As an alternative (and rather than calculating charge percentiles for HCPCS code H0015), MultiPlan calculated charge percentiles for IOP Services using billed charges for health care services that are assigned to APC 5823.[41]

50.	APC 5823 corresponds to "Level 3 Health and Behavior Services" and is the highest-level (*i.e.*, involving services with the highest costs and with the highest reimbursement rates) outpatient

---

[37] Deposition of Karen Beckstead (November 22, 2022) at 57, 66-69.

[38] *Id*.

[39] Medicare Payment Advisory Commission, Outpatient Hospital Services Payment System (Revised: October 2022) at 1 *available at* https://www.medpac.gov/wp-content/uploads/2022/10/MedPAC_Payment_Basics_22_OPD _FINAL_SEC_v3.pdf.

[40] *See* Centers for Medicare & Medicaid Services, Hospital Outpatient Prospective Payment System Addendum B (January 2023 – updated January 20, 2023) *available at* https://www.cms.gov/medicare/medicare-fee-service-payment/hospitaloutpatientpps/addendum-and-addendum-b-updates/january-2023.

[41] Deposition of Karen Beckstead (November 22, 2022) at 10, 17-19.

behavioral health service covered by Medicare that does not involve partial hospitalization.[42] The procedure codes that are currently assigned to APC 5823 by CMS are shown in Figure 5.

**Figure 5: Procedure Codes Assigned to APC 5823**

| Procedure Code | Procedure Code Description |
|---|---|
| 90791 | Psychiatric diagnostic evaluation |
| 90792 | Psychiatric diagnostic evaluation with medical services |
| 90832 | Psychotherapy, 30 minutes with patient |
| 90834 | Psychotherapy, 45 minutes with patient |
| 90837 | Psychotherapy, 60 minutes with patient |
| 90839 | Psychotherapy for crisis, first 60 minutes |
| 90845 | Psychoanalysis |
| 90846 | Family psychotherapy (without the patient present), 50 minutes |
| 90847 | Family psychotherapy (conjoint psychotherapy) (with patient present), 50 minutes |
| 90849 | Multiple-family group psychotherapy |
| 90865 | Narcosynthesis for psychiatric diagnostic and therapeutic purposes (*e.g.*, sodium amobarbital (Amytal) interview) |
| 99487 | Complex chronic care management services, with the following required elements: multiple (two or more) chronic conditions expected to last at least 12 months, or until the death of the patient; chronic conditions place the patient at significant risk of death, acute exacerbation/decompensation, or functional decline; establishment or substantial revision of a comprehensive care plan; moderate or high complexity medical decision making; 60 minutes of clinical staff time directed by a physician or other qualified health care professional, per calendar month. |
| G0397 | Alcohol and/or substance (other than tobacco) misuse structured assessment (*e.g.*, AUDIT, DAST), and intervention, greater than 30 minutes |
| G2086 | Office-based treatment for opioid use disorder, including development of the treatment plan, care coordination, individual therapy and group therapy and counseling; at least 70 minutes in the first calendar month |
| G2087 | Office-based treatment for opioid use disorder, including care coordination, individual therapy and group therapy and counseling; at least 60 minutes in a subsequent calendar month |

51.     The use of charge data for APC 5823 (rather than for HCPCS H0015) allows MultiPlan to calculate charge percentiles for IOP Services for nearly all of the approximately 200 MultiPlan

---

[42] Centers for Medicare & Medicaid Services, Hospital Outpatient Prospective Payment System Addendum A (January 2023 – updated January 20, 2023) *available at* https://www.cms.gov/medicare/medicare-fee-service-payment/hospitaloutpatientpps/addendum-and-addendum-b-updates/january-2023-0.

geographies in the United States rather than calculating a national charge percentile as MultiPlan previously had.[43]

52.     The three Intuit Inc. health plans I referenced above used the Viant OPR database to calculate "a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna."[44] If an out-of-network transaction for IOP Services was not adjudicated using another method (*e.g.*, one of the cost-containment methods discussed in Section IV.A), the plan would allow the lesser of the MRC1 benefit for IOP Services and the provider's billed charges. As noted in the Schedule for the Intuit Inc. 2018 plan, if the MRC1 benefit cap is less than the provider's billed charges, "[t]he provider may bill [the participant] for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance."[45]

### 2.  MRC2 Benefit Caps

53.     MRC2 plans do not use the Viant OPR database to calculate the Maximum Reimbursable Charge for IOP Services. As with MRC1 plans, MRC2 plans cover an out-of-network provider's billed charges up to an amount that is not higher than the plan's Maximum Reimbursable Charge, but the Maximum Reimbursable Charge is based on a Medicare-like fee schedule developed by CHLIC and not the Viant OPR database. For example, the 2019 plan documents for a plan offered by Impossible Foods Inc., which covered Plaintiff DS, define the plan's Maximum Reimbursable Charge for out-of-network services as:

> If the provider is not a network provider, the Maximum Reimbursable Charge for covered expenses is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or
>
> - an Employer-selected percentage of a fee schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.

---

[43] MPI-C0000216 – 224 at 221.

[44] CIG_RJ00000029-90 at 85; CIG_RJ00691297-358 at 353; CIG_RJ00972085-152 at 148.

[45] CIG_RJ00000029-90 at 42.

The percentage used to determine the Maximum Reimbursable Charge is the 110th percentile.

In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:

- the provider's normal charge for a similar service or supply; or

- the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[46]

54.     A 2022 plan document for a plan offered by Robert Half International Inc. uses a different definition of the Maximum Reimbursable Charge for medical services:

The Maximum Reimbursable Charge for covered services for Open Access Plus is determined based on the lesser of:

- the provider's normal charge for a similar service or supply;

- the amount agreed to by the Out-of-Network provider and Cigna; or

- a policyholder-selected percentage of a fee schedule Cigna has developed that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable reimbursement for the same or similar service within the geographic market.

The percentage used to determine the Maximum Reimbursable Charge is listed in The Schedule.

In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:

- the provider's normal charge for a similar service or supply; or

- the amount agreed to by the Out-of-Network provider and Cigna; or

---

[46] CIG_RJ00000577-646 at 633-634.

- the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[47]

55.     As I noted above, because IOP Services are not covered by Medicare, CMS does not calculate a Medicare fee schedule amount for IOP Services. To calculate the MRC2 benefit cap for IOP Services, I understand that CHLIC calculates Medicare-like rates for another substance use disorder service: APC 5863, which corresponds to services for hospital-based partial hospitalization programs with three or more services per day.[48] These partial hospitalization services represent a higher level of care for substance use disorders than IOP Services, suggesting that the MRC2 benefit cap for IOP Services is higher than it would have been if CMS calculated a Medicare fee schedule amount that was specific to IOP Services.

56.     To see this, CMS notes that "APC 5863…is the maximum partial hospitalization per diem payment rate for a hospital…. [CMS] believe[s] that the costs associated with administering a partial hospitalization program at a hospital represent the most resource intensive of all outpatient mental health services."[49] That is, the MRC2 benefit cap for IOP Services is based, in part, on the highest-level outpatient behavioral health services covered by Medicare, which CMS believes "represent the most resource intensive of all outpatient mental health services."[50] In addition, APC

---

[47] CIG_RJ00099366-434 at 429.

[48] During part of the period at issue in this litigation, CMS maintained two APCs for hospital-based partial hospitalization behavioral health services: APC 5861 (Level One Partial Hospitalization (Three Services) for Hospital-based Partial Hospitalization Programs) and APC 5862 (Level Two Partial Hospitalization (Four or More Services) for Hospital-based Partial Hospitalization Programs). Beginning in 2017, APCs 5861 and 5862 were consolidated by CMS into APC 5863 (Partial Hospitalization (Three or More Services Per Day) for Hospital-based Partial Hospitalization Programs). (Department of Health & Human Services, Centers for Medicare & Medicaid Services, CMS Manual System, Transmittal 3685, December 22, 2016.)

[49] Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs; Price Transparency of Hospital Standard Charges; Radiation Oncology Model, 83 Fed. Reg. 63477 (November 16, 2021).

[50] *Id.*

5863 corresponds to a higher level of care than HCPCS H0015, which implies that if Medicare did cover IOP Services, the Medicare allowed amount for IOP Services would be no higher than the Medicare allowed amount for the partial-hospitalization behavioral health services reflected in APC 5863.[51]

57.     The Maximum Reimbursable Charge for IOP Services covered by an MRC2 plan is calculated using the product of Medicare-like rates for APC 5863 and the multiplier chosen by the plan sponsor. For example, the national Medicare fee schedule amount for APC 5863 in calendar year 2023 is $268,[52] so an MRC2 plan that used a multiplier of 150 percent would hypothetically set the national Maximum Reimbursable Charge for IOP Services to be no higher than $402 (= $268 × 150 percent).

58.     To summarize, the Maximum Reimbursable Charge in Plaintiff DS's MRC2 plan is an amount that is no higher than the lesser of "the provider's normal charge" and a "percentage of a fee schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market."[53] Because Medicare does not cover IOP Services, there is no Medicare fee schedule amount for those services, so CHLIC instead uses a Medicare-like rate for partial hospitalization services as the basis for the Maximum Reimbursable Charge. Partial hospitalization services correspond to a higher level of care than IOP Services, so the Maximum Reimbursable Charge for IOP Services in MRC2 plans is likely higher than it would have been if CMS calculated a Medicare fee schedule amount that was specific to those services.

*  *  *

59.     In the next section I discuss the role of balance billing in determining the difference between what members of the putative class paid for IOP Services and the amount that they would

---

[51] Deposition of Wendy Gompper as 30(b)(6) Designee (October 21, 2022) at 47-49.

[52] Centers for Medicare & Medicaid Services, Hospital Outpatient Prospective Payment System Addendum A (January 2023 – updated January 20, 2023) *available at* https://www.cms.gov/medicare/medicare-fee-service-payment/hospitaloutpatientpps/addendum-and-addendum-b-updates/january-2023-0.

[53] CIG_RJ00000577-646 at 633-634.

have paid if the Viant OPR database had been replaced by an alternative database of charge percentiles.

### V. INDIVIDUALIZED INQUIRY WOULD BE REQUIRED TO CALCULATE THE DIFFERENCE BETWEEN WHAT MEMBERS OF THE PUTATIVE CLASS PAID AND WHAT THEY SHOULD HAVE PAID

60.     Although they did not perform such a calculation or describe how they would perform such a calculation, in their report Drs. Luke and Piper state that ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████ [54] While Drs. Luke and Piper do not describe how they propose calculating underpayments for each transaction or provide the details of their proposed method for calculating alternative percentile values, I assume that damages for each plan participant would be calculated as the difference between (1) what the participant paid for out-of-network IOP Services that were adjudicated using the Viant OPR database and (2) what the participant would have paid for out-of-network IOP Services had the allowed amounts for those transactions been adjudicated using percentiles values that Drs. Luke and Piper would consider reasonable for each plan participant.

61.     Under Plaintiffs' presumed approach, Drs. Luke and Piper do not address a key consideration in performing this calculation: calculating the difference between what members of the proposed class paid and what they should have paid depends critically on whether those members were balance billed by their providers. This is an inherently individualized inquiry that cannot be performed on a class-wide basis. In what follows, I discuss the impact of balance billing on calculating damages on a class-wide basis and the prevalence of balance billing by out-of-network providers of IOP Services.

---

[54] RPC REPORT, ¶ 48.

### A. Balance Billing Affects Whether a Participant Would Have Paid More or the Same Amount Under Plaintiffs' Presumed Approach

62.     Participants may be balance billed by out-of-network providers for transactions that are adjudicated at their plans' Maximum Reimbursable Charge. As described in the 2019 documents for a plan offered by Intuit Inc., for out-of-network services "[t]he provider may bill [the plan participant] for the difference between the provider's normal charge and the Maximum Reimbursable Charge, in addition to applicable deductibles and coinsurance."[55] As an example, a participant in the 2019 Intuit Inc. plan received out-of-network IOP Services from a provider with a billed charge of $1,700. The transaction was adjudicated at the plan's MRC1 benefit cap, which was calculated using the Viant OPR database. The allowed amount for the transaction was $184.52; the participant had not yet met their individual or family deductible, so the entirety of the allowed amount was owed by the participant. In addition to owing that deductible amount, the participant may have also been billed for $1,515.48, which is the difference between the amount allowed under their plan ($184.52) and the amount billed by the provider ($1,700). However, while the deductible amount is recorded in the CHLIC transaction data, nothing in those data indicates whether the participant was balance billed or for how much.

63.     Calculating the difference between what this participant paid for their IOP Services and what they would have paid had the MRC1 benefit cap been determined in some other way requires information about whether the participant was balance billed. To see this, consider the hypothetical transactions summarized in Figure 6. Although Drs. Luke and Piper have not calculated "███████████████████████████████████" for any transaction at issue in this matter, the 2019 Intuit Inc. plan used the 80th percentile in calculating MRC1 benefit caps.[56] ██

███████████████████████████████████████████████████████████████████

████████████████████████████████ [57] █████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[55] CIG_RJ00691297-358 at 310.

[56] *Id.*

[57] RPC Report at 19.

█████████████████.[58] But for the purpose of these hypotheticals, I assume that Plaintiffs' position is that the MRC1 benefit cap for this transaction should have been calculated using $2,100.00 as the 80th percentile of charges rather than $184.52 from the Viant OPR database.

64.     For each of the three transactions, I assume that the provider's billed charge ($1,700.00), the 80th percentile of charges from the Viant OPR database ($184.52), and the 80th percentile of charges from the alternative database ($2,100.00) are the same. For the first two transactions, I assume that the plan participant had not made any payments towards their annual individual out-of-network deductible of $2,500.00.[59] For the third transaction, I assume that the plan participant had already met either their individual or family out-of-network deductible, had not met their plan's out-of-pocket maximum, and would owe the out-of-network coinsurance amount of 30 percent of the allowed amount for IOP Services.[60] Lastly, I assume that the provider does not balance bill the participant for transactions 1 and 3 and that the provider does balance bill the participant for transaction 2. With this background, I describe the change in the amounts that participants would have paid for each of the three transactions.

**Figure 6: Balance Billing and Damages**

**A. Viant OPR Database**

| Trans. Number | Billed Charge | Charge Percentile | Allowed Amt. | Deduct. | Coins. | Amt. Paid by Plan | Balance Bill Amt. | Total Paid. By Participant |
|---|---|---|---|---|---|---|---|---|
| | [1] | [2] | [3] = lesser of {[1],[2]} | [4] | [5] | [6] = [3]-[4]-[5] | [7] | [8] = [4]+[5]+[7] |
| 1 | $ 1,700.00 | $ 184.52 | $ 184.52 | $ 184.52 | $ - | $ - | $ - | $ 184.52 |
| 2 | $ 1,700.00 | $ 184.52 | $ 184.52 | $ 184.52 | $ - | $ - | $ 1,515.48 | $ 1,700.00 |
| 3 | $ 1,700.00 | $ 184.52 | $ 184.52 | $ - | $ 55.36 | $ 129.16 | $ - | $ 55.36 |

**B. Alternative Database of Charge Percentiles**

| Trans. Number | Billed Charge | Charge Percentile | Allowed Amt. | Deduct. | Coins. | Amt. Paid by Plan | Balance Bill Amt. | Total Paid. By Participant | Change in Amt. Paid by Participant |
|---|---|---|---|---|---|---|---|---|---|
| | [1'] | [2'] | [3'] = lesser of {[1'],[2']} | [4'] | [5'] | [6'] = [3']-[4']-[5'] | [7'] | [8'] = [4']+[5']+[7'] | [9'] = [8']-[8] |
| 1 | $ 1,700.00 | $ 2,100.00 | $ 1,700.00 | $ 1,700.00 | $ - | $ - | $ - | $ 1,700.00 | $ 1,515.48 |
| 2 | $ 1,700.00 | $ 2,100.00 | $ 1,700.00 | $ 1,700.00 | $ - | $ - | $ - | $ 1,700.00 | $ - |
| 3 | $ 1,700.00 | $ 2,100.00 | $ 1,700.00 | $ - | $ 510.00 | $ 1,190.00 | $ - | $ 510.00 | $ 454.64 |

65.     **Transaction 1**: Deductible and no balance billing.

---

[58] Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 80-81.

[59] CIG_RJ00691297-358 at 310.

[60] *Id.* at 320.

- With a Viant OPR charge percentile of $184.52 (column [2]) and a billed charge of $1,700.00 (column [1]), the allowed amount for the transaction is $184.52 (column [3]). If the participant has an unmet deductible, they owe $184.52 in deductible (column [4]) and the plan pays $0 (column [6]). The participant is not balance billed and the total amount paid by the participant is $184.52 (column [8]).

- With an alternative charge percentile of $2,100.00 (column [2']) and a billed charge of $1,700.00 (column [1']), the allowed amount for the transaction is $1,700.00 (column [3']). If the participant has an unmet deductible, they owe $1,700.00 in deductible (column [4']) and the plan pays $0 (column [6']). The participant is not balance billed (column [7']) and the total amount paid by the participant is $1,700.00 (column [8']).

- The amount paid by the participant in this example increases by $1,515.48 (column [9']).

66. **Transaction 2**: Deductible with balance billing.

- With a Viant OPR charge percentile of $184.52 (column [2]) and a billed charge of $1,700.00 (column [1]), the allowed amount for the transaction is $184.52 (column [3]). If the participant has an unmet deductible, they owe $184.52 in deductible (column [4]) and the plan pays $0 (column [6]). By assumption, the participant is balance billed for $1,515.48 (column [7]), which is the difference between the billed charge and the allowed amount. The total amount paid by the participant is $1,700.00 (column [8]), which is comprised of the deductible of $184.52 and the balance bill amount of $1,515.48.

- With an alternative charge percentile of $2,100.00 (column [2']) and a billed charge of $1,700.00 (column [1']), the allowed amount for the transaction is $1,700.00 (column [3']). If the participant has an unmet deductible, they owe $1,700.00 in deductible (column [4']) and the plan pays $0 (column [6']). There is no balance bill because the allowed amount is equal to the billed charge and the total amount paid by the participant is comprised of the deductible amount of $1,700.00 (column [8']).

- The amount paid by the participant in this example is unchanged (column [9']).

67. **Transaction 3**: Coinsurance and no balance billing.

- With a Viant OPR charge percentile of $184.52 (column [2]) and a billed charge of $1,700.00 (column [1]), the allowed amount for the transaction is $184.52 (column [3]).

The participant owes 30 percent of the allowed amount, or $55.36 (column [5]). The plan pays the remaining 70 percent of the allowed amount, or $129.16 (column [6]). The participant is not balance billed and the total amount paid by the participant is $55.36 (column [8]).

- With an alternative charge percentile of $2,100.00 (column [2']) and a billed charge of $1,700.00 (column [1']), the allowed amount for the transaction is $1,700.00 (column [3']). The participant owes 30 percent of the allowed amount, or $510.00 (column [5']). The plan pays the remaining 70 percent of the allowed amount, or $1,190.00 (column [6']). The participant is not balance billed and the total amount paid by the participant is $510.00 (column [8']).

- The amount paid by the participant in this example increases by $454.64 (column [9']).

68. To summarize, while these three hypothetical transactions share the same billed charge and plan benefits are the same, a higher out-of-network allowed amount for IOP Services—as Plaintiffs argue there should have been—implies that some participants might have paid the same amount or a larger amount depending on whether they had met their deductible and whether they are balance billed by the provider. In general, plan participants are financially better off with lower allowed amounts for out-of-network services if they will not be balance billed by providers. This is because a lower allowed amount for the transaction reduces the plan participant's deductible payment or coinsurance payment. For other transactions where the participant has not yet met their deductible but is balance billed, they would pay the same amount regardless of the Maximum Reimbursable Charge or allowed amount for the transaction.

### B. Individualized Inquiry Is Necessary to Determine How Much Members of the Proposed Class Would Have Paid

69. Although the three transactions I previously discussed were simplified hypothetical transactions, analogues of each type of transaction are present in the transaction data produced by CHLIC in this matter.

### 1. Deductible Transactions without Balance Billing

70. The out-of-network transactions for IOP Services for one participant who paid deductibles for those services are shown in Figure 7. The services reflected in this figure were rendered by a

single provider in 2017 and were covered by an MRC1 plan that used the 80th percentile of the Viant OPR database to calculate the plan's Maximum Reimbursable Charge. Each of the eight transactions reflected in the figure was adjudicated at the plan's MRC1 benefit cap. The provider's billed charge for each transaction is ███████ (column [1]) and the 80th percentile in the Viant OPR database is ██████ (column [2]), resulting in an allowed amount of ██████ (column [3]). The participant owed the entire allowed amount as a deductible for each of the eight transactions (column [4]), resulting in total deductible payments over the plan year of ████████ Nothing in the transaction data indicates whether the participant is balanced billed by their provider, but I first assume that the participant is not. Under that assumption the balance bill amount (column [5]) is ██ for each transaction.

**Figure 7: MRC1 Benefit Cap Deductible Transactions without Balance Billing**

| Trans. Number | Billed Charge | Viant OPR Database | | | | Alternative Database of Charge Percentiles | | | | Change in Amount Paid |
| | | Charge Percentile | Allowed Amount | Deduct. Amount | Balance Bill Amt. | Charge Percentile | Allowed Amount | Deduct. Amount | Balance Bill Amt. | |
| | [1] | [2] | [3] = lesser of {[1],[2]} | [4] | [5] | [6] | [7] = lesser of {[1],[6]} | [8] | [9] | [10] = [8]+[9] -[4]-[5] |
| 1 | $ | | | | | | | | | |
| 2 | $ | | | | | | | | | |
| 3 | $ | | | | | | | | | |
| 4 | $ | | | | | | | | | |
| 5 | $ | | | | | | | | | |
| 6 | $ | | | | | | | | | |
| 7 | $ | | | | | | | | | |
| 8 | $ | | | | | | | | | |
| **Total Amount Paid During Plan Year** | | | ████████ | - | | | $ | | | |

71.    In columns [6] through [9] I recalculate the amount that the participant would owe for these transactions using an alternative database of charge percentiles. Because Drs. Luke and Piper have not proposed an alternative to the Viant OPR database, I assume that Plaintiffs' position is that the MRC1 benefit cap for this transaction should have been based on ████████████████████████ ████████████████████████████████████████████████████████ (column [6]).[61] The allowed amount for each transaction would increase to ██████ (column [7]) and the participant would owe a deductible amount of ██████ (column [8]) for each transaction. (The transaction data do not report the participant's unmet deductible for the plan year. However, another participant in the same plan has ████████ in out-of-network deductible payments, so I assume the participant in this example has at least ████████ in unmet deductible that could be

---

[61] RPC REPORT at 19.

applied to these transactions.) There is no balance bill because the allowed amount is equal to the billed charge (column [9]). In this case the amount the participant owed would increase by ▮▮▮▮ (column [10]) for each transaction, or ▮▮▮▮ for the plan year. That is, under Plaintiffs' presumed approach and under Plaintiffs' experts' calculations of hypothetical national percentiles, in the absence of balance billing this member of the proposed class would owe more for their transactions.

## 2. Deductible Transactions with Balance Billing

72.　Now consider the same set of transactions but assume that the participant is balance billed by their provider. This situation is shown in Figure 8. Columns [1] through [4] are as in Figure 7, but the participant is also balance billed for the difference between the provider's billed charge and the allowed amount for each transaction (column [5]). As a result, for each transaction the participant owes ▮▮▮▮ in deductible and is balance billed for ▮▮▮▮, for total out-of-pocket payments of ▮▮▮▮.

**Figure 8: MRC1 Benefit Cap Deductible Transactions with Balance Billing**

| Trans. Number | Billed Charge | Viant OPR Database | | | | Alternative Database of Charge Percentiles | | | | Change in Amount Paid |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Charge Percentile | Allowed Amount | Deduct. Amount | Balance Bill Amt. | Charge Percentile | Allowed Amount | Deduct. Amount | Balance Bill Amt. | |
| | [1] | [2] | [3] = lesser of | [4] | [5] = [1]-[3] | [6] | [7] = lesser of | [8] | [9] = [1]-[7] | [10] = [8]+[9] -[4]-[5] |
| 1 | $ | | | | | | | | | |
| 2 | $ | | | | | | | | | |
| 3 | $ | | | | | | | | | |
| 4 | $ | | | | | | | | | |
| 5 | $ | | | | | | | | | |
| 6 | $ | | | | | | | | | |
| 7 | $ | | | | | | | | | |
| 8 | $ | | | | | | | | | |
| **Total Amount Paid During Plan Year** | | | | | | | | $ | | |

73.　In columns [6] through [9] I recalculate the amount that the participant would have owed for these transactions using an alternative charge percentile of ▮▮▮▮ (column [6]). The allowed amount for each transaction would increase to ▮▮▮▮ (column [7]) and the participant would owe a deductible amount of ▮▮▮▮ (column [8]) for each transaction. There is no balance bill because the allowed amount is equal to the billed charge (column [9]). In this case there is no difference in the amount the participant owed for each transaction (column [10]), but instead of paying a deductible of ▮▮▮▮ with a balance bill of ▮▮▮▮, the participant would pay a deductible of ▮▮▮▮ with no balance bill. That is, under Plaintiffs' presumed approach, with

balance billing this member of the proposed class would owe the same amount for their transactions.

### 3. Coinsurance Transactions without Balance Billing

74.     Figure 9 shows the out-of-network IOP Service transactions for another participant who paid coinsurance amounts for those transactions. The IOP Services reflected in these transactions were rendered by a single provider in 2021 and were covered by an MRC1 plan that used the 80th percentile of the Viant OPR database to calculate the plan's Maximum Reimbursable Charge. Each of the two transactions reflected in the figure was adjudicated at the plan's MRC1 benefit cap. The provider's billed charge for each transaction is ████ (column [1]) and the 80th percentile from the Viant OPR database is ████ (column [2]), resulting in an allowed amount of ████ (column [3]). There was no deductible owed for the transaction and the participant owed a coinsurance of ████ (column [4]) for each transaction. The coinsurance rate for out-of-network IOP Services is not recorded in the transaction data, but it appears that the relevant coinsurance rate from the participant's plan's Schedule was 50 percent (*e.g.*, ████ is ████). Nothing in the transaction data indicates whether the participant is balanced billed by their provider, but I assume that the participant is not. Under that assumption, the balance bill amount (column [5]) is ██ for each transaction.

**Figure 9: MRC1 Benefit Cap Coinsurance Transactions without Balance Billing**

| Trans. Number | Billed Charge | Viant OPR Database | | | | Alternative Database of Charge Percentiles | | | | Change in Amount Paid |
| | | Charge Percentile | Allowed Amount | Coins. Amount | Balance Bill Amt. | Charge Percentile | Allowed Amount | Coins. Amount | Balance Bill Amt. | |
| | [1] | [2] | [3] = lesser of {[1],[2]} | [4] = 50% × [3] | [5] | [6] | [7] = lesser of {[1],[6]} | [8] = 50% × [7] | [9] | [10] = [8]+[9] -[4]-[5] |
| 1 | $ | | | | | | | | | |
| 2 | $ | | | | | | | | | |
| **Total Amount Paid During Plan Year** | | | | $ | | | | | | |

75.     In columns [6] through [9] I recalculate the amount that the participant would have owed for these transactions using a higher alternative charge percentile. To do this I use Drs. Luke and Piper's ████ (column [6]). [62] The allowed amount for each transaction would increase to ████ (column [7]) and the participant would owe a coinsurance amount of ████ (column [8]).

---

[62] *Id.* at 19.

(I assume that the increase in the coinsurance amount does not cause the participant to meet their plan's out-of-pocket maximum.) There is no balance bill because the allowed amount is equal to the billed charge (column [9]). In this case the amount the participant owed would increase by ███████ (column [10]) for each transaction, or ███████ for the plan year. That is, under Plaintiffs' presumed approach, in the absence of balance billing this member of the proposed class would owe *more* for their transactions and therefore be economically worse off in Plaintiffs' proposed alternative scenario.

* * *

76.     To summarize, Figure 7 shows that a participant who pays only deductibles for out-of-network IOP Services may pay more using an alternative charge percentile if they are not balance billed. Figure 8 shows that the same participant may pay the same amount for those services if they are balanced billed. Figure 9 shows that a participant who pays only coinsurance for out-of-network IOP Services may pay more with Plaintiffs' higher alternative charge percentile if they are not balance billed by their provider. For these transactions, whether the participant pays more or the same amount out-of-pocket depends on whether they are balance billed, but I am not aware of any comprehensive source of information on the incidence of balance billing on a transaction-by-transaction basis. Instead, as Dr. Luke testified, ████████████████████████████████ ███████████████████████████████.[63] However, as I discuss in Section V.D below, the records of individual providers in this matter indicate that at least some providers do not balance bill.

### C.  Balance Billing May Lead Members of the Putative Class to Have Differing Incentives Regarding their MRC1 Benefit Caps

77.     In the previous discussion I showed that some participants may pay more with higher MRC1 benefit caps under Plaintiffs' presumed approach while others may pay the same amount, depending on whether each participant is balance billed by their provider. Determining which members of the proposed class are financially better off with higher or lower MRC1 benefits caps therefore requires an individualized assessment of whether those members' providers balance billed them for IOP Services. In this section I show that members of the proposed class might have

---

[63] Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 200-202.

divergent interests regarding whether to use the Viant OPR database or an alternative to calculate their plans' Maximum Reimbursable Charge. This is true even if it were possible to establish which providers balance billed members of the proposed class.

78. Figure 10 shows seventeen transactions for out-of-network IOP Services for a single participant in 2017, who I refer to as ███. ███ was enrolled in a plan that calculated the Maximum Reimbursable Charge using the MRC1 method at the 80th percentile of providers' charges. Transactions 1 to 16 are associated with the ████████████████ and transaction 17 (highlighted in blue) is associated with ████████████████. All seventeen transactions were adjudicated using the Viant OPR database, with some transactions priced at the plan's MRC1 benefit cap and some repriced under CHLIC's cost containment methods. (Although MRC1 benefit cap and repricing transactions differ in participant's potential exposure to balance billing, for the purpose of this discussion I do not distinguish between these two uses of the Viant OPR database.)

**Figure 10: Out-of-Network Transactions for IOP Services, ███**



79. Columns [1] through [6] show how the transactions are actually adjudicated and columns [7] though [11] reflect how the transactions would be adjudicated if the Viant OPR database were replaced with a database of higher charge percentiles. For each transaction, the columns shown in the figure are:

- Column [1] shows the providers' billed charge.

- Column [2] shows the relevant charge percentile from the Viant OPR database.

- Column [3] shows the allowed amount, which is calculated the lesser of the providers' charge and the Viant OPR charge percentile.

- Column [4] shows the deductible amount paid by the participant. This amount is zero except for transaction 1 (*i.e.*, the participant meets their unmet deductible of $300.00 on the first transaction in the figure).

- Column [5] shows the coinsurance amount paid by the participant. While the coinsurance rate from the plan's Schedule is not recorded in the transaction data, it appears that the member owed a coinsurance rate of 40 percent for out-of-network IOP Services. The coinsurance amount is calculated as 40 percent of the difference between the allowed amount and the deductible paid.

- Column [6] shows the amount that the participant would be charged if they were balanced billed by the provider. This is calculated as the difference between the providers' billed charge and the allowed amount for the transaction.

- Column [7] shows an alternative charge percentile. While Plaintiffs have not proposed an alternative to the Viant OPR database, I assume that their position is that the Viant OPR percentile should be replaced by Drs. Luke and Piper's ██████████████████████████ ████████████████████████████████████████[64]

- Columns [8] through [11] are calculated in a manner analogous to columns [3] through [6] but replacing the Viant OPR charge percentile with the 80th percentile calculated by Plaintiffs' experts. As a result, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████. (The transaction data do not record the participant's unmet contributions towards their out-of-pocket maximum, so I assume that the increase in coinsurance amounts would not cause them to reach that threshold.)

80. Figure 11 shows 45 transactions for out-of-network IOP Services for a second participant in 2019, who I refer to as ████ was enrolled in a plan that calculated the Maximum Reimbursable

---

[64] RPC REPORT at 19.

Charge using the MRC1 method at the 80th percentile of providers' charges. Transactions 1 to 4 are associated with the ▮▮▮▮▮▮▮▮▮▮▮▮ and transactions 5 to 45 (highlighted in blue) are associated with ▮▮▮▮▮▮▮▮▮▮▮▮. All 45 transactions were adjudicated using the Viant OPR database, with some transactions priced at the plan's MRC1 benefit cap and some repriced under CHLIC's cost containment methods.

**Figure 11: Out-of-Network Transactions for IOP Services, ▮**

| Trans. Number | Billed Charge | Viant OPR Database | | | | | Alternative Database of Charge Percentiles | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Charge Percentile | Allowed Amount | Deduct. Amount | Coins. Amount | Balance Bill Amt. | Charge Percentile | Allowed Amount | Deduct. Amount | Coins. Amount | Balance Bill Amt. |
| | [1] | [2] | [3] = lesser of {[1],[2]} | [4] | [5] = 20%×([3]-[4]) | [6] = [1]-[3] | [7] | [8] = lesser of {[1],[7]} | [9] | [10] = 40%×([8]-[9]) | [11] = [1]-[8] |
| 1 | | | | | | | | | | | |
| 2 | | | | | | | | | | | |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | | | | | | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | | | | | | | | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |
| 31 | | | | | | | | | | | |
| 32 | | | | | | | | | | | |
| 33 | | | | | | | | | | | |
| 34 | | | | | | | | | | | |
| 35 | | | | | | | | | | | |
| 36 | | | | | | | | | | | |
| 37 | | | | | | | | | | | |
| 38 | | | | | | | | | | | |
| 39 | | | | | | | | | | | |
| 40 | | | | | | | | | | | |
| 41 | | | | | | | | | | | |
| 42 | | | | | | | | | | | |
| 43 | | | | | | | | | | | |
| 44 | | | | | | | | | | | |
| 45 | | | | | | | | | | | |

81.    Each column in Figure 11 is calculated in the same manner as the corresponding column in Figure 10. Because the transactions in Figure 11 are from 2019, I use Drs. Luke and Piper's ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,

██████████████ [65] As with ███ the transaction data do not record ███ unmet contributions towards their out-of-pocket maximum, so I assume that the increase in coinsurance amounts would not cause them to reach that threshold. ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████

82.     ███ and ██ received out-of-network IOP Services from the same two providers. But, even so, they may have divergent financial interests regarding whether they prefer that their respective plans use the Viant OPR database or Plaintiffs' experts' alternative database to adjudicate their transactions. Intuitively, this is because if the ████████████████ balance bills patients but ████████████████████ does not, ██ prefers the *higher* alternative charge percentile. This reduces ███ 's out-of-pocket expenses at the ████████████████████████ (where most of their services were received) at the cost of increasing their out-of-pocket expenses at ████████████ (where they had only one transaction). In contrast, under the same assumptions, ███ prefers the *lower* Viant OPR charge percentile. This reduces ███ 's out-of-pocket expenses at ███ ████████████████████ (where most of their services were received) at the cost of increasing their out-of-pocket expenses at the ████████████████████ (where they had only four transactions). The opposite is true if ████████████████████ balance bills patients but the ██████████████ ████████ does not: ███ prefers the lower Viant OPR charge percentile and ███ prefers the higher alternative charge percentile. That is, even in a situation in which it was possible to determine which providers balance bill patients, members of the proposed class may have divergent financial interests.

83.     To see this, Figure 12 summarizes the amounts that ███ (in the upper panel of the figure) and ███ (in the lower panel of the figure) would pay in coinsurance/deductibles and balance bills under each of the four possible combinations of approaches to balance billing by the ████████ ████████████████████████████████ . These approaches are indicated in columns [1] and [2]. Column [3] shows the amount that the participant pays in deductible and coinsurance (which is unaffected by providers' balance billing) using the Viant OPR database. Column [4]

---

[65] *Id.*

shows the amount that the participant would pay in balance bills using the Viant OPR database under the four different assumptions regarding whether the ████████████████ and ████ ████████████ balance bill patients. Column [5] shows total (*i.e.*, including both coinsurance, deductibles, and balance bills) out-of-pocket expenses for the participants. Columns [6] through [8] are analogous to columns [3] through [5], but the figures in these columns base the adjudication of each transaction on Plaintiffs' presumed alternative database of charge percentiles.

**Figure 12: Summary of Out-of-Pocket Expenses for** ████████████



84. The last column in the table indicates whether the participant would have paid less out-of-pocket using the Viant OPR database rather than the alternative database of charge percentiles.

- If neither provider balance bills, both participants pay less with the Viant OPR database.

- Participants ████████ have divergent financial interests if one provider balance bills and the other does not. If the ████████████████ balance bills, ██ pays more with the Viant OPR database than the alternative and PB pays less. If ████████████████ ████████, ██ pays less with the Viant OPR database than the alternative and ██ pays more.

That is, even knowing which provider balance bills, members of the putative class have differing financial interests regarding which database is used to adjudicate transactions for out-of-network IOP Services.

### D. The Prevalence of Balance Billing

85.     For the reasons discussed above, whether members of the proposed class would have paid less or the same amount for IOP Services under Plaintiffs' presumed approach depends on whether those members were balanced billed by their out-of-network providers. However, as Dr. Luke recognizes, [66] ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████ .

86.     Despite the lack of class-wide information on the incidence of balance billing for each transaction potentially at issue in this matter, ███████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████

- ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████"[67]

- ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████

---

[66] Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 200-202.

[67] Declaration of Thomas Hathorn Regarding Subpoena Issued to ███████████████ , *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (April 30, 2022), ¶ 7.

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████. „68

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████. 69

87. ████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
█████████

88. ████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

---

[68] Declaration of Catherine Bucheger Regarding Subpoena Issued to ███████████████████████, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (November 3, 2022), ¶ 5.

[69] Declaration of Michael Borkowski Regarding Subpoena Issued to ███████████████████████, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (November 3, 2022), ¶¶ 5-6.

████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████ ██ █
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

That is, under Plaintiffs' presumed approach, this member of the proposed class would owe *more* for their transaction.

**Figure 13:** ████████████ **Coinsurance Transaction**



| Trans. Number | Billed Charge | Viant OPR Database | | | Alternative Database of Charge Percentiles | | | Change in Amount Paid |
|---|---|---|---|---|---|---|---|---|
| | | Charge Percentile | Allowed Amount | Coins. Amount | Charge Percentile | Allowed Amount | Coins. Amount | |
| | [1] | [2] | [3] = lesser of {[1],[2]} | [4] = 30% × [3] | [5] | [6] = lesser of {[1],[5]} | [7] = 30% × [6] | [8] = [7] - [4] |
| 1 | $ █████ | ███ | ██████ | ██████ | ██████ | ██████ | ██████ | ██████ |

89.    Figure 14 shows a deductible transaction for ████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[70] RPC REPORT at 19.

[71] *Id.*



**Figure 14:** ▮▮▮▮▮▮▮▮▮▮ **Deductible Transaction**

| Trans. Number | Billed Charge | Viant OPR Database | | | Alternative Database of Charge Percentiles | | | Change in Amount Paid |
| | | Charge Percentile | Allowed Amount | Deduct. Amount | Charge Percentile | Allowed Amount | Deduct. Amount | |
| | [1] | [2] | [3] = lesser of {[1],[2]} | [4] | [5] | [6] = lesser of {[1],[5]} | [7] | [8] = [7] - [4] |
| 1 | $ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | | | | | | | |

90.    Aside from transactions for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, the relative prevalence of repricing transactions for IOP Services and transactions for IOP Services that were subject to secondary closure is informative regarding the incidence of balance billing. As I discussed in Section IV.A, for repricing transactions, a provider may choose to reject the offer made using the Viant OPR database. In those situations, the participant is informed that they should contact CHLIC if they are balanced billed by their provider.[72] In such a case, the transaction would be subject to secondary closure and the allowed amount would increase above the initial repricing amount if Viant and the provider were able to reach an agreement.

91.    If the provider rejects the initial repricing amount, the plan participant has strong financial incentive to seek secondary closure for the transaction. For the participant who is potentially balanced billed, secondary closure increases the allowed amount for the transaction with the goal of securing an agreement from the provider not to balance bill the patient. As a result, the amount owed by the patient is reduced in secondary closure.

92.    However, although there are 239,503 transactions for out-of-network IOP Services that were repriced using the Viant OPR database, there are only 25,702 transactions for out-of-network IOP Services that resulted in a secondary closure.[73] Because each secondary closure transaction was initially repriced using the Viant OPR database, it follows that secondary closure was sought

---

[72] *See, e.g.*, PRJ0000043-69.

[73] *See* n. 13, *supra*.

on less than ten percent of Viant OPR repricing transactions. While this analysis concerns repricing transactions and not transactions where the Viant OPR database was used to determine MRC1 benefit caps, it suggests that plan participants were balance billed for a minority of transactions for out-of-network IOP Services that were allowed at the plans' MRC1 benefit caps. For those participants who did not receive a balance bill, they may have paid less out-of-pocket than they would have if, as Plaintiffs argue, an alternative to the Viant OPR database had been used to calculate the plan MRC1 benefit caps.

## VI. MEMBERS OF THE PUTATIVE CLASS DIFFER IN HOW THE VIANT OPR DATABASE WAS USED TO ADJUDICATE TRANSACTIONS FOR IOP SERVICES

93.     In this section I return to a discussion of how out-of-network transactions for IOP Services were adjudicated in CHLIC client plans. To summarize my previous discussion in Section IV:

- In both MRC1 and MRC2 plans, the Viant OPR database may be used to determine repricing amounts under cost containment methods that CHLIC makes available to plan sponsors. For repricing transactions, the provider may choose to reject the pricing recommendation, but the participant is told to contact CHLIC if the provider attempts to balance bill them (*i.e.*, if the provider does not accept the repricing amount as payment in full). Among the transactions potentially at issue in this matter, there are 240 thousand transactions for out-of-network IOP Services repriced using the Viant OPR database.

- The Viant OPR database is used to determine benefit caps for IOP Services in MRC1 plans. Among the transactions potentially at issue in this matter, there are 17 thousand transactions for out-of-network IOP Services adjudicated at the MRC1 benefit cap. For transactions that are adjudicated at the MRC1 benefit cap, the participant may be balance billed by the provider for the difference between the plan allowed amount and the provider's billed charge.

- The Viant OPR database is not used to determine benefit caps for IOP Services in MRC2 plans. There are 215 transactions for out-of-network IOP Services that were originally adjudicated using the Viant OPR database but were ultimately adjudicated at the plans' MRC2 benefit cap. Any participant whose transactions for out-of-network IOP Services

were ultimately adjudicated only at the MRC2 benefit cap (or using any other method that did not involve the Viant OPR database) would not be a member of the proposed class.

In this section, I explain that the different methods for adjudicating out-of-network transactions for IOP Services have implications for which plan participants might be members of the proposed class and how those members would have been financially affected by the use of an alternative to the Viant OPR database to adjudicate out-of-network transactions.

### A. Cost Containment Repricing Transactions

94.     As reflected in the transaction data produced by CHLIC, there are 240 thousand transactions for IOP Services that were repriced using the Viant OPR database. This figure includes transactions for both MRC1 and MRC2 plans but it does not include transactions that were initially repriced using the Viant OPR database and subsequently subjected to secondary closure or adjudicated at the plans' Maximum Reimbursable Charge.

95.     As I noted previously, plan participants whose transactions were repriced using the Viant OPR database receive a letter informing them that they should contact CHLIC if they are balance billed by their provider for an amount more than is indicated on their explanation of benefits form.[74] (The explanation of benefits records coinsurance, copayments, or deductibles owed by the participant, but not the amount of any balance bill.) If they are balance billed, the participant has a strong financial incentive to contact CHLIC because, as indicated on the letter that participants receive, CHLIC "will work with Viant on your behalf to attempt to reduce your expenses from this out-of-network provider."[75] I understand that for these secondary closure transactions, Viant attempts to negotiate a signed agreement with the provider for an amount that exceeds the initial repricing amount. If Viant and the provider are successful in reaching an agreement in secondary closure, the participant may receive an updated explanation of benefits form that outlines their new cost-sharing amounts for the transaction. If Viant and the provider are unsuccessful in reaching an agreement, the transaction may be adjudicated at the plan's Maximum Reimbursable Charge benefit cap.

---

[74] See, *e.g.*, PRJ0000043-69.

[75] PRJ0000043-69 at 43.

96.     If plan participants are not balance billed by their provider, the participant would generally pay less if their transaction was repriced with the Viant OPR database rather than using, as in Plaintiffs' presumed approach, a database of charge percentiles that would increase the allowed amount for the transaction. This is because deductible payments and coinsurance amounts generally increase with the allowed amount for transactions. (*See* Section V, *infra*.) That is, members of the proposed class who were not balance billed would likely be financially worse off if CHLIC client plans adopted a database of charge percentiles for IOP Services like the ones described by Drs. Luke and Piper.

97.     To summarize, among transactions that were initially repriced using the Viant OPR database:

- If the participant was not balance billed by their provider, they likely would have paid more out of pocket under Plaintiffs' presumed approach (*i.e.*, an alternative method in which the percentiles in the Viant OPR database were replaced by higher amounts). These members would not have been financially harmed by CHLIC's use of the Viant OPR database.

- If the participant was balance billed by their provider and contacted CHLIC, if the secondary closure resulted in an agreement between Viant and the provider, the allowed amount for the secondary closure transaction would be determined in negotiations with the provider rather than with the Viant OPR database. In these cases, the provider would agree to refrain from balance billing the participant.

- If the participant was balance billed by their provider and contacted CHLIC, if the secondary closure did not result in an agreement between Viant and the provider, the allowed amount for the transaction would be determined by the plan's Maximum Reimbursable Charge benefit cap.

The transactions in the first category are included among the 240 thousand transactions that were repriced with the Viant OPR database. There are 26 thousand secondary-closure transactions in the second category, but these transactions were not adjudicated with the Viant OPR database.[76]

---

[76] During his deposition, ███████████████████████████████████████████████████████████████████████████ Deposition of

The transactions in the third category are included among the 279 transactions that were initially repriced using the Viant OPR database but were subsequently adjudicated at plans' MRC1 or MRC2 benefit caps, which I discuss in the next section.

## B. Benefit Caps for Out-of-Network IOP Services

98.     Many CHLIC client plans use the MRC1 or MRC2 methods for determining the Maximum Reimbursable Charge for out-of-network services. MRC1 plans use a database of percentiles of providers' charges that is selected by CHLIC for this purpose (*e.g.*, the Viant OPR database or a FAIR Health database).[77] For out-of-network IOP Services in MRC1 plans, CHLIC selects the Viant OPR database to determine percentiles of providers' charges. MRC2 plans use a fee schedule developed by CHLIC that is "based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market."[78] For out-of-network IOP Services in MRC2 plans, CHLIC currently bases the benefit cap on the Medicare fee schedule for APC 5863, which corresponds to partial hospitalization services for substance use disorder.

99.     Because of this, although participants in MRC1 plans whose transactions for IOP Services were adjudicated at their plans' benefit caps may be members of the proposed class, participants in MRC2 plans whose transactions were adjudicated at their plans' benefit caps would not be. Participants with MRC1 benefit cap transactions may differ in whether they were balance billed by providers, which affects whether the participant would have owed more, less, or the same amount under Plaintiffs' approach. In addition, among transactions that were adjudicated at the MRC1 benefit cap, changes in plan language, the method used by MultiPlan to calculate the percentiles in the Viant OPR database, the availability of alternative databases of charge percentiles (*e.g.*, FAIR Health), or the language used on explanation of benefits forms received by plan participants may require different analyses. I discuss these issues in more detail below.

---

Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 161-162. However, there is no such field in the transaction data produced by CHLIC. Rather, the adjudication method for each transaction is identified based on the "remark codes" contained in the transaction data. For example, for transactions processed on CHLIC's Proclaim system, the remark code 651 indicates that a transaction was adjudicated using an OPR Repricing offer amount while remark code 650 indicates that a transaction was adjudicated subject to a secondary closure agreement between Viant and the provider.

[77] See, *e.g.*, CIG_RJ00000029-90 at 85.

[78] See, *e.g.*, CIG_RJ00000577-646 at 633-634.

### 1. MRC1 Plans

100.     As reflected in the transaction data produced by CHLIC, there are 17 thousand transactions for IOP Services that were adjudicated at the MRC1 benefit cap (*i.e.*, where the Maximum Reimbursable Charge was determined using the Viant OPR database). These 17 thousand transactions were associated with approximately 1,700 participants. According to Plaintiffs' proposed class definition, these participants in CHLIC client plans may be members of the putative class.

101.     However, among potential members of the proposed class whose transactions were adjudicated at their plans' MRC1 benefit caps, the incidence of balance billing for their transactions affects whether the participant would have paid more, less, or the same amount for out-of-network IOP Services. (*See* Section V, *supra*.) Whether a member of the proposed class was balance billed by their provider is an individualized inquiry because neither the transaction data produced by CHLIC nor, to my knowledge, any other source of comprehensive, class-wide information identifies whether those members were balance billed.

102.     An individualized analysis would be needed to determine how much each member of the proposed class would have paid for IOP Services under Plaintiffs' presumed approach. Starting with members whose transactions for IOP Services were adjudicated at MRC1 benefit caps, the necessary steps in this analysis would include:

- Determining the alternative database of charge percentiles that would be used to determine the MRC1 benefit cap for each transaction under Plaintiffs' approach. (I discuss in Section VII that Drs. Luke and Piper have not identified an alternative to the Viant OPR database that could be used to calculate MRC1 benefit caps for IOP Services on a class-wide basis.)

- Calculating how the alternative MRC1 benefit cap would have affected the amount the member owed in coinsurance or deductibles for each transaction. While the amounts the member owed in coinsurance and deductible are recorded in the transaction data, the coinsurance rate from the plan Schedule, the member's unmet deductible, and the member's unmet contributions towards their plan's out-of-pocket maximum are not. In addition to the alternative benefit cap, this information is needed to calculate how much the member would owe for each transaction.

- If the alternative charge percentile were higher than the corresponding percentile in the Viant OPR database, the amount the member owed in deductible may increase. The increase in the deductible may then *lower* the member's deductible payments for subsequent transactions because the member's unmet deductible for subsequent transactions would be lower. Plans include individual and family out-of-pocket deductibles, requiring the recalculation of deductibles for class members as well as other participants in their families to trace the effects of shifts in transaction-by-transaction deductible accumulations.

- Many benefit plans offered by CHLIC clients contain limits on the total amounts that plan participants pay out-of-pocket over the course of a plan year. (While coinsurance and deductibles contribute to out-of-pocket maximum accumulations, balance billing amounts do not.) If the alternative MRC1 benefit cap were higher, the amount the member owed in coinsurance or deductible may increase, thereby moving the member closer to meeting their plan's out-of-pocket maximum. This potentially lowers the member's out-of-pocket payments for subsequent transactions. Plans include individual and family out-of-pocket maximums, requiring the recalculation of out-of-pocket payments for class members as well as other participants in their families to trace the effects of shifts in transaction-by-transaction out-of-pocket maximum accumulations.

- Determining whether the member was balanced billed by their provider. As I detailed in Section V, if the member was not balanced billed, they potentially pay more with a higher MRC1 benefit cap. This is because a higher MRC1 cap increases the allowed amount for the transaction which, in turn, increases the plan participant's deductible payment or coinsurance payment.

- For members who were balance billed, calculating the change in the member's balance bill payments offset by changes in the member's and the member's family's payments for deductible and coinsurance. For some members who were balance billed and had not yet met their deductible, they would pay the same amount regardless of the MRC1 cap or allowed amount for the transaction.

103. Plaintiffs' experts do not address any of these calculations in their report. Rather, Drs. Luke and Piper simply state that ████████████████████████████████████████████████



," [79]

104.    Moreover, even if Plaintiffs had proposed a method for performing these calculations, I described in Section V.C that members of the proposed class may have differing financial incentives—depending on whether their providers balance billed them—regarding whether they would have paid more or less out-of-pocket if CHLIC had used an alternative to the Viant OPR database. These differing financial interests create potentially divergent interests for members of the proposed class.

## 2.  MRC2 Plans

105.    Turning to MRC2 plans, although Plaintiffs state that the "MRC1 methodology [for calculating the benefit cap for IOP Services] is at issue in this litigation," [80] they argue that MRC2 plans, which did not use the Viant OPR database to calculate the Maximum Reimbursable Charge for IOP Services, should have used the same charge-based approach as MRC1 plans. [81] Plaintiffs base this argument on the fact that IOP Services are not covered by Medicare (and so there is no Medicare fee schedule for IOP Services) and, in some cases, instead of a Medicare-based approach MRC2 plans may use a charge-based approach to calculate the plan's Maximum Reimbursable Charge:

> In some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or
>
> - the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database

---

[79] RPC REPORT, ¶ 48.

[80] COMPLAINT, ¶ 66.

[81] *Id.*, ¶ 68.

for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.[82]

106.    I offer no opinion on whether MRC2 plans are required to use charge-based percentiles for IOP Services, but the 2019 plan document for a plan that covered Plaintiff DS defines the plan's Maximum Reimbursable Charge for out-of-network services, in part, as:

> If the provider is not a network provider, the Maximum Reimbursable Charge for covered expenses is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or
>
> - an Employer-selected percentage of a fee schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for **the same or similar service** within the geographic market. [83]

I understand that CHLIC currently calculates the benefit cap for IOP Services in MRC2 plans using the Medicare fee schedule for APC 5863 (partial hospitalization for hospital-based substance use disorder programs), which is covered by Medicare. Both IOP Services and partial hospitalization are outpatient treatments for substance use disorder, but according to CMS, partial hospitalization services correspond to a higher level of care.[84] This implies that if Medicare did cover IOP Services, the Medicare allowed amount for IOP Services would be lower than the Medicare allowed amount for the partial-hospitalization behavioral health services reflected in APC 5863.

107.    Regardless, Plaintiffs' proposed class definition includes: "Any member of a health benefit plan administered or issued by Cigna and governed by ERISA, where the member's plan utilized Cigna's 'Maximum Reimbursable Charge' program for out-of-network benefits and whose claim(s) for intensive outpatient services billed with HCPCS H0015 and/or revenue code 0906 were priced by MultiPlan's Viant methodology, during the class period January 1, 2015 to the present."[85] In MRC2 plans, transactions for IOP Services adjudicated at the MRC2 benefit cap

---

[82] CIG_RJ00000577-646 at 633-634; COMPLAINT, ¶ 69.

[83] CIG_RJ00000577-646 at 633-634 (emphasis added).

[84] *See* ¶¶ 55-56, *supra*.

[85] CLASS CERT. MOTION at 1-2.

were priced using a fee schedule based on Medicare-like reimbursement rates for partial hospitalization services and not the Viant OPR database. Accordingly, any participant whose transactions for out-of-network IOP Services were adjudicated only at the MRC2 benefit cap (or using any other method that did not involve the Viant OPR database) would not be a member of the proposed class.

108.    As reflected in the transaction data produced by CHLIC, there are 215 transactions for IOP Services that were adjudicated at the MRC2 benefit cap after being initially repriced using the Viant OPR database. These 215 transactions were associated with 47 participants; of those 47 participants, 8 had no transactions for IOP Services that were ultimately adjudicated using the Viant OPR database and therefore are not members of the putative class under Plaintiffs' proposed definition.

### C.  Summary of Out-of-Network Transactions for IOP Services

109.    In addition to the differences in methods used to adjudicate out-of-network transactions for IOP Services, I understand from counsel for CHLIC that other factors may also affect Plaintiffs' claims for members of the proposed class. These factors include:

- Among CHLIC client plans, the language used in plan documents to define the Maximum Reimbursable Charge varies. For example, beginning in 2019 the documents for the plan offered by Intuit Inc., which covered Plaintiff RJ, added language to its Maximum Reimbursable Charge definition explaining that state, regional, or national charge data may be used to calculate charge percentiles when sufficient data are not available in a local geographic area.

- Some CHLIC clients draft their own plan documents, and the language in these client-drafted documents may differ from the language used in other CHLIC client plan documents. However, the only way to identify differences in language among these plan documents is to review each one individually.

- Among transactions that were repriced with the Viant OPR database, the language used on the explanation of benefits forms received by participants varies. The language used on the explanation of benefits forms changed beginning on May 27, 2021 for repricing

transactions processed on CHLIC's Proclaim system and on March 23, 2021 for repricing transactions processed on CHLIC's Facets system.[86]

- .[87]

- As I discuss in Section VII, although Plaintiffs characterize FAIR Health as an "accepted method for determining UCR,"[88] I understand that the FAIR Health database did not include charge percentiles for facility transactions, including IOP Services, until April 2020.[89]

- For some transactions, Plaintiffs may have failed to challenge the adjudication of their transactions in a timely manner. For example, counsel for CHLIC has explained that transactions that predate the filing of the Complaint in this matter by more than three years may be barred based on plan language that CHLIC has drafted for plan sponsors, and other plans may contain language that bars transactions more recent than that.[90] For the purposes of illustration below, I calculate the impact of a potential limitation of three years.

---

[86] Letter from Caroline Incledon to Matt Lavin, et al., Re: *RJ, et al. v. Cigna Health and Life Insurance Co., et al., No. 5:20-cv-02255-EJD*, September 8, 2022.

[87] Deposition of Karen Beckstead (November 22, 2022) at 57, 66-69.

[88] COMPLAINT, ¶164.

[89] A February 2021 press release on the FAIR Health website includes the FAIR Health Facility HCPCS product among a list of "Recent Additions to the Suite of FAIR Health Benchmarks." FAIR Health, "Recent Additions to the Suite of FAIR Health Benchmarks," February 18, 2021, *available at* https://www.fairhealth.org/article/recent-additions-to-the-suite-of-fair-health-benchmarks.

[90] I understand that it is CHLIC's position that the following provision in Plaintiff RJ's plan language requires plan participants to initiate legal challenges related to transactions for out-of-network services within three years: "If your plan is governed by ERISA, you have the right to bring a civil action under section 502(a) of ERISA if you are not satisfied with the outcome of the Appeals Procedure. In most instances, you may not initiate a legal action against Cigna until you have completed the appeal processes. However, no action will be brought at all unless brought within 3 years after a claim is submitted for In-Network Services or within three years after proof of claim is required under the Plan for Out-of-Network services." (CIG_RJ00000029-90 at 76; CIG_RJ00691297-358 at 344; CIG_RJ00972085-152 at 131.)

- Some participants with out-of-network transactions for IOP Services may have assigned their benefits to their providers while others may not have. I also understand from counsel for CHLIC that some plans may contain provisions limiting the assignment of benefits. Plaintiffs have not identified a way to identify which members of the proposed class assigned their benefits to providers, and the CHLIC transaction data do not contain information regarding benefit assignments.

110. Taken together, these factors imply that there are several categories of potential members of the proposed class. Although identifying the precise number of possible combinations would require individualized analysis, in the analysis that follows I rely on proxies to demonstrate how these factors may affect which participants in CHLIC client plans would be members of the proposed class.

111. Beginning with changes in plans' definition of Maximum Reimbursable Charges language, identifying relevant differences in language across MRC1 plans over time would only be possible by reviewing each CHLIC plan document and linking those plan documents to transactions. In the analysis that follows I use changes over time in the language used to describe the Maximum Reimbursable Charge for the Plaintiff RJ's plan as a proxy. The August 2018 plan documents for this plan define Maximum Reimbursable Charge for medical services as:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or
> - a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.
>
> The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.
>
> The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[91]

---

[91] CIG_RJ00000029-90 at 85.

112. This definition was updated in August 2019 to add the italicized text below:

> The Maximum Reimbursable Charge for covered services for Open Access Plus is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply; or
>
> - a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. *If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.*
>
> The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.
>
> The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[92]

113. The Maximum Reimbursable Charge language used in the August 2022 plan documents is shown below (with changes compared to the August 2019 language marked in italics):

> The Maximum Reimbursable Charge for covered services for Open Access Plus is determined based on the lesser of:
>
> - the provider's normal charge for a similar service or supply;
>
> - *the amount agreed to by the Out-of-Network provider and Cigna; or*
>
> - a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.

---

[92] CIG_RJ00691297-358 at 353 (emphasis added).

The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[93]

114.    I understand that CHLIC clients may not update plan language each year and instead rely on the same plan language for multiple plan years.[94] For purposes of the analysis below, I use the dates these changes were made in Plaintiff RJ's plan documents as proxies and assume that other CHLIC client plans made the same changes on the same dates.

115.    Next, I identify changes in the language used on the explanation of benefits forms participants received for IOP Service repricing transactions:

- For CHLIC's Proclaim system, the explanation of benefit language for OPR Repricing transactions was updated beginning on May 27, 2021. Prior to this date, the following language was used: "Health care professional: We reduced the allowed amount based on Viant's Facility Bill Review program. If you have questions about this discount contact Viant at 866.233.0121." Starting on May 27, 2021, the following language has been used: "PROVIDER THIS IS THE VIANT ALLOWED AMOUNT OFFERED, DIRECT INQUIRIES TO 866.233.0121. MEMBER YOU MAY OWE MORE IF OFFER IS NOT ACCEPTED."[95]

- For CHLIC's Facets system, the explanation of benefit language for OPR Repricing transactions was updated beginning on March 23, 2021. Prior to this date, the following language was used: "We reduced the allowed amount based on Viant's Facility Bill Review. If you have questions about this discount contact Viant at 800-598-6888." Starting on March 23, 2021, the following language has been used: "Provider this is the Viant

---

[93] CIG_RJ00972085-152 at 147-148 (emphasis added).

[94] Deposition of Gabriel Levine Smith as 30(b)(6) Designee (November 11, 2022) at 77.

[95] Letter from Caroline Incledon to Matt Lavin, et al., Re: *RJ, et al. v. Cigna Health and Life Insurance Co., et al., No. 5:20-cv-02255-EJD*, September 8, 2022 at 2.

allowed amount offered, direct inquiries to 866.233.0121. Member you may owe more if offer is not accepted."[96]

116.    In Figure 15, I count the number transactions for out-of-network IOP Services and the number of plan participants for each unique combination of: (1) how the transaction was adjudicated (MRC1 benefit cap, MRC2 benefit cap after being adjudicated using the Viant OPR database, or repricing using offer amounts based on the Viant OPR database); (2) whether the plan used client-drafted plan documents; (3) whether the plan is an MRC2 plan;[97] (4) date ranges reflecting when changes were made to the plan language in Plaintiff RJ's plan documents; (5) whether updated language was used on the explanation of benefits form for repricing transactions; (6) whether the updated Viant OPR method was used to calculate charge percentiles; (7) whether charge percentiles for IOP Services were available in the FAIR Health database; and (8) whether the transactions correspond to potentially time-barred claims if transactions for dates of service that predate the filing of the complaint by more than three years were found to be untimely. There are 40 such combinations containing CHLIC transactions for IOP Services. I am unable to identify those transactions where a participant assigned their benefits to their provider or to identify which transactions are covered under plans that limit the assignment of benefits.

117.    While I group together transactions associated with plans using client-drafted plan documents for illustrative purposes in Figure 15, this understates the extent to which there may be variation in language across plan documents. The nearly 76 thousand transactions associated with plans utilizing client-drafted plan documents in Figure 15 span 219 CHLIC client account numbers, each of which may be utilizing its own distinct client-drafted language that may require individual analysis.

---

[96] *Id.* at 1.

[97] For transactions processed on CHLIC's Facets system, the transaction data do not indicate whether the transaction is associated with an MRC1 or MRC2 plan. In this analysis, I assume that none of the transactions processed on the Facets system are associated with MRC2 plans, which conservatively undercounts the number of transactions associated with MRC2 plans.

**Figure 15: Summary of Out-of-Network Transactions for IOP Services**



## VII. NEITHER PLAINTIFFS NOR THEIR EXPERTS HAVE IDENTIFIED AN ALTERNATIVE TO THE VIANT OPR DATABASE

118. Although Plaintiffs allege that the use of the Viant OPR database to adjudicate transactions for out-of-network IOP Service resulted in reimbursement for some transactions that was too low, neither Plaintiffs nor their experts have identified an alternative to that database. Because Plaintiffs have not identified an alternative database, it is not possible to assess whether members of the proposed class would have paid more, less, or the same for IOP Services or whether there may be disagreement among class members as to which alternative database to use.

119.    In this section, I first discuss the FAIR Health database, which Plaintiffs have previously described as an alternative database that could have been used to adjudicate out-of-network transactions for IOP Services. However, the FAIR Health database did not include charge percentiles for IOP Services during most of the Plaintiffs' proposed class period. And even when the FAIR Health database includes percentiles for IOP Services, Plaintiffs' experts have previously argued that the FAIR Health database is itself flawed.

120.    Because FAIR Health did not include charge percentiles for IOP Services for most of the proposed class period, I also discuss several methodological choices that must be made if Plaintiffs were to create an alternative database of charge percentiles. While Plaintiffs' experts' firm, RPC, has discussed these methodological issues in publications that are unrelated to this case, Plaintiffs' experts do not discuss these issues in their class certification expert report. As I demonstrate below, for many of these methodological choices, there may be divergent interests among members of the proposed class as to which method results in those members paying the lowest amount for out-of-network IOP Services. In some scenarios, the methods that RPC has described in publications regarding databases for adjudicating out-of-network transactions would result in some members of the proposed class paying more for their out-of-network IOP Services.

## A. FAIR Health

121.    In the Complaint, Plaintiffs include a lengthy discussion of the FAIR Health database of charge percentiles.[98] Plaintiffs state that they "do not assert that FAIR Health is the only possible method for determining UCR; rather, it is an accepted method for determining UCR."[99] However, the FAIR Health database did not include charge percentiles for IOP Services for most of the proposed class period. In particular, I understand that charge percentiles for facility transactions submitted with HCPCS Code H0015 are included in the FAIR Health Facility HCPCS benchmark database product, but this database was not available prior to April 2020.[100]

---

[98] COMPLAINT, ¶¶155-67.

[99] *Id.*, ¶164. Plaintiffs also describe FAIR Health as a "valid UCR methodology" in their motion for class certification (CLASS CERT. MOTION at 4).

[100] *See* n. 89, *supra.*

122.   Even if the FAIR Health database had included percentiles for IOP Services during the entire proposed class period, RPC has described FAIR Health as having "major weaknesses" in a white paper that is cited in Drs. Luke and Piper's expert report.[101] According to RPC:

- The FAIR Health database calculates percentiles at the three-digit ZIP Code, or "geozip," level, which RPC contends is not a "reasonable definition of medical markets."[102]

- FAIR Health does not require a minimum number of providers to calculate a charge percentile in an area—only a minimum number of charges are required.[103] RPC contends that the FAIR Health percentiles are flawed because they are calculated as percentiles of transactions rather than as percentiles of unique providers.[104] As I explain below, Plaintiffs' experts are themselves inconsistent with RPC's position as to whether charge percentiles should be calculated based on transaction-level data or provider-level data.

- FAIR Health is "not transparent in how they arrive at their percentile values for each CPT code."[105] In particular, RPC states that FAIR Health does not disclose the details of its "actual" and "derived" charge methodologies, including the number of charges deemed necessary for FAIR Health to calculate percentiles using its "actual" charge methodology or the "code groups" that FAIR Health utilizes for its "derived" charge methodology.[106]

123.   As FAIR Health explains on its website, it utilizes its derived charge methodology when it has an "insufficient" number of actual transactions for a procedure in an area.[107] To implement the derived charge methodology, FAIR Health calculates percentiles of charges for groups of

---

[101] *See* Research and Planning Consultants, LP, "RPC's Usual, Customary, and Reasonable Charge Database for Practitioner Charges," October 5, 2020, *available at* https://www.rpcconsulting.com/rpcs-usual-customary-and-reasonable-charge-database-for-practitioner-charges/ [hereinafter RPC WHITE PAPER], ¶¶7-14. *See also* RPC REPORT, ¶15 & n. 6.

(Deposition of Brian Douglas Piper, Ph.D. (March 14, 2023) at 65-66.) (Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 56-57.)

[102] RPC WHITE PAPER, ¶¶7, 11.

[103] *Id.*, ¶9.

[104] *Id.*, ¶14.

[105] *Id.*, ¶8.

[106] *Id.*, ¶¶12-13.

[107] FAIR Health, Methodologies, *available at* https://www.fairhealth.org/methodologies.

procedure codes rather than calculating percentiles using only charges for a single procedure code.[108] Although Plaintiffs take issue with MultiPlan relying on "crosswalking" by "using rates for one service to come up with or fill-in rates for another service," neither Plaintiffs nor their experts have indicated if their position is that FAIR Health's derived charge methodology, which relies on groupings of procedure codes, would result in reliable charge percentiles for IOP Services.[109]

124.    In the absence of a suitable existing alternative database, a method for calculating charge percentiles from another source of transaction data would be required to calculate damages on a class-wide basis. As I explain below, however, Plaintiffs and their experts have not articulated a method for calculating these percentiles.

## B.  Methods Based on CHLIC's Transaction Data

125.    Although Plaintiffs' experts write that ███████████████████████████████
██████████████████████████████████████[110] Plaintiffs' experts have not described the proper (in their opinions) method for creating that database of charge percentiles using the CHLIC transaction database. In this section, I discuss examples of the methodological choices that RPC has described in its work related to another database of charge percentiles, which is intended to be used in adjudicating out-of-network transactions submitted by health care professionals. Examples of the methodological choices described by RPC include: (1) whether to calculate nationwide percentiles or percentiles at the local level, and how to define local geographies; (2) whether to calculate percentiles of provider-level or transaction-level data; (3) what time period of transaction data to include when calculating percentiles; and (4) whether to require a minimum number of transactions, charges, or other data points in order to calculate percentiles for a given service or geography over a certain time period.

126.    These methodological choices are important in this matter because, depending on the methods that Plaintiffs use to prepare an alternative database of charge percentiles, some members of the proposed class may owe more for their out-of-network IOP Services *even in the presence of*

---

[108] *Id.*

[109] COMPLAINT, ¶¶193-94

[110] RPC REPORT, ¶33.

*balance billing* than they would using the Viant OPR database. Because neither Plaintiffs nor their experts have described the method they would use to prepare an alternative database of charge percentiles, I cannot identify which members of the proposed class would owe more if the Viant OPR database were replaced by Plaintiffs' alternative database. However, in what follows I demonstrate that making different choices of method in calculating charge percentiles using the CHLIC transaction data creates different financial outcomes for members of the proposed class.

127.   Starting with the choice of geographic regions in which to calculate charge percentiles, Plaintiffs and their experts appear to differ as to ██████████████████████████ ██████████████████████. In their complaint, Plaintiffs argue that "[g]eographic location is an essential component of the UCR rate."[111] Plaintiffs also allege that CHLIC was obligated to adjudicate transactions "based on competitive fees *in the same geographic area* for both MRC-I and MRC-II plans for IOP treatment."[112] Despite Plaintiffs' position regarding the alleged shortcomings of nationwide charge percentiles for IOP Services, █████████████████ ████████████████████████████████.[113]

128.   To the extent that Plaintiffs eschew the method used by their experts in the RPC Report and proposed an alternative database of charge percentiles calculated in ██████ geographic regions, Plaintiffs have not described how those regions would be defined. For example, I understand that for the purpose of preparing the Viant OPR database, ████████████████ ████████████████████████████.[114] FAIR Health divides the country into 493 "geozips" based on groupings of the first three-digits of ZIP Codes.[115] An RPC white paper that is cited in Drs. Luke and Piper's expert report states that defining local regions based on ZIP Codes is a "major weakness" of databases such as FAIR Health.[116] Instead, for purposes of creating its own database of charge percentiles for professional services based on Medicare's

---

[111] Complaint, ¶187.

[112] *Id*., ¶369 (emphasis added).

[113] RPC Report, ¶¶42-46.

[114] MPI-C0000216 – 224 at 221.

[115] FAIR Health, "Geozips," *available at* https://s3.amazonaws.com/media2.fairhealth.org/resource/asset/FAIR%20Health%20Geozips.pdf.

[116] RPC White Paper, ¶7.

Carrier Standard Analytical File (which, like the Medicare Outpatient Standard Analytical File that MultiPlan relies on in creating the OPR database, includes claims submitted to CMS for services provided to Medicare beneficiaries), RPC defines local regions based on Hospital Referral Regions ("HRRs") from the *Dartmouth Atlas of Health Care*.[117] Drs. Luke and Piper have also ███████████████████████████████████████████████████.[118] While Dr. Luke ████████████ ████████████████████████████████████████████████████████████████████████████████, Plaintiffs' experts have not explained if they would adopt HRRs, retain MultiPlan's geographical definitions, use FAIR Health's geozips, or propose some other definition of local regions in calculating an alternative to the Viant OPR database for IOP Services.[119]

129.    A second methodological consideration that Plaintiffs' experts do not discuss in their report is whether percentiles should be calculated based on transaction-level or provider-level data. The RPC white paper that Drs. Luke and Piper cite in their report criticizes FAIR Health for calculating charge percentiles based on transaction-level data (thereby giving more influence to the charges of providers who more commonly perform the services) rather than giving equal weight to each provider in an area, regardless of the number of services that the provider performed.[120] To address this, in their database of charge percentiles for professional services RPC explains that it first calculates the average billed charge for each provider and procedure code combination, and then calculates percentiles of these provider-level average charges by procedure code.[121] However, ██ ███████████████████████████████████████████████████████████████████████████████████

---

[117] *Id.*, ¶33. While the Outpatient Standard Analytical File that MultiPlan uses to create the Viant OPR database contains 100 percent of the outpatient facility claims submitted to CMS on behalf of Medicare fee-for-service beneficiaries, the Carrier Standard Analytical File that RPC relies on for calculating its own database of charge percentiles for professional services contains claims from a five percent sample of Medicare beneficiaries. (MPI-C0000216 – 224 at 217; RPC WHITE PAPER, ¶31; ResDAC, "Medicare Limited Data Set (LDS) Quarterly Claims and Enrollment Data," *available at* https://resdac.org/articles/medicare-limited-data-set-lds-quarterly-claims-and-enrollment-data.)

[118] Deposition of Brian Douglas Piper, Ph.D. (March 14, 2023) at 227-230, 247-248, 277, 288-291; Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 106, 134-136.

[119] Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 68-69. While RPC uses HRRs for professional charges in its Usual, Customary, and Reasonable Charge Database for Practitioner Charges, I note that HRRs are defined by the *Dartmouth Atlas of Health Care* based on referral patterns for neurosurgery and four major cardiovascular procedures. (Dartmouth Atlas Project, "FAQ," *available at* https://www.dartmouthatlas.org/faq/.) Plaintiffs' experts have not offered any analysis of geographic referral patterns that is specific to IOP Services.

[120] RPC WHITE PAPER, ¶14.

[121] *Id.*, ¶39.



130.    A third methodological consideration that Plaintiffs' experts do not discuss in their report concerns the date range of the transaction data that they would use to calculate an alternative database of charge percentiles. In RPC's database of charge percentiles for professional services, RPC indicates that those percentiles are based on three years of data from the Medicare Standard Analytical File without any adjustment for inflation.[123] In a separate white paper describing a database of charge percentiles for outpatient hospital transactions, RPC uses transaction data for "either the calendar year matching the discharge date or the most recent 4 quarters of data for planned procedures."[124] ███████████████████████████████████████████████
████████████████████████████.[125] Plaintiffs' experts do not explain whether they would calculate separate annual percentiles, combine data across years (such as the three-year window used in the RPC database for practitioner charges), or use some other time period in calculating an alternative to the Viant OPR database.

131.    A fourth methodological consideration that Plaintiffs' experts do not discuss in their expert report is whether they would require a minimum number of providers or transactions in an area to—according to whatever standards they intend to adopt—calculate statistically precise estimates of percentiles. In RPC's database of charge percentiles for professional services, ███████████████

[122] Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 81-82, 150-151.

[123] RPC WHITE PAPER, ¶39 ("RPC combines data from the CMS files for three most recent years. As of this writing, they are the 2016, 2017, and 2018 files. Data from these files are combined with no inflationary adjustments.").

[124] Research and Planning Consultants, LP, "Determining Usual, Customary, and Reasonable Charges for Healthcare Services," July 1, 2022, *available at* https://www.rpcconsulting.com/wp-content/uploads/2022/07/Determining-Usual-Customary-and-Reasonable-Charges-for-Healthcare-Service_White-Paper_7-1-2022.pdf, ¶87. Dr. Piper testified that he was the primary author of this white paper, with editing assistance from Dr. Luke (Deposition of Brian Douglas Piper, Ph.D. (March 14, 2023) at 58-59.) Dr. Luke explained that he and Dr. Piper were coauthors of the white paper (Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023) at 52-55.)

[125] RPC REPORT, ¶¶42-46.



, Plaintiffs' experts have not disclosed what, if any, threshold conditions they would apply regarding the number of transactions or providers that are necessary to calculate direct estimates of charge percentiles using CHLIC's transaction data.

132.    To demonstrate how these methodological choices impact whether some putative class members would have owed more or owed less using an alternative to the Viant OPR database, I calculate percentiles of charges using the data CHLIC produced in this litigation under various scenarios. In particular, I use the CHLIC transaction data to calculate the 80th percentile of charges using the changes in method described below. To be clear, I do not endorse any of these variations nor am I offering an opinion as to whether any of these alternative databases should have been used by CHLIC client plans instead of the Viant OPR database. Rather, I implement these variations only to demonstrate that some members of the proposed class may have owed more or less for out-of-network IOP Services depending on which method Plaintiffs' experts adopt.

- Geography: I calculate nationwide, state-level, and regional percentiles based on the FAIR Health geozips and HRRs (the same geographic region that RPC uses in its database of charge percentiles for professional services) and compare these to allowed amounts in CHLIC's transaction data for transactions adjudicated using the Viant OPR database (which reflect MultiPlan's geographical definition).

- Time period: I calculate percentiles separately by year (█████████████████ ███████████████████████████ ) or by pooling transactions across three years (consistent with RPC's approach in its database of charge percentiles for professional services).

---

126 *Id.*, ¶42.

127 *Id.*, ¶¶43-45.

- Data level: I calculate percentiles of charges at the transaction level and percentiles of charges at the provider level. For percentiles of provider-level charges, I first calculate the average charge for each provider using the National Provider Identification fields included in CHLIC's transaction data.

This results in four possible alternative levels of geographic aggregation, two possible levels of time-related aggregation, and aggregation at either the transaction or provider levels, for a total of sixteen possible alternative approaches to the calculation of charge percentiles using the CHLIC transaction data. I do not place any restrictions on the minimum number of providers or transactions required to calculate charge percentiles.

133. Figure 16 summarizes the results of these alternative percentile calculations for one transaction for IOP Services in 2021. The billed charge associated with this transaction is ████; the transaction was repriced with the Viant OPR database and has an allowed amount of ████.[128] The figure is sorted by descending order of the estimated ████ of charges for H0015 calculated using each of the sixteen methods described in the previous paragraph. That is, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.



134. In contrast to the Viant OPR database, adjudicating the transaction using national percentiles of charges from the CHLIC transaction data may result in the transaction being allowed at the provider's billed charges: the estimated ████ percentiles are between ████ and ████ (regardless of time period or whether percentiles are calculated at the transaction level or provider level), which exceed the provider's billed charge of ████. An estimated percentile based on provider-level average charges at the HRR level using one year of data also may have resulted in the transaction being allowed at a slightly higher amount than the Viant OPR database (████ compared to ████), but at an amount that is slightly less than the provider's billed charges (████ compared to ████). Other alternative percentile calculations may have resulted in being allowed at lower amounts than the Viant OPR database, potentially increasing

---

[128] As I explained previously, OPR Repricing transactions could not have been associated with harm under Plaintiffs' presumed approach because repricing includes balance billing protections. However, I include this transaction as an example of how methodological choices could result in this member being made worse-off in Plaintiffs' but-for world.

the class member's balance bill (while also potentially reducing the amount that they owed in deductibles or coinsurance).

**Figure 16: Alternative Charge Percentiles, 2021 Transaction**

| Geography | Time Period | Data Level | Billed Charge | Alternative Database of Charge Percentiles | |
|---|---|---|---|---|---|
| | | | | Charge Percentile | Allowed Amount |
| | | | [1] | [2] | [3] = lesser of {[1],[2]} |
| National | 1 Year | Provider Level | | | |
| National | 1 Year | Charge Level | | | |
| National | 3 Year | Charge Level | | | |
| National | 3 Year | Provider Level | | | |
| HRR | 1 Year | Provider Level | | | |
| | Viant OPR Database | | | | |
| FAIR Health Geozip | 1 Year | Charge Level | | | |
| FAIR Health Geozip | 1 Year | Provider Level | | | |
| FAIR Health Geozip | 3 Year | Charge Level | | | |
| HRR | 1 Year | Charge Level | | | |
| HRR | 3 Year | Charge Level | | | |
| State | 1 Year | Charge Level | | | |
| State | 1 Year | Provider Level | | | |
| State | 3 Year | Charge Level | | | |
| FAIR Health Geozip | 3 Year | Provider Level | | | |
| HRR | 3 Year | Provider Level | | | |
| State | 3 Year | Provider Level | | | |

135.    Although the transaction in Figure 16 may have been allowed at a higher amount using national percentiles of charges from the CHLIC transaction data, this is not true for the transaction shown in Figure 17. This 2017 transaction for IOP Services has a billed charge of ▮▮▮▮ and an allowed amount of ▮▮▮▮. The ▮▮ percentile of charges based on one year of data from the CHLIC transaction data is lower than both the billed charges and the allowed amount for this transaction, regardless of whether percentiles are calculated nationally, state-wide, or separately by local area, or whether percentiles were calculated using transaction-level or provider-level data.[129] In this case, replacing the Viant OPR database with an alternative database of charge percentiles would always result in a lower allowed amount for the transaction, potentially

---

[129] For this transaction, I am not able to calculate alternative percentiles based on three years of data because the transaction has a date of service in 2017 but CHLIC did not produce transaction data for dates of service prior to 2016.

increasing the class member's balance bill (while also potentially reducing the amount that they owed in deductibles or coinsurance).

**Figure 17: Alternative Charge Percentiles, 2017 Transaction**

| Geography | Time Period | Data Level | Billed Charge | Alternative Database of Charge Percentiles | |
|---|---|---|---|---|---|
| | | | | Charge Percentile | Allowed Amount |
| | | | [1] | [2] | [3] = lesser of {[1],[2]} |
| Viant OPR Database | | | | | |
| HRR | 1 Year | Provider Level | | | |
| State | 1 Year | Charge Level | | | |
| FAIR Health Geozip | 1 Year | Provider Level | | | |
| State | 1 Year | Provider Level | | | |
| FAIR Health Geozip | 1 Year | Charge Level | | | |
| HRR | 1 Year | Charge Level | | | |
| National | 1 Year | Charge Level | | | |
| National | 1 Year | Provider Level | | | |

136.    These examples show that, depending on the method used by Plaintiffs' experts to calculate an alternative to the Viant OPR database, members of the proposed class may have divergent interests as to which database results in them paying the lowest amount for out-of-network IOP Services. In some cases, these methods would result in members of the proposed class paying more for their out-of-network IOP Services.

## VIII.    CONCLUSION

137.    This declaration contains a statement of the opinions I offer in response to the analyses prepared by Drs. Luke and Piper in the RPC Report. This declaration also describes the bases for my opinions, the data and other information that I relied on in forming my opinions, and the analyses and figures that I prepared to support those opinions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Sean M. May, Ph.D.
Dated: March 27, 2023

**APPENDIX 1**



# Sean M. May
Vice President

PhD Economics
Massachusetts Institute of
Technology

BS Mathematics
Queen's University

Dr. May is an economist who specializes in industrial organization, econometrics, and labor economics. He is an expert in the health care industry and has testified, published, and spoken at conferences on matters related to competition, provider reimbursement, and health plan design. In addition to health care, his industry expertise includes cable television, professional sports, consumer products, internet search engines, and retail services. Dr. May has presented economic and econometric evidence to the US Department of Justice and the Federal Trade Commission, in federal court, and in state regulatory proceedings.

## Professional history

2000–Present    *Vice President*, Charles River Associates, Boston, MA

1999            *Lecturer*, Massachusetts Institute of Technology, Cambridge, MA

                Dr. May taught an undergraduate course in probability and statistical inference. The course covered material on probability theory, statistical distributions, and sampling theory in addition to statistical estimation, hypothesis testing, and an introduction to regression analysis.

1998            *Consultant*, World Bank, Washington, DC

                Dr. May worked to evaluate the effect of a program that provided supplemental textbooks to Kenyan schoolchildren. The research estimated the effect of the provision of these textbooks on standardized mathematics and writing exam scores of program participants.

## Consulting experience

### Antitrust and competition

Dr. May analyzes the competitive effects of mergers in many industries, including hospitals, health insurance, office supplies, and newspapers. He also provides economic and econometric analyses in private antitrust litigation, including advising clients in cases involving class certification, antitrust liability, and damages.

## Selected projects

- *Hospital and physician practice mergers.* Dr. May has analyzed the competitive effects of dozens of hospital mergers and physician practice mergers, including Evanston Northwestern Healthcare's acquisition of Highland Park Hospital, the proposed acquisition of Rockford Health System by OSF Healthcare System, the acquisition of St. Mary's Medical Center by Cabell Huntington Hospital, the acquisition of the Hospital of Saint Raphael by Yale New Haven Health. He has also assisted state attorneys general in evaluating the competitive effects of hospital and physician practice mergers.

- *Health insurer mergers.* Dr. May has also analyzed the buy-side and sell-side competitive effects of health insurance mergers, including Anthem's acquisition of WellPoint; *US v. UnitedHealth and PacifiCare*; *US v. UnitedHealth and Sierra Health;* UnitedHealth's acquisitions of Oxford, John Deere Health, Neighborhood Health Plan, and Health Net's northeast business; and Humana's acquisition of CHA. Dr. May has testified before state regulators regarding the competitive effects of insurance mergers on the sale of individual, group, and Medicare Advantage plans.

- *Antitrust litigation.* Dr. May has testified in antitrust litigation regarding attempted monopolization and conspiracy to monopolize markets for inpatient hospital services, outpatient surgical services, and physician services. He has also led teams at CRA supporting testifying economists in class action antitrust lawsuits, including *Comcast v. Behrend* and *Le v. Zuffa.*

## Health care disputes

Dr. May is an expert in public and private reimbursement policies for health care providers. He advises on disputes between health insurers and providers/plan members regarding reimbursement for covered services, regulatory investigations of health plan coverage decisions, and assessments of competitive rates for providers' services.

## Selected projects

- *Out-of-network provider reimbursement.* Dr. May has served as an expert in several cases involving reimbursement to health care providers that did not collect patients' cost-sharing obligations, including *Cigna v. Southwest Surgery Center, North Cypress Medical Center v. Cigna, Arapahoe Surgery Center v. Cigna,* and *Elite Center for Minimally Invasive Surgery v. Cigna.*

- *Health plan benefits.* Dr. May has served as an expert or consulted on several class action lawsuits involving determination of health plan members' benefits. Among other issues, these lawsuits included allegations that plans improperly denied benefits for services, improperly calculated members' cost-sharing responsibilities, or incorrectly paid claims for out-of-network services. Dr. May has also served as a consultant to insurers in connection with Department of Labor investigations.

- *Provider rate determination.* Dr. May has consulted with health care providers and health insurers involved in arbitration concerning competitive or market rates for health care services.

- *Reasonable and customary rates*. Dr. May has led teams at CRA supporting testifying economists in several class action antitrust lawsuits involving reasonable and customary rates, including *Franco v. Cigna* and *MySpine v. USAA.*

## Econometrics

Dr. May specializes in econometrics and statistics, and conducts sophisticated analyses involving large health care claims, transaction, and demographic databases.

### Selected projects

- *Demand estimation.* Dr. May has estimated consumer-level models of demand for products as diverse as hospitals and cigarettes. He has used these models to simulate the competitive effects of mergers, define relevant markets, and to derive estimates of lost sales.

- *Statistical analyses*. Dr. May has synthesized and critiqued statistical studies in economics, health care, public health, and epidemiology. He has deep knowledge of statistical sampling and has worked in conjunction with other experts on survey design and implementation.

- *Damages.* Dr. May has developed statistical models of damages in dozens of cases involving industries as diverse as health care, cable television, professional sports, cigarettes, and manufacturing. He also has evaluated, rebutted, and corrected the econometric damages models of opposing experts.

### Regulation and public policy

Dr. May also provides consulting services related to health care regulation, labor economics, and public policy.

### Selected projects

- *Policy research*. Dr. May has authored white papers on behalf of America's Health Insurance Plans regarding health plan benefit design and on behalf of the American Hospital Association

- *Disparities in hiring.* Dr. May provided statistical consulting services to a large US city on disparities in its utilization and the availability of minority- and women-owned businesses.

- *Royalties.* Dr. May has worked on behalf of broadcasting services in proceedings before the Copyright Royalty Board, and on behalf of a public agency in determining "fair and reasonable compensation" federal Telecommunications Act of 1996 for the use of rights-of-way.

- *Certificate of Need applications*. Dr. May has analyzed the competitive implications of Certificate of Need applications to build or relocate hospitals, or to add services at existing hospitals.

## Testimony

- *Baptist Memorial Health Care Corporation v. Cigna Healthcare of Tennessee, Inc.,* Private and Confidential Arbitration. (Client: Cigna.) Deposition testimony February 2021, November 2021, and January 2023; arbitration testimony March 2021, December 2021, and January 2023.

- *Kimberly A. Negron, et al. v. Cigna Health and Life Insurance Company and OptumRx, Inc.,* No. 3:16-cv-01702 (D. Conn.). (Client: Cigna.) Deposition testimony July 2020 and November 2022.

- *Baptist Hospital of Miami, Inc., et al. v. Cigna Healthcare of Florida.* Private and Confidential Arbitration. (Client: Cigna.) Deposition testimony November 2021 and April 2022.

- *Jeffrey Neufeld, et al. v. Cigna Health and Life Insurance Company,* No. 3:17-cv-1693 (D. Conn.). (Client: Cigna.) Deposition testimony July 2021.

- *Prime Healthcare Services – Shasta, LLC v. Blue Cross of California d/b/a Anthem Blue Cross, et al.,* JAMS Arbitration No. 1130005747. (Client: Anthem.) Deposition testimony November 2018; arbitration testimony December 2018.

## Publications and presentations

*Hospital Merger Benefits: An Econometric Analysis Revisited.* With Monica Noether and Benjamin Stearns. Study on behalf of the American Hospital Association (August 2021).

*Viewing Hospital and Physician Mergers from Two Sides.* With Melissa Hill and Leigh Oliver. Presentation at the American Health Law Association Virtual Health Care Antitrust Conference (May 2021).

*Economic Tools for Analyzing Vertical Mergers in Healthcare.* With Josh Lustig, Monica Noether, and Ben Stearns. CPI Antitrust Chronicle (May 2020).

*Comments on Changes in Quality of Care after Hospital Mergers and Acquisitions* (Nancy D. Beaulieu, et al., New England Journal of Medicine 382(1), January 2020). Study of behalf of the American Hospital Association (February 2020).

*Hospital Merger Benefits: Views from Hospital System Leaders and Econometric Analysis – An Update.* With Monica Noether and Benjamin Stearns. Study on behalf of the American Hospital Association (September 2019).

*Re: Federal Trade Commission Hearing on Competition and Consumer Protection in the 21st Century – Project Number P181201 – Comments from the American Hospital Association on Defects in the Models Used for Evaluating Hospital Transactions.* With Monica Noether. White paper on behalf of the American Hospital Association (December 2018).

*Cutting Edge Economics for Future Merger Cases.* Presentation at the American Bar Association Health Law Section, ABA Section of Antitrust Law, American Health Law Association, 2018 Antitrust in Healthcare Conference.

*Consolidation: How big is big enough?* Presentation at the American Medical Association Integrated Physician Practice Session 2017 Annual Meeting (June 9, 2017).

*Hospital Merger Benefits: Views from Hospital System Leaders and Econometric Analysis.* With Monica Noether. Study on behalf of the American Hospital Association (January 2017, Extension December 2018).

*The Second Circuit Amex Decision and its Relationship to the DOJ's Suit Against Carolinas Health Care System.* Panel speaker, ABA Section of Antitrust Law presentation (December 7, 2016).

*Prepping an Economic Expert for Trial.* Panel speaker, 43rd Annual Fordham Competition Law Institute's Annual International Antitrust Law & Policy Conference, (September 21, 2016).

*Antitrust Standing and Injury.* With coauthors. ABA Section of Antitrust Law, Proving Antitrust Damages, 3rd Edition.

*Health Care Antirust 101.* Panel speaker, ABA Young Lawyers Division Antitrust Law Committee (March 11, 2015).

*Comments on "The Accuracy of Hospital Merger Screening Methods."* Presentation at the Seventh Annual Federal Trade Commission Microeconomics Conference (October 2014).

*Unresolved Questions Relating to Market Definition in Hospital Mergers.* With Monica Noether. Antitrust Bulletin, vol. 59 (September 2014).

*Feeling Blue: Antitrust Challenges to Health Insurers in the Post-Affordable Care Act World.* Panel speaker, New York State Bar Association Antitrust Law Section presentation (March 2014).

*Predicting the price effects of hospital mergers.* With Monica Noether. CRA Competition Memo (March 2014).

*Antitrust Analysis of Hospital Mergers.* Presentation to the Dallas Bar Association (September 2013).

*The health insurance exchange landscape.* With Monica Noether and Matthew List. CRA Insights (June 2013).

*Merger Review Under the New Horizontal Merger Guidelines.* Presentation at the American Bar Association Health Law Section, ABA Section of Antitrust Law, American Health Law Association, 2012 Antitrust in Healthcare Conference.

*A look at hospital mergers and antitrust enforcement through the lens of willingness-to-pay.* With Gregory Vistnes and Robert Maness. CRA Competition Memo (June 2010).

*Economic Analysis of Monopsony Concerns in Health Plan Mergers.* With Monica Noether and Laura Phillips-Perkins. Prepared for the American Bar Association Health Law Section, ABA Section of Antitrust Law, American Health Law Association, 2010 Antitrust in Healthcare Conference.

*Antitrust Issues Raised in the DOJ's Investigation of the Anthem-WellPoint and United-Oxford Mergers.* With Monica Noether and Caterina Nelson. Health Lawyers News (February 2005).

*Efficient Bootstrapping for GMM.* With Bryan Brown and Whitney Newey. Massachusetts Institute of Technology Department of Economics Working Paper.

## Honors and awards

- W.E. Upjohn Institute for Employment Research Dissertation Award for outstanding thesis on an employment-related issue (honorable mention), 2000

- Massachusetts Institute of Technology Undergraduate Economics Association Teaching Award, 2000

- Social Sciences and Humanities Research Council of Canada Doctoral Fellowship, 1997-2000

- Massachusetts Institute of Technology Graduate Fellowship, 1996-1998

- Queen's University Prince of Wales Prize (awarded to the graduating science student judged to have the best academic record)

- Queen's University medal in Mathematics and Statistics (awarded to the graduating student with the highest standing in the Department)

- Queen's University Dean's List

- Natural Science and Engineering Research Council of Canada Undergraduate Research Awards, 1994 and 1995

## APPENDIX 2: MATERIALS RELIED ON

### Case Materials

Analysis of Underpayment of HCPCS Code H0015 by Cigna, Prepared by Ron Luke, J.D., Ph.D. and Brian Piper, Ph.D., Research and Planning Consultants, LP, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (January 16, 2023)

First Amended Class Action Complaint, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (April 30, 2021)

Letter from Caroline Incledon to Matt Lavin, et al., Re: *RJ, et al. v. Cigna Health and Life Insurance Co., et al., No. 5:20-cv-02255-EJD*, September 8, 2022

Plaintiffs Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (January 17, 2023)

Declaration of Catherine Bucheger Regarding Subpoena Issued to ███████████ ████████████, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (November 3, 2022)

Declaration of Michael Borkowski Regarding Subpoena Issued to ███████████ ████████████████, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (November 3, 2022)

Declaration of Thomas Hathorn Regarding Subpoena Issued to ███████████████, *RJ, et al. v. Cigna Health and Life Ins. Co., et al.*, Case No. 5:20-cv-02255-EJD (N.D. Cal.) (April 30, 2022)

Deposition of Brian Douglas Piper, Ph.D. (March 14, 2023)

Deposition of Gabriel Levine Smith as 30(b)(6) Designee (November 11, 2022)

Deposition of Karen Beckstead (November 22, 2022)

Deposition of Ronald T. Luke, JD, Ph.D. (March 17, 2023)

Deposition of Wendy Gompper as 30(b)(6) Designee (October 21, 2022)

CIG_RJ_CLMS00000427

CIG_RJ00000029-90

CIG_RJ00000577-646

CIG_RJ00029068-073

CIG_RJ00099366-434

CIG_RJ00691297-358

CIG_RJ00972085-152

MPI-C0000216 – 224

PRJ0000043-69


CIG_RJ00002626

CIG_RJ00002627

CIG_RJ00002628

CIG_RJ00002629

CIG_RJ00002630

CIG_RJ00002631

CIG_RJ00972059

CIG_RJ00972060

CIG_RJ00972061


## **Publicly Available Materials**

Centers for Medicare & Medicaid Services, Hospital Outpatient Prospective Payment System Addendum A (January 2023 – updated January 20, 2023) *available at* https://www.cms.gov/medicare/medicare-fee-service-payment/hospitaloutpatientpps/addendum-and-addendum-b-updates/january-2023-0

Centers for Medicare & Medicaid Services, Hospital Outpatient Prospective Payment System Addendum B (January 2023 – updated January 20, 2023) *available at* https://www.cms.gov/medicare/medicare-fee-service-payment/hospitaloutpatientpps/addendum-and-addendum-b-updates/january-2023

Centers for Medicare & Medicaid Services, National Health Expenditure Accounts, Table 20, *available at* https://www.cms.gov/files/zip/nhe-tables.zip

Dartmouth Atlas Project, "FAQ," *available at* https://www.dartmouthatlas.org/faq/

Dartmouth Atas Project, HSA to HRR Crosswalk, *available at* https://data.dartmouthatlas.org/supplemental/#crosswalks

Department of Health & Human Services, Centers for Medicare & Medicaid Services, CMS Manual System, Transmittal 3685, December 22, 2016

FAIR Health, "Geozips," *available at* https://s3.amazonaws.com/media2.fairhealth.org/resource/asset/FAIR%20Health%20Geozips.pdf

FAIR Health, "Recent Additions to the Suite of FAIR Health Benchmarks," February 18, 2021, *available at* https://www.fairhealth.org/article/recent-additions-to-the-suite-of-fair-health-benchmarks

FAIR Health, Methodologies, *available at* https://www.fairhealth.org/methodologies

Jonathan Gruber. "The Incidence of Mandated Maternity Benefits." *American Economic Review* (1994)

Jonathan T. Kolstad and Amanda E. Kowalski. "Mandate-based health reform and the labor market: Evidence from the Massachusetts reform." *Journal of Health Economics* (2016)

Katherine Baicker and Amitabh Chandra. "The Labor Market Effects of Rising Health Insurance Premiums." *Journal of Labor Economics* (2006)

Katherine Ho, "The Welfare Effects of Restricted Hospital Choice in the US Medical Care Market," *Journal of Applied Econometrics*, vol. 21 (2006)

Medicare Payment Advisory Commission, Outpatient Hospital Services Payment System (Revised: October 2022) *available at* https://www.medpac.gov/wp-content/uploads/2022/10/MedPAC_Payment_Basics_22_OPD_FINAL_SEC_v3.pdf

Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs; Price Transparency of Hospital Standard Charges; Radiation Oncology Model, 83 Fed. Reg. 63477 (November 16, 2021)

Peter R. Kongstvedt, ed., *The Managed Health Care Handbook* (Fourth Edition), Gaithersburg: Aspen Publishers (2001)

Priyanka Anand. "Health Insurance Costs and Employee Compensation: Evidence from the National Compensation Survey." *Health Economics* (2017)

ResDAC, "Medicare Limited Data Set (LDS) Quarterly Claims and Enrollment Data," *available at* https://resdac.org/articles/medicare-limited-data-set-lds-quarterly-claims-and-enrollment-data

Research and Planning Consultants, LP, "Determining Usual, Customary, and Reasonable Charges for Healthcare Services," July 1, 2022, *available at* https://www.rpcconsulting.com/wp-content/uploads/2022/07/Determining-Usual-Customary-and-Reasonable-Charges-for-Healthcare-Service_White-Paper_7-1-2022.pdf

Research and Planning Consultants, LP, "RPC's Usual, Customary, and Reasonable Charge Database for Practitioner Charges," October 5, 2020, *available at* https://www.rpcconsulting.com/rpcs-usual-customary-and-reasonable-charge-database-for-practitioner-charges/

Robert V. Hogg and Allen T. Craig, *Introduction to Mathematical Statistics* (fifth edition), Upper Saddle River: Prentice Hall (1995)

U.S. Bureau of Labor Statistics, CPI Series CUSR0000SAM, CUSR0000SS5703, CUSR0000SEMC04, and CUSR0000SEMC01, *available at* https://beta.bls.gov/dataViewer/view/timeseries/CUSR0000SAM, https://beta.bls.gov/dataViewer/view/timeseries/CUSR0000SS5703, https://beta.bls.gov/dataViewer/view/timeseries/CUSR0000SEMC04, and https://beta.bls.gov/dataViewer/view/timeseries/CUSR0000SEMC01

**<u>Other Materials Provided by Counsel</u>**

*Franco v. Conn. Gen. Life Ins. Co.*, 289 F.R.D. 121, (D.N.J. 2011)

List of Client-Drafted SPDs Produced in Litigation