# EXHIBIT 1

RJ, AS THE REPRESENTATIVE OF HER BENEFICIARY SON SJ, ET AL.

PLAINTIFFS,

V.

CIGNA HEALTH AND LIFE INSURANCE COMPANY, AND MULTIPLAN, INC.

No. 5:20-CV-02255-EJD

**EXPERT REPORT OF DR. LAURENCE BAKER**

**MARCH 27, 2023**

# TABLE OF CONTENTS

I. Introduction ........................................................................................................... 1

    A. Qualifications ............................................................................................... 1

    B. Assignment .................................................................................................. 2

    C. Report Preparation ....................................................................................... 3

    D. Documents Considered ................................................................................ 3

II. Summary of Opinions ............................................................................................ 4

III. Background ............................................................................................................ 6

    A. Cigna's Services ........................................................................................... 6

    B. Background on the Claim Adjudication Process .......................................... 7

    C. OON Cost-Containment Programs ............................................................ 10

    D. Named Plaintiffs ........................................................................................ 20

IV. Contrary to Plaintiffs' Claims, There is Not a Single Industry Definition of UCR ....................................................................................................................... 26

V. Plan Members, Healthcare Providers, and Plan Sponsors Have Varying Economic Incentives, and Individualized Inquiry is Necessary to Determine Liability and Injury ................................................................................................ 33

    A. Plaintiffs' But-For World Is Not Clearly Defined ..................................... 34

    B. Individualized Inquiry is Necessary to Determine Which Proposed Class Members (if Any) Were Injured by Cigna's Use of Viant OPR ...... 36

    C. Many Healthcare Providers Accept Payments Below Their Full Billed Charges and Do Not Balance Bill Plan Members ....................................... 47

    D. Plan Sponsors May Have Unique Financial Considerations That Do Not Align With Plaintiffs' Theory or Plaintiff Experts' Opinions ............. 53

VI. The RPC Report's Methodology for Calculating Charge Percentiles Suffers from Multiple Flaws and Plaintiffs Have Not Articulated Any Means by Which these Calculations Could be Used to Calculate Class-Wide Damages ... 55

# I.  Introduction

## A.  Qualifications

1. I am a health economist.  I hold a Ph.D. in economics from Princeton University and appointments as Professor of Health Policy at Stanford University, Professor of Economics (by courtesy), Senior Fellow of the Stanford Institute for Economic Policy Research, and Research Associate of the National Bureau of Economic Research in Cambridge, Massachusetts.  I am a former Chair of the Department of Health Research and Policy at Stanford.  I have more than 25 years of experience conducting analyses of economic issues related to health care and the U.S. health care system, including studies that deal directly with health care utilization and spending and include consideration of the structure and operations of health plans, health insurance premiums, patient cost sharing, markets for health care and health insurance, and physician and hospital payment.  I have frequently taught courses at Stanford on health care systems and related economic issues, including courses for both undergraduate and graduate students.  These courses cover a range of issues related to health economics and health care systems, including health care utilization and spending, health insurance, health care markets, and physician and hospital payment.  I have published more than 150 peer-reviewed articles in leading journals including the *Journal of the American Medical Association*, the *New England Journal of Medicine*, *Health Affairs*, the *American Economic Review*, the *Journal of Health Economics*, and the *American Journal of Health Economics*.  I have been invited on many occasions to give public lectures and seminars on my research and on health care economic issues more broadly, including presentations for industry groups, professional associations, and academic audiences.  I am an elected member of the National Academy of Medicine, and have received awards for my work on health economic issues from the American Society of Health Economists; AcademyHealth, a large national organization promoting health policy and health services research; and the National Institute for Health Care Management.  I have served as an elected member of the board of directors of the American Society of Health Economists and AcademyHealth, and served as President of the American Society of Health Economists.  I have served as Senior Associate Editor of *Health Services Research*, a leading academic journal in my

field.  My curriculum vitae, which includes a list of my publications is attached as **Appendix A** to this report.  **Appendix B** lists my testimony at trial or by deposition in the previous five years.

## B.    Assignment

2. I have been retained by counsel for Cigna Health and Life Insurance Co. to offer expert opinions in the matter of *RJ, et al.,* ("Plaintiffs") *v. Cigna Health and Life Insurance Co., and MultiPlan, Inc.* ("Defendants").  Plaintiffs RJ and DS[1] (the "Named Plaintiffs") are seeking to certify a class (the "Proposed Class") consisting of:

> Any member of a health benefit plan administered or issued by Cigna and governed by ERISA, where the member's plan utilized Cigna's 'Maximum Reimbursable Charge' program for out-of-network benefits and whose claim(s) for intensive outpatient services billed with HCPCS H0015 and/or revenue code 0906 were priced by MultiPlan's Viant methodology, during the class period January 1, 2015 to the present.[2]

3. Plaintiffs allege that "thousands of putative class members were directly injured by Cigna and MultiPlan's unlawful scheme to underpay valid, medically necessary claims through the fraudulent and deceptive use of the Viant OPR methodology."[3]  Plaintiffs further assert that "[e]ach named Plaintiff and putative Class member has financial responsibility for the difference between their provider's billed charges and the Viant OPR determined reimbursement amount."[4]

4. I have been asked to comment on certain opinions presented in the expert reports submitted by the Plaintiffs' experts: Ron Luke and Brian Piper (the "RPC Report"),[5] Mark A. Hall (the "Hall Report"),[6] and Alexandra D. Lahav (the "Lahav Report"), including explaining the economic principles relevant to the background of this case and my response to Plaintiffs'

---

[1] I understand that LW's claims were dismissed.  *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the First Amended Complaint, September 2, 2022, p. 23.

[2] Plaintiffs Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification, January 17, 2023 ("Motion for Class Certification"), pp. 1 – 2.

[3] Motion for Class Certification, p. 1.

[4] Motion for Class Certification, p. 15.

[5] Expert Report of Ron Luke, JD and PhD, and Brian Piper, PhD, January 16, 2023 (the "RPC Report").

[6] Expert Report of Professor Mark A. Hall, January 16, 2023 (the "Hall Report").

experts' opinions.[7]  In particular, counsel has asked me to respond to Plaintiffs' assertion, and that of their experts, that "usual, customary and reasonable" ("UCR") has a uniform meaning, and refers to "prevailing charges of similar healthcare providers in the same or similar geographic area."[8]  I have also been asked to consider whether Plaintiffs' theory of liability and damages would lead to a but-for world in which plan members, plan sponsors, and providers would uniformly benefit if Cigna used an alternative methodology to Viant OPR to reimburse out-of-network claims for intensive outpatient ("IOP") treatment.  I was also asked to assess whether Plaintiffs have proposed a feasible method capable of reliably quantifying any alleged damages sustained by each member of the Proposed Class.

### C.  Report Preparation

5. I am being compensated for my time in this matter at my standard billing rate of $1,050 per hour.  Employees of Analysis Group, Inc., working under my direction, assisted me in preparing this report and Analysis Group is being paid for work performed supporting me in this matter.  I also receive compensation based on the professional fees received by Analysis Group for work performed supporting me.  My compensation in this matter is not contingent upon my findings or the outcome of this or any other litigation.

### D.  Documents Considered

6. In performing my analysis, I and staff working at my direction reviewed documents and data produced in this matter as well as other documents available in the public record.  The materials reviewed include, among other things, deposition transcriptions, materials describing Cigna's adjudication and pricing methodologies for out-of-network ("OON") claims, and the RPC Report, Hall Report, and Lahav Report.

7. The materials that I considered in this matter are listed in **Appendix C** to this report or are included in the text of this report and its accompanying exhibits and appendices.

---

[7] Declaration of Professor Alexandra D. Lahav Relating to Class Certification, January 16, 2023 (the "Lahav Report").

[8] Motion for Class Certification, p. 4

## II.    Summary of Opinions

8. Based on my review of the information identified throughout this report and my own expertise and experience, I have reached the following opinions to a reasonable degree of professional certainty:

- Plaintiffs and their experts incorrectly assert that UCR has a consistent meaning in the healthcare industry as referring to "the determination of claim pricing based upon prevailing charges of similar healthcare providers in the same or similar geographic area." I disagree that UCR has a single definition in the healthcare industry. Plaintiffs' experts' reports, the sources they cite, and the plan documents for sample plans all make clear that the term UCR may be used differently and to convey different concepts within the healthcare industry, some of which do not reference a provider's billed charges at all. Moreover, Plaintiffs and their experts ignore that plans that use charge-based methodologies to set allowed amounts may use different percentile values to calculate those amounts. *See* **Section IV**.

- Plaintiffs ignore that there is considerable variation in the circumstances of Proposed Class Members and in the actions of their providers and health plan sponsors that provide reason to believe that any financial impact of using the Viant OPR methodology as opposed to some other alternative charge-based methodology would vary substantially across Proposed Class Members. In fact, many could have been worse off under alternate arrangements. *See* **Section V**.

  o  Plaintiffs and their experts have not clearly defined a "but-for world." Lacking this, it is not possible to determine that any Proposed Class Members were harmed, let alone that all Proposed Class Members were harmed. In fact, if the conditions in the actual world were equal to or better for any Proposed Class Member than those in the but-for world, then no harm to that individual would have occurred. *See* **Section V.A.**

  o  Individualized inquiry would be required to determine which Cigna members (if any) were injured by Cigna's use of Viant OPR, and whether

they would be economically better off if Cigna were to have processed claims at higher allowed amounts. Members who did not receive balance bills may be economically worse off if Cigna were to reprocess the claims at a higher allowable amount. *See* **Section V.B.**

- o Contrary to Plaintiffs' claims, many providers, including those that are out-of-network, accept amounts less than their full billed charges and do not regularly balance bill members. While some providers do balance bill patients, they may not always collect the amounts they bill, or may routinely accept amounts less than their full bulled charges. *See* **Section V.C.**

- o Plan sponsors have unique economic considerations and incentives, which do not necessarily align with Plaintiffs' theory of liability and Plaintiffs' experts' opinions. An alternative methodology of pricing the claims may result in higher payments for plan members and deprive plan sponsors of the benefit of the reductions achieved through the cost-containment programs, which could affect plan premiums and other plan characteristics. *See* **Section V.D.**

- Plaintiffs have not articulated any means by which the calculations in the RPC Report could be used to calculate class-wide damages, let alone shown that they have a reliable methodology for calculating class-wide damages for each Proposed Class Member. Even if it were appropriate to process the claims based on a percentile of billed charges from a source other than Viant OPR, the methodology proposed in the RPC Report suffers from multiple flaws, ████ ████████████████████████████████████████ ██████████████████████████████ *See* **Section VI**.

9. My analysis and conclusions are based on the information available to me as of the date this report was submitted. Should additional information become available to me as this matter proceeds, I reserve the right to update my analysis and refine my opinions as appropriate.

III.     **Background**

A.     **Cigna's Services**

10.     Cigna is a healthcare company that provides health plan administrative services and insurance products to employers and individuals throughout the United States.  About 85 percent of Cigna's commercial medical customers use what are called "self-funded" or "administrative services only" ("ASO") health benefit plans.[9]  In these arrangements, as the name suggests, the sponsor of the ASO plan—normally the plan members' employer—is responsible for covering the cost for any plan benefits with the plan sponsor's own funds, and the plan sponsor pays Cigna fees for providing administrative services to the plans, like determining whether a claim for healthcare service is eligible for coverage.  In contrast, some employers select fully-insured plans, meaning that the sponsor of the plan purchases insurance for healthcare services provided to members of the plan, and the insurer both administers the plan and pays for covered plan benefits out of the insurer's funds, carrying the financial risk.

11.     Two of Cigna's core functions for both ASO and fully-insured plans are managing provider networks and adjudicating claims associated with health services, including behavioral health treatment, submitted for coverage.[10]  Cigna constructs provider networks for its plans by contracting with a set of providers who agree to provide services to plan enrollees for rates specified by contract.[11]  I refer to these providers as "participating," "contracted," or "in-network" providers.[12]  These providers also agree to accept the contracted payment rates as payment in full for their services and to not further bill the plan member for additional

---

[9] Cigna, "Employer-Sponsored Coverage," July 29, 2019, p. 3, available at https://www.cigna.com/static/www-cigna-com/docs/employers-brokers/insights/informed-on-reform/cigna-employer-sponsored-coverage-overview-final-7-29-19.pdf.

[10] Cigna Corporation Form 10-K, Year Ended December 31, 2021, p. 14, available at https://www.sec.gov/Archives/edgar/data/1739940/000173994022000007/ci-20211231.htm.

[11] I understand that the provider networks may be different for different plans.  *See* Cigna, "In-Network vs. Out-of-Network Providers," available at https://www.cigna.com/knowledge-center/in-network-vs-out-of-network.

[12] Throughout my report, I use the term "contracted" interchangeably with "in-network" or "participating."  However, there could be circumstances when a provider and a payor are contracted for some services (or for some of the payor's plans), but the specific services billed are not covered by the contract or for other reasons are considered OON.

amounts.[13]  As of 2022, Cigna's networks included more than 265,000 in-network mental and behavioral health care providers.[14]

12.    Some of Cigna's plans provide benefits to members only for services provided through healthcare providers that participate in Cigna's networks (absent extenuating circumstances like emergency situations).  Other Cigna plans provide coverage when members receive care from OON providers that do not participate in Cigna's networks (who are also referred to as "non-participating," "non-contracted," or "out-of-network" providers).[15]  Care delivered under these circumstances is sometimes referred to as "covered out-of-network" care.  In 2018, ▮▮▮▮▮ of Cigna members' medical costs were for in-network care.[16]

### B.    Background on the Claim Adjudication Process

13.    After medical services are rendered for a plan member, it is common for the provider to submit a bill to the member's payor that shows, among other things, the services provided and the amount charged for each service.  Individual services are commonly represented by a set of standardized codes used across the healthcare industry.

14.    The Healthcare Common Procedure Coding System ("HCPCS") is a collection of standardized codes that identify medical procedures, supplies, products, and services.[17]  This coding system includes two subsystems: (1) Level 1 consists of five digit numeric codes based on the American Medical Association's Common Procedural Terminology ("CPT codes") that

---

[13] Cigna, "In-Network vs. Out-of-Network Providers," available at https://www.cigna.com/knowledge-center/in-network-vs-out-of-network.

[14] Cigna, "Company Profile," available at https://web.archive.org/web/20221209131121/https://www.cigna.com/about-us/company-profile/.

[15] *See, e.g.,* Cigna, "HMO and Network," available at https://static.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalPlansAndProduct/medicalPlansProductsHmoAndNetwork.html; Cigna, "Open Access Plus," available at https://static.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalPlansAndProduct/medicalPlansProductsOpenAccessPlusOapInNetwork.html.

[16] Cigna, "Save More, Worry Less: Cigna's Out-of-Network Cost-Containment Solution," 2018 (CIG_RJ00006248 at p. 4).

[17] CMS.gov, "HCPCS Coding Questions," available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/HCPCS_Coding_Questions.

identify medical and surgical services and procedures rendered by medical professionals, and (2) Level 2 consists of five digit alphanumeric codes that identify other products and services.[18]

15.    In some cases, when plan members receive care provided in a health care facility, the facility may bill for its role in providing the services.[19]  Such claims for facility services may include a revenue code, which is a three-digit code that indicates the department or place in which a treatment is performed.[20]  Depending on the service, facility claims may include both a HCPCS code and a revenue code, or just one of these codes.

16.    I understand that intensive outpatient program ("IOP") services are typically billed using HCPCS code H0015, which can be defined as treatment for drug abuse and rehabilitative services that is based on an individualized recovery plan and occurs at least three hours per day on at least three days per week.[21]  I also understand that facility IOP services are sometimes also billed with revenue code 906, which can be defined as "[b]ehavioral health treatment services, intensive outpatient chemical dependency."[22]

17.    When payors receive claims, they normally "adjudicate" the claim to determine the reasonable reimbursement for covered services, an amount sometimes referred to as the "allowed amount."[23]  The allowed amount may include a component paid by the payor, as well as a component owed by the member.  The payor's process for adjudicating claims will normally differ depending on whether the provider is contracted with the payor and whether the services are considered in-network.  If a provider is in-network and the service is covered by the plan

---

[18] In addition, there is a third level of codes that is used by some individual contractors and state agencies to process claims.  *See* ResDAC, "Healthcare Common Procedure Coding System (HCPCS) Code (FFS)," available at https://resdac.org/cms-data/variables/healthcare-common-procedure-coding-system-hcpcs-code-ffs.

[19] Cigna, "Managing Your Medical Bills," available at https://www.cigna.com/knowledge-center/hw/managing-your-medical-bills-abo3249.

[20] While revenue codes are recorded with four digits, the first digit is typically a "0".  *See* Value Healthcare Services, "Understanding Hospital Revenue Codes," available at https://valuehealthcareservices.com/education/understanding-hospital-revenue-codes/.

[21] HCPCS.codes, "HCPCS Code H0015," available at https://hcpcs.codes/h-codes/H0015/.

[22] *See, e.g.,* Cigna, "Revenue Code List-CPT-HCPCS," March 15, 2020, p. 9, available at https://static.cigna.com/assets/chcp/pdf/resourceLibrary/medical/revenue-code-list-requiring-cpt-and-hcps-codes-for-outpatient-facility-claims.pdf.

[23] *See*, *e.g*., Cigna, "Explanation of Benefits for Claim Number ██████████████████████ ████████ (CIG_RJ_CLMS00001392 – 395 at 392).

member's plan, the payor will normally use its contract with the provider to determine how much to allow for the given service.

18.    For in-network services and covered OON services, plan members may be responsible for paying a copay, deductible, and/or coinsurance.  These are often referred to as "out-of-pocket" ("OOP") payments, "cost sharing," or "member responsibility" amounts.  A copay is a flat fee a plan member pays when they receive eligible medical services, for example $20 per physician office visit.[24]  Coinsurance refers to an arrangement where the plan member pays a percentage of the amount to be paid to the provider, for example 20 percent of the allowed amount for in-network services.  A deductible is the amount a member must pay for eligible health care services during a plan year before the health plan begins to pay benefits.  Plans may use a single form of cost sharing, or they may use multiple forms in combination, for example using a structure where after a deductible is met, a plan member is responsible for paying coinsurance.  In addition, plans will often set an OOP maximum, which can limit the amount owed by members for some or all covered services.

19.    For contracted services, the provider typically accepts the allowed amount as payment in full and agrees as part of its network arrangement not to bill the plan member for amounts beyond any member responsibility amount assessed by the payor.  I understand that Cigna's plan designs commonly include incentives for plan members to receive care from in-network providers, including by requiring plan members to share a higher portion of the cost for OON claims than in-network claims.[25]

20.    In contrast, for OON services, there is no contractual agreement between the provider and payor that governs the allowed amount or that limits the provider's ability to bill

---

[24] I understand that Cigna members may not be responsible for paying a copay when they receive services from an OON provider, however, they may be responsible for paying coinsurance.  *See* Cigna, "In-Network vs. Out-of-Network Providers," available at https://www.cigna.com/knowledge-center/in-network-vs-out-of-network.

[25] For example, Plaintiff RJ's plan document states that Cigna will pay 90 percent of in-network covered expenses and 70 percent of OON covered expenses (Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 041 (Deposition of RJ, Exhibit 1)).  Similarly, Plaintiff DS's plan document states that Cigna will pay 90 percent of in-network covered expenses and 70 percent of OON covered expenses for IOP services (Impossible Foods Inc. Open Access Plus Plan Document, January 1, 2019 (CIG_RJ00000577 – 646 at 591 (Deposition of DS, Exhibit 6)).

both the plan and the member for payments.[26]  When providers bill the plan for OON covered services, the plan will normally adjudicate the claim and determine an amount that it will pay, which may be less than the charged amount.  Below, I describe the processes Cigna uses to adjudicate OON covered claims relevant to this matter.  In addition, when OON providers do not receive their desired payment from the plan or from cost sharing the plan requires the member to pay, the provider may bill the plan member directly for additional amounts, a practice sometimes referred to as "balance billing."

### C.    OON Cost-Containment Programs

21.    Payors and third-party administrators use a variety of strategies to address and reduce OON healthcare costs for plans and their members.[27]

22.    As noted above, one mechanism is through offering benefit plan designs that encourage plan members to receive care from in-network providers.  In particular, a plan may require plan members to share a higher portion of the cost for OON claims than in-network claims, such as by requiring a higher percentage of coinsurance or higher dollar deductible for OON claims than in-network claims.  For example, Named Plaintiff DS's Impossible Foods plan states that the plan will pay 90 or 100 percent of most covered in-network expenses (making the member's co-insurance 0 or 10 percent), but will pay 70 percent of all covered out-of-network expenses (making the member's co-insurance 30 percent).[28]  Another mechanism that Cigna uses is capping the amount that the plan will cover, typically through what is called the "Maximum Reimbursable Charge" or "MRC."  Plan sponsors can select between two primary methods by which MRCs for OON services may be determined: MRC1 and MRC2.

---

[26] Cigna, "In-Network vs. Out-of-Network Providers," available at https://www.cigna.com/knowledge-center/in-network-vs-out-of-network.

[27] *See* generally Deposition of Mario Vangeli, November 4, 2022, 105:10 – 106:7, 143:12 – 144:13; Deposition of Trisha Rawlings, October 7, 2022, 81:23 – 82:11.

[28] Impossible Foods Inc. Open Access Plus Plan Document, January 1, 2019 (CIG_RJ00000577 – 646 at 591 (Deposition of DS, Exhibit 6)).  Similarly, Named Plaintiff RJ's plan document states that Cigna will pay 90 percent of in-network covered expenses and 70 percent of OON covered expenses.  *See* Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 041 (Deposition of RJ, Exhibit 1)).

23.     In addition to MRC benefit limits, plan sponsors may elect to have Cigna use third-party vendor network and negotiation services (such as those offered by MultiPlan and Viant),

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.

For example, these services may apply values based on a percentile of charges for a service observed in a specific database.  Such services comprise Cigna's OON "cost-containment program," which consists of a hierarchy of services, referred to by Cigna as the "funnel," that Cigna can apply when adjudicating claims for OON services.  Plan sponsors can elect to use all, some, or none of these cost-containment program services.

### 1.      Cigna's OON Cost-Containment Funnel

24.     In this section, I describe the OON cost-containment program funnel offered by Cigna.

25.     For a claim being adjudicated, the cost-containment program begins with a "target price," ████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████.[29]

26.     Cigna works with contracted vendors to implement key components of its cost-containment program.  As part of this process, Cigna provides vendors with the claim details and the target price.  The claim then moves through the cost-containment funnel.

27.     ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████. ███████████████████████

███████████████████████████████████████████████

---

[29] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 367); Deposition of Gabriel Smith, November 11, 2022, 161:10 – 8 ("████████████████████████"); Deposition of Terri Cothron, November 8, 2022, 80:7 – 11 ("████████████████████████████████").



28.



---

[30] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 372 – 373); Cigna, "Non Par Cost Containment Presentation," June 12, 2020 (CIG_RJ00608614 – 627 at 621 – 623).

[31] Cigna, "Save More, Worry Less: Cigna's Out-of-Network Cost-Containment Solution," 2018 (CIG_RJ00006248 at p. 6).

[32] Cigna, "Non-Par Cost-Containment Overview and Service Model," June 2017 (CIG_RJ00607111 – 112 at 111).

[33] Cigna, "Save More, Worry Less: Cigna's Out-of-Network Cost-Containment Solution," 2018 (CIG_RJ00006248, p. 6); *See* Deposition of Mario Vangeli, November 4, 2022, 155:8 – 156:1 ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

[34] Cigna, "Non-Par Cost-Containment Overview and Service Model," June 2017 (CIG_RJ00607111 – 112 at 111); Cigna, "Save More, Worry Less: Cigna's Out-of-Network Cost-Containment Solution," 2018 (CIG_RJ00006248 at p. 6). The Supplemental Network program does not require members to have a logo on their member medical ID card.

[35] This is separate from the NSP program where MultiPlan's network is used. I understand that for the BNS program, the logo for the supplemental network may not appear on the member's card. *See* Deposition of Trisha Rawlings, October 7, 2022, 49:4 – 49:9 ("Q: And what is a non-logo network? How would you describe that? A: From what I recall, that included networks that our vendors may have contracted with that did not require an ID on a member -- or I'm sorry, a logo on the member's ID card.").

████████████████████████████████████████████████████████████████████████████

███████████████████████████████.[36]

29.    MultiPlan's Viant OPR facility review program is one of the repricing methods that Cigna uses for BNS, in particular for outpatient facility claims.    ████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ ████ █████████████████████████████████

█████████████████████████████ ██ █████████████████████████████████

██████████████████████████████[37]

30.    When Viant OPR repricing is used through BNS, the provider receives an explanation of payment from Cigna, which indicates that the claim was priced based on Viant's facility review program and asks them to call before balance billing the member.[38]  The member also receives a letter (referred to as a patient advocacy or "PAD" letter) that provides information on the process and instructs the member to call if they receive a balance bill.[39]  If the provider balance bills the member for more than the rate repriced through Viant OPR, MultiPlan will attempt to negotiate an amount that the provider will agree to accept without balance billing; if unsuccessful, Cigna will adjust the allowed amount to the plan-selected MRC1 or MRC2 rate.[40] As a result of these steps, the member should not receive a balance bill for any claims that are ultimately adjudicated using Viant OPR through BNS.

31.    ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████[41]

---

[36] Cigna, "Non-Par Cost-Containment Overview and Service Model," June 2017 (CIG_RJ00607111 – 112 at 111, 112).

[37] Deposition of Terri Cothron, November 8, 2022, 238:7 – 240:6.

[38]  *See* Deposition of Terri Cothron, November 8, 2022, 32:9 – 32:21; Cigna, "Non-Par Cost-Containment Overview and Service Model" June 2017 (CIG_RJ00607111 – 112 at 111).

[39]  *See* Deposition of Terri Cothron, November 8, 2022, 66:18 – 67:14.

[40]  *See* Deposition of Terri Cothron, November 8, 2022, 31:5 – 11, 305:14 – 307:11; Cigna, "Non-Par Cost-Containment Overview and Service Model," June 2017 (CIG_RJ00607111 – 112 at 112).

[41] Cigna, "Non-Par Cost-Containment Overview and Service Model," June 2017 (CIG_RJ00607111 – 112 at 111).

### 2. *MRC1*

32.     While I understand that aspects of MRC1 determination can vary between plans and the circumstances of the claim,[42] in general, I understand that Cigna calculates MRC1 based on the lesser of the provider's charges for the services submitted and a plan-sponsor-selected percentile of charges for the same or similar service in the geographic area where the service was provided, based on an available data source that Cigna selects. For instance, as I discuss in the next section, Named Plaintiff RJ had an MRC1 plan in the first half of 2019 that defined "Maximum Reimbursable Charge" as follows:

> The Maximum Reimbursable Charge for covered services is determined based on the lesser of: the provider's normal charge for a similar service or supply; or a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna.
>
> The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule [attached to the plan document]. The Maximum Reimbursable Charge is subject to all other benefit limitations and applicable coding and payment methodologies determined by Cigna. Additional information about how Cigna determines the Maximum Reimbursable Charge is available upon request.[43]

33.     The percentile refers to the percentage value on a scale from zero to one hundred that determines the proportion of charges for the services in the applicable geographic area equal to or lower than the selected percentage value. 

.[44] In the case of RJ's plan, the plan used the 80th percentile to calculate

---

[42] I understand that plans may define MRC differently, not use the term MRC at all, or incorporate different factors for Cigna to consider. For example, the Honeywell International Plan included, among other exceptions, that: "[i]n the case of out-of-network Emergency Care, the Maximum Reimbursable Charge will be increased as necessary to ensure that the Covered Person has no greater liability than he or she would have incurred for similar in-network Emergency Care." *See* Honeywell International Inc., "Plan Document and Summary Plan Description," January 1, 2018 (CIG_RJ_CLMS00006366 – 533 at 465). Cigna may also use different databases depending on the type of claim at issue. *See* Deposition of Wendy Gompper, October 21, 2022, 35:22 – 37:12.

[43] Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 041, 085 (Deposition of RJ, Exhibit 1)).

[44] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 375, 376).

MRC1, which means that the MRC1 value for a claim would reflect that 80 percent of provider charges for the services in the applicable area were less than the plan-selected MRC1 value.[45]

34.    The databases on which the percentiles are based can change depending on the type of service and availability of data. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[47] It is my understanding that FAIR Health did not start to report percentile values for outpatient facility IOP services by HCPCS code until 2020.[48]

35.    To calculate the percentiles for its OPR product, Viant accesses the Centers for Medicare & Medicaid Services ("CMS") Standard Analytical Outpatient File ("SAF"), which contains all outpatient claims submitted to CMS by providers for Medicare beneficiaries for the preceding year.[49] █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

36.    Viant OPR ████████████████████████████████████████████████████████████████████████████████████

[45] Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 042 (Deposition of RJ, Exhibit 1)).

[46] *See* Deposition of Wendy Gompper, October 21, 2022, 35:22 – 36:5; Deposition of Jo-Ann Lebel, November 29, 2022, 23:7 – 12.

[47] I use "claims at issue" to refer to the claims that Plaintiffs assert were "billed with HCPCS H0015 and/or revenue code 0906 [and] were priced by MultiPlan's Viant methodology, during the class period January 1, 2015 to the present." *See* Motion for Class Certification, pp. 1 – 2.

[48] Email from Matt Mayfield to Wendy Gompper, Jo-Ann Lebel, Rachel Hernandez, Michael Battistoni, "Follows from Meeting," August 14, 2020 (CIG_RJ00635586); FAIR Health, "Cigna Client Meeting," August 13, 2020 (CIG_RJ00635587 – 615); FAIR Health, "FH Benchmarks: HCPS Solutions," 2020 (CIG_RJ00635616 – 617 at 617).

[49] In 2018, CMS' Standard Analytical Outpatient File contained approximately 170 million claims from more than 5,800 hospitals and 30,000 additional outpatient providers. (*See* Viant, "Viant Facility U&C Review: Outpatient Review (OPR) Module," September 2018 (CIG_RJ00003668 – 676 at 669).)

[50] Viant, "Viant Facility U&C Review: Outpatient Review (OPR) Module," September 2018 (CIG_RJ00003668 – 676 at 669).



37.    Viant OPR also ███████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████ ████████████████████████████

██████████████████████ ████ ████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████.[54]

38.    As Plaintiffs' experts recognize, "any data source, even the best available, will inevitably have gaps."[55]  Therefore, payors and vendors commonly develop "gap-fill" processes to fill these gaps.[56]  For example, Professor Hall recognizes that "data for one time period can be trended to another based on standard inflation metrics" or "UCR rates for a service that is missing sufficient data can be benchmarked to another service."[57]

---

[51] Viant, "Viant Facility U&C Review: Outpatient Review (OPR) Module," September 2018 (CIG_RJ00003668 – 676 at 669, 672).

[52] Viant, "Viant Facility U&C Review: Outpatient Review (OPR) Module," September 2018 (CIG_RJ00003668 – 676 at 673).

[53] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 374).

[54] Email from Mike Schill to Kevin Williams, "████████████," October 4, 2018, (MPI-C0003443 – 445 at 443, 444 (Deposition of Kevin Williams, Exhibit 21)).

[55] Hall Report, p. 8.

[56] *See, e.g.*, FAIR Health, "Medicare GapFill PLUS," available at https://www.fairhealth.org/benchmark-data-products/medicare-gapfill-plus; CMS.gov, "Gapfill Pricing Inquiries," December 1, 2021, available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/ClinicalLabFeeSched/Gapfill-Pricing-Inquiries.

[57] Hall Report, p. 8.

39.     While I offer no opinion on the propriety or reasonableness of the gap-fill process used in this case, applying a gap-fill process can have an economically recognizable benefit by providing a way for plan sponsors to determine an allowed amount for out-of-network services that is consistent with the methodology they elected to pay out-of-network claims and avoid simply allowing the provider's billed charges.   As I discuss in **Section V.C.1**, charges need not be tethered to market forces in the market for insured patient services, and the payment of full billed charges would be costly for clients and members.

### 3.     MRC2

40.     Cigna's other MRC option is MRC2.   While aspects of MRC2 determination will vary from one plan to another, Cigna generally calculates MRC for MRC2 plans based on what it determines is the lesser of the billing provider's charge for the services and a plan-sponsor selected percentage of a fee schedule developed by Cigna based on a methodology similar to the one utilized by Medicare to determine the allowable fee for the same or similar service.   For instance, Named Plaintiff DS's plan was an MRC2 plan, and the plan document defined MRC as:

> [T]he lesser of: the provider's normal charge for a similar service or supply; or an Employer-selected percentage of a fee schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.[58]

41.     

Medicare may not have established fee schedules for certain services that it does not reimburse, or for HCPCS codes that have recently been implemented but for which Medicare has not yet

[58] Impossible Foods Inc. Open Access Plus Plan Document, January 1, 2019 (CIG_RJ00000577 – 646 at 633, 634 (Deposition of DS, Exhibit 6)).

[59] Impossible Foods Inc. Open Access Plus Plan Document, January 1, 2019 (CIG_RJ00000577 – 646 at 633, 634 (Deposition of DS, Exhibit 6)).

[60] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 367). ███████████████████████████████████████
██████████████.

determined a rate.

42.     As with MRC1-based claim adjudications, a gap-fill may be used to inform MRC payments for MRC2 plans.

43.     Within MRC2 plans, a plan member may pay more in cost sharing when a claim is priced based on NSP or BNS, rather than the plan-elected MRC2 amount.  As disclosed in Cigna's ASO agreements,[65]

While the plan member may pay more in cost sharing, if a provider

---

[61] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 369).

[62] Deposition of Wendy Gompper, October 21, 2022, 47:10 – 48:10; Deposition of Jo-Ann Lebel, November 29, 2022, 119:21 – 120:14.)

[63] *See* Deposition of Wendy Gompper, October 21, 2022, 47:10 – 48:3.

[64] Deposition of Wendy Gompper, October 21, 2022, 47:15 – 49:2, 52:24 – 53:7.

[65] *See, e.g.*, Letter from Cigna to Sarah Lecuna, "RE: 2019 Plan Year Services and Charges (Effective August 1, 2019) Intuit Inc," (CIG_RJ00002477 – 494 at 482) ("                                                                                ").

[66] Deposition of Gabriel Smith, November 11, 2022, 161:10 – 18 ("                                                    "); Deposition of Terri Cothron, November 8, 2022, 80:7 – 11 ("                                        "); Cigna, "Non Par Cost Containment Presentation," June 12, 2020 (CIG_RJ00608614 – 627 at 624, 625).

agrees to an allowed amount repriced through NSP or BNS, the plan member is protected from balance billing, a potentially significant economic benefit.

44.     Take, for example, a provider that billed $600 for a service for which Cigna's base MRC2 fee schedule rate is $100 and a member whose plan selects a MRC2 cap based on 150 percent.  The allowed amount based on 150 percent of the base MRC2 rate would be $150, while the target price would be $400.  If the member had satisfied their deductible but not met their OOP maximum, and had a 20 percent coinsurance for this OON service, the member would owe $30 ($150 *x* 20 percent) in coinsurance, plus $450 more if they were balance billed by the provider the difference between the MRC2 cap of $150 and the provider's billed charge of $600, for a total member payment of up to $480.  The plan would be responsible for paying $120 ($150 *x* 80 percent).

45.     However, if the claim is paid based on the target price of $400, that would become the plan allowed amount, and the plan member would pay $80 ($400 x 20 percent) and the plan would pay $320 ($400 *x* 80 percent).  The plan's payment of $320 is $200 more than the amount the plan would have paid based on the MRC2 rate.  The plan member's payment of $80 is $50 more than the amount the member would have paid in ***coinsurance*** had the allowed amount been based on the plan's MRC2 cap, but the member still may benefit overall by avoiding having to pay the provider's balance bill, resulting in an overall economic benefit of up to $400 in this case.

46.     While Plaintiffs' experts appear to include plan members with claims priced at the MRC2 plan benefit limit as part of the Proposed Class,[67] claims priced at the MRC2 plan cap are not priced using Viant OPR at all.  Instead, my understanding is that Cigna priced these claims ███████████████████████████████████████████████████████████████ ███████████████████████████████████████        Thus, claims at the priced MRC2 plan benefit limit would not be included in Plaintiffs' definition of the Proposed Class ("…priced by MultiPlan's Viant methodology").[69]

---

[67] *See*, *e.g*., Lahav Report ¶ 13.

[68] Deposition of Wendy Gompper, October 11, 2022, 47:15 – 49:2.

[69] Motion for Class Certification, pp. 1 – 2.

### D.    Named Plaintiffs

47.    There are two named plaintiffs in this case: RJ and DS.  Both are members of ASO plans who either received IOP treatment themself (in the case of DS) or whose dependent received such services (in the case of RJ) from Summit Estate Recovery Center ("Summit") on an OON basis.  These services were billed using the HCPCS code H0015.[70]  Summit describes its outpatient facility as a "luxury rehab center in California"[71] and an online gallery includes photos of the facility's breakout rooms, dining room, café, and "education theater and family room."[72]  Summit further describes its IOP program (which they refer to as their "day treatment") as:

> [F]ocused on clients who may require a lower level of care to address their addiction issues.  Our clients enjoy a cozy, inviting space where they can relax and socialize in a safe and sober environment, while participating in various therapies.  Group sessions occur five days a week, in addition to one-on-one counseling and therapy.[73]

48.    Below I provide more background on each Named Plaintiff's plan and benefit claims for these services.

#### 1.    RJ

49.    As of 2019, RJ and her son SJ were members of a self-funded plan sponsored by RJ's employer, Intuit, Inc., for which Cigna provides administrative services (the "Intuit Plan").[74]  The Intuit Plan is an MRC1 plan.  Starting in March 2019, RJ's son SJ began receiving

---

[70] Summit Estate Recovery Center Documents (SUMMIT 00414 – 440 at 424, 440 (Deposition of RJ, Exhibit 6)); Summit Estate Recovery Center Invoice (P00000034 (Deposition of DS, Exhibit 12)).

[71] Summit Estate, "Intensive Outpatient Program," available at https://www.summitestate.com/northern-california-drug-and-alcohol-rehab-programs/iop-intensive-outpatient-program-ca/.

[72] Summit Estate, "IOP Photo Gallery," available at https://www.summitestate.com/about-summit-estate-recovery-center-iop-photo-gallery/.

[73] Summit Estate, "Intensive Outpatient Program," available at https://www.summitestate.com/northern-california-drug-and-alcohol-rehab-programs/iop-intensive-outpatient-program-ca/.

[74] "Plaintiff, RJ, is a pseudonym for a participant in an employee benefits plan subject to E.R.I.S.A which is sponsored and funded by Inuit, Inc.  RJ is the parent of her beneficiary son, SJ, who is a behavioral health patient."  *See* Amended Complaint, ¶ 38.

inpatient treatment from Summit, progressing from detox, to partial hospitalization, to residential treatment.[75]  From April 22 through June 7, 2019, SJ received IOP treatment from Summit.[76]

50.    Before providing treatment, Summit provided SJ with a document that indicated ▮



.[77] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Consistent with the cost-containment program that is part of the Intuit Plan,[79] Cigna used MultiPlan's Viant OPR product to make an offer to Summit of ▮▮▮▮▮▮ for each day of OON IOP treatment.[80]  Cigna also sent Summit an explanation of payment ("EOP") with each payment, which stated that:

> [Cigna] reduced the allowed amount based on Viant's facility bill review program.  If you have questions about this discount contact Viant at 866.233.0121.[81]

51.    RJ received an explanation of benefits ("EOB") that contained identical language, as well as a patient advocacy letter stating: "To help lower out-of-network charges, Cigna has contracted with Viant to negotiate on your behalf" and:

> If you get a bill from a provider for more than the 'What I Owe' amount [on] the Cigna EOB, please call Cigna Customer Service at the number on your ID card.  We will work

---

[75] *See* Summit Estate Recovery Center Verification of Benefits (SUMMIT 05457 (Deposition of Creyna Franco, Exhibit 8)); Deposition of RJ, September 29, 2022, 121:12 – 22, 144:25 – 145:6.

[76] Summit Estate Recovery Center Documents (SUMMIT 00414 – 440 at 424 (Deposition of RJ, Exhibit 6)); *see also* Letter to Intuit Employee Benefit Council, "RE: Appeal-▮▮▮▮▮▮▮ Viant/Cigna Claims Repricing," December 18, 2019 (RJ0001970 – 975 at 971 (Deposition of RJ, Exhibit 20)).

[77] Summit Estate Recovery Center Documents, (SUMMIT 00414 – 440 at 415, 416 (Deposition of RJ, Exhibit 6)).

[78] Summit Estate Recovery Center Documents (SUMMIT 00414 – 440 at 416 (Deposition of RJ, Exhibit 6)); Deposition of RJ, September 29, 2022, 163:1 – 9.

[79]  Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 376) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.").)

[80] Cigna, "Customer Appeal Request," September 17, 2019 (PRJ0000034 – 042 at 038 (Deposition of RJ, Exhibit 8)).

[81] Cigna, "Provider Explanation of Medical Benefits," April 9, 2019 (CIG_RJ00002178 – 180 at 180).

with Viant on your behalf to attempt to reduce your expenses from this out-of-network provider.[82]

52.　After Cigna's initial payment on the claim, RJ contacted her employer and indicated that she had received a balance bill of ██████ from Summit, which reflected the difference between Summit's billed charges and the Viant OPR offer.[83]　Consistent with what I understand to be its policies and procedures, upon learning of this balance bill, Cigna adjusted the allowed amount on the claim to the 80th percentile of MRC1, which is the Intuit Plan's MRC1 election.[84] This resulted in a revised allowable amount of ██████ per date of service, or an additional amount of ██████ per day.[85]　MultiPlan and Cigna attempted to further negotiate with Summit, but the parties were unable to reach an agreement.[86]　RJ's employer, Intuit, was also ██████ ██████████████████████████████████████████████████████.[87]

53.　RJ testified that she paid the balance bill to Summit for her IOP services, which, after Cigna's adjustment to MRC1, was ██████.[88]　In early 2020, Intuit reimbursed RJ $80,000 (around $50,000 on an after-tax basis), which Intuit's representatives stated was intended to reimburse RJ for the difference between the amount charged by Summit for the IOP services and the initial amount allowed by Cigna (prior to Cigna increasing the allowed

---

[82] Letter from Cigna to SJ, "Information about Explanation of Benefits," May 21, 2019 (PRJ0000043 (Deposition of RJ, Exhibit 12)).

[83] Deposition of RJ, September 29, 2022, 95:15 – 20; Email from RJ to Jennifer Gentry, et. al., "Intuit Employee Benefits," August 9, 2019 (PRJ0001516 – 522 at 521 – 522 (Deposition of RJ, Exhibit 15)); Email from Joan Borsten to RJ, "██████ – Balance Invoice #_2019_56-IOP.xlsx – Superbill.pdf," August 28, 2019 (PRJ0001817 – 820 at 820 (Deposition of RJ, Exhibit 18)).

[84] Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 042 (Deposition of RJ, Exhibit 1)).

[85] Deposition of RJ, September 29, 2022, 148:13 – 18; Cigna, "Customer Appeal Request," September 17, 2019, (PRJ0000034 – 042 at 038 (Deposition of RJ, Exhibit 8)).

[86] Deposition of RJ, September 29, 2022, 236:6 – 237:9.

[87] Email from Sarah Lecuna to JoAnne Forrest, "Re: Verification of Coverage Calls," November 25, 2019 (CIG_RJ00009737 – 743 at 737 (Deposition of JoAnne Forrest, Exhibit 9)); Deposition of JoAnne Forrest, October 14, 2022, 230:8 – 15.

[88] Deposition of RJ, September 29, 2022, 274:9 – 12; *see also* Check from RJ to Summit Estate Recovery Center, February 2, 2020 (PRJ0001850 (Deposition of RJ, Exhibit 23)).

amount).[89]  As a result, RJ received approximately $16,000 more from Intuit to reimburse her for Summit's 2019 IOP treatment than she actually paid for those services.

54.    SJ later returned to Summit for further treatment, and received IOP treatment from February 13, 2020 through November 20, 2020.[90]  I understand that some of these IOP services were billed using HCPCS code H2036,[91] which Summit's corporate representative, Joan Borsten Vidov, testified that ███████████████████████████████████████████████████████ ██████████████████████████████████ ████.[92]  My understanding is that Viant OPR was not used, and Cigna allowed the claim at ███████████[93]  Claims billed with HCPCS code H2036 are not at issue in this matter, based on my understanding of the case and class definition.

### 2.    DS

55.    DS was covered by a self-funded health benefits plan sponsored through his employer, Impossible Foods, Inc., for which Cigna provided administrative services (the "Impossible Foods Plan").[94]  The Impossible Foods Plan was an MRC2 plan, and selected 110 percent as its MRC cap.[95]

---

[89] Email from Beth Scott to RJ, "Summary of Discussion re: Plan Payments," January 18, 2020 (Deposition of RJ, Exhibit 21.); *see also* Deposition of RJ, Exhibit 22; Deposition of RJ, September 29, 2022, 266:5 – 18.

[90] *See* Plaintiff RJ's Supplemental Responses to Cigna's Interrogatories, Response to Interrogatory No. 1, June 1, 2022 (Deposition of RJ, Exhibit 4).

[91] *See, e.g.*, Summit Estate Recovery Center Verification of Benefits, March 4, 2019 (SUMMIT 05457 (Deposition of Creyna Franco, Exhibit 8)).

[92] Deposition of Joan Borsten Vidov, November 16, 2022, 44:7 – 11 ("…███████████████████████████ ███████████████████████████████████████████); *see also* Deposition of Joan Borsten Vidov, November 16, 2022, 47:1 – 5 ("███████████████████████████████████████████████████ ██████████████████████████████████████████████████████████.")



[93] MultiPlan, "Agreement," March 5, 2020 (PRJ0000703 (Deposition of RJ, Exhibit 28)).

[94] Deposition of DS, October 1, 2022, 14:8 – 10.

[95] *See, e.g.*, Summit Estate Recovery Information Form, August 22, 2019 (SUMMIT00155 – 158 at 158 (Deposition of DS, Exhibit 3)).

56. DS received both inpatient and outpatient treatment from Summit.[96] Before providing these services, Summit called Cigna to verify DS's benefits. Summit was informed that a 3rd party billing company or cost-containment vendor such as Viant had the right to re-price claims.[97]

57. On August 24, 2019 – one day after his admission to Summit for residential treatment[98] –  DS subsequently received IOP treatment from Summit between September 20, 2019 and November 26, 2019 for which Summit charged ▮▮▮▮ per day.[100] Before he received this treatment, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[101]

58. Cigna made offers to Summit ranging from ▮▮▮▮ to ▮▮▮▮ for each day of IOP treatment, which I understand was consistent with the cost-containment programs selected by the Impossible Foods Plan.[102] Cigna also sent Summit an Explanation of Direct Deposit with each payment, which stated that:

> [Cigna] reduced the allowed amount based on Viant's facility bill review. If you have questions about this discount contact Viant at 800.598.6888.[103]

---

[96] Deposition of DS, October 1, 2022, 68:4 – 8; Plaintiff DS's Second Supplemental Responses to Defendant Cigna's Interrogatories, June 6, 2022, p. 9 (Deposition of DS, Exhibit 4).

[97] Deposition of DS, Exhibit 3.

[98] DS completed residential treatment at Summit from August 23, 2019 – September 19, 2019. (Summit, Named Plaintiff DS File (SUMMIT03200 – 640 at 409, 452).)

[99] Summit Estate Statement, July 31, 2021 (SUMMIT 00159 (Deposition of DS, Exhibit 13)); Summit Estate Recover Center Documents (SUMMIT 06111 – 116 at 111 (Deposition of DS, Exhibit 14)).

[100] Summit Estate Recovery Center Invoice, January 21, 2020 (P00000034 (Deposition of DS, Exhibit 12)); Cigna had reimbursed DS's previous inpatient treatment at Summit at ▮▮▮▮▮▮▮▮▮. *See* Deposition of DS, October 1, 2022, 63:7 – 13.

[101] Summit Estate Recovery Center, "Financial Addendum – Intensive Outpatient" (SUMMIT 00805 – 807 at 805, 806 (Deposition of DS, Exhibit 10)).

[102] Summit Estate Recovery Center Spreadsheet (SUMMIT 05459 (Deposition of Creyna Franco, Exhibit 9)).

[103] Cigna, "Explanation of Direct Deposit," October 15, 2019 (CIG_RJ00001123 – 128 at 127).

59. DS also received a letter from Cigna that contained identical language, as well as a patient advocacy letter stating: "To help lower out-of-network charges, Cigna has contracted with Viant to negotiate on your behalf" and:

> If you get a bill from a provider for more than the 'What I Owe' amount [on] the Cigna EOB, please call Cigna Customer Service at the number on your ID card. We will work with Viant on your behalf to attempt to reduce your expenses from this out-of-network provider."[104]

60. DS testified that he was balance billed by Summit for █████ and that he paid some (but not all) of this bill.[105] DS testified that he did not recall the amounts he had paid, but that he still owed Summit "a large amount of money."[106] He testified that Cigna should have reimbursed Summit for the full amount Summit charged for his IOP services.[107] DS has not identified any record showing that he notified Cigna or Viant that he was balance billed, or appealed the pricing of his claims.[108] I understand that there is also no record that Summit informed Cigna or Viant that DS was balance billed.

61. Approximately four months after his initial admission to Summit, DS returned to Summit and entered a partial hospitalization program ("PHP").[109] Although Summit's billed rate for a single day of PHP treatment was █████, Summit charged DS a "████████████ ████████████.[110] Therefore, despite the fact that ████████████ ████████████ ███████ ████████████

---

[104] Letter from Cigna to DS, "Information about Explanation of Benefits," October 10, 2019 (MPI-C0016429 (Deposition of DS, Exhibit 9)).

[105] Deposition of DS, October 1, 2022, 186:1 – 6.

[106] Deposition of DS, October 1, 2022, 192:14 – 17; 183:9 – 10.

[107] Deposition of DS, October 1, 2022, 25:23 – 26:3.

[108] Deposition of DS, October 1, 2022, October 1, 2022, 168:18 – 4 ("Q: Did you ever appeal those payments?... A: "No, I wouldn't know how to appeal, what the process is, nor do I recall doing such a thing.")

[109] ████████████████████████. *See* Summit Estate Recovery Center, "Financial Addendum, 5dpw Day Treatment Program," (SUMMIT 1213 – 215 at 213, 214 (Deposition of Joan Borsten Vidov, Exhibit 16)).

[110] Summit Estate Recovery Center, "Financial Addendum, 5dpw Day Treatment Program," (SUMMIT 1213 – 215 at 213, 214 (Deposition of Joan Borsten Vidov, Exhibit 16)).

[111] Deposition of Wendy Gompper, October 21, 2022, 47:15 – 49:2.

█████████████████████████████████████████████████████████

████. Additionally, Summit billed Cigna ██████████for PHP treatment DS received on

12/26/2019, but MultiPlan and Summit later negotiated a payment of ████████ for that same

date.[112] Therefore, ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████.[113]

## IV. Contrary to Plaintiffs' Claims, There is Not a Single Industry Definition of UCR

62. Plaintiffs allege that the plans at issue in this case "referred to a 'Usual & Customary' or 'UCR' claim determination methodology," meaning "all claims at issue in this litigation were required to be determined according to UCR,"[114] which Plaintiffs assert has a consistent meaning in the healthcare industry as referring to "the determination of claim pricing based upon prevailing charges of similar healthcare providers in the same or similar geographic area."[115] I disagree that UCR has a single definition in the industry and, furthermore, that plans use the same percentile values to calculate benefits.

63. **First**, based on a review of Named Plaintiffs' plan documents, neither of the Named Plaintiffs' plans state that benefits will be based on "UCR," or even use the terms "usual," "customary," or "reasonable." Instead, their plans state that reimbursement will be determined by reference to the "maximum reimbursable charge," and in the case of DS, that term was defined based on Cigna's MRC2 methodology, not MRC1.[116] I did not see Plaintiffs or their

---

[112] Summit Estate Recovery Center Spreadsheet (SUMMIT 05459 (Deposition of Creyna Franco, Exhibit 9)).

[113] As described previously, the charges for RJ's IOP care were ████████ per day, ████████████ ████████████████████████████████.

[114] Motion for Class Certification, p. 3.

[115] *See* Motion for Class Certification, pp. 3 – 4; *see also* Hall Report, pp. 5 – 6; (stating that UCR "refer[s] to a pricing method based on prevailing fees for the same or similar services, in the same or similar geographic area."); RPC Report, pp. 4 – 5 (asserting that the "definition of 'usual, customary, and reasonable' . . . [is] consistent for all disputed claims").

[116] Impossible Foods Inc. Open Access Plus Plan Document, January 1, 2019 (CIG_RJ00000577 – 646 at 633 (Deposition of DS, Exhibit 6)); Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 041 (Deposition of RJ, Exhibit 1)).

experts identify places in the Named Plaintiffs' plan documents that made reference to UCR methodologies.

64. **Second**, a review of materials from Plaintiffs' experts indicates, that there is no uniform definition of "UCR." Despite Professor Hall stating that the term UCR has a "widely accepted meaning that applies across the industry of health coverage and claims administration" in his report,[117] he has previously written that "'usual' or 'customary' prices" are "intentionally ambiguous price terms,"[118] and that "usual charges" is a "calculatedly vague" term.[119] The sources cited by Professor Hall provide even more alternative definitions of UCR. Some sources state that UCR is the amount "typically," or most commonly, charged.[120] Other definitions do not reference charges at all, but refer to UCR as being cost-based, or determined by reference to *payments* made.[121] Professor Hall also references a Florida statute that at his deposition he admitted used the term "usual and customary provider charge" to describe the fair market value for a service, rather than a charge based value.[122]

---

[117] Hall Report, p. 6.

[118] Hall, Mark, et al., "Overbilling and Informed Financial Consent – A Contractual Solution," *The New England Journal of Medicine* 367(5), August 2, 2012, available at https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=5329&context=faculty_scholarship.

[119] Hall, Mark and Carl Schneider, "Patients as a Consumers: Courts, Contracts, and the New Medical Marketplace," *Michigan Law Review* 106(4), 2008, at 673, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1402&context=mlr.

[120] *See, e.g.*, FAIR Health ("plans may reimburse for out-of-network care based on a percentage of usual, customary, and reasonable (UCR) charges based on FAIR Health data that reflect what providers **typically charge** for a specific procedure in a given geographic area."); E-Health Insurance ("Usual, Customary and Reasonable (UCR) Charge: This refers to the standard or **most common charge** for a particular medical service when rendered in a particular geographic area."). *See* Hall Report, pp. 10 – 11 (emphasis added).

[121] *See, e.g.*, Cigna's Glossary ("Usual, customary, and reasonable (UCR) is part of every health plan…UCR is based on how much that service **usually costs**. It may vary in different cities or states."); Horizon Blue Cross ("Concepts like usual and customary charges were designed to permit payment amounts that would be predictable, **change with market-based changes in prevailing payments**, and keep insurance costs in check by eliminating excessive charges."). *See* Hall Report, pp. 10 – 18 (emphasis added).

[122] In Professor Hall's report he cites the Florida Statue § 641.513 as a source that "either define[s] UCR and its equivalents consistent with my opinions, or that use[s] these terms in a manner that clearly reflects that they are commonly understood as I have described them." *See* Hall Report, p. 15. However, in his deposition, he conceded that a court ruling found that "[i]n the context of the statute, it is clear that what is called for is the fair market value of the services provided" and that this definition is different than the one used in the Hall Report. *See also* Deposition of Mark Hall, March 13, 2023, 226:8 – 232:18.

65. Moreover, Dr. Luke and Dr. Piper reference in their report a RPC white paper that they authored[123] that finds a "UCR charge is a provider's charge for a service less than or equal to a charge percentile threshold for that service in the medical market where the service was delivered,"[124] but also acknowledge that plans may have their own limits in their policies regarding what constitutes UCR for that plan.[125] Consistent with the acknowledgement that UCR does not have a uniform definition, RPC's white paper also provides the example of FAIR Health, which states on its website that the UCR data it uses will not be "the same thing as an insurer's internal determination of UCR based on their policies."[126] RPC's white paper also notes that "UCR" may refer to "usual and customary rate," which RPC considers an entirely different concept that may reflect "the allowed amount paid under a provider contract, a health plan's policies and procedures, or government regulation."[127] Professor Lahav's report provides yet another definition, stating that UCR "is determined based on competitive fees for similar services in the same geographic area."[128]

66. **Third**, Professor Hall suggests that "usual and customary" and "reasonable and customary" are the same as UCR,[129] but there is ample reason to believe that these terms can have varied meanings. The RPC white paper has also distinguished between these terms, defining "usual and customary charge" to refer to "the charges on a provider's chargemaster,"[130] and "'usual, customary, and reasonable' charge" to refer to "a provider's charge for a service less than or equal to a charge percentile threshold for that service in the medical market where the

---

[123] Deposition of Brian Piper, March 14, 2023, 59:6 – 60:1.

[124] RPC, "Determining Usual Customary and Reasonable Charges for Healthcare Services," July 1, 2022, ¶ 16, available at https://www.rpcconsulting.com/wp-content/uploads/2022/07/Determining-Usual-Customary-and-Reasonable-Charges-for-Healthcare-Service_White-Paper_7-1-2022.pdf (referenced in N. 5 of the RPC Report) (the "RPC 2022 White Paper").

[125] RPC 2022 White Paper, ¶ 17 ("The Physicians' Fee Reference software program explains that each private health plan has its own policies on payment limits, and they often refer to these limits as usual, customary and reasonable, or UCR.").

[126] RPC 2022 White Paper, ¶ 17.

[127] RPC 2022 White Paper, ¶ 18.

[128] Lahav Report, p. 6.

[129] Hall Report, pp. 5 – 6.

[130] RPC 2022 White Paper, ¶ 14.

service was delivered."[131]  RPC further specifies that "[a]ll UCR charge analysis is performed on undiscounted billed charges."[132]  Inconsistent with this definition, Professor Hall in a separate article published in the *Michigan Law Review* describes a court ruling in which "reasonable" rates were defined "as something between the hospital's full charges and its negotiated discounts."[133]

67.  Professor Hall also opined that "reasonable" charges should be determined by reference to negotiated charges, meaning "what insurers actually pay and what… hospitals have been willing to accept."[134]  He also noted that that reasonable value for services should be based at least in part on costs incurred by a provider.[135]

68.  **Fourth**, Plaintiffs and their experts ignore that plans that use charge-based methodologies to set UCR rate may use different percentile values to calculate benefits. However, Professor Hall testified that adjudication based on a UCR methodology is not defined by use of a particular percentile at which a claim should be paid, and that information regarding payment percentile would need to be obtained to determine a UCR-based payment.[136]  While Plaintiffs argue that UCR is "most often" based upon the 80th percentile of charges,"[137] neither Plaintiffs nor their experts claim that there is a universally agreed upon percentile that defines UCR when charge-based methodologies are used.  For instance, the sources Professor Hall relies

---

[131] RPC 2022 White Paper, ¶ 16.

[132] RPC 2022 White Paper, ¶ 2.

[133] Hall, Mark and Carl Schneider, "Patients as Consumers: Courts, Contracts, and the New Medical Marketplace," *Michigan Law Review* 106(4), 2008, p. 687, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1402&context=mlr.

[134] Hall, Mark and Carl Schneider, "Patients as Consumers: Courts, Contracts, and the New Medical Marketplace," *Michigan Law Review* 106(4), 2008, p. 687, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1402&context=mlr.

[135] "On quantum meruit grounds, the [Plaintiff] hospital was entitled only to the reasonable value of its services **based on its costs** and what other hospitals charged."  (Hall, Mark and Carl Schneider, "Patients as Consumers: Courts, Contracts, and the New Medical Marketplace," Michigan Law Review 106(4), 2008, p. 674, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1402&context=mlr (emphasis added).)

[136] Q: "And so – and so in isolation, a representation that UCR will be paid doesn't – doesn't tell you whether that particular claim is going to be paid at any particular level, correct?… A: It gives you a basis for making that determination, but further inquiry is needed. Q: And the further inquiry that would be needed would be the percentile? … A: Yes, and if one's not specified, what is sort of normally done or typically done." (Deposition of Mark Hall, March 13, 2023, 143:21 – 144:11.)

[137] Motion for Class Certification, p. 4.

on refer to a percentile or percentage of charges, but the percentile used to determine the "UCR" rate varies widely in these materials. For example, Professor Hall's survey of different UCR definitions finds that the Code of Federal Regulations references the 70th percentile, the California State Auditor references the 31.5 percentile, and the Handbook of Health Economics references the 75th percentile.[138] Professor Hall cites no source stating that there is a uniform percentile used to determine UCR charges – nor could he, as literature he cites indicates that there is no single charge percentile that payors adopt.

69. Consistent with my understanding, the RPC Report does not state that a particular percentile exists for determining UCR rates. Instead, the RPC Report presents a table with the purported UCR charges for HCPCS code H0015 for the 50th, 60th, 70th, and 80th charge percentiles without taking a position on which percentile would appropriately capture the "UCR" rate for this HCPCS code.[139] The RPC white paper notes that, as a general policy, it determines the UCR based on the 80th percentile when possible. However, it also notes that "some publications do not publish an 80th percentile threshold charge," in which case it instead "determines the UCR charge based on a 75th percentile threshold."[140] Dr. Luke also testifies that the percentile selections may vary by plan.[141] I understand that Cigna allows its clients to choose a percentile election that the client wishes to be considered the "maximum reimbursable charge" under its plans.[142]

70. **<u>Finally</u>**, I disagree with Professor Hall's claim that the 22 sample plans[143] covering some of the Proposed Class Members all have the same "core meaning" of UCR based on the "prevailing fees for the same or similar services, in the same or similar geographic area."[144]

---

[138] *See* Hall Report, Appendix.

[139] *See* RPC Report, pp. 19, 20.

[140] RPC 2022 White Paper, ¶ 4.

[141] Deposition of Ron Luke, March 17, 2023, 301:4 – 16.

[142] Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 90 (Deposition of RJ, Exhibit 1)).

[143] These sample plans do not include the plans for the Named Plaintiffs. *See* Motion for Class Certification, Exhibit 4.

[144] Hall Report, p. 6. As stated previously, Professor Hall defines UCR as "the determination of claim pricing based upon prevailing charges of similar healthcare providers in the same or similar geographic area." *See* Motion for Class Certification, pp. 3 – 4.

Indeed, none of the 22 plans Professor Hall reviewed state a definition that matches his exact definition for UCR. As described in the next section, from a health economic perspective the differences in this plan language may have implications for determining liability and injury.

71. In fact, 13 of the 22 plans that Professor Hall reviewed state that MRC will be determined by "a methodology similar to a methodology utilized by Medicare," which I understand to be Cigna's MRC2 methodology, rather than a methodology based on a percentile of provider charges.[145] As Dr. Luke and Dr. Piper acknowledged at their depositions, a Medicare-based methodology is not, in their view, an UCR methodology.[146] Plaintiffs allege that reimbursement should have been based on UCR, because "when Medicare does not cover a particular service… Cigna either pays the provider's actual charges or uses a standard UCR method."[147] However, from my review, none of the plans Professor Hall reviewed contains a requirement that the service at issue must be covered by Medicare for Cigna to apply a Medicare-like reimbursement schedule.[148] To the contrary, the documents for these plans I reviewed state that reimbursement will be based on a methodology similar, but not identical, to Medicare.[149] ███████████████████████████████████████████████████ ██████████████████████████████████████████████████████.

72. The remaining nine plans Professor Hall reviewed are MRC1 plans. None contain the "prevailing fees" language used by Professor Hall, or the language relating to the "same or similar geographic area,"[150] and there appear to be differences among the data they use to determine the OON plan benefits. For example, the 2017 Bobst Group North American Plan

---

[145] *See* Motion for Class Certification, Exhibit 4, which includes excerpts from the following 13 plans with summary plan descriptions that reference a MRC that is "similar" to the one used by Medicare: APS, Associated Wholesale Grocers Inc, CBRE Services Inc., CBS Studios, EcoSense Lighting, General Motors, Hilton Domestic Operating Co., Intel Corp., Lab Corp of America Holdings, Marcolin U.S.A Eyewear, Mitsubishi International, and Waste Management.

[146] Deposition of Ron Luke, March 17, 2023, 318:24 – 309:1; Deposition of Brian Piper, March 14, 2023, 152:23 – 153:4.

[147] Hall Report, p. 6.

[148] *See* Motion for Class Certification, Exhibit 4, which summarizes the 22 sampled plans. *See also* Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019, cited in footnote 6 of the Hall Report (CIG_RJ00793367) ("██████████████████████████████████████████████ ███████████████████████████████████████████████████.").

[149] Motion for Class Certification, Exhibit 4.

[150] Motion for Class Certification, Exhibit 4.

references "[a] percentile of charges made by providers of such service or supply in the geographic area where the service is received. These services are compiled in a database we have selected."[151] As another example, the Consolidated Edison Company of New York's 2021 plan document references a "policyholder-selected percentile of charges made by providers of such service of supply in the geographic area where it is received as compiled in a database selected by Cigna," but then adds:

> If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then state, regional or national charge data may be used. If sufficient charge data is unavailable in the database for that geographic area to determine the Maximum Reimbursable Charge, then data in the database for similar services may be used.[152]

73. Moreover, I was provided with plan documents that Cigna produced but which Professor Hall did not review that include similarly varied definitions for the maximum amount the plans will pay for OON treatment. The plan document for Episcopal Church Medical Trust indicates that reimbursement could be based on "negotiated rates agreed to by the out-of-network provider and either the Claims Administrator or one of its vendors, affiliates or subcontractors."[153] The Nucor Corporation's 2018 plan document uses different language entirely:

> The Plan pays 50% of the Allowed Charges for out-of-network Covered Expenses, until you reach your out-of-network out-of-pocket limit… The customary allowance is the basic Allowable Charge. However, Allowable Charge may vary, given the facts of the case and the opinion of the Claims Administrator. Allowable Charges for services or supplies received out of network may be determined by the Claims Administrator.[154]

74. For the reasons described in this section, I find that UCR does not have a single definition in the healthcare industry and may have a different meaning than "prevailing charges

---

[151] *See* Motion for Class Certification, Exhibit 4 (citing CIG_RJ_CLMS00006090).

[152] Motion for Class Certification, Exhibit 4 (citing CIG_RJ_CLMS00003827).

[153] Alternatively, OON benefits could be determined based on: "Calculating Eeligible [sic] Expenses based on available data resources of competitive fees in that geographic area." *See* Episcopal Church Medical Trust, Plan Document Handbook, January 2018 (CIG_RJ_CLMS00011735 – 837 at 823).

[154] Nucor, "Summary Plan Description," January 1, 2018 (CIG_RJ_CLMS00008707 – 800 at 720, 725).

of similar healthcare providers in the same or similar geographic area."[155]  Furthermore, many of the Proposed Class Members likely had plans that did not reference "UCR" in the plan documents.  Depending on Plaintiffs' but-for world (which as described in the next section, they have failed to describe with specificity), different economic analysis may be required depending on whether the plan documents referenced UCR at all, as well as depending on the databases that Cigna selected to determine the MRC.

## V. Plan Members, Healthcare Providers, and Plan Sponsors Have Varying Economic Incentives, and Individualized Inquiry is Necessary to Determine Liability and Injury

75.  Plaintiffs and their experts opined that all Proposed Class Members "incur[red] financial obligations that they would not have otherwise incurred if their claims had been paid according to a genuine UCR methodology."[156]  This is incorrect for multiple reasons, as I describe in this section.  Plaintiffs ignore that there is considerable variation in the circumstances of Proposed Class Members and in the actions of providers and health plan sponsors that, in my opinion, based on a reasonable degree of certainty, means that any financial impact of using the Viant OPR methodology as opposed to some other methodology would vary substantially across Proposed Class Members.  In fact, many could have been worse off under alternate arrangements.

76.  As an initial matter, Plaintiffs and their experts do not clearly define the alternative to using the Viant OPR methodology.  This precludes any conclusion that all Proposed Class Members suffered harm, let alone in a uniform way.  In particular, to determine the harm that each Proposed Class Member allegedly suffered, Plaintiffs must define the but-for world that would have resulted had Cigna not engaged in the challenged conduct to serve as a point of comparison to the economic conditions in the actual world.  Absent this comparison, it is impossible to determine whether the challenged conduct caused harm, and if so, the extent of that harm.

77.  In addition, Plaintiffs and their experts assume that all members were harmed by the pricing of their claims by Viant OPR.  Plaintiffs and their experts do not consider the multiple

---

[155] Motion for Class Certification, pp. 3 – 4

[156] Motion for Class Certification, p. 19.

reasons that Proposed Class Members may not have been harmed, or may have even benefitted, from the use of Viant OPR. These include the fact that Proposed Class Members who did not receive balance bills benefitted by paying less cost sharing or lower insurance premiums than they would have otherwise paid. Individualized inquiry would be required to determine which, if any, Proposed Class Members were harmed, and the degree of harm, if any.

78. The presence of variations in the implications of the use of Viant OPR across Proposed Class Members is supported by variations in incentives of providers with respect to billing, and particularly balance billing, for OON services. Providers vary widely in whether they balance bill patients, and which patients they balance bill.

79. Finally, the actions of plan sponsors vary. Plan sponsors may take multiple actions to manage their health care costs, which will affect the way that the use of Viant OPR influenced the premiums charged for the plan, the access to OON providers provided by plans, and the cost sharing requirement when OON providers are used. Since each of these terms affects the ultimate implications of the use of Viant OPR for plan members, variation in these terms is consistent with the need for individualized inquiry to determine liability and injury.

80. In this section, I describe how the circumstances and incentives of plan members, healthcare providers, and plan sponsors are all consistent with the need for individualized inquiry to determine whether any Proposed Class Members were harmed and, if so, the degree of the harm by the challenged conduct.

## A.     Plaintiffs' But-For World Is Not Clearly Defined

81. In order to determine whether any Proposed Class Members were in fact injured by the use of Viant OPR, it is necessary to know what would have occurred had Viant OPR not been used. One often measures damages by comparing the financial position of those affected by the challenged conduct (the actual world) to the financial position that those affected would have been in but-for the challenged conduct (the "but-for" world).[157] However, in this matter, Plaintiffs and their experts have not clearly defined such a but-for world. Lacking this, it is not possible to determine that any Proposed Class Members were actually harmed, let alone that all

---

[157] Allen, Mark, et. al., "Reference Guide on Estimation of Economic Damages," Reference Manual on Scientific Evidence, National Academies Press, Washington DC, 2011, pp 425 – 502 at 432.

Proposed Class Members were harmed. In fact, if the conditions in the actual world were equal to those in the but-for world for any Proposed Class Member, or better than them, then no harm to that individual would have occurred.

82. Central to the determination of a but-for world in this matter is identifying how Cigna would have reimbursed the Proposed Class Members' claims absent the challenged conduct. Specifically, if the Viant OPR methodology was not used, it is important to identify what would have been used in its place, and what implications this would have had for the amounts of any payments to providers, and, ultimately, for member financial responsibility.

83. Plaintiffs and their experts suggest multiple alternative approaches at different times. Plaintiffs appear to suggest that allowed amounts for the claims at issue should have been adjudicated using a different methodology, but do not define that alternative methodology precisely, nor do they offer clarity about the data on which these calculations would have been based. The RPC Report opines that "UCR calculations are based on provider billed charges, regardless of a provider's network status."[158] But, inconsistent with this, the RPC Report also suggests that Cigna could have used its own claims data to calculate charge percentile values for MRC1 based on the amounts charged by IOP providers.[159]

84. At other points, Plaintiffs or their experts appear to suggest that Cigna could have used FAIR Health,[160] or other unidentified databases as an alternative to Viant OPR.[161] Professor Hall finds that that "[i]f the court determines that the insurance claims at issue here were incorrectly paid, it is feasible to determine an appropriate payment methodology that applies consistently to a large number of cases."[162] To do this, he finds that "[t]he most

---

[158] RPC Report, ¶ 35.

[159] RPC Report, ¶ 33 ("For H0015, CIGNA and Multiplan should have analyzed CIGNA's claim data for H0015 as a possible database."); *See* also Hall Report, p. 8.

[160] Motion for Class Certification, p. 4. *See also* Deposition of Brian Piper, March 14, 2023, 217:21 – 25 ("Q: Would you consider FAIR Health to be a data source that you believe Cigna should have considered to price H0015 claims? A: FAIR Health is a data source that can be considered."). However, Dr. Piper also testified "that FAIR Health's data has things that can be improved on, which is why we -- we do it ourselves instead of relying on FAIR Health's data." *See* Deposition of Brian Piper, March 14, 2023, 225:12 – 18.

[161] Hall Report, p. 7 (stating that "several such sources" of "payment data," exist without identifying them).

[162] Hall Report, p. 7.

straightforward way would be to identify a fair and accurate source of payment data."[163]  It is not clear what data he suggests using, but it is notable that he refers to "payment data" (which suggests an analysis of the amounts actually paid rather than charged), despite the fact that the RPC Report proposes a methodology based on a charge percentiles.

85.    Moreover, Plaintiffs and their experts do not consider other implications of not using the Viant OPR methodology.  When Viant OPR is used as part of BNS, the service includes, in addition to pricing claims, an agreement with the provider to accept the offered amount and not balance bill the member.  Potential changes to these practices do not appear to have been contemplated by the Plaintiffs or their experts, but are components one would need to analyze in determining what would have taken place in the but-for world.  More generally, other changes that might have been induced in the but-for world – such as changes to Cigna's OON cost-containment funnel – are not assessed.

86.    Ultimately, without a clear but-for world, it is not possible to determine how the Proposed Class Members' experiences would have been different – let alone that each of the Proposed Class Members would have been better off – had the claims been adjudicated using a data source other than Viant OPR, or what other implications of changes to the challenged conduct would have been.  However, as discussed in more detail in the next section, the record suggests that many Proposed Class Members would have been worse off had Cigna adjudicated the claims using an alternate methodology that resulted in higher allowed amounts.

**B.    Individualized Inquiry is Necessary to Determine Which Proposed Class Members (if Any) Were Injured by Cigna's Use of Viant OPR**

87.    Despite lacking a clear but-for world from which to make a determination, Plaintiffs nonetheless appear to assume that all Proposed Class Members were harmed by the pricing of their IOP claims by Viant OPR.  This is incorrect for multiple reasons, and ignores that many Proposed Class Members benefitted by paying less in balance bills, cost sharing, and insurance premiums in total than they would have paid if the claims were not processed by Viant OPR.  Plaintiffs and their experts do not demonstrate a means of determining which, if any, Proposed Class Members were actually harmed by the challenged conduct.  The Proposed Class is likely to

---

[163] Hall Report, p. 7.

contain many individuals who were not harmed, and if any were, the extent to which they were harmed is likely to be highly variable and not possible to determine without individualized inquiry.

> 1.  *Members Who Did Not Receive a Balance Bill Were Unlikely to Have Been Harmed, and Individualized Inquiry Would Be Required to Determine Which Members Received Balance Bills*

88.  Plaintiffs claim "[e]ach named Plaintiff and putative Class member has financial responsibility for the difference between their provider's billed charges and the Viant OPR determined reimbursement amount."[164]  However, this ignores that some Proposed Class Members did not receive balance bills.  Members who had claims priced using Viant OPR but who did not receive balance bills (or received bills that were later waived) would not have been harmed by the use of Viant OPR.  In fact, many Proposed Class Members would likely have been worse off economically had Cigna used an alternate methodology that resulted in processing the claims with a higher allowed amount, as Plaintiffs and their experts appear to contemplate.[165]  In these cases, processing their claims at a higher allowed amount would not have decreased any outstanding balance bill (since there was no such bill), but, members who had not reached their OOP maximum may have owed more in cost sharing.[166]

89.  There are at least three categories of Proposed Class Members who are unlikely to have made any payments towards balance bills.  **First**, members whose IOP claims were adjudicated using BNS, which uses Viant OPR, would have been protected from balance billing entirely.[167]

90.  **Second,** some members whose claims were adjudicated using the Viant OPR methodology may not have received a balance bill, even when there was no explicit balance billing protection.  As discussed below in **Section IV.C.2**, providers may choose to forego balance billing some or all patients entirely.  There is reason to believe that many providers accept the amounts allowed through Viant OPR.  MultiPlan's statistics show that for over ■

---

[164] Motion for Class Certification, p. 15.

[165] *See, e.g.,* RPC Report, ¶ 47.

[166] This is discussed in more detail below in **Section V.B.2**.

[167] *See* discussion above in **Section III.C.1**.

██████ of claims, providers do not contact MultiPlan to dispute Viant OPR pricing.[168]  As an example, one of the providers that provided IOP treatment to Proposed Class Members, ████████████████████████, did not balance bill any of the ██████Cigna members who received IOP care at the facility and whose claims were adjudicated using the Viant OPR methodology.[169]

91.  **<u>Third</u>**, some members may have initially received a balance bill that was later waived or retracted.  Cigna members who received a balance bill may have benefited from what is referred to as a "secondary closure," an instance in which a provider may have rejected the initial Viant OPR offer and initially balance billed the member, but then later accepted a different amount in exchange for not balance billing the member.  In fact, Cigna members who receive a balance bill are also informed to contact Cigna or Viant, which may attempt to further negotiate the bill on the member's behalf.  Negotiation on behalf of a plan member may also occur as a result of an inquiry from the provider.  This may mean that, despite sending a balance bill initially, the provider accepts the offer made on the repriced claim as payment in full for services and agrees not to balance bill the member.  In fact, between January 2016 and April 2022, ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████r.[170]

92.  Members whose claims were resolved with secondary closures may also have been worse off if the claims had been adjudicated using a methodology that resulted in the claim having a higher allowed amount.  For example, ██████████████████████ accepted █████ for a

---

[168] I understand these statistics include all claims adjudicated with Viant OPR, some, but not all, of which would have been adjudicated with BNS, over the period of January 2016 – April 2022.  *See* Cigna & MultiPlan January Governance Meeting, January 24, 2017 (CIG_RJ00636567 – 602 at 582); Cigna & MultiPlan January Governance Meeting, January 23, 2018 (CIG_RJ00673619 – 653 at 632, 643); Cigna & MultiPlan January Governance Meeting, January 22, 2019 (CIG_RJ00607572 – 606 at 585, 596); Cigna & MultiPlan January Governance Meeting, January 28, 2020 (CIG_RJ00609138 – 175 at 151, 162); Cigna & MultiPlan January Governance Meeting, January 26, 2021 (CIG_RJ00608754 – 791 at 767, 778); Cigna & MultiPlan Governance Meeting, December 23, 2021 (CIG_RJ00823152 – 189 at 165, 176); Cigna & MultiPlan Governance Meeting, May 26, 2022 (CIG_RJ00912007 – 046 at 020, 031) (hereto referred to as "Cigna & MultiPlan Governance Meetings, January 2017 – May 2022").

[169] Declaration of ██████████ Regarding Subpoena Issued to ██████████████████, April 30, 2020 (CIG_RJ00972153 – 155 at 154).

[170] The 98 percent is calculated by summing the number of claims with some savings retained and no savings retained and dividing by the total number of appeals, as reported in Cigna's EAST and Facets data systems.  *See* Cigna & MultiPlan Governance Meetings, January 2017 – May 2022.

secondary closure for a claim with a HCPCS code of H0015 and a service date of ███████. The member's coinsurance was ██████, which was ████████ of the allowed amount for this claim.[171]  In contrast, the RPC Report found that, in 2018, ████████████████████████████████



███████████████████ ████ ███████████████ ████ ██████. [172]  ██████████████

███████████████████████ ██ █████████████████████████ █

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████. [174]

93.    Individualized inquiry would be required to determine whether the member received a balance bill.  While in some cases the IOP provider or member may notify Cigna or Viant about the balance bill, I understand that this is not always the case.  Therefore, as Dr. Luke testified, "you would almost have to call up every patient and say, you know, did – did you get a balance bill." [175]

94.    Moreover, depending on the particular specifications of the but-for world, Proposed Class Members who did not receive a balance bill in the actual world, might have instead received one in the but-for world.  While Plaintiffs appear to propose that Cigna should have adjudicated the claims using an alternative methodology that allowed greater amounts, the but-for allowed amounts proposed by Plaintiffs may still be less than IOP providers' full billed charges and so members may still have exposure to balance billing.  Members whose claims were priced via BNS may have benefitted from the associated balance billing protection.  In a but-for world that did not use the Viant OPR methodology, and thus may not have used BNS either, this protection may not have been available, and these members may have been subject to balance billing.

---

[171] Secondary Closure to Viant OPR Sample Claims Spreadsheet, January 12, 2023.

[172] RPC Report, p. 19.

[173] In my opinion, using charge percentile values based on national data would likely be inappropriate as the amounts charged by IOP providers may vary across different healthcare markets.

[174] The coinsurance would increase if Cigna were to process the claim at a higher charge percentile.

[175] Deposition of Ron Luke, March 17, 2023, 207:13 – 16.

*Individualized Inquiry Would be Required to Determine Whether Plaintiffs' But-For World Would Increase Members' Cost Sharing*

95.     Whether or not Proposed Class Members received balance bills, any effect of the challenged conduct on the Proposed Class Members would depend on the way the challenged conduct affected their cost sharing.  Plaintiffs' experts do not discuss cost sharing (or premiums, as discussed in a later section) in their reports at all.[176]  However, if instead of using Viant OPR, Cigna had processed claims using a methodology that resulted in different allowed amounts for the claims at issue, cost sharing may have been different.  If the allowed amounts in the but-for world would have been higher, some Proposed Class Members would have been responsible for increased cost sharing.  To the extent that a member was not responsible for a balance bill, they would clearly be worse off if their cost sharing increased in such a but-for world.  In such a but-for world, Proposed Class Members who did receive a balance bill may or may not have been harmed, depending on the specific circumstances affecting their cost sharing.  Circumstances specific to each Proposed Class Member will determine whether there are any changes in the amounts owed in cost sharing, and would thus necessitate individualized inquiry to determine if any given Proposed Class Member had been injured.

96.     A member's cost sharing for a given claim depends on at least three factors: (1) their plan benefits, including the cost sharing provisions, (2) the amount allowed by Cigna for the service, and (3) their covered expenses incurred across all providers and family members in that plan year up to the point in time when the claim was adjudicated.  The amount that Cigna allows for covered OON services is based on the services that were billed by the healthcare provider, and the plan benefit design (*e.g.*, MRC1 versus MRC2) selected by the plan sponsor.[177]  As described in **Section III.B.**, cost sharing provisions for covered OON services can require the member to pay the entire amount allowed until their deductible is met, after which they are responsible for paying coinsurance, a plan-defined percentage of the allowed amount.[178]

---

[176] Nor are coinsurance or premiums referenced in the Plaintiffs' Motion for Class Certification.

[177] *See* **Section III.C**.

[178] It is possible that some plans may have different types of cost sharing provisions.  For example, in my experience, some plans may require members to make a copayment – a plan-defined fixed dollar payment for each covered service – or not have a coinsurance at all.

Members whose OOP payments reach their OOP maximum amount may not owe any further cost sharing.

97.     Each of these factors must be considered if one is to determine the cost sharing amount owed by the member.  To illustrate this, I first considered a claim submitted for services rendered in May 2021 to a Proposed Class Member who had health coverage through an employer sponsor, ███████████████.[179]  The member who received the care had a family plan with a OON deductible of ██████ for their entire family, an OOP maximum of ██████, and 60 percent cost sharing for OON services.[180]  ██████████ charged Cigna ██████ for two days of IOP care provided to this member for which Cigna allowed ██████.  As the member' OOP maximum was not yet met, Cigna paid ██████ of this amount ██████ per day) and the member paid the other ██████ (██████ per day).

98.     While for this claim, the ██████████████ member had not met their OOP maximum and had a coinsurance of ██████, as illustrated in the below figure, a member with the same plan may have been responsible for paying the entire allowed amount, not owe any payment, or owe a different amount, depending on their total spending as of the date the claim is adjudicated.  For example, if the member had instead spent ██████ towards their OOP maximum as of the date this claim was adjudicated and in the case of this same claim allowed at ██████, the member would only owe an additional ██████ in coinsurance before they reached their OOP maximum, after which Cigna would be responsible for any covered charges.  (*See* **Scenario 1** in the below **Figure 1**.)  Alternatively, if the member had already reached their OOP maximum of ██████ as of the date the same claim was adjudicated – as shown with **Scenario 2** – they would not owe any cost sharing for this claim.

---

[179] Cigna, "Explanation of Benefits for Claim Number ██████████████" May 17, 2021 – May 18, 2021 (CIG_RJ_CLM00001392 – 395 at 392).

[180] Cigna, "Explanation of Benefits for Claim Number ██████████████," May 17, 2021 – May 18, 2021 (CIG_RJ_CLM00001392 – 395 at 394).

**Figure 1**
**Amount Owed for Member with a Plan**
**with ███████ Deductible and ███████ OOP Maximum**



| | Actual Member | Scenario 1 | Scenario 2 |
|---|---|---|---|
| Spending Already Incurred Towards OOP Maximum in Plan Year as of the Date the Claim is Adjudicated | | | |
| Claim Allowed Amount | | | |
| Portion of Allowed Amount Paid by Cigna | | | |
| Portion of Allowed Amount Owed by Member | | | |

\* The ███████ in OOON OOP expenses is calculated as the ███████ in contributions after the adjudication of this claim minus the ███████ in coinsurance.

99.    In this plan design, the amount plan members may owe in a but-for world, and thus whether or not they were harmed by the challenged conduct, would similarly depend on the specifics of their plan design and prior spending in the plan year.  For example, if Cigna had instead used a methodology that was required to allow ███████ for this claim,[181] the allowed amount would increase from ███████ to ███████ (an increase of ███████).  The ███████ plan member would have owed an additional ███████ in coinsurance (███████ in additional allowed amount before meeting the OOP maximum multiplied by the ███████ cost sharing), which is ███████ above the amount the member actually paid.[182]  In contrast, a member who has already met their OOP maximum (as shown in Scenario 2), would not owe any additional cost sharing.  In addition, although the ███████ member would owe an additional ███████ for this IOP claim, the higher allowed amount may not impact their total OOP

---

[181] The charges of ███████ per day are less than all of the ███████ calculated in the RPC Report for 2021.  *See* RPC Report, p. 19.

[182] After making this payment, this member's total payments towards his OOP maximum would be ███████, which is below his OOP maximum of ███████.  *See* Cigna, "Explanation of Benefits for Claim Number ███████ (CIG_RJ_CLM00001392 – 395 at 394).

spending for the year if the member reaches their OOP maximum later in the year.[183] Individualized inquiry is therefore needed to understand how each member's annual healthcare payments would be impacted by increasing the allowed amount for IOP services.

100. Even if Cigna had used an alternate pricing approach that had resulted in higher allowed amounts and lower balance bills for some Proposed Class Members who received balance bills, whether or not these members would have benefitted would depend on their cost sharing. For example, if a claim were adjudicated at a higher allowed amount for a Proposed Class Member who had not met their deductible for the year, any resulting decrease in the balance bill could have been offset by an increase in their deductible, leaving them with no net change in their total spending.

101. Since any additional cost sharing owed by a member may depend on their plan characteristics and the amount of prior spending in the plan year,[184] Plaintiffs and their experts are mistaken when they claim that Cigna need only reprocess claims "using the correct methodology" to determine damages.[185] To assess the economic impact from pricing IOP services, one must consider the entirety of the claims submitted by each member during the relevant plan year, along with the member's plan design, which would require individualized inquiry. One cannot consider single claims in isolation.

102. Moreover, whether or not the challenged conduct affected the total OOP spending for a member over the course of a year would require assessing not only the amount of spending prior to the claim or claims at issue, but also covered spending later in the year. For example, a Proposed Class Member who met their OOP maximum at some point in the year in the actual world even after the IOP bill in question, and would also have done so in the but-for world, would face the same level of total annual cost sharing regardless of the challenged conduct. Returning to the prior example, the ███████████████ member had not yet reached their OOP

---

[183] This claim was for services rendered on May 17 – 18, 2021. As the member had already reached ███████ in OOP spending as of this date, it is reasonably likely that they would have reached their ███████ family OOP maximum later in this year. *See* Cigna, "Explanation of Benefits for Claim Number ███████████ (CIG_RJ_CLM00001392 – 395 at 394).

[184] For example, in contrast to the plan document described above, RJ's family plan had a deductible of $2,700 (for each family) and the OOP maximum was $5,200; these limits were the same for in-network and OON services. *See* Intuit Inc. Open Access Plus Medical Benefits Plan Document, August 1, 2018 (CIG_RJ00000029 – 090 at 042, 043 (Deposition of RJ, Exhibit 1)).

[185] Lahav Report, ¶ 58.

maximum and so owed ███████ in coinsurance for the claim submitted by ████████████

██████.  Although this member would owe an additional ███████████ for that claim if it was

allowed at ██████████████, the higher allowed amount may not impact their total OOP

spending for the year if the member would have reached their OOP maximum later in the year.

Assessing whether or not Proposed Class Members would have reached their OOP maximums at

some point in the year in the actual and but-for worlds would require individualized inquiry into

their total spending as related to the specific aspects of their plan design.  Individualized inquiry

would also be required to determine the plan design, including cost sharing provisions,

applicable to each Proposed Class Member.

       3.       *Individualized Inquiry Would be Required to Determine Whether Members Received Any Additional Financial Assistance or Benefit*

103.  Even if a provider did balance bill a Proposed Class Member, the member may have

received financial assistance from the provider, their employer, or a third party to assist them in

paying that balance bill.  Assessing the impact of the challenged conduct on the Proposed Class

Members would require assessing the amount of financial assistance members received in the

actual world and the amount they would have received in a but-for world.  For example, some

Proposed Class Members who received a financial assistance in connection with a balance bill

may have ultimately paid the same amount after receiving the assistance in either case. Other

members may have ultimately paid more or less.  Determining the impact for any given Proposed

Class Member would require individualized inquiry.

104.  Some healthcare providers offer financial assistance to patients, which may include

waiving or reducing a balance bill in full or in part. In addition, Cigna members may have

received assistance through employer or state programs.  For example, Named Plaintiff RJ

received a payment from Intuit that exceeded the amount she paid to Summit in connection with

the balance bill for her son's IOP treatment.[186] If an alternate methodology for determining

allowed amounts had been used and this had resulted in lower balance bill amounts for some

Proposed Class Members, it is also reasonable to expect that parties that provided financial

assistance may have instead been less motivated to do so at all, and if they still did may have

---

[186] Email from Beth Scott to RJ, "Summary of Discussion re: Plan Payments," January 18, 2020
  (PRJ0001396 – 397 at 396 (Deposition of RJ, Exhibit 21)).

changed the amounts of assistance given, and it is thus possible that Proposed Class Members could have been worse off in the but-for world with less financial assistance.

105. Other members may have had a prior agreement with the IOP provider on the amount they would pay for OON services and have received some discount from the provider's billed charges. For instance, as discussed in **Section III.D.2.**, Named Plaintiff DS ███████ ████████████████████████████████████████████.[187] Determining how these arrangements worked would be necessary to determine whether and how Proposed Class Members were impacted. For example, if providers offer discounts at a fixed rate and that rate would not have changed in the but-for world, Proposed Class Members receiving the rate need not have seen a difference in their payment. Determining which Proposed Class Members received such assistance, the form of the assistance, and how that would have changed in a but-for world would require individualized inquiry.

### 4. *Proposed Class Members Who Used Flexible Spending or Related Accounts to Cover Balance Bills May Not Have Been Harmed*

106. Many individuals pay for healthcare services from tax advantaged accounts, which allow individuals to set aside money for healthcare expenses on a pre-tax basis. In particular, individuals with employer sponsored health plans may be eligible for flexible spending accounts, which allows individuals to set aside funds on a pre-tax basis that generally expire if they are not spent by the end of the plan year.[188]

107. Members who paid a balance bill using an account with funds that would expire at the end of the year (or who paid a balance bill directly but were later reimbursed from such an account) need not have been harmed by the challenged conduct. Specifically, Proposed Class Members who did so, but who did not fully exhaust all of the funds in their account during the year, and would not have done so in the but-for world, would not have been affected by any change in the amount of the balance bill. Individualized inquiry would be required to determine

---

[187] Summit Estate Recovery Center, "Financial Addendum, 5dpw Day Treatment Program," (SUMMIT 1213 – 215 at 213, 214 (Deposition of Joan Borsten Vidov, Exhibit 16)).

[188] HealthCare.gov, "Using a Flexible Spending Account," available at https://www.healthcare.gov/have-job-based-coverage/flexible-spending-accounts/.

if Proposed Class Members used such an account, and whether or not they exhausted or would have exhausted the funds in the actual and but-for worlds.

     5.     *Proposed Class Members May Have Been Affected By Changes in Plan Premiums*

108.  Changes to Cigna's cost-containment programs that affected the amounts Cigna or plan sponsors paid for OON services may also have affected the premiums of the plans or the total cost of the plan to plan sponsors.  These changes could ultimately have influenced amounts paid for insurance by Proposed Class Members.  Determining if this occurred and how it affected Proposed Class Members would require individualized inquiry.

109.  In insurance markets, increases in payments to healthcare providers are normally expected to factor into premium calculations, resulting in higher premiums for employers who arrange for insurance for their employees or for individual consumers purchasing their own coverage.[189]  Even when these premiums are nominally paid by the employer, economic analysis indicates that an increase in premiums could affect individual employees if the premium change affects the amount of wages or other benefits the employees receive.  For example, Baicker and Chandra (2006) found that a 10 percent increase in premiums resulted in an offsetting decrease in wages of 2.3 percent, which corresponded to a "full shifting of the increased price of health insurance onto wages."[190]

110.  Therefore, if an alternate approach to adjudicating the claims at issue had been used, it could have resulted in higher premiums that could have affected Proposed Class Members.  Any such effects could offset changes in balance bills that might have been observed in a but-for world.  The extent to which this occurs could vary from one plan to another and from one employer to another, and thus affect individual Proposed Class Members differently.  Plaintiffs and their experts do not address the potential impact that adjudicating claims based on an alternative methodology would have on Proposed Class Member through premiums costs.

---

[189] Congressional Budget Office, "The Prices that Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services," January 2022, available at https://www.cbo.gov/system/files/2022-01/57422-medical-prices.pdf, p. 9.

[190] *See* Baicker, K. and A. Chandra, "The Labor Market Effects of Rising Health Insurance Premiums," *Journal of Labor Economics,* 24(3), 2006.  *See also* Emanuel, E., and V. Fuchs, "Who Really Pays for Health Care?", *JAMA* 299(9), 2008.

**C.**     **Many Healthcare Providers Accept Payments Below Their Full Billed Charges and Do Not Balance Bill Plan Members**

111.  Variations in whether or not Proposed Class Members receive balance bills, and variation in the amounts of balance bills members receiving balance bills are expected to pay, is consistent with observed provider behavior and incentives.

1.     *Healthcare Providers Rarely Receive their Full Billed Charges and Often Accept Discounts from their Charges as Payment in Full*

112.  Providers are often willing to accept less than their full billed charges for services they provide.  Individuals experienced with healthcare charges and payments are aware that healthcare providers typically do not receive their full billed charges when they provide in-network covered services for insured patients, and that very commonly they will be paid at large discounts to their full billed charge amounts.

113.  Providers can unilaterally set their billed charges and face limited or no regulatory constraints in doing so.[191]  Provider billed charges are seldom tied to rates providers receive for in-network covered services in any uniform way.  The fact that billed charges are disconnected from the rates actually paid and accepted for in-network care to insured patients is widely supported in academic, policy, and industry discussions.[192]

114.  Even in the case of OON care, there is clear reason to believe that providers regularly accept less than their full billed charges.  I reviewed a spreadsheet prepared by Cigna that included a sample of six IOP providers that had some claims priced using Viant OPR repricing, while other claims were recorded as a Viant OPR secondary closure (meaning that

---

[191] Adler, Loren, "Provider Charges Relative to Medicare Rates, 2012-2017," *USC-Brookings Schaeffer*, December 5, 2019, available at https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2019/12/05/provider-charges-relative-to-medicare-rates-2012-2017/.  ("Because charges are unilaterally set and patients typically have no choice over the specific provider who treats them regardless of cost, charges for emergency and ancillary clinicians are subject to minimal market constraint.").  *See also* Deposition of Brian Piper, March 14, 2023, 185:10 – 14 ("It's generally true that -- that providers are unconstrained in establishing what their billed charge is; not -- not always, but in most circumstances.")

[192] *See also,* Hall, Mark, et al., "Breaking Down the Bipartisan Senate Group's New Proposal to Address Surprise Billing," *Health Affairs*, May 21, 2019, available at available at https://www.healthaffairs.org/do/10.1377/forefront.20190521.144063/full/.

Viant and the provider agreed to the amount that Cigna would allow for that claim).[193]  At least the six providers included in the spreadsheet agreed to accept amounts well below their full billed charges for some claims.[194]  In fact, none of the claims were allowed at more than ██ ████ of billed charges and some of the secondary closures were allowed at ████████ ████ of billed charges.[195]  As another example, █████████████████ charged Cigna ███████████ in connection with services rendered to a Cigna member in 2019.  Cigna allowed ████████ for these services, which █████████████████ did not contest.[196]

115.  Documents I have reviewed indicate that providers also understand that OON cost-containment programs may exist.[197]  For example, I understand that Summit (which provided IOP services to the Named Plaintiffs) generally ████████████████████████████████ ████████████████████████████████████████████████████████████ ████.[198]  Likewise, I understand providers receive explanations of payment from Cigna that include Viant's name on them, and which direct them to call MultiPlan with any questions.[199]

116.  MultiPlan's data show that OON healthcare providers are often willing to accept less than their full billed charges as payment in full for their services.[200]  Claims processed between January 2016 and April 2022 using Viant OPR were paid at approximately ████████ of billed charges (a "savings" or reduction from billed charges of ███████).[201]  Moreover, providers only appealed ███████████ of these claims.

---

[193] *See* Secondary Closure to Viant OPR Sample Claims Spreadsheet, January 12, 2023.

[194] Secondary Closure to Viant OPR Sample Claims Spreadsheet, January 12, 2023.

[195] Secondary Closure to Viant OPR Sample Claims Spreadsheet, January 12, 2023.

[196] Declaration of ████████████ Regarding Subpoena Issued to █████████████, April 30, 2020 (CIG_RJ00972153 – 155 at 154).

[197] Deposition of Creyna Franco, November 16, 2022, 70:14 – 72:16; 73:17 – 74:25; Deposition of Terri Cothron, November 8, 2022, 31:18 – 33:6.

[198] Summit Estate Recovery Information Form, August 22, 2019 (SUMMIT00155 – 158 at 157 (Deposition of DS, Exhibit 3)).

[199] Deposition of Terri Cothron, November 8, 2022, 32:9-11 ("On the EOP, [providers] are informed that the price on that claim initially was through Viant and it provides their phone number to call").

[200] *See* Cigna & MultiPlan Governance Meetings, January 2017 – May 2022.

[201] I understand this data includes all claims processed using Viant OPR and is not limited to claims for IOP services.  The ███████ is calculated by dividing the total Savings Net Appeals by the Total New Charges associated with enhanced and non-enhanced claims from Cigna's EAST and Facets data

117. Providers that do appeal payments may appeal payments for some claims, but not other claims.  For example, ███████████████████████████ submitted a claim to Cigna for one day of IOP that was originally priced by Viant OPR at ███████.[202] ███████████████ ████████████████ later agreed to a revised allowed amount with MultiPlan (resulting in an additional ██████ paid to the provider), which was memorialized in a signed agreement.[203] When the same member received further IOP treatment at ████████████████████████████ later that month, the provider accepted the Viant OPR rate of █████████████ without further negotiation – despite the fact that the center had successfully requested that the prior claim be re-adjudicated at a ████████████████████[204]

118. Plaintiffs' experts appear to agree that providers frequently accept less than their full billed charges when they provide services, even for OON members.  For example, the white paper published by RPC includes that "charges are usually more than the amounts providers accept as payment in full from the plan member and other payors."[205]  A sample expert report on RPC's website also includes that "[p]rovider charges are not a reliable indicator of the value of medical services."[206]  Furthermore, Professor Hall co-published an article that stated provider billed charges can be "extremely high and untethered by any market forces."[207]

---

systems that used Viant OPR during the period of January 2016 through April 2022.  Enhanced claims are OON claims that Cigna adjudicates as in-network claims (*e.g.* OON emergency claims).  *See* Cigna & MultiPlan Governance Meetings, January 2017 – May 2022.

[202] Cigna, "Explanation of Benefits for Claim Number ████████████████████████ (CIG_RJ_CLMS00001277 – 280 at 279).

[203] Viant, "Claim Adjustment for Claim Number ████████████████████ (CIG_RJ_CLMS00000427).

[204] Cigna, "Explanation of Benefits for Claim Number ██████████████████████████ ███ (CIG_RJ_CLMS00001305 – 308 at 307).

[205] RPC 2022 White Paper, p. 4.  In addition, Professor Hall coauthored an article, in which, in the context of emergency medicine and ancillary physicians, he found that "the amount charged to out-of-network patients faces few market constraints."

[206] RPC, "Reasonable Charges & Reasonable Value for Medical Care for Jane Plaintiff," August 30, 2022, ¶ 40, available at https://www.rpcconsulting.com/wp-content/uploads/2022/11/MBA_Sample-Report.pdf.

[207] The article also included, in the context of a bill banning surprise OON billing, that arbitrators could consider: "'Commercially reasonable rates' for similar services in the same area, with an explicit clarification that this **references contracted rates and not charges**[.]"  *See* Adler, Loren, et al., "Breaking Down The Bipartisan Senate Group's New Proposal To Address Surprise Billing," May 21,

## 2. *Many Healthcare Providers Do Not Balance Bill Plan Members*

119. Plaintiffs' but-for world appears to assume that all IOP providers balance bill their patients. For example, Plaintiffs allege that balance billing "is a common practice for out-of-network healthcare providers and is done as a part of their usual course of business."[208] Plaintiffs' implied position that providers always balance bill does not account for the varying economic incentives that many healthcare providers face when determining what to bill for their services, as demonstrated by the fact that many providers, in fact, do not balance bill members.[209]

120. **First**, providers may be discouraged from balance billing patients by the fact that many patients ultimately do not pay medical bills from providers or do not pay them in full. For example, a survey by the Kaiser Family Foundation found that 18 percent of individuals with health care debt did not expect to ever pay it off; among the individuals who did expect to pay their health care debt, only 33 percent expected to do so within a year.[210]

121. I reviewed several declarations submitted by representatives of substance abuse treatment providers that show variation in balance billing practices. For example, ███████ ████████████████████████████████████████████████████████████████████████ does, at least in some circumstances, submit balance bills to Cigna members for the difference between their billed charges and the amount allowed by Cigna.[211] Specifically, based on ████ ████████ records, they appeared to have balance billed ████████ Cigna members whose bills were reviewed.[212] However, of the ███ Cigna members who received a balance bill, ████████

---

2019, available at https://www.healthaffairs.org/do/10.1377/forefront.20190521.144063/ (emphasis added).

[208] Motion for Class Certification, p. 19.

[209] Plaintiffs' experts appear to agree that OON providers do not always balance bill patients for the difference between their billed charges and the amount allowed by the payor. *See* Deposition of Brian Piper, March 14, 2023, 313:24 – 314:5; Deposition of Ron Luke, March 17, 2023, 175:19 – 176:4.

[210] Kaiser Family Foundation, "Health Care Debt in The U.S.: The Broad Consequences of Medical and Dental Bills," Figure 4, June 16, 2022, available at https://www.kff.org/report-section/kff-health-care-debt-survey-main-findings/.

[211] Declaration of ████████████ Regarding Subpoena Issued to ████████████, December 14, 2022, ¶ 5.

[212] Declaration of ████████████ Regarding Subpoena Issued to ████████████, December 14, 2022, ¶ 5; Cigna members were assumed to have received a balance bill if the "Charges Due Patient" on

███████████████████████████████████████████████

████.[213] ████████████████████████ providers may choose to forego balance billing some or all patients entirely.  For example, ████████████████ did not balance bill any of the ████ Cigna members who received care at the facility.[214]  There are administrative costs of balance billing and costs associated with collecting billed amounts including debt collection, such as from hiring a collections agency.[215]  Providers weighing limitations in the amounts they might reasonably expect to receive against the costs of balance billing and collecting billed amounts may find it economically rationally not to balance bill some or all of their patients.

122. **Second**, balance billing patients may cause reputational harm to a healthcare provider that makes it more difficult to attract new patients.[216]  Dissatisfied patients who unexpectedly received a balance bill may provide negative reviews for the provider.  For example, ████████ has several negative reviews on Google from individuals who received a balance bill.[217]  Online reviews can be an important source of provider information for consumers.  According to a survey conducted by Healthgrades, 90 percent of consumers use online reviews to evaluate providers.[218]  In addition, healthcare providers may rely on recommendations from members who have received services in the past to support the attraction

---

their patient activity listing was greater than $0.  *See* CONFIDENTIAL_████00020 – CONFIDENTIAL_████000664 ("████████ Activity Listings").

[213] Whether ████████ received payment related to a balance bill was determined based on the "Patient Payments" amount on the patient activity listings.  A balance bill was assumed to be fully paid if the "Patient Payments" amount was equal to or greater than the total "Charges Due Patient" amount.  *See* ████████ Activity Listings.

[214] Declaration of ████████████ Regarding Subpoena Issued to ████████████████, April 30, 2020 (CIG_RJ00972153 – 155 at 154).

[215] Kaiser Family Foundation, "Health Care Debt in The U.S.: The Broad Consequences of Medical and Dental Bills," June 16, 2022, available at https://www.kff.org/report-section/kff-health-care-debt-survey-main-findings/.

[216] *See, e.g.* Cooper, Zack, et al., "Surprise! Out-of-Network Billing for Emergency Care in the United States," *Journal of Political Economy* 128(9), September 2022, 3285 – 3678 at 3637.

[217] ███████████████████████████████████████████

[218] Healthgrades, "Online Reviews Impact How Patients Select Hospitals & Doctors," March 28, 2022, available at https://b2b.healthgrades.com/insights/blog/online-reviews-impact-how-patients-select-hospitals-doctors/.

of new patients. Similarly, providers may rely on members' positive experiences to encourage return customers in the event additional services are needed.

123. While healthcare providers can have an economic incentive to increase their compensation levels, for the reasons described above, this objective is not necessarily achieved by balance billing plan members. Providers may instead consider alternative arrangements to increase their revenues. For example, some providers may offer so-called "prompt pay discounts." For example, Summit itself includes on its website that it offers "prompt pay" discounts for individuals who are uninsured, and thus accepts amounts below its full billed charges.[219] As discussed in **Section III.D.2.**, Named Plaintiff DS received ███████ ████████████████████████████████████. Specifically, he paid ████ per day, which was ████████████████████████████.[220]

124. Other providers may inform patients that they will not balance bill them or waive cost sharing to encourage OON usage, a practice that I understand is called "fee forgiveness." I understand that payors often prohibit fee forgiveness, in part because it may distort the economic incentives for how patients select a provider and how providers charge and are reimbursed for their services. ████████████████████████████████████████

████████████████████████████████████

████████████████████ ████████ ███████████

████████████████████████████████████████████

████████████████████████████ ██ ████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████ ██ ████████████████████████

---

[219] Summit Estate, "Insurance Verification," available at https://www.summitestate.com/northern-california-rehab-admissions-process/health-insurance-verification/.

[220] Summit Estate Recovery Center, "Financial Addendum, 5dpw Day Treatment Program," (SUMMIT 1213 – 215 at 213, 214 (Deposition of Joan Borsten Vidov, Exhibit 16)).

[221] *See* Cigna, Special Investigations Unit Case Log (CIG_RJ00681244 – 329).

[222] ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████ (Cigna, Special Investigations Unit Case Log (CIG_RJ00681244 – 329 at 310 – 311).")

[223] Cigna, Verification of Services Response Spreadsheet (CIG_RJ00688601).

████████████████████████████████████████████████

████████████ Individualized inquiry is required to determine whether any other Proposed Class Members benefitted from similar practices.

125.  For the reasons described in this section, consistent with expected provider economic incentives, variation from one Proposed Class Member to another can be expected in whether or not they receive a balance bill and the size of any balance bill.  Individualized inquiry is therefore required to understand the behavior of each provider and their billing practices as they relate to each Proposed Class Member.

### D.  Plan Sponsors May Have Unique Financial Considerations That Do Not Align With Plaintiffs' Theory or Plaintiff Experts' Opinions

126.  In selecting the health policies to make available to employees, an employer plan sponsor must balance the objectives of providing employees with access to health benefits they will value and providing those benefits in a cost-effective manner in the context of the overall compensation package they offer employees.  Such decisions must consider the preferences of their employees.

127.  Plan sponsors have incentives to keep the cost of health insurance down to ensure that health care is affordable for employees and enable the plan sponsors to provide a competitive overall compensation package for employees including health benefits along with wages and other benefits.  Health benefits are a consideration in the attraction and retention of employees.  For example, a 2022 survey conducted by *The Society for Human Resources Management* found that 88 percent of employees reported that health-related benefits were a "very" or "extremely important" benefits they can offer.[225]

128.  One component of health benefits that plan sponsors must consider is the coverage and reimbursement rates for OON services.  When selecting benefit levels, plan sponsors must weigh the benefits of providing members with greater (and cheaper) access to OON providers

---

[224] Cigna, Special Investigations Unit Case Log (CIG_RJ00681244 – 329 at 246).

[225] The Society for Human Resources Management, "2022 Employee Benefits Survey," p. 3 available at https://shrm-res.cloudinary.com/image/upload/v1654193525/Membership%202022/Employee_Benefits_Survey_-_Executive_Summary_-_FINAL.pdf.

with the costs of offering these greater benefits. Each plan sponsor must make its own decisions about what benefit levels (and corresponding costs) are most appropriate for their members.[226]

129. Plan sponsors may seek to improve the affordability of their insurance offerings by utilizing Cigna's cost-containment programs to help them save the plan, and ultimately members, money.[227] A plan sponsor may calibrate the parameters of the cost-containment programs to suit their specific goals. For example, if a plan sponsor wants to reduce costs, it may elect to set the MRC at lower thresholds. Likewise, a plan sponsor's considerations may inform whether it selects an MRC1 or MRC2 plan. ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████ ████.[228]

130. Plan sponsors may prefer to maintain their current benefit structure instead of adopting Plaintiffs' theory that Cigna should have reimbursed Proposed Class Members' claims based on higher MRC1 percentile values. As described in **Section V.C.1**, claims processed between January 2016 and April 2022 using Viant OPR were paid at approximately ████████ of billed charges.[229] If in a but-for world Cigna had used an alternate approach to adjudicate the claims at issue that would have allowed a higher percentage of billed charges – a hypothetical because neither Plaintiffs nor their experts have specified a clear but-for world – plan sponsors who opted into Cigna's cost-containment programs would not receive the full benefit of the programs they contracted for (including protecting their members from balance billing).

131. Plan sponsors may still have wished to keep the total employer costs of their plans down and could have responded by shifting those increased OON costs to plan members in the form of increased cost sharing, or reductions in other aspects of the generosity of the plan. Individualized inquiry is required to assess how an alternate approach to adjudicating the claims

---

[226] *See, e.g.,* Claxton, G., et al., "Health Benefits In 2013: Moderate Premium Increases In Employer-Sponsored Plans," *Health Affairs* 2013, which discusses differences in premiums and plan types by firm characteristics.

[227] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 372).

[228] Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 (CIG_RJ00793367 – 381 at 367, 379); Deposition of Trisha Rawlings, October 7, 2022, 152:11 –17 ("████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████.").

[229] *See* Cigna & MultiPlan Governance Meetings, January 2017 – May 2022.

would have impacted employer sponsors and may have influenced the premiums charged for the plan, the access to OON providers provided by plans, and the cost sharing requirement when OON providers are used.

## VI.   The RPC Report's Methodology for Calculating Charge Percentiles Suffers from Multiple Flaws and Plaintiffs Have Not Articulated Any Means by Which these Calculations Could be Used to Calculate Class-Wide Damages

132.   Plaintiffs have not articulated any means by which the calculations in the RPC Report could be used to calculate class-wide damages, let alone shown that they have a reliable methodology for calculating damages for each Proposed Class Member.[230]  While the RPC Report calculates charge percentiles based on Cigna's national OON claims data, neither Dr. Luke nor Dr. Piper have proposed a means to use these charge percentiles to calculate damages. Moreover, the methodology proposed in the RPC Report to calculate the charge percentiles suffers from multiple flaws, █████████████████████████████████████████

████████████████████████████████████████████████████████████  And as Plaintiffs' experts have admitted, using different databases, such as FAIR Health, can lead to different results, in part because different organizations make different methodological choices when calculating charge percentiles.[231]  In addition, while Dr. Luke and Dr. Piper have testified that they typically calculate separate charge percentiles for "healthcare referral region[s]" (or, if there is insufficient data, for each state) and may do so here, they have not yet conducted such an analysis and, further, have admitted that the data may be insufficient to do so.[232]  For these reasons, while the RPC Report asserts that "it is relatively easy and simple to consistently calculate the allowed amount for the disputed claims using reasonable percentile values and a

---

[230] *See, e.g.,* Deposition of Brian Piper, March 14, 2023, 316:12 – 18 ("Q: Do you have any opinions on a damages methodology that would account for the fact of whether or not a provider balance billed? A: Again, at this -- at this point in time, I don't have any opinions on a -- a damages methodology."

[231] Deposition of Ron Luke, March 17, 2023, 300:11 – 16; Deposition of Brian Piper, March 14, 2023, 40:22 – 41:1, 220:11 – 224:21.

[232] Deposition of Ron Luke, March 17, 2023, 104:20 - 22; 113:22 – 114:2; 116:8 – 14.

reasonable percentile,"[233]  I find that Plaintiffs and their experts have not shown that this is the case.

133.  **First**, Dr. Luke's and Dr. Piper's proposed methodology for calculating charge percentile is inconsistent with their opinion that "UCR calculations are based on provider billed charges, regardless of a provider's network status."[234]  Setting aside whether this is an accurate statement, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████.[235]  Providers that are predominately OON with major payors may have different economic incentives than providers that are predominately in-network.  For example, one academic article found that, after New York passed a surprise billing law that used arbitration tied to provider charges, provider charges for OON services increased by $1,157 compared to states without surprise billings laws.[236]  In contrast, charges for OON providers in California – which uses a payment standard that is instead tied to in-network prices – decreased by $752 compared to the states without surprise billing laws.[237] ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████[238]



---

[233] *See* RPC Report, ¶ 48.  Similarly, the Lahav Report finds that: "Reprocessing will not require court action or a series of mini-trials, it is the standard practice of the defendant to process claims and it can perform this functional for all class members using the correct methodology."  *See* Lahav Report, ¶ 58.

[234] RPC Report, ¶ 35.

[235] ████████████████████████████████████████████████████████████

[236] *See* Gordon, A. et al., "Provider Charges and State Surprise Billing Laws: Evidence From New York and California," *Health Affairs* 41(9), September 2022, available at https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2021.01332.

[237] *See* Gordon, A. et al., "Provider Charges and State Surprise Billing Laws: Evidence From New York and California," *Health Affairs* 41(9), September 2022, available at https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2021.01332.

[238] *See, e.g.,* Deposition of Brian Piper, March 14, 2023, 204:12 – 19.

134. **<u>Second</u>**, ███████████████████████████████████████████
████████████████████████████████████████████
███████. The RPC Report includes a table with the distribution of the OON IOP providers that were used to calculate the charge percentiles by state.[239] ████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████.

135. For example, RPC's analysis showed that, during the 2016 to 2021 review period,
████████████████████████████████████████████
█████████.[240]
███████████████████████████████████[241] █████
███████████████████████████████ ███████
████████████████████████████████████████████
██████████████████.[243]

136. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████.



---

[239] RPC Report, pp. 17 – 18.

[240] ██████████████████████████████████████████. *See* RPC Report, pp. 17 – 18.

[241] ██████████████████████████████████████████. *See* American Medical Association, "Competition in Health Insurance," 2018, available at https://www.ama-assn.org/system/files/2018-11/competition-health-insurance-us-markets_1.pdf.

[242] He also testified "it's going to be based, in part, on where freestanding IOP providers choose to locate." *See* Deposition of Brian Piper, March 14, 2023, 255:10 – 226:25.

[243] ████████████████████████████████████. *See* Deposition of Brian Piper, March 14, 2023, 253:7 – 254:15. *See also* RPC Report, pp. 17 – 18.



137. **Third,** ███████████████████████████████████

████████████████████████████████████████████████████[244]  However, Dr. Piper testified that RPC "would refuse to calculate a UCR amount" if there were "fewer than five providers in that [health referral region]"[245] and "in a great many instances, one would want far more than five national observations to -- to apply."[246] ████████████████████████████

████.[247]  In contrast, Dr. Piper did not recall having data for fewer than five providers at the state level for any of the thousands of cases for which he had prepared a similar analysis.[248]  Dr. Luke similarly testified that he did not "know that [RPC] ha[d] ever [used national data], and I don't know that we would" and that "[a]t some point, we would say, you know, UCR just doesn't seem to be – a reasonable methodology for this specific service."[249] ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████.

138.  Finally, Dr. Luke, Dr. Piper, and Plaintiffs' other experts do not address central issues that would impact the calculation of class-wide damages.  As described in **Section V.B.2,**

---

[244] RPC Report, ¶ 48.

[245] Health referral regions are "regional health care markets for tertiary medical care" that are defined by the Dartmouth Atlas Project.  There are 306 such health referral regions, so they are generally more narrowly defined than states.  *See* Dartmouth Atlas Project, General FAQ, available at https://www.dartmouthatlas.org/faq/.

[246] He further specified that "I would expect to see thousands of observations in any given time period in order to attempt any sort of interpolation across more granular geographies."  *See* Deposition of Brian Piper, March 14, 2023, 237:11 – 17.

[247] ██████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
████████  *See* RPC Report, pp. 17 – 18.

[248] Deposition of Brian Piper, March 14, 2023, 289:6 – 17.

[249] Deposition of Ron Luke, March 17, 2023, 106:21 – 25.

the RPC Report does not address the issue of cost sharing for the Proposed Class Members.[250] As demonstrated above, effects of an alternative methodology on cost sharing would have major impacts on the Proposed Class Members, and play a significant role in determining the amount of damages (if any).  Failure to consider the effects on cost sharing by itself would render any proposed methodology for calculating damages significantly incomplete and unreliable. Moreover, the RPC Report does not include consideration of other important factors affecting potential harm to the class, including that many Proposed Class Members may not have received balance bills, or may have received financial assistance to cover the costs, factors that could have major impacts on class-wide damages.

\* \* \*

Signed on March 27, 2023 in Stanford, California.

Laurence Baker

---

[250] Deposition of Ron Luke, March 17, 2023, 296:23 – 297:6.

# Appendix A

**Laurence C. Baker, PhD**

Stanford University School of Medicine
Department of Health Policy
Encina Commons, Rm 118
615 Crothers Way
Stanford, CA  94305-6019
650-723-4098

## ACADEMIC HISTORY

1990    B.A. (Mathematics and Economics), Calvin University (formerly Calvin College), Grand Rapids, MI
1994    M.A. (Economics), Princeton University, Princeton, NJ
1994    Ph.D. (Economics), Princeton University, Princeton, NJ
        (Principal advisor: Alan B. Krueger, Ph.D.)

## EMPLOYMENT HISTORY

**Academic Appointments:**

| | |
|---|---|
| August 1994 – August 2001 | Assistant Professor, Department of Health Research and Policy Stanford University School of Medicine, Stanford, CA |
| August 1995 – August 2002 | Assistant Professor, by courtesy, Department of Economics Stanford University, Stanford, CA |
| September 2001 – August 2007 | Associate Professor, Department of Health Research and Policy Stanford University School of Medicine, Stanford, CA |
| September 2001 – September 2015 | Chief of the Division of Health Services Research Department of Health Research and Policy Stanford University School of Medicine, Stanford, CA |
| September 2002 – August 2007 | Associate Professor, by courtesy, Department of Economics Stanford University, Stanford, CA |
| May 2014 – September 2015 | Associate Chair, Department of Health Research and Policy, Stanford University School of Medicine, Stanford CA |
| October 2015 – September 2019 | Chair, Department of Health Research and Policy Stanford University School of Medicine, Stanford CA |
| September 2007 – Present | Professor, Stanford University School of Medicine, Stanford, CA Department of Health Research and Policy 2007-2019 Department of Medicine, Division of Primary Care and Outcomes Research 2019-2021 Department of Health Policy 2021-present |
| December 2019 – Present | Bing Professor of Human Biology, Stanford University |
| January 2022 – Present | Associate Chair for Education, Department of Health Policy Stanford University School of Medicine, Stanford CA |
| December, 2022 – Present (also 2007-2014) | Professor, by courtesy, Department of Economics Stanford University, Stanford, CA |

# Appendix A

## Other Appointments

| | |
|---|---|
| 1994-2002 | Faculty Research Fellow |
| | National Bureau of Economic Research, Cambridge, MA |
| 2000-present | Fellow |
| | Center for Primary Care and Outcomes Research and Center for Health Policy |
| | Stanford University, Stanford, CA |
| 2001-2002 | Acting Director |
| | Health Services Research Interdepartmental Masters Degree Program |
| | Stanford University, Stanford CA |
| 2002 - present | Research Associate |
| | National Bureau of Economic Research, Cambridge, MA |
| 2007 - present | Director of the Scholarly Concentrations Program |
| | Stanford University School of Medicine, Stanford, CA |
| 2015 - present | Senior Fellow |
| | Stanford Institute for Economic Policy Research, Stanford University, Stanford CA |
| 2016 - 2020 | Kennedy-Grossman Faculty Fellow, Human Biology Program, Stanford University, Stanford CA |
| 2016 - present | Core Faculty, Stanford Health Policy |

## Non-Academic Employment

| | |
|---|---|
| 1993-1994 | Research Economist |
| | The Robert Wood Johnson Foundation, Princeton, NJ |

# PUBLIC AND PROFESSIONAL SERVICE

## University, School, and Departmental Committees

| | |
|---|---|
| 1994 – present | Member, Health Policy Masters Program (formerly Health Services Research Masters Program), Admission Committee |
| 1994 – 2000 | Member, Health and Safety Committee, Department of Health Research and Policy |
| 1996-1997 | Member, Computer Committee, Department of Health Research and Policy |
| 1997-2003 | Elected Departmental Representative, Stanford University School of Medicine Faculty Senate |
| 1997-1999 | Member, Health Services Research faculty search committee |
| 2003 | Member, HIPAA compliance committee, Department of Health Research and Policy |
| 2003 | Member, Faculty search committee, Center for Primary Care and Outcomes Research and Center for Health Policy |
| 2003-2007 | Member, Courses and Curriculum Committee, School of Medicine |
| 2005-2007 | Member, Committee on Medical Student Scholarship |
| 2007-2008 | Chair, Courses and Curriculum Committee, School of Medicine |
| 2007-present | Chair, Committee on Medical Student Scholarship, School of Medicine |
| 2010-present | Member, Bing Overseas Studies Program Faculty Oversight Committee, Stanford University |
| 2012-present | Member, Committee on Curriculum and Academic Policy, School of Medicine |
| 2012-2013 | Member, PCOR faculty search committee |
| 2012-2013 | Member, General medical disciplines faculty search committee |
| 2012-2014 | Member, Appointments and Promotions Committee, School of Medicine |

# Appendix A

| | |
|---|---|
| 2013-present | Member, Committee on Faculty Staff Human Resources, Stanford University (Chair, October 2017-present) |
| 2014 | Chair, Bing Overseas Studies Program, Madrid Center Review Committee |
| 2014-present | Member, Executive Committee, Human Biology Program, Stanford University |
| 2018-19 | Chair, Bing Overseas Studies Program, Berlin Center Review Committee |
| 2021-2022 | Member, Department of Health Policy faculty search committee |
| 2022 | Department of Medicine/SPRC faculty search committee |

## Other Public and Professional Service

| | |
|---|---|
| 1993 | Consultant, The White House Task Force on Health Care Reform, Washington DC |
| 1994-1998 | Member, Evaluation team for the Robert Wood Johnson Foundation Minority Medical Education Program," (Joel Cantor, principal evaluator). |
| 1996-2001 | Freshman advisor, Stanford University |
| 1997-1999 | Member, Health Economics Committee, Medical Care Section, American Public Health Association |
| 1997-1999 | Member, Health Economics Annual Meeting Program Committee Medical Care Section, American Public Health Association |
| 1998-present | Member, Editorial Board, Health Services Research |
| 1999 | Special Member, AHCPR Health Services Research Study Section |
| 1999-2000 | Member, State of California Universal Health Care Technical Assessment Committee (charged with overseeing studies of the effect of health reforms on health care in California) |
| 1999-2020 | Advisory Committee Member, Center on the Demography and Economics of Health and Aging, Stanford University |
| 2001-2003 | Member, State of California Universal Health Care Technical Assessment Committee (charged with overseeing studies of the effect of health reforms on health care in California) |
| 2002 | Invited Contributor, Economic Report of the President |
| 2002-2003 | Member, Local Organizing Committee, International Health Economics Association 2003 Annual Meeting |
| 2002-2004 | Member, AcademyHealth Alice S. Hersh New Investigator Award Selection Committee |
| 2002-2004 | Advisor, RWJF Scholars in Health Policy Research Program, UC Berkeley |
| 2002-present | Member, Editorial Board, Medical Care Research and Review |
| 2003 | Organizer and Chair, NBER Health Care Program Fall meeting |
| 2003-2004 | Member, Planning Executive Committee and Planning Committee, AcademyHealth 2004 Annual Research Meeting |
| 2003-2004 | Proposal Reviewer, Office of Technology Licensing, Stanford University |
| 2003-2007 | Co-founder and Co-organizer, Annual Bay Area Health Care Quality and Outcomes Research Conference (with Hal Luft, UCSF; and Tom Rundall, UC Berkeley) |
| 2004-2006 | Member, Advisory Board, Health Economics, Policy, and Law (new Journal) |
| 2004-2008 | Member, Advisory Board for NIH funded project "Advanced Neuroimaging: Ethical, Legal and Social Issues" (Principal Investigator Judy Illes) |
| 2005 | Chair, Panel Selection Committee, AcademyHealth 2005 Annual Research Meeting |
| 2005 | Member, Planning Committee, AcademyHealth Annual Health Policy Conference |
| 2005-2007 | Guest Editor, special issue of Medical Care Research and Review on Markets and Managed Care |
| 2005-2008 | Member, Scholarship Oversight Committee for Pediatrics Fellow Henry Lee |
| 2006-2008 | Member, Editorial Board, Health Economics, Policy, and Law |

3

# Appendix A

| | |
|---|---|
| 2006 | Special Member, NIH HSOD Study Section |
| 2007-present | Member, Research Award Selection Committee, National Institute for Health Care Management (chair 2009-present) |
| 2007-2015 | Senior Associate Editor, Health Services Research |
| 2008-2011 | Member, AcademyHealth board nominating committee |
| 2008-2009 | Member, Planning committee, and Abstract Reviewer, AcademyHealth Annual Research Meeting |
| 2009-2017 | Member, Board of Directors, American Society of Health Economists (ASHEcon) |
| 2010 | Abstract Reviewer, AcademyHealth Annual Research Meeting |
| 2010 | Member, CMS Geographic Variation Special Study Technical Expert Panel |
| 2010-2011 | Annual Meeting Chair, AcademyHealth 2011 Annual Research Meeting |
| 2010-2016 | Member, Board of Directors, International Health Economics Association |
| 2012 | Reviewer for Institute of Medicine report, "The California Institute for Regenerative Medicine: Science, Governance, and the Pursuit of Cures" (released December 6, 2012) |
| 2012-2020 | Member, Board of Directors, AcademyHealth |
| 2013-2015 | Member, Alice Hersh Award selection committee, AcademyHealth |
| 2013 | Member, host committee, ASHE annual meeting |
| 2013-2016 | Member, National Advisory Council, Robert Wood Johnson Foundation Scholars in Health Policy Research Program |
| 2015 | Chair, AHRQ Review Committee, Comparative Health System Performance in Accelerating PCOR dissemination RFA |
| 2015 | Testimony before the California Senate Committee on Health (Informational Hearing "Making Health Care Affordable: Impact on Consumers," March 18) |
| 2016-2020 | Member, Technical Expert Panel, AHRQ/Coordinating Center for the Study of Health System Performance |
| 2017-2020 | Member, Board Nominating Committee, Finance Committee AcademyHealth |
| 2018-2019 | President, American Society of Health Economists (President-Elect, 2016-2018; Past-President 2019-2020) |
| 2022 | Member, Technical Advisory Panel, ASPE report on effects of the No Surprises Act, convened by RAND |


## HONORS AND AWARDS

| | |
|---|---|
| 1990-1993 | International Finance Section Fellowship, Department of Economics, Princeton University |
| 1997 | National Institute for Health Care Management Research Award (recognizes one article per year; this award for "The Effect of HMOs on Fee-For-Service Health Care Expenditures: Evidence from Medicare") |
| 1999 | National Institute for Health Care Management Research Award (recognizes one article per year; this award for "Managed care, Consolidation Among Health Care Providers, and Health Care: Evidence From Mammography") |
| 1998-2003 | Letter of Excellence in Education for HRP 205, "Introduction to Health Care Systems and Health Policy," Stanford University School of Medicine |
| 1999 | Henry J. Kaiser Award for Excellence in Preclinical Teaching, Stanford University School of Medicine |
| 2000 | Alice S. Hersh Young Investigator Award, AcademyHealth (recognizes one individual per year for excellence in Health Services Research, among individuals within 6 years of entering the field) |
| 2000 | Most Outstanding Abstract, Academy for Health Services Research and Health Policy Annual Meeting |

# Appendix A

| | |
|---|---|
| | (recognized about 6 best from all submitted abstracts, this for "Is it health plans of providers that influence the quality of care?") |
| 2001 | Most Outstanding Abstract, Academy for Health Services Research and Health Policy Annual Meeting |
| | (recognized 3 best abstracts from all submitted abstracts (about 500), this for "Managed Care, Technology Adoption, and Health Care: The Adoption of Neonatal Intensive Care") |
| 2001 | Advisor of Merit, Stanford University Undergraduate Advising Program |
| 2006 | Henry J. Kaiser Award for Excellence in Preclinical Teaching, Stanford University School of Medicine |
| 2007 | Most Outstanding Abstract, AcademyHealth Annual Meeting |
| | (recognized 28 best abstracts from all submitted abstracts, this for "Hospital Safety Culture: Relationship to Organizational Characteristics") |
| 2007 | Best Paper Proceedings, Academy of Management Annual Meeting (for Singer and Baker, "Relationship of Safety Climate and Safety Performance in Hospitals") |
| 2008 | ASHE Medal, American Society of Health Economists. ("awarded biannually to the economist age 40 or under who has made the most significant contributions to the field of health economics.") |
| 2009 | Best Paper for the Health Care Management Division and Best Paper Proceedings, Academy of Management Annual Meeting (for Singer, Rosen, Gaba, Meterko, Baker, and Hartmann "Identifying Organizational Cultures that Promote Patient Safety" |
| 2019 | Outstanding Reviewer, *Health Services Research* |
| 2020 | Elected to National Academy of Medicine |

## BIBLIOGRAPHY

### Peer-Reviewed Articles

1.  **Baker LC**, Cantor JC. Physician Satisfaction Under Managed Care. *Health Affairs* 12 (Supplement 1993) 258-270. PMID: 8477938

2.  **Baker LC**, Krueger AB. Twenty-Four-Hour Coverage and Workers' Compensation Insurance. *Health Affairs* 12 (Supplement 1993) 271-281. PMID: 8477939

3.  Cantor JC, **Baker LC**, Hughes RG. Preparedness for Practice: Young Physicians' Views of Their Professional Education. *Journal of the American Medical Association* 270:9 (September 1, 1993) 1035-1040. PMID: 8350444

4.  **Baker LC**, Cantor JC, Miles EL, Sandy LG. What Makes Young HMO Physicians Satisfied? *HMO Practice* 8:2 (June 1994) 53-57. PMID: 10135262

5.  **Baker LC**, Baker LS. Excess Cost of Emergency Department Visits for Nonurgent Care. *Health Affairs* 13:5 (Winter 1994) 162-171. PMID: 7868020

6.  Hughes RG, **Baker LC**. Tracking the Changes in Physician Practice Settings. *Archives of Family Medicine* 4:9 (September 1995) 759-765. PMID: 7647941

7.  **Baker LC**, Krueger AB. Medical Costs in Workers' Compensation Insurance. *Journal of Health Economics* 14:5 (December 1995) 531-549. PMID: 10156500
    Reply to comments in *Journal of Health Economics* 16:5 (October 1, 1997) 623-624.

# Appendix A

8.   **Baker LC**.  Differences in Earnings Between Male and Female Physicians.  *New England Journal of Medicine* 334:15 (April 11, 1996) 960-964.  PMID: 8596598
     Reply to comments in *New England Journal of Medicine* 335:7 (August 15, 1996) 525.

9.   **Baker LC**, Corts KS.  HMO Penetration and the Cost of Health Care: Market Discipline or Market Segmentation?  *American Economic Review Papers and Proceedings* 86:2 (May 1996) 389-394.  PMID: 10160551

10.  Cantor JC, Miles EL, **Baker LC**, Barker DC.  Physician Service to the Underserved: Implications for Affirmative Action in Medical Education.  *Inquiry* 33:2 (Summer 1996) 167-180.  PMID: 8675280.
     Reprinted in *The Economics of Affirmative Action*, ed. Holtzer HJ and Neumark D, Edward Elgar Publishing, Northampton, MA, 2004.

11.  **Baker LC**.  The Effect of HMOs on Fee-For-Service Health Care Expenditures: Evidence from Medicare.  *Journal of Health Economics* 16:4 (August 1997) 453-481.  PMID: 10169101

12.  Burdi MD, **Baker LC**.  Market-Level Health Maintenance Organization Activity and Physician Autonomy and Satisfaction.  *American Journal of Managed Care* 3:9 (September 1997) 1357-1366.  PMID: 10178484

13.  **Baker LC**, Barker DC.  Factors Associated with the Perception that Debt Influences Physicians' Specialty Choices.  *Academic Medicine* 72:12 (December, 1997) 1088-1096. PMID: 9435716

14.  Phillips KA, Kerlikowske K, **Baker LC**, Chang SW, Brown ML.  Factors Associated with Women's Adherence to Mammography Screening Guidelines.  *Health Services Research* 33:1 (April 1998) 29-53.  PMID: 9566176

15.  Cantor JC, Bergeisen L, **Baker LC**.  Effect of an Intensive Educational Program for Minority College Students and Recent Graduates on the Probability of Acceptance to Medical School.  *Journal of the American Medical Association* 280:9 (September 2, 1998) 772-776.  PMID: 9729987

16.  **Baker LC**, Wheeler SK.  Managed Care and Technology Diffusion: The Case of MRI.  *Health Affairs* 17:5 (September/October 1998) 195-207.  PMID: 9769583

17.  **Baker LC**.  Association of Managed Care Market Share and Health Expenditures for Fee-For-Service Medicare Patients.  *Journal of the American Medical Association* 281:5 (February 3, 1999) 432-437.  PMID: 9952203
     Reply to comments in *Journal of the American Medical Association* 282:3 (July 21, 1999) 235-236.

18.  **Baker LC**, Brown ML.  Managed care, Consolidation Among Health Care Providers, and Health Care: Evidence From Mammography.  *Rand Journal of Economics*  30:2 (Summer 1999) 351-374.  PMID: 10558503

19.  Burdi MD, **Baker LC**.  Physicians' Perceptions of Autonomy and Satisfaction in California.  *Health Affairs* 18:4 (July/August 1999) 134-145.  PMID: 10425851

20.  Dranove D, Spier KE, **Baker LC**.  "Competition" Among Employers Offering Health Insurance. *Journal of Health Economics* 19:1 (January 2000) 121-140. PMID: 10947570

# Appendix A

21. **Baker LC**, Royalty AB. Medicaid Policy, Physician Behavior, and Health Care for the Low-Income Population. *Journal of Human Resources* 35:3 (Summer 2000) 480-502.

22. **Baker LC**, Cantor JC, Long S, Marquis MS. HMO Market Penetration and Costs of Employer-Sponsored Health Plans. *Health Affairs* 19:5 (September/October 2000) 121-128. PMID: 10992659

23. Spetz J, **Baker LC**, Phibbs CS, Petersen R, Tafoya S. The Effect of Passing an "Anti-Immigrant" Ballot Proposition on the Use of Prenatal Care by Foreign-Born Mothers in California. *Journal of Immigrant Health* 2:4 (October 2000) 203-212. PMID: 16228741

24. Chehab EL, Panicker N, Alper PR, **Baker LC**, Wilson SR, Raffin TA. The Impact of Practice Setting on Physician Perceptions of the Quality of Practice and Patient Care in the Managed Care Era. *Archives of Internal Medicine* 161:2 (January 22, 2001) 202-211. PMID: 11176733

25. **Baker LC**. Measuring Competition in Health Care Markets. *Health Services Research* 36:1 Part II (April 2001) 223-252. PMID: 11327175

26. **Baker LC**. Managed Care and Technology Adoption in Health Care: Evidence from Magnetic Resonance Imaging. *Journal of Health Economics* 20:3 (May 2001) 395-421. PMID: 11373838

27. **Baker LC**, McClellan MB. Managed Care, Health Care Quality, and Regulation. *Journal of Legal Studies* 30:2, part 2 (June 2001) 715-742.

28. Skarbinski J, Walker HK, **Baker LC**, Kobaladze A, Kirtava Z, Raffin TA. The Burden of Out-of-Pocket Payments for Healthcare in Tbilisi, Republic of Georgia. *Journal of the American Medical Association* 287:8 (February 27, 2002) 1043-1049. PMID: 11866656

29. Heidenreich PA, McClellan MB, Frances C, **Baker LC**. The Relation Between Managed Care Market-Share and the Treatment of Elderly Fee-For-Service Patients with Myocardial Infarction. *American Journal of Medicine* 112:3 (February 2002) 176-182. PMID: 11893343

30. Backus L, Moron M, Bachetti P, **Baker LC**, Bindman AB. Effect of Managed Care on Preventable Hospitalization Rates in California. *Medical Care* 40:4 (April 2002) 315-324. PMID: 12021687

31. **Baker LC**, Phibbs CS. Managed Care, Technology Adoption, and Health Care: The Adoption of Neonatal Intensive Care. *Rand Journal of Economics* 33:3 (Autumn 2002) 524-548. PMID: 12585306

32. Alexander M, **Baker LC**, Clark C, McDonald KM, Rowell R, Saynina O, Hlatky MA. Management of Ventricular Arrhythmias in Diverse Populations in California. *American Heart Journal* 144:3 (September 2002) 431-439. PMID: 12228779

33. Haas JS, Phillips KA, **Baker LC**, Sonneborn D, McCullough CE. Is the Prevalence of Gatekeeping in a Community Associated With Individual Trust in Medical Care? *Medical Care* 41:5 (May 2003) 660-668. PMID: 12719690

34. **Baker LC**, Wagner TH, Singer S, Bundorf MK. Use of the Internet and E-Mail for Health Care Information: Results from a National Survey. *Journal of the American Medical Association* 289:18 (May 14, 2003) 2400-2406. PMID: 12746364
    Reply to comments in *Journal of the American Medical Association* 290:3 (July 16, 2003) 334.

**Appendix A**

35. **Baker LC**, Birnbaum H, Geppert J, Mishol D, Moyneur E. The Relationship Between Technology Availability and Health Care Spending. *Health Affairs* Web exclusive, W3 (November 5, 2003) 537-551. PMID: 15506158

36. **Baker LC**, Phibbs CS, Guarino C, Supina D, Reynolds JL. Within-Year Variation in Hospital Utilization and its Implications for Hospital Costs. *Journal of Health Economics* 23:1 (January 2004) 191-211. PMID: 15154694.

37. Phillips KA, Haas JS, Liang SY, **Baker LC**, Tye S, Kerlikowski K, Sakowski J, Spetz J. Are Gatekeeper Requirements Associated with Cancer Screening Utilization? *Health Services Research* 39:1 (February 2004) 153-174. PMID: 14965082

38. **Baker LC**, Hopkins D, Dixon R, Rideout J, Geppert J. Do Health Plans Influence Quality of Care? *International Journal for Quality in Health Care* 16:1 (February 2004) 19-30. PMID: 15020557

39. **Baker LC**, Afendulis CC, Heidenreich PA. Managed Care, Information, and Diffusion: The Case of Treatment for Heart Attack Patients. *American Economic Review Papers and Proceedings* 94:2 (May 2004) 347-351. PMID: 29068187

40. **Baker LC**, Atlas SW. Relationship Between HMO Market Share and the Diffusion and Use of Advanced MRI Technologies. *Journal of the American College of Radiology* 1:7 (July 2004) 478-487. PMID: 17411636

41. Haas JS, Phillips KA, Sonneborn D, McCulloch CE, **Baker LC**, Kaplan CP, Perez-Stable EJ, Liang SY. Variation in Access to Health Care for Different Racial/Ethnic Groups by the Racial/Ethnic Composition of an Individual's County of Residence. *Medical Care* 42:7 (July 2004) 707-714. PMID: 15213496

42. Ko CY, Escarce JE, **Baker LC**, Klein D, Guarino C. Predictors For Medical Students Entering a General Surgery Residency: National Survey Results. *Surgery* 136:3 (September 2004) 567-572. PMID: 15349103

43. Bundorf MK, Singer SJ, Wagner TH, **Baker LC**. Consumers' Use of the Internet for Health Insurance. *American Journal of Managed Care* 10:9 (September 2004) 609-616. PMID: 15515993

44. Wagner TH, **Baker LC**, Bundorf MK, Singer SJ. Use of the Internet For Health Information By the Chronically Ill. *Preventing Chronic Disease* 1:4 (October 2004). PMID: 15670445

45. **Baker LC**, Phillips KA, Haas JS, Liang SY, Sonneborn, D. The Effect of Area HMO Market Share on Cancer Screening. *Health Services Research* 39:6 part 1 (December 2004) 1751-1772. PMID: 15533185

46. Bermudez DM, **Baker LC**. The Relationship Between SCHIP Enrollment and Hospitalizations for Ambulatory Care Sensitive Conditions in California. *Journal of Health Care for the Poor and Underserved*.16:1 (February 2005) 96-110. PMID: 15741712

47. Ko CY, Escarce JJ, **Baker LC**, Sharp J, Guarino C. Predictors of Surgery Resident Satisfaction with Teaching By Attendings: A National Survey. *Annals of Surgery* 241:2 (February 2005): 373-380. PMID: 15650650

## Appendix A

48.     Wagner TH, Bundorf MK, Singer SJ, **Baker LC**.  Free Internet Access, the Digital Divide, and Health Information.  *Medical Care* 43:4 (April 2005) 415-420.  PMID: 15778645

49.     Berger M, Wagner TH, **Baker LC**.  Internet Use and Stigmatized Illness.  *Social Science and Medicine* 61:8 (2005) 1821-1827. PMID: 16029778

50.     Haberer JE, Garrett B, **Baker LC**.  Does Medicaid Managed Care Affect Access to Care for the Uninsured.  *Health Affairs* 24:4 (July/August 2005) 1095-1105.  PMID: 16012150

51.     **Baker LC**, Rideout J, Raube K, Gertler P.  Effect of an Internet-Based System for Doctor-Patient Communication on Health Care Spending.  *Journal of the American Medical Informatics Association* 12:5 (September-October 2005) 530-536.  PMID: 15905484

52.     **Baker LC**, Afendulis C.  Medicaid Managed Care and Health Care for Children.  *Health Services Research* 40:5 part 1 (October 2005) 1466-1488.  PMID: 16174143

53.     Wennberg JE, Fisher ES, **Baker LC**, Sharp SM, Bonner KK.  Evaluating the Efficiency of California Providers in Caring for Patients with Chronic Illnesses.  *Health Affairs* Web Exclusive W5, (November 16, 2005) 526-543. PMID: 16291779

54.     Alexander JA, Weiner BJ, Shortell SM, **Baker LC**, Becker M.  The Role of Organizational Infrastructure in Implementation of Hospitals' Quality Improvement.  *Hospital Topics* 84:1 (Winter 2006) 11-20.  PMID: 16573012

55.     Weiner BJ, Alexander JA, **Baker LC**, Shortell SM, Becker M.  Quality Improvement Implementation and Hospital Performance on Patient Safety Indicators.  *Medical Care Research and Review* 63:1 (February 2006) 29-57.  PMID: 16686072

56.     Guarino CM, Ko CY, **Baker LC**, Klein DJ, Quiter ES, Escarce JJ.  Impact of Instructional Practices on Student Satisfaction with Attendings' Teaching in the Inpatient Component of Internal Medicine Clerkships.  *Journal of General Internal Medicine* 21:1 (January 2006) 7-12.  PMID: 16423117

57.     Weiner BJ, Alexander JA, Shortell SM, **Baker LC**, Becker M, Geppert JJ.  Quality Improvement Implementation and Hospital Performance on Quality Indicators.  *Health Services Research* 41:2 (April 2006) 307-333. PMID: 16584451

58.     Bundorf MK, Wagner TH, Singer S, **Baker LC**.  Who Searches the Internet for Health Information?  *Health Services Research* 41:3, part I (June 2006) 819-836.  PMID: 16704514

59.     Alexander JA, Weiner BJ, **Baker LC**, Shortell SM, Becker M.  Care Management Implementation and Patient Safety.  *Journal of Patient Safety* 2:2 (June 2006) 83-96.

60.     Hsia R, Chan J, **Baker LC**.  Do Mandates Requiring Insurers to Pay for Emergency Care Influence the Use of the Emergency Department?  *Health Affairs* 25:4 (July-August 2006) 1086-1094. PMID: 16835190

61.     Haberland CA, Phibbs CS, **Baker LC**.  Effect of Opening Mid-Level Neonatal Intensive Care Units on the Location of Low-Birthweight Births in California.  *Pediatrics* 118:6 (December, 2006) e1667-e1679.  Epub November 20, 2006. PMID: 17116699

# Appendix A

62. **Baker LC**, Afendulis CC, Chandra A, McConnville S, Phibbs CS, Fuentes-Afflick E. Differences in Neonatal Mortality Among Whites and Asian American Subgroups: Evidence from California. *Archives of Pediatrics and Adolescent Medicine* 161:1 (January 2007) 69-76. PMID: 17199070

63. Ketcham J, **Baker LC**, MacIsaac D. Physician Practice Size and Variations in Treatments and Outcomes: Evidence from Medicare patients with Acute Myocardial Infarction. *Health Affairs* 26:1 (January-February 2007) 195-205. PMID: 17211029

64. Alexander JA, Weiner BJ, Shortell SM, **Baker LC**. Does Quality Improvement Implementation Affect Hospital Quality of Care? *Hospital Topics* 85:2 (Spring 2007) 3-12. PMID: 17650463

65. Longaker MT, **Baker LC**, Greely HT. Proposition 71 and CIRM: Assessing the Return on Investment. *Nature Biotechnology* 25:5 (May 2007) 513-523. PMID: 17483831

66. Phibbs CS, **Baker LC**, Caughey AB, Danielsen B, Schmitt SK, Phibbs RH. Level and Volume of Neonatal Intensive Care and Mortality in Very-Low-Birth-Weight Infants. *New England Journal of Medicine* 356:21 (May 24, 2007) 2165-2175. PMID: 17522400

67. **Baker LC**, Chan J. Laws Requiring Health Plans to Provide Direct Access to Obstetricians and Gynecologists, and Use of Cancer Screening by Women. *Health Services Research* 42:3 part 1 (June 2007) 990-1007. PMID: 17489900

68. Singer S, Meterko M, **Baker LC**, Gaba D, Falwell A, Rosen A. Workforce Perceptions of Hospital Safety Culture: Development and Validation of the Patient Safety Climate in Healthcare Organizations Survey. *Health Services Research* 42:5 (October, 2007) 1999-2021. PMID: 17850530

69. King AC, Friedman RH, Marcus B, Castro C, Napolitano M, Ahn D, **Baker LC**. Ongoing Physical Activity Advice by Humans Versus Computers: The Community Health Advice by Telephone (CHAT) Trial. *Health Psychology* 26:6 (November 2007) 718-727. PMID: 18020844

70. Hsia R, MacIsaac D, **Baker LC**. Decreasing Reimbursements for Outpatient Emergency Department Visits Across Payer Groups from 1996 to 2004. *Annals of Emergency Medicine* 51:3 (March 2008) 265-274. Epub November 13, 2007. PMID: 17997503

71. **Baker LC,** Fisher ES, Wennberg JE. Variations in Hospital Resource Use for Medicare HMO and Privately Insured Populations in California. *Health Affairs* 27:2 (March/April 2008) w123-w134. PMID: 18270221

72. Hsia RY, MacIsaac D, Palm E, **Baker LC.** Trends in Charges and Payments for Nonhospitalized Emergency Department Pediatric Visits, 1996-2003. *Academic Emergency Medicine* 15:4 (April 2008) 347-354. PMID 18370988

73. Bundorf MK, Choudry K, **Baker LC**. Health Plan Performance Measurement: Does it Affect Quality of Care for Medicare Managed Care Enrollees. *Inquiry* 45:2 (Summer 2008) 168-183. PMID: 18767382

74. Singer S, Falwell A, Gaba D, **Baker LC.** Patient Safety Climate in US Hospitals: Variation by Management Level. *Medical Care* 46:11 (November 2008) 1149-1156. PMID 18953225

75. **Baker LC**, Atlas SW, Afendulis CC. Expanded Use of Imaging Technology and the Challenge of Measuring Value. *Health Affairs* 27:6 (November-December, 2008) 1467-1478. PMID: 18997202

# Appendix A

76. Janus K, Amelung VE, **Baker LC**, Gaitanides M, Schwartz FW, Rundall TG. Job Satisfaction and Motivation Among Physicians in Academic Medical Centers: Insights from a Cross-National Study. *Journal of Health Politics Policy and Law* 33:6 (December 2008) 1133-1167. PMID: 19038874

77. Singer SJ, Gaba DM, Falwell A, Lin S, Hayes J, **Baker LC**. Patient Safety Climate in 92 US Hospitals: Differences by Work Area and Discipline. *Medical Care* 47:1 (January 2009) 23-31. PMID: 19106727
    [Selected January 2009 "Article of the Month" by the Swiss Patient Safety Foundation]

78. Janus K, Volcker VE, **Baker LC**, Gaitanides M, Rundall TG, Schwartz FW. Sind amerikanische Ärtze zufriedener? Ergebnisse einer internationalen Studie under Ärtzen an Universitätskliniken. [Are American physicians more satisfied? Results from an international study of physicians in university hospitals.] *Das Gesundheitswesen* 71:4 (April 2009) 210-217. Epub March 13 2009. PMID: 19288428

79. Singer SJ, Lin S, Falwell A, Gaba D, **Baker LC**. Relationship of Safety Climate and Safety Performance in Hospitals. *Health Services Research* 44:2 part 1 (April 2009) 399-421. Epub November 4 2008. PMID: 19178583

80. Bundorf MK, Royalty AB, **Baker LC**. Health Care Cost Growth Among the Privately Insured. *Health Affairs* 28:5 (September-October 2009) 1294-1304. PMID: 19738244

81. Singer SJ, Falwell A, Gaba DM, Meterko M, Rosen A, Hartmann CW, **Baker LC**. Identifying Organizational Cultures that Promote Patient Safety. *Health Care Management Review* 34:4 (October-December 2009) 300-311. PMID: 19858915

82. Baras JD, **Baker LC**. Magnetic Resonance Imaging and Low Back Pain Care for Medicare Patients. *Health Affairs* 28:6 (November-December 2009) w1133-1140. Epub October 14 2009. PMID: 19828486

83. **Baker LC**, Hopkins DSP. The Contribution of Health Plans and Provider Organizations to Variations in Measured Plan Quality. *International Journal of Quality in Health Care* 22:3 (June 2010) 210-218. Epub March 18 2010. PMID 20299493

84. **Baker LC**, Bundorf MK, Kessler, DP. HMO Coverage Reduced Variation in the Use of Health Care Among Patients Under Age Sixty-Five. *Health Affairs* 29:11 (November 2010) 2068-2074. PMID: 21041750

85. **Baker LC**, Afendulis CC, Atlas SW. Assessing Cost-Effectiveness and Value as Imaging Grows: The Case of Carotid Artery CT. *Health Affairs* 29:12 (December 2010) 2260-2267. PMID: 21134928.

86. **Baker LC**. Acquisition of MRI Equipment By Doctors Drives Up Imaging Use and Spending. *Health Affairs* 29:12 (December 2010) 2252-2259. PMID: 21134927.

87. **Baker LC**, Johnson SJ, Macaulay D, Birnbaum, H. Integrated Telehealth and Care Management Program for Medicare Beneficiaries with Chronic Disease Linked to Savings. *Health Affairs* 30:9 (September 2011) 1689-1697. PMID: 21900660.

88. Shreibati JB, **Baker LC**. The Relationship Between Low Back Magnetic Resonance Imaging, Surgery, and Spending: Impact of Physician Self-Referral Status. *Health Services Research* 46:5 (October 2011) 1362-1381. Epub April 21, 2011. PMID: 21517834.

# Appendix A

89.     Shreibati JB, **Baker LC**, Hlatky MA.  Association of Coronary CT Angiography or Stress Testing with Subsequent Utilization and Spending Among Medicare Beneficiaries.  *Journal of the American Medical Association* 306:19 (November 15, 2011) 2128-2136. PMID: 22089720.

90.     Meer AB, Basu PA, **Baker LC**, Atlas SW.  Exposure to Ionizing Radiation and Estimate of Secondary Cancers in the Era of High-Speed CT Scanning: Projections from the Medicare Population. *Journal of the American College of Radiology* 9:4 (April 2012) 245-250.  PMID: 22469374.

91.     Shreibati JB, **Baker LC**, Hlatky MA, Mell MW.  Impact of Screening Abdominal Aortic Aneurysms Very Efficiently (SAAAVE) Act on Abdominal Ultrasonography Use Among Medicare Beneficiaries. *Archives of Internal Medicine*.  172:19 (October 22, 2012) 1456-1462.  Epub September 17, 2012. PMID: 22987204

92.     Hlatky MA, Boothroyd DB, **Baker LC**, Kazi DS, Solomon MD, Chang TI, Shilane D, Go AS. Comparative Effectiveness of Multivessel Coronary Bypass Surgery and Multivessel Percutaneous Coronary Intervention: A Cohort Study.  *Annals of Internal Medicine.* 158:10 (May 21, 2013) 727-34. Epub April 23, 2013.  PMID: 23609014

93.     Mell MW, Hlatky MA, Shreibati JB, Dalman RL, **Baker LC**.  Late Diagnosis of Abdominal Aortic Aneurysms Substantiates Underutilization of Abdominal Aortic Aneurysm Screening for Medicare Beneficiaries.  *Journal of Vascular Surgery* 57:6 (June 2013) 1519-1523. Epub February 12 2013. PMID: 23414696

94.     **Baker LC**, Bundorf MK, Royalty A.  Private Insurers' Payments for Routine Physician Office Visits Vary Substantially Across the United States.  *Health Affairs* 32:9 (September 2013) 1583-1590.  PMID: 24019363

95.     Baker LC, Macaulay DS, Sorg RA, Diener MD, Johnson SJ, Birnbaum HG.  Effects of Care Management and Telehealth: A Longitudinal Analysis Using Medicare Data.  *Journal of the American Geriatrics Society*  61:9 (September 2013) 1560-1567.  Epub September 3, 2013.  PMID: 24028359

96.     Hsia RY, Brownell J, Wilson S, Gordon N, **Baker LC**.  Trends in Adult Emergency Department Visits in California by Insurance Status, 2005-2010 [Research Letter].  *Journal of the American Medical Association* 310:11 (September 18, 2013) 1181-1183.  PMID: 24045743

97.     Davies S, Saynina O, Schultz E, McDonald KM, **Baker LC**.  Implications of Metric Choice for Common Applications of Readmission Metrics.  *Health Services Research* 48:6 part 1 (December 2013) 1978-1995.  Epub June 6, 2013.  PMID 23742056

98.     Davies SM, Saynina O, McDonald KM, **Baker LC**.  Limitations of Using Same-Hospital Readmission Metrics.  *International Journal for Quality in Health Care*. 25:6 (December 2013) 633-639.  Epub October 27, 2013.  PMID: 24167061

99.     Hlatky MA, Boothroyd DB, Reitz BA, Shilane DA, **Baker LC,** Go AS.  Adoption and Effectiveness of Internal Mammary Artery Grafting in Coronary Artery Bypass Surgery Among Medicare Beneficiaries. *Journal of the American College of Cardiology* 63:1 (January 7, 2014) 33-39.  Epub September 27, 2013. PMID: 24080110

100.    **Baker LC**, Bundorf MK, Kessler DP.  Why are Medicare and Commercial Insurance Spending Weakly Correlated?  *American Journal of Managed Care* 20:1 (January 2014) e8-e14.  PMID 24669412

# Appendix A

101. Mell MW, **Baker LC**, Dalman RL, Hlatky MA. Gaps in Preoperative Surveillance and Rupture of Abdominal Aortic Aneurysm Among Medicare Beneficiaries. *Journal of Vascular Surgery* 59:3 (March, 2014) 583-588. Epub November 16, 2013. PMID: 24246537

102. **Baker LC**, Bundorf MK, Kessler DP. Vertical Integration: Hospital Ownership of Physician Practices is Associated with Higher Prices and Spending. *Health Affairs*. 33:5 (May, 2014) 756-763. PMID: 24799571

103. **Baker LC**, Hsia RY. The Association Between Community-Level Insurance Coverage and Emergency Department Use. *Medical Care* 52:6 (June 2014) 535-540. PMID 24824537

104. **Baker LC**, Bundorf MK, Kessler DP. Patients' Preferences Explain a Small but Significant Share of Regional Variation in Medicare Spending. *Health Affairs* 33:6 (June 1, 2014) 957-963. PMID 24889944

105. Shreibati JB, **Baker LC**, McConnell MV, Hlatky MA. Outcomes After Coronary Artery Calcium and Other Cardiovascular Biomarker Testing Among Asymptomatic Medicare Beneficiaries. *Circulation Cardiovascular Imaging* 7:4 (July 2014) 655-662. Epub Apr 28 2014. PMID 24777939

106. Mell MW, **Baker LC**. Payer Status, Preoperative Surveillance, and Rupture of Abdominal Aortic Aneurysms in the U.S. Medicare Population. *Annals of Vascular Surgery*. 28:6 (August 2014) 1378-1383. Epub Feb 12 2014. PMID 24530712

107. Hernandez-Boussard T, Burns CS, Wang NE, **Baker LC**, Goldstein BA. The Affordable Care Act Reduces Emergency Department Use by Young Adults: Evidence From Three States. *Health Affairs* 33:9 (September 1, 2014) 1648-1654. PMID 25201671

108. Hsia RY, Brownell Nath J, **Baker LC**. Emergency Department Visits by Children, Adolescents, and Young Adults in California by Insurance Status, 2005-2010 [Research Letter]. *Journal of the American Medical Association* 312:15 (October 15, 2014) 1587-1588. PMID 25321913

109. **Baker LC**, Bundorf MK, Royalty A, Levin Z. Physician Practice Competition and Prices Paid by Private Insurers for Office Visits. *Journal of the American Medical Association* 312:16 (October 22/29, 2014) 1653-1662. PMID 25335147

110. Hlatky MA, Boothroyd DB, **Baker LC**, Go AS. Impact of Drug-Eluting Stents on the Comparative Effectiveness of Coronary Artery Bypass Surgery and Percutaneous Coronary Intervention. *American Heart Journal* 169:1 (January 2015) 149-154. Epub October 25, 2014. PMID 25497260

111. Garg T, **Baker LC**, Mell MW. Adherence to Postoperative Surveillance Guidelines After Endovascular Aortic Aneurysm Repair Among Medicare Beneficiaries. *Journal of Vascular Surgery* 61:1 (January 2015) 23-27. Epub July 31, 2014. PMID 25088738

112. Pershing S, Pal Chee C, Asch SM, **Baker LC**, Boothroyd DB, Wagner TH, Bundorf MK. Treating Age-Related Macular Degeneration: Comparing the Use of Two Drugs Among Medicare and Veterans Affairs Populations *Health Affairs* 34:2 (February 2015) 229-238. PMID 25646102

113. **Baker LC**, Bundorf MK, Kessler DP. Expanding Patients' Property Rights in Their Medical Records. *American Journal of Health Economics* 1:1 (Winter 2015) 82-100.

# Appendix A

114. Davies SM, Saynina O, **Baker LC,** McDonald KM.  Impact of Including Readmissions for Qualifying Events in the Patient Safety Indicators.  *American Journal of Medical Quality* 30:2 (March-April 2015) 114-118. Epub January 24, 2014.  PMID 24463327

115. Hsia RY, Nath JB, **Baker LC**.  California Emergency Department Visit Rates for Medical Conditions Increased While Visit Rates for Injuries Fell, 2005-2011.  *Health Affairs* 34:4 (April 1, 2015) 621-626. PMID 25847645

116. Eisenberg ML, Li S, Brooks JD, Cullen MR, **Baker LC**.  Increased Risk of Cancer in Infertile Men: Analysis of US Claims Data. *Journal of Urology* 193:5 (May 2015) 1596-1601. Epub November 15, 2014.  PMID 25463997

117. Sun E, **Baker LC**.  Concentration In Orthopedic Markets Was Associated With A 7 Percent Increase In Physician Fees For Total Knee Replacements.  *Health Affairs* 34:6 (June 1 2015) 916-921.  PMID 26056195

118. **Baker LC**, Bundorf MK, Kessler DP. Antitrust for Accountable Care Organizations.  *Journal of Competition Law and Economics* 11:2 (June 2015) 317-329.

119. Sun EC, Dexter F, Macario A, Miller TR, **Baker LC.**  No Significant Association between Anesthesia Group Concentration and Private Insurer Payments in the United States.  *Anesthesiology*  123:3 (September 2015) 507-514. Epub July 18, 2015.  PMID 26192028

120. Garg T, **Baker LC**, Mell MW.  Postoperative Surveillance and Long-term Outcomes After Endovascular Aneurysm Repair Among Medicare Beneficiaries.  *JAMA Surgery* 150:10 (October 1, 2015) 957-963. Epub July 8, 2015.  PMID 26154598

121. Austin DR, **Baker LC**. Less Physician Practice Competition is Associated with Higher Prices Paid for Common Procedures.  *Health Affairs* 34:10 (October 1, 2015) 1753-1760.  PMID 26438753

122. **Baker LC**, Bundorf MK, Kessler DP.  Does Health Plan Generosity Enhance Hospital Market Power?  *Journal of Health Economics* 44 (December 2015) 54-62. Epub August 22, 2015.  PMID 26402570

123. Eisenberg ML, Li S, Cullen MR, **Baker LC**.  Increased Risk of Incident Chronic Medical Conditions in Infertile Men: Analysis of United States claims data.  *Fertility and Sterility* 105:3 (March 2016) 629-636. Epub December 7, 2015.  PMID 26674559

124. **Baker LC**, Bundorf MK, Devlin AM, Kessler DP.  Medicare Advantage Plans Pay Hospitals Less than Traditional Medicare Pays.  *Health Affairs* 35:8 (August 2016): 1444-1451.  PMID 27503970

125. Sun EC, Darnall B, **Baker LC**, Mackey S. Incidence of and Risk Factors for Chronic Opioid Use Among Opioid-Naive Patients in the Postoperative Period. *JAMA Internal Medicine* 176:9 (September 1, 2016) 1286-1293.  Epub July 11, 2016. PMID 27400458

126. Clark CA, Asch SA, **Baker L**, Bilimoria K, Dudley RA, Fong N, Holliday-Hanson ML, Hopkins DSP, Imholz EM, Malin J, Moy L, O'Sullivan M, Parker JP, Saigal CS, Spurlock B, Teleki S, Zingmond D, Lang L.  Public Reporting of Hospital-Level Surgical Volumes in California: An Opportunity to Inform Decision Making and Improve Quality.  *Journal of Oncology Practice* 12:10 (October 2016) e944-948. Epub September 6, 2016.  PMID 27601510

# Appendix A

127.    **Baker LC**, Bundorf MK, Kessler DP.  The Effect of Hospital/Physician Integration on Hospital Choice. *Journal of Health Economics* 50 (December 2016) 1-8. Epub September 3, 2016.  PMID 27639202

128.    Zhang S, Vora M, Harris AH, **Baker L**, Curtin C, Kamal RN.  Cost-Minimization Analysis of Open and Endoscopic Carpal Tunnel Release. *Journal of Bone and Joint Surgery* 98:23 (December 7, 2016) 1970-1977.  PMID 27926678

129.    Sun EC, Dexter F, Miller TR, **Baker LC**.  "Opt Out" and Access to Anesthesia Care for Elective and Urgent Surgeries among U.S. Medicare Beneficiaries. *Anesthesiology* 126:3 (March 2017) 461-471. Epub January 19, 2017.  PMID 28106610

130.    Sun EC, Dixit A, Humphreys K, Darnall BD, **Baker LC**, Mackey S.  Association between concurrent use of prescription opioids and benzodiazepines and overdose: retrospective analysis. *BMJ*  356:j760 (March 14, 2017).  PMID 28292769

131.    Truntzer JN, Triana B, Harris AHS, **Baker L**, Chou L, Kamal RN.  Cost-minimization Analysis of the Management of Acute Achilles Tendon Rupture. *Journal of the American Academy of Orthopedic Surgeons* 25:6 (June 2017) 449-457.  PMID 28459710

132.    Sun EC, Bateman BT, Memtsoudis SG, Neuman MD, Mariano ER, **Baker LC**.  Lack of Association Between the Use of Nerve Blockade and the Risk of Postoperative Chronic Opioid Use Among Patients Undergoing Total Knee Arthroplasty: Evidence from the Marketscan Database. *Anesthesia and Analgesia* 125:3 (September, 2017) 999-1007.  Epub April 19, 2017.  PMID 28430692
            Reply to comments in *Anesthesia and Analgesia* 126:2 (February 2018) 732. PMID 29239946

133.    Mueller KG, Memtsoudis SG, Mariano ER, **Baker LC**, Mackey S, Sun EC.  Lack of Association Between the Use of Nerve Blockade and the Risk of Persistent Opioid Use Among Patients Undergoing Shoulder Arthroplasty: Evidence From the Marketscan Database. *Anesthesia and Analgesia* 125:3 (September 2017) 1014-1020. Epub July 21, 2017. PMID 28742777

134.    Mell MW, Garg T, **Baker LC**.  Under-Utilization of Routine Ultrasound Surveillance After Endovascular Aortic Aneurysm Repair. *Annals of Vascular Surgery* 44 (October 2017) 54-58.  Epub May 10, 2017. PMID 28501663

135.    Brubaker WD, Li S, **Baker LC,** Eisenberg ML. Increased risk of autoimmune disorders in infertile men: analysis of US claims data. *Andrology* 6:1 (January 2018) 94-98.  Epub November 27, 2017.  PMID 29179258

136.    Polyakova M, Bundorf MK, Kessler DP, **Baker LC**.  "ACA Marketplace premiums and competition among hospitals and physician practices." *American Journal of Managed Care* 24:2 (February 2018) 85-90.  PMID 29461855

137.    **Baker LC**, Bundorf MK, Devlin AM, Kessler DP.  Hospital Ownership of Physicians: Hospital Versus Physician Perspectives. *Medical Care Research and Review* 75:1 (February 2018) 88-99.  Epub November 2, 2016. PMID 27811140

138.    Eminaga O, Li S, **Baker LC**, Brooks JD, Eisenberg ML. "Male infertility is associated with altered treatment course of men with cancer." *Andrology* 6:3 (May 2018) 408-413. Epub February 18, 2018. PMID 29457365

# Appendix A

139. Gil JA, Goodman AD, Kleiner J, Kamal RN, **Baker LC**, Akelman E. The Affordable Care Act Decreased the Proportion of Uninsured Patients in a Safety Net Orthopaedic Clinic. *Clinical Orthopaedics and Related Research* 476:5 (May 2018) 925-931. PMID 29672327

140. Enthoven AC, **Baker LC**. With Roots In California, Managed Competition Still Aims To Reform Health Care. *Health Affairs* 37:9 (September 2018) 1425-30. PMID 30179555

141. Sun EC, Miller TR, Moshfegh J, **Baker LC.** Anesthesia Care Team Composition and Surgical Outcomes. *Anesthesiology* 129:4 (October 2018) 700-709. Epub May 24, 2018. PMID 29847429

142. Shortell SM, Ramsay PP, **Baker LC**, Pesko MF, Casalino LP. The characteristics of physician practices joining the early ACOs: looking back to look forward. *American Journal of Managed Care* 24:10 (October 2018) 469-474. PMID 30325188

143. Casalino LP, Ramsay P, **Baker LC**, Pesko MF, Shortell SM. Medical Group Characteristics and the Cost and Quality of Care for Medicare Beneficiaries. *Health Services Research* 53:6 (December 2018) 4970-4996. Epub July 5, 2018. PMID 29978481

144. **Baker LC**, Bundorf MK, Kessler DP. Competition in Outpatient Procedure Markets. *Medical Care* 57:1 (January 2019) 36-41. PMID 30507654

145. Chi D, Mariano ER, Memtsoudis SG, **Baker LC**, Sun EC. Regional Anesthesia and Readmission Rates After Total Knee Arthroplasty. *Anesthesia and Analgesia* 128:6 (June 2019) 1319-1327. Epub October 3, 2018. PMID 30286005

146. Shapiro LM, Eppler SL, **Baker LC**, Harris AS, Gardner MJ, Kamal RN. The Usability and Feasibility of Conjoint Analysis to Elicit Preferences for Distal Radius Fractures in Patients 55 Years and Older. *Journal of Hand Surgery* 44:10 (October 2019) 846-852. Epub September 5, 2019. PMID 31495523

147. Itoga NK, **Baker LC**, Mell MW. Impact of office-based laboratories on physician practice patterns and outcomes after percutaneous vascular interventions for peripheral artery disease. *Journal of Vascular Surgery* 70:5 (November 2019) 1524-1533. Epub June 14, 2019. PMID 31204219

148. Sun EC, Mello MM, Moshfegh J, **Baker LC**. Assessment of Out-of-Network Billing for Privately Insured Patients Receiving Care in In-Network Hospitals. *JAMA Internal Medicine* 179:11 (November 2019) 1543-1550. Epub August 12, 2019. PMID 31403651

149. Shah RF, Zhang S, Li K, **Baker LC**, Sox-Harris A, Kamal RN. Physical and Occupational Therapy Use After Common Hand Procedures. *The Journal of Hand Surgery* Epub November 18, 2019. PMID 31753716

150. **Baker LC**, Bundorf MK, Kessler DP. The Effects of Medicare Advantage on Opioid Use. *Journal of Health Economics* 70 (March 2020): 102278. Epub December 26, 2019. PMID 31972536. NIHMS ID 1580600

151. Guo DP, Zlatev DV, Li S, **Baker LC**, Eisenberg ML. Demographics, Usage Patterns, and Safety of Male Users of Clomiphene in the United States. *World Journal of Mens Health* 38:2 (April 2020) 220-225. Epub July 12, 2019. PMID 31385473

# Appendix A

152.    Itoga NK, **Baker LC**, Mell MW.  Initial Financial Impact of Office-Based Laboratories on Medicare Payments for Percutaneous Interventions for Peripheral Artery Disease.  *Journal of Vascular Surgery* 72:2 (August 2020) 686-691.  Epub January 20, 2020.  PMID 31973948

153.    **Baker LC**, Bundorf MK, Kessler DP.  Does Multispecialty Practice Enhance Physician Market Power? *American Journal of Health Economics* 6:3 (Summer 2020) 324-347. Epub July 7, 2020.  PMID 34113693.  NIHMS ID 1580662

154.    **Baker LC**, Pesko M, Ramsay P, Casalino LP, Shortell SM.  Are Changes in Medical Group Practice Characteristics Over Time Associated With Medicare Spending and Quality of Care?  *Medical Care Research and Review*  77:5 (October 2020) 402-415.  Epub November 22, 2018.  PMID 30465626

155.    Zhuang T, Kortlever JTP, Shapiro LM, **Baker LC**, Sox-Harris AH, Kamal RN.  The Influence of Cost Information on Treatment Choice: A Mixed-Methods Study. *The Journal of Hand Surgery* 45:10 (October 2020) 899-908. Epub July 25, 2020. PMID 32723572

156.    Magnani CJ, Bievre N, **Baker LC**, Brooks JD, Blayney DW, Hernandez-Boussard T. Real World Evidence to Estimate Prostate Cancer Costs for First-line Treatment or Active Surveillance.  *European Urology Open Science* 23 (2021) 20-29.  Epub December 2020.  PMID 33367287

157.    Barnes JL, Paci G, Zhuang T, **Baker LC**, Asch SM, Kamal RN. Cost-Effectiveness of Open Versus Endoscopic Carpal Tunnel Release. *Journal of Bone and Joint Surgery* 103:4 (February 17, 2021) 343-355.  PMID 33591684

158.    Itoga NK, Martinez-Singh K, Lee JT, John Harris E, **Baker LC**, Garcia-Toca M.  Analysis of Medicare Payments and Patient Outcomes with Pre-Operative Imaging for Carotid Endarterectomy. *Annals of Vascular Surgery* 76 (October 2021) 179-184.  Epub June 18, 2021. PMID 34153493

159.    **Baker LC**, Kessler DP, Vaska GK. The Relationship Between Provider Age and Opioid Prescribing Behavior. *American Journal of Managed Care* 28:5 (May 2022) 223-228. PMID: 35546585

160.    Magnani CJ, Hernandez-Boussard T, **Baker LC**, Goldhaber-Fiebert JD, Brooks JD. Cost-Effectiveness Analysis and Microsimulation of Serial Multiparametric Magnetic Resonance Imaging in Active Surveillance of Localized Prostate Cancer.  *Journal of Urology* 208:1 (July 2022) 80-89. Epub February 25, 2022.  PMID 35212570

161.    Tewari P, Sweeney BF Jr, Lemos JL, Shapiro L, Gardner MJ, Morris AM, **Baker LC**, Harris AS, Kamal RN.  Evaluation of Systemwide Improvement Programs to Optimize Time to Surgery for Patients With Hip Fractures: A Systematic Review.  *JAMA Network Open* 5:9 (September 16, 2022) e2231911. PMID: 36112373

162.    Welch JM, Zhuang T, Shapiro LM, Harris AHS, **Baker LC**, Kamal RN. Is Low-value Testing Before Low-risk Hand Surgery Associated With Increased Downstream Healthcare Use and Reimbursements? A National Claims Database Analysis. *Clinical Orthopedics and Related Research* 480:10 (October 1, 2022) 1851-1862. Epub May 24 2022.  PMID: 35608508

163.    Zhuang T, Michaud JB, Shapiro LM, **Baker LC**, Welch JM, Kamal RN.  Prevalence, Burden, and Sources of Out-of-Network Billing in Elective Hand Surgery: A National Claims Database Analysis. *The Journal of Hand Surgery* 47:10 (October 2022) 934-943.  Epub August 1, 2022. PMID: 35927122

# Appendix A

164. **Baker LC**, Lamiraud K. Adoption of Hospital Diagnosis-Related Group Financing in Switzerland and the Availability of Computed Tomography Scanners. *Health Economics* 31:12 (December 2022) 2537-2557. Epub September 1 2022. PMID: 36046948

165. Tewari P, Sweeney BF Jr, Lemos JL, Shapiro L, Gardner MJ, Morris AM, **Baker LC**, Harris AS, Kamal RN. Evaluation of Systemwide Improvement Programs to Optimize Time to Surgery for Patients With Hip Fractures: A Systematic Review. *JAMA Network Open* 5:9 (September 1, 2022) e2231911. PMID: 36112373

166. Sun R, Staiger B, Chan A, **Baker LC**, Hernandez-Boussard T. Changes in Medicaid enrollment during the COVID-19 pandemic across 6 states. *Medicine* 101:52 (December 30, 2022) e32487. PMID: 36596028

167. Zhuang T, Shapiro LM, **Baker LC**, Kamal RN. The Price-Quality Mismatch: Are Negotiated Prices for Total Joint Arthroplasty Associated With Hospital Quality in a Large California Health System? *Clinical Orthopaedics and Related Research*. Epub December 13, 2022. PMID: 36729581

## Non-peer-reviewed articles

1. **Baker LC**. Managed Care, Medical Technology, and the Well Being of Society. *TMRI: Topics in Magnetic Resonance Imaging* 13:2 (April 2002) 107-113.
2. **Baker LC**. Managed Care Spillover Effects. *Annual Review of Public Health* 24 (2003) 435-456.
3. **Baker LC**. Benefits of Interoperability: A Closer Look at the Estimates. *Health Affairs* Web Exclusive W5 (January 19, 2005) 22-25. [Commentary on J. Walker et al, "The Value of Health Care Information Exchange and Interoperability" Health Affairs, web exclusive, January 19, 2005]
4. **Baker LC**, Deal B. Some Economic Implications of State Stem Cell Funding Programs. in *States and Stem Cells: A Symposium on the Policy and Economic Implications of State-Funded Stem Cell Research* ed. AD Levine, Princeton University Policy Research Institute for the Region, Princeton, NJ, (2006) 51-74.
5. **Baker, LC**, Bundorf MK, Royalty A, Galvin C, McDonald K. "Consumer Oriented Strategies for Improving Health Benefit Design: An Overview" Technical Review 15. (Prepared by the Stanford University-UCSF Evidence Based Practice Center, Stanford CA under Contract No 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.) AHRQ Publication No. 07-0067. Rockville, MD: Agency for Healthcare Research and Quality. July 2007.
6. **Baker LC**. Editorial: Efforts to Expand Physician Supply Deserve Scrutiny. Health Services Research.43:4 (August 2008) 1121-1127.
7. **Baker LC**. The Challenges of Health System Capacity Growth. National Institute for Health Care Management report, November 2008.
8. Colby DC, **Baker LC**. Health Services Research in 2020: An Assessment of the Field's Workforce Needs. [Introduction to HSR Theme Issue] *Health Services Research* 44:6 (December 2009) 2193-2197 PMID: 20459582
9. Fraser I, Encinosa W, **Baker L.** Payment Reform [Introduction to HSR Theme Issue] Health Services Research 45:6 part 2 (December 2010) 1847-1853. PMID: 21058946
10. **Baker LC**. Editorial: Oversimplifying health reform discussions. Health Services Research 47:3 part 1 (June 2012) 893-896. PMID: 22568651.

## Disseminated Working Papers

# Appendix A

1.  **Baker LC**.  Does Competition From HMOs Affect Fee-For-Service Physicians? NBER Working Paper No. 4920, November 1994.

2.  **Baker LC**.  Can Managed Care Control Health Care Costs: Evidence from the Medicare Experience. National Institute for Health Care Management Discussion Paper. June 1995.

3.  **Baker LC**, Corts KS.  The Effects of HMOs on Conventional Insurance Premiums: Theory and Evidence.  NBER Working Paper No. 5356, November 1995.
    published version in *American Economic Review* (Papers and Proceedings) 86:2 (1996) 389-394

4.  **Baker LC**.  HMOs and Fee-For-Service Health Care Expenditures: Evidence from Medicare.  NBER Working Paper No. 5360, November 1995.
    published version in *Journal of Health Economics* 16:4 (August 1997) 453-481.

5.  Corts KS, **Baker LC**. The Effects of HMOs on Conventional Insurance Premiums: Theory and Evidence. Harvard Business School Working Paper No. 97-026, 1996.

6.  **Baker LC**, Brown ML.  The Effect of Managed Care on Health Care Providers.  NBER Working Paper No. 5987, April 1997.
    published version in *Rand Journal of Economics* 30:2 (Summer 1999) 351-374.

7.  **Baker LC**, Royalty AB.  Medicaid Policy, Physician Behavior, and Health Care for the Low-Income Population.  Stanford University Department of Economics Working Paper No. 97-003, July 1997.
    published version in *Journal of Human Resources* 35:3 (Summer 2000) 480-502.

8.  **Baker LC**, Shankarkumar S.  Managed Care and Health Care Expenditures: Evidence From Medicare, 1990-1994.  NBER Working Paper No. 6187, September 1997.
    published version in *Frontiers in Health Policy Research*, Vol 1, ed. AM Garber, MIT Press, 1998, 117-152.

9.  **Baker LC**, Spetz J.  Managed Care and Medical Technology Growth.  NBER Working Paper No. 6894, January 1999.
    published version in *Frontiers in Health Policy Research*., Vol 2, ed AM Garber, MIT Press, 1999, 27-52.

10. Spetz J, **Baker LC**.  Has Managed Care Affected the Availability of Medical Technology.  Public Policy Institute of California Report, San Francisco, CA, 1999.

11. **Baker LC**, Phibbs CS.  Managed Care, Technology Adoption, and Health Care: The Adoption of Neonatal Intensive Care.  NBER Working Paper 7883, September 2000.
    published version in *Rand Journal of Economics* 33:3 (Autumn 2002) 524-548.

12. **Baker LC**.  Managed Care and Technology Adoption in Health Care: Evidence from Magnetic Resonance Imaging.  NBER Working Paper 8020, November 2000.

13. Heidenreich PA, McClellan MB, Frances C, **Baker LC**.  The Relation Between Managed Care Market Share and the Treatment of Elderly Fee-for Service Patients with Myocardial Infarction.  NBER Working Paper 8065, January 2001.
    published version in *American Journal of Medicine* 112:3 (February 2002) 176-182.

14. Bundorf MK, **Baker L**, Singer S, Wagner T.  Consumer Demand for Health Information on the Internet. NBER Working Paper 10386, March 2004.

15. Bundorf MK, Henne M, **Baker LC**.  Mandated Health Insurance Benefits and the Utilization and Outcomes of Infertility Treatments.  NBER Working Paper 12820, January 2007.

16. **Baker LC**, Bundorf MK, Kessler DP.  Expanding Patients' Property Rights in Their Medical Records. NBER Working Paper 20565, October 2014.
    published version in *American Journal of Health Economics* 1:1 (Winter 2015) 82-100.

17. **Baker LC**, Bundorf MK, Kessler DP.  The Effect of Hospital/Physician Integration on Hospital Choice. NBER Working Paper 21497, August 2015.
    published version in *Journal of Health Economics* 50 (December 2016) 1-8.

18. **Baker LC**, Bundorf MK, Kessler DP.  Does Health Plan Generosity Enhance Hospital Market Power? NBER Working Paper 21513, August 2015.
    published version in *Journal of Health Economics* 44 (December 2015) 54-62.

## Appendix A

19. **Baker LC**, Bundorf MK, Devlin A, Kessler DP.  Why Don't Commercial Health Plans Use Prospective Payment? NBER Working Paper 22709, October 2016.
20. **Baker LC**, Bundorf MK, Kessler DP.  Does Multispecialty Practice Enhance Physician Market Power? NBER Working Paper 23871, September 2017.
    published version in *American Journal of Health Economics*. 6:3 (Summer 2020) 324-347.
21. **Baker LC**, Bundorf MK, Kessler DP.  The Effects of Medicare Advantage on Opioid Use.  NBER Working Paper 25327, December 2018.
    published version in *Journal of Health Economics* 70 (March 2020) 102278.
22. **Baker LC**, Bundorf MK, Royalty AB. The Effects of Multispecialty Group Practice on Health Care Spending and Use.  NBER Working Paper 25915, June 2019.


**Book Chapters:**

1. **Baker LC**, Shankarkumar S.  Managed Care and Health Care Expenditures: Evidence From Medicare, 1990-1994. in *Frontiers in Health Policy Research*, Volume 1, ed. Garber AM, Cambridge, MA: MIT Press, 1998, p. 117-152.
2. **Baker LC**.  Digging into the effects of managed care on health care delivery: comments on the papers by Feldman and Scharfstein and Meltzer, Hiltz, and Bates (Comments on Chapters 7 and 8).  in *The Changing Hospital Industry: Comparing Not-For-Profit and For-Profit Institutions*, ed. Cutler D, Chicago, IL: University of Chicago Press, 2000, p. 273-277.
3. **Baker LC**, Spetz J.  Managed Care and Medical Technology Growth.  in *Frontiers in Health Policy Research*, Volume 2, ed. Garber AM, Cambridge, MA: MIT Press, 1999, p. 27-52.
4. **Baker LC**.  What Does HMO Market Share Measure? Examining Provider Choice Restrictions.  in *Frontiers in Health Policy Research*, Volume 3, ed. Garber AM, Cambridge, MA: MIT Press, 2000 p. 91-112.
5. **Baker LC**.  Managed Care and Social Welfare: What Has Managed Care Really Done to the U.S. Health Care System?  in *The Political Economy of Health Care Reforms*, ed. Zhou H, Kalamazoo, MI: W.E. Upjohn Institute for Employment Research, 2001.
6. Singer SJ, Dunham KM, Bowen JD, Geppert JJ, Gaba DM, McDonald KM, **Baker LC**.  Lessons from a California Hospital Consortium About Safety Climate and Safety Practices.  in *Advances in Patient Safety: From Research to Implementation, volume 3, Implementation Issues*, ed Henriksen K, Battles JB, Lewin DI, and Marks E, Rockville, MD: Agency for Healthcare Research and Quality, 2005.
7. **Baker, LC.**  Managed Care. in *The Oxford Handbook of Health Economics*, ed. Glied S and Smith PC. Oxford University Press 2011.
8. **Baker LC**, Bundorf MK, Royalty AB.  Measuring Physician Practice Competition Using Medicare Data. in *Measuring and Modeling Health Care Costs*, ed. Aizcorbe A, Baker C, Berndt E, Cutler D, University of Chicago Press, 2018, p 351-377.


**Book Reviews:**

1. **Baker LC**.  Review of E. Ginzberg, Tomorrow's hospital: A look to the twenty-first century (Yale University Press, 1996).  *Journal of Economic Literature* 35:3 (September 1997) 1394-1395.


**Abstracts:**

1. Baker LG, **Baker LC**.  Estimating the excess cost of emergency department visits for primary care. Association for Health Services Research Abstract Book, 1994, 11:123-4.

# Appendix A

2.     **Baker LC**. Does competition from HMOs affect fee-for-service physicians? Association for Health Services Research Abstract Book, 1995, 12:22-3.
3.     Phillips KA, Kerlikowske K, Chang SW, **Baker LC**, Brown ML. Factors associated with lifetime adherence to screening mammography guidelines: individual, provider, and environmental factors. Association for Health Services Research Abstract Book, 1996, 13:11-2.
4.     **Baker LC**, Brown ML. Managed care and the market for preventive health care: evidence from the market for mammography. Association for Health Services Research Abstract Book, 1996, 13:89.
5.     **Baker LC**. Managed care spillovers and Medicare fee-for-service expenditures, 1990-1994. Association for Health Services Research Abstract Book, 1997, 14:116-7.
6.     **Baker LC**, Phibbs CS. The effects of HMO coverage on health care for newborns. Association for Health Services Research Abstract Book, 1997, 14:118-9.
7.     Hsia RY, **Baker LC**, MacIsaac D. Decreasing reimbursement in emergency departments in the United States from 1996 to 2003. *European Journal of Emergency Medicine* 2006;(13):A13.
8.     Magnani C, Bievre N, Erdogdu B, **Baker LC**, Brooks JD, Hernandez-Boussard T. Multiparametric magnetic resonance imaging and reclassification from active surveillance. *The Journal of Urology* 203:4S (May 15, 2020 Supplement), pages e342-e343.

**Other Disseminated Research and Reports:**

1.     **Baker LC.** Same Disease, Different Care: How Patient Health Coverage Drives Treatment Patterns in California. California HealthCare Foundation Issue Brief, April 2008.
2.     **Baker LC.** Variation Across Hospitals in End-of-Life Hospital Utilization Among Chronically Ill Patients Covered by Medicaid. California HealthCare Foundation Research Note, November 2008.
3.     **Baker LC.** Briefing – Regional Variation in Health Care: Is There a McAllen, California? California HealthCare Foundation State health policy briefing, November 2009.
4.     **Baker LC.** Analysis for "All Over the Map: Elective Procedure Rates in California Vary Widely" California HealthCare Foundation Research Summary September 2011, updated 2013, 2014. See also results reported at http://www.chcf.org/publications/2013/05/medical-variation-map#6/36.985/-119.443&procedure=lura_123&region=has
5.     Mulaney B, Shah S, Kim C, **Baker LC**. Compliance with Price Transparency Policy by California Hospitals. July 2021.

# Appendix B

Laurence Baker, PhD                                             March 2023

Testimony since March 2018

1.  <u>Danielle Seaman v. Duke University, Duke University Health System, et al.</u>, United States District Court for the Middle District of North Carolina.  Deposition testimony given November 7, 2017 and October 4, 2018.

2.  <u>Computer Programs and Systems, Inc. and Evident, LLC  v.  Wazu Holdings, Ltd. and Evident, Inc.</u> and counterclaim <u>Evident, Inc. v. Computer Programs and Systems, Inc. and Evident, LLC</u>, United States District Court for the Southern District of Alabama Southern Division.  Deposition testimony given December 20, 2017.  Trial testimony given April 18, 2018.

3.  <u>Mylan Pharmaceuticals Inc v. Sanofi-Aventis Deutschland GMBH</u>; Inter-Partes Review of U.S. Patent No. 7,476,652 and 7,713,930.  Patent and Trial Appeal Board, United States Patent and Trademark Office.  Deposition testimony given June 22, 2018.

4.  <u>Oscar Insurance Company of Florida v. Blue Cross and Blue Shield of Florida, Inc et al.</u>, United States District Court for the Middle District of Florida, Orlando Division.  Hearing testimony given January 23, 2019.

5.  <u>In re: National Prescription Opiate Litigation (Track one cases).  County of Cuyahoga et al v. Walgreens Boots Alliance, Inc a/k/a Walgreen Co et al. and County of Summit et al v Walgreens Boots Alliance, Inc a/k/a Walgreen Co et al.</u>, United States District Court for the Northern District of Ohio, Eastern Division.  Deposition testimony given June 6, 2019.

6.  <u>In re: National Prescription Opiate Litigation.  County of Nassau v. Walgreens Boots Alliance, Inc, Walgreen Eastern Co, Walgreen Co et al. and County of Suffolk v Walgreens Boots Alliance, Inc, Walgreen Eastern Co, Walgreen Co, et al.</u>, Supreme Court of the State of New York, County of Suffolk. Deposition testimony given February 19, 2020.

7.  <u>Ahmed D. Hussein v. Sheldon Razin et al</u>. Superior Court of the State of California for the County of Orange.  Deposition testimony given October 16, 2020.

8.  <u>In re: National Prescription Opiate Litigation (Track 3 cases).  County of Trumbull v. Walgreen Co.; Walgreens Boots Alliance, Inc.; Walgreen Eastern Co., Inc.;  et al.; and County of Lake v Walgreen Co.; Walgreens Boots Alliance, Inc.; Walgreen Eastern Co., Inc.; et al.;</u> United States District Court for the Northern District of Ohio, Eastern Division.  Deposition testimony given July 8, 2021.

9.  <u>James Dannenberg et al v. State of Hawaii et al</u> (2019-2021).  Circuit Court of the First Circuit, State of Hawaii. Deposition testimony given September 9, 2021. Trial testimony given November 17, 2021.

10.  <u>State of Florida, Office of the Attorney General v. Walgreens Co et al</u>;  Circuit Court of the Sixth Judicial Circuit in and for Pasco County, West Pasco Division New Port Richey, Florida.  Deposition testimony given December 7, 2021.

## Appendix B

11.  <u>In re Novartis and Par anti-trust litigation</u>. United States District Court for the Southern District of New York.  Deposition testimony given December 21, 2021.

12.  T<u>he City and County of San Francisco, CA and the People of the State of California Acting by and Through San Francisco City Attorney Dennis J. Herrera v. Purdue Pharma, L.P., Walgreens Co., et al</u>; United States District Court for the Northern District of California.  Deposition testimony given January 7, 2022.

13.  <u>Coordinated Proceedings Gilead Tenofovir Cases</u>. Superior Court of the State of California for the County of San Francisco. Deposition testimony given March 15, 2022.

14.  <u>Hooman Melamed MD, Inc. v Blue Shield of California et al.</u>  Superior Court of the State of California, County of Los Angeles.  Deposition testimony given March 28, 2022.

15.  <u>State of New Mexico, ex rel., Hector Balderas, Attorney General v. Purdue Pharma, L.P., Walgreens Boots Alliance, Inc., Walgreen Co., Walgreen Eastern Co., Walgreen Arizona Drug Co. et al</u>;  First Judicial District Court, County of Santa Fe, State of New Mexico.  Deposition testimony given May 3, 2022.

16.  <u>In re Insulin pricing litigation.</u>  United States District Court for the District of New Jersey. Deposition testimony given August 16, 2022.

17.  

18.  <u>State of West Virginia ex rel. Patrick Morrisey, Attorney General v. Walgreens Boots Alliance, Inc., Walgreen Co., Walgreen Eastern Co., and Walgreen Eastern Co., Inc.</u>;  Circuit Court of Kanawah County, West Virginia.  Deposition testimony given August 24, 2022.

19.  <u>State of Michigan ex rel. Dana Nessel Attorney General v Walgreen Co., et al.</u>; Circuit Court for the County of Wayne, Michigan.  Deposition testimony given December 7, 2022.

20. <u>Value Drug Company et al. v. Takeda Pharmaceuticals U.S.A., Inc., et al.</u>; United States District Court for the Eastern District of Pennsylvania.  Deposition testimony given December 19, 2022.

21.  <u>State of Nevada v. McKesson Corporation, Walgreens Boots Alliance, Inc., Walgreen Co., Walgreen Eastern Co., and Walgreen Arizona Drug Co., et al.</u>; District Court of Clark County, Nevada.  Deposition testimony given January 24, 2023.

**Appendix C**
**Materials Considered**

| Legal Documents, Expert Reports, and Declarations |
|---|
| First Amended Class Action Complaint, April 30, 2021 |
| Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the First Amended Complaint, September 2, 2022 |
| Plaintiffs Notice of Motion, Motion, and Memorandum of Points and Authorities in Support of Class Certification, January 17, 2023, and all exhibits thereto |
| Expert Report of Ron Luke, JD and PhD, and Brian Piper, PhD, January 16, 2023 |
| Expert Report of Professor Mark A. Hall, January 16, 2023 |
| Declaration of Professor Alexandra D. Lahav Relating to Class Certification, January 16, 2023 |
| Declaration of ███████████ Regarding Subpoena Issued to ███████████, April 30, 2020 |
| Declaration of ███████████ Regarding Subpoena Issued to ███████, December 14, 2022 |

| Depositions |
|---|
| Deposition of Brian Piper, March 14, 2023, and all exhibits thereto |
| Deposition of Mark Allen Hall, March 13, 2023, and all exhibits thereto |
| Deposition of Ron Luke, March 17, 2023, and all exhibits thereto |
| Deposition of DS (Named Plaintiff), October 1, 2022, and all exhibits thereto |
| Deposition of RJ (Named Plaintiff), September 29, 2022, and all exhibits thereto |
| Deposition of Creyna Franco (Senior Auditor at Summit Estate Recovery Center), November 16, 2022, and all exhibits thereto |
| Deposition of Gabriel Smith (Product Manager of the Non-Par Cost Containment Program at Cigna), November 11, 2022, and all exhibits thereto |
| Deposition of Jo-Ann Lebel (Advisor for MRC Pricing and Operations Team at Cigna), November 29, 2022, and all exhibits thereto |
| Deposition of Joan Borsten Vidov (Executive Director at Summit Recovery Center) - Vol. I, November 16, 2022, and all exhibits thereto |
| Deposition of Joan Borsten Vidov (Executive Director at Summit Recovery Center) - Vol. II, December 19, 2022, and all exhibits thereto |
| Deposition of JoAnne Forrest (Vice President of National Accounts at Cigna), October 14, 2022, and all exhibits thereto |
| Deposition of Kevin Williams (IT Service Senior Advisor at Cigna), October 4, 2018, and all exhibits thereto |
| Deposition of Mario Vangeli (Managing Director of National Ancillary Contracting and Non-Par Management at Cigna), November 4, 2022, and all exhibits thereto |
| Deposition of Terri Cothron (Director of the Non-Par Cost Containment Program at Cigna), November 8, 2022, and all exhibits thereto |
| Deposition of Trisha Rawlings (Affordability Lead for Go To Market at Cigna), October 7, 2022, and all exhibits thereto |
| Deposition of Wendy Gompper (Business Manager of MRC team at Cigna), October 21, 2022, and all exhibits thereto |

| SEC Filings |
|---|
| Cigna Corporation Form 10-K, Year Ended December 31, 2021 |

| Produced Documents | Bates Start | Bates End |
|---|---|---|
| ***Governance Meetings*** | | |
| Cigna & MultiPlan January Governance Meeting, January 24, 2017 | CIG_RJ00636567 | CIG_RJ00636602 |
| Cigna & MultiPlan January Governance Meeting, January 23, 2018 | CIG_RJ00673619 | CIG_RJ00673653 |
| Cigna & MultiPlan January Governance Meeting, January 22, 2019 | CIG_RJ00607572 | CIG_RJ00607606 |
| Cigna & MultiPlan January Governance Meeting, January 28, 2020 | CIG_RJ00609138 | CIG_RJ00609175 |
| Cigna & MultiPlan January Governance Meeting, January 26, 2021 | CIG_RJ00608754 | CIG_RJ00608791 |
| Cigna & MultiPlan Governance Meeting, December 23, 2021 | CIG_RJ00823152 | CIG_RJ00823189 |
| Cigna & MultiPlan Governance Meeting, May 26, 2022 | CIG_RJ00912007 | CIG_RJ00912046 |
| ***Other Produced Documents*** | | |
| Cigna, "Explanation of Benefits for Claim Number ███████ | CIG_RJ_CLMS00001277 | CIG_RJ_CLMS00001280 |
| Cigna, "Explanation of Benefits for Claim Number ███████ | CIG_RJ_CLMS00001305 | CIG_RJ_CLMS00001308 |
| Cigna, "Explanation of Benefits for Claim Number ███████ | CIG_RJ_CLMS00001392 | CIG_RJ_CLMS00001395 |
| Cigna, "Explanation of Direct Deposit," October 15, 2019 | CIG_RJ00001123 | CIG_RJ00001128 |
| Cigna, "Maximum Reimbursable Charge: Sales Talking Points," April 2019 | CIG_RJ00793367 | CIG_RJ00793381 |
| Cigna, "Non Par Cost Containment Presentation," June 12, 2020 | CIG_RJ00608614 | CIG_RJ00608627 |
| Cigna, "Non-Par Cost-Containment Overview and Service Model," June 2017 | CIG_RJ00607111 | CIG_RJ00607112 |
| Cigna, "Provider Explanation of Medical Benefits," April 9, 2019 | CIG_RJ00002178 | CIG_RJ00002180 |
| Cigna, "Save More, Worry Less: Cigna's Out-of-Network Cost-Containment Solution," 2018 | CIG_RJ00006248 | CIG_RJ00006248 |
| Cigna, Special Investigations Unit Case Log | CIG_RJ00681244 | CIG_RJ00681329 |

**Appendix C**
**Materials Considered**

| | | |
|---|---|---|
| Cigna, Verification of Services Response Spreadsheet | CIG_RJ00688601 | CIG_RJ00688601 |
| Email from Matt Mayfield to Wendy Gomper, Jo-Ann Lebel, Rachel Hernandez, Michael Battistoni, "Follows from Meeting," August 14, 2020 | CIG_RJ00635586 | CIG_RJ00635586 |
| Episcopal Church Medical Trust, Plan Document Handbook, January 2018 | CIG_RJ_CLMS00011735 | CIG_RJ_CLMS00011837 |
| FAIR Health, "Cigna Client Meeting," August 13, 2020 | CIG_RJ00635587 | CIG_RJ00635615 |
| FAIR Health, "FH Benchmarks: HCPS Solutions," 2020 | CIG_RJ00635616 | CIG_RJ00635617 |
| Honeywell International Inc., "Plan Document and Summary Plan Description," January 1, 2018 | CIG_RJ_CLMS00006366 | CIG_RJ_CLMS00006533 |
| Letter from Cigna to Sarah Lecuna, "RE: 2019 Plan Year Services and Charges (Effective August 1, 2019) Intuit Inc.," January 6, 2020 | CIG_RJ00002477 | CIG_RJ00002494 |
| Nucor, "Summary Plan Description," January 1, 2018 | CIG_RJ_CLMS00008707 | CIG_RJ_CLMS00008800 |
| Secondary Closure to Viant OPR Sample Claims Spreadsheet, January 12, 2023 | | |
| ████████ Union Activity Listings | CONFIDENTIAL_██ 000020 | CONFIDENTIAL_██ 000664 |
| Summit, Named Plaintiff DS File | SUMMIT03200 | SUMMIT03640 |
| Viant, "Claim Adjustment for Claim Number████" | CIG_RJ_CLMS00000427 | CIG_RJ_CLMS00000427 |
| Viant, "Viant Facility U&C Review: Outpatient Review (OPR) Module," September 2018 | CIG_RJ00003668 | CIG_RJ00003676 |

**Books and Publicly Available Documents**

| |
|---|
| Adler, Loren, et al., "Breaking Down the Bipartisan Senate Group's New Proposal to Address Surprise Billing," *Health Affairs* , May 21, 2019, available at https://www.healthaffairs.org/do/10.1377/forefront.20190521.144063/full/ |
| Adler, Loren, et al., "Provider Charges Relative to Medicare Rates, 2012-2017," *USC-Brookings Schaeffer* , December 5, 2019, available at https://www.brookings.edu/blog/usc-brookings-schaeffer-on-health-policy/2019/12/05/provider-charges-relative-to-medicare-rates-2012-2017/ |
| Allen, Mark, et al., "Reference Guide on Estimation of Economic Damages," *Reference Manual on Scientific Evidence* , 2011 |
| American Medical Association, "Competition in Health Insurance," 2018, available at https://www.ama-assn.org/system/files/2018-11/competition-health-insurance-us-markets_1.pdf |
| Baicker, K. and A. Chandra, "The Labor Market Effects of Rising Health Insurance Premiums," *Journal of Labor Economics* 24(3), 2006 |
| Cigna, "Company Profile," available at https://web.archive.org/web/20221209131121/https://www.cigna.com/about-us/company-profile/ |
| Cigna, "Employer-Sponsored Coverage," July 29, 2019, available at https://www.cigna.com/static/www-cigna-com/docs/employers-brokers/insights/informed-on-reform/cigna-employer-sponsored-coverage-overview-final-7-29-19.pdf |
| Cigna, "HMO and Network," available at https://static.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalPlansAndProduct/medicalPlansProductsHmoAndNetwork.html |
| Cigna, "In-Network vs. Out-of-Network Providers," available at https://www.cigna.com/knowledge-center/in-network-vs-out-of-network |
| Cigna, "Managing Your Medical Bills," available at https://www.cigna.com/knowledge-center/hw/managing-your-medical-bills-abo3249 |
| Cigna, "Open Access Plus," available at https://static.cigna.com/assets/chcp/resourceLibrary/medicalResourcesList/medicalPlansAndProduct/medicalPlansProductsOpenAccessPlusOapInNetwork.html |
| Cigna, "Revenue Code List-CPT-HCPCS," March 15, 2020, available at https://static.cigna.com/assets/chcp/pdf/resourceLibrary/medical/revenue-code-list-requiring-cpt-and-hcps-codes-for-outpatient-facility-claims.pdf |
| Claxton, G., et al., "Health Benefits In 2013: Moderate Premium Increases In Employer-Sponsored Plans," *Health Affairs* , 2013 |
| CMS.gov, "Gapfill Pricing Inquiries," December 1, 2021, available at https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/ClinicalLabFeeSched/Gapfill-Pricing-Inquiries |
| CMS.gov, "HCPCS Coding Questions," available at https://www.cms.gov/Medicare/Coding/MedHCPCSGenInfo/HCPCS_Coding_Questions |
| Congressional Budget Office, "The Prices That Commercial Health Insurers and Medicare Pay for Hospitals' and Physicians' Services," January 2022, available at https://www.cbo.gov/system/files/2022-01/57422-medical-prices.pdf |
| Cooper, Zack, et al., "Surprise! Out-of-Network Billing for Emergency Care in the United States," *Journal of Political Economy* 128(9), September 2022 |
| Dartmouth Atlas Project, General FAQ, available at https://www.dartmouthatlas.org/faq/ |
| Emanuel, E., and V. Fuchs, "Who Really Pays for Health Care?" *JAMA* 299(9), 2008 |
| FAIR Health, "Medicare GapFill PLUS," available at https://www.fairhealth.org/benchmark-data-products/medicare-gapfill-plus |
| Gordon, A. et al., "Provider Charges and State Surprise Billing Laws: Evidence From New York and California," *Health Affairs* 41(9), September 2022, available at https://www.healthaffairs.org/doi/epdf/10.1377/hlthaff.2021.01332 |
| Hall, Mark and Carl Schneider, "Patients as Consumers: Courts, Contracts, and the New Medical Marketplace," *Michigan Law Review* 106(4), 2008, available at https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1402&context=mlr |
| Hall, Mark, et al., "Overbilling and Informed Financial Consent – A Contractual Solution," *The New England Journal of Medicine* 367(5), August 2, 2012, available at https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=5329&context=faculty_scholarship |
| HCPCS.codes, "HCPCS Code H0015," available at https://hcpcs.codes/h-codes/H0015/ |
| HealthCare.gov, "Using a Flexible Spending Account," available at https://www.healthcare.gov/have-job-based-coverage/flexible-spending-accounts/ |

**Appendix C**
**Materials Considered**

Healthgrades, "Online Reviews Impact How Patients Select Hospitals & Doctors," March 28, 2022, available at https://b2b.healthgrades.com/insights/blog/online-reviews-impact-how-patients-select-hospitals-doctors/

Kaiser Family Foundation, "Health Care Debt In The U.S.: The Broad Consequences of Medical and Dental Bills," June 16, 2022, available at https://www.kff.org/report-section/kff-health-care-debt-survey-main-findings/

ResDAC, "Healthcare Common Procedure Coding System (HCPCS) Code (FFS)," available at https://resdac.org/cms-data/variables/healthcare-common-procedure-coding-system-hcpcs-code-ffs

RPC, "Determining Usual Customary and Reasonable Charges for Healthcare Services," July 1, 2022, available at https://www.rpcconsulting.com/wp-content/uploads/2022/07/Determining-Usual-Customary-and-Reasonable-Charges-for-Healthcare-Service_White-Paper_7-1-2022.pdf

RPC, "Reasonable Charges & Reasonable Value for Medical Care for Jane Plaintiff," August 30, 2022, available at https://www.rpcconsulting.com/wp-content/uploads/2022/11/MBA_Sample-Report.pdf

████████████████████████████████████████████████████

Summit Estate, "Insurance Verification," available at https://www.summitestate.com/northern-california-rehab-admissions-process/health-insurance-verification/

Summit Estate, "Intensive Outpatient Program," available at https://www.summitestate.com/northern-california-drug-and-alcohol-rehab-programs/iop-intensive-outpatient-program-ca/

Summit Estate, "IOP Photo Gallery," available at https://www.summitestate.com/about-summit-estate-recovery-center-iop-photo-gallery/

The Society for Human Resources Management, "2022 Employee Benefits Survey," available at https://shrm-res.cloudinary.com/image/upload/v1654193525/Membership%202022/Employee_Benefits_Survey_-_Executive_Summary_-_FINAL.pdf

Value Healthcare Services, "Understanding Hospital Revenue Codes," available at https://valuehealthcareservices.com/education/understanding-hospital-revenue-codes/