# EXHIBIT 9

# Filed as Redacted Exhibit

Page 1

1                 UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                       OAKLAND DIVISION

4

5     RJ, et al,

6                    Plaintiffs,

7         vs.

8     CIGNA HEALTH AND LIFE INSURANCE

9     COMPANY, et al.,

10    _____

11

12              ATTORNEYS' EYES ONLY

13

14              The Zoom Videoconferenced/Video Recorded

15              30(b)(6) Deposition of KATHY PRAXMARER,

16              Commencing at 9:38 a.m. CST,

17              Thursday, December 8, 2022,

18              Before Stenographic Shorthand Reporter,

19              Lori Ann Baldwin, CSR-5207, RPR, CRR.

20

21

22

23

24

25

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 2

1  APPEARANCES VIA ZOOM VIDEOCONFERENCE:
2
3  MATTHEW M. LAVIN
4  NICOLE WEMHOFF
5  Arnall Golden Gregory, LLP
6  1775 Pennsylvania Avenue NW, Suite 1000
7  Washington, D.C.  20006
8  202.677.4030
9  matt.lavin@agg.com
10  nicole.wemhoff@agg.com
11     Appearing on behalf of the Plaintiffs.
12
13  ERROL J. KING, JR.
14  Phelps Dunbar LLP
15  400 Convention Street, Suite 1100
16  Baton Rouge, Louisiana  70802-5618
17  225-376-0207
18  errol.king@phelps.com
19     Appearing on behalf of MultiPlan Corporation.
20
21
22
23
24
25  APPEARANCES (Continued)...

Page 3

1  APPEARANCES (Continued):
2
3  CAROLINE INCLEDON
4  McDermott Will & Emery LLP
5  One Vanderbilt Avenue
6  New York, New York  10017-3852
7  212.547.5598
8  cincledon@mwe.com
9     Appearing on behalf of Cigna Health and
10    Life Insurance Company.
11
12  ALSO PRESENT VIA ZOOM VIDEOCONFERENCE:
13  Kurt Henschel - Videographer
14  Jaysun Loushin - Concierge
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                TABLE OF CONTENTS
2
3  WITNESS                          PAGE
4  KATHY PRAXMARER
5
6  EXAMINATION BY MR. LAVIN:
7                    8
8
9                 EXHIBITS
10
11  EXHIBIT                         PAGE
12
13
14  EXHIBIT 1                        13
15  Amended Notice of Deposition
16  EXHIBIT 2                        40
17  MultiPlanInc.'s Answer to Plaintiff's
18  First Amended Class Action Complaint;
19  Demand For Jury Trial
20  EXHIBIT 3                        85
21  Email Chain
22  MPI-C0000297-MPI-C0000311
23  EXHIBIT 4                        108
24  Email Chain
25  MPI-C14516-MPI-C14526

Page 5

1  EXHIBIT 5                        119
2  Email Chain
3  MPI-C0014935-MPI-C0014938
4  EXHIBIT 6                        139
5  Email Chain
6  MPI-C13506-MPI-C13516
7  EXHIBIT 7                        143
8  7/31/2017 Correspondence - MPI-C16189
9  EXHIBIT 8                        146
10  6/5/2014 Correspondence - MPI-C0000902
11  EXHIBIT 9                        154
12  Email Chain
13  MPI-C12522-MPI-C12531
14  EXHIBIT 10                       160
15  9/16/2020 Correspondence - MPI-C16258
16  EXHIBIT 11                       172
17  7/26/2021 Correspondence - MPI-C16274
18  EXHIBIT 12                       175
19  MPI-C14939-MPI-C14940
20  EXHIBIT 13                       183
21  MPI-C16381-MPIC-16383
22  EXHIBIT 14A (not attached)       196
23  PCI Confidential 1272
24  Audio Recording
25  EXHIBIT 14B                      207

2 (Pages 2 - 5)

AEO 30(b)(6) Kathy Praxmarer                               December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

---

Page 6

1  MultiPlan Update for Cigna
2  2017 in Review
3  February 28, 2018
4  MPI-C0001803-MPI-C0001832
5  EXHIBIT 15                                    211
6  First Amended Class Action Complaint
7  EXHIBIT 16                                    221
8  Viant Facility U&C Review
9  MPI-C000216-MPI-C000224
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 7

1  Via Zoom Videoconference/Video Recording
2  Thursday, December 8, 2022
3  9:38 a.m. CST
4        ATTORNEYS' EYES ONLY
5
6        THE VIDEOGRAPHER:  Today's date is
7  December 8th, 2022.  The time is 9:38.  This is the
8  matter of RJ, et al versus Cigna Health and Life
9  Insurance Company, et al.
10        Witness today is located in Naperville,
11  Illinois.  Please note that this deposition is being
12  conducted virtually by Veritext.  Quality of recording
13  depends on the quality of camera and Internet
14  connection of participants.
15        Counsel please state appearances for the
16  record and whom you represent.
17        MR. LAVIN:  This is Matt Lavin of Arnall
18  Golden and Gregory for the plaintiffs and I'm joined
19  by my colleague Nicole Wemhoff.
20        MR. KING:  This is Errol King with the firm
21  of Phelps Dunbar representing MultiPlan and the
22  witness, Ms. Praxmarer.
23        MS. INCLEDON:  Caroline Incledon with
24  McDermott Will & Emory for Cigna.
25        THE REPORTER:  Ms. Praxmarer -- Praxmarer,

---

Page 8

1  I beg your pardon, I'm sorry -- can I ask you to raise
2  your right hand, please, and I'll swear you in to tell
3  the truth.
4            KATHY PRAXMARER,
5  Was thereupon called as a witness herein, and after
6  having first been duly sworn, via Zoom
7  Videoconference/Zoom Video Recording to testify to the
8  truth, the whole truth and nothing but the truth, was
9  examined and testified as follows:
10        THE REPORTER:  Thank you very much.
11            EXAMINATION
12  BY MR. LAVIN:
13  Q.  Good morning, ma'am.  Could you state your name for
14    the record, please?
15  A.  Kathy Praxmarer.
16  Q.  Nice to see you again, Ms. Praxmarer.
17  A.  Thank you.
18  Q.  Where are you located today?
19  A.  Naperville, Illinois.
20  Q.  And who is your employer?
21  A.  MultiPlan.
22  Q.  And how long have you worked for MultiPlan?
23  A.  Twenty-four years.
24  Q.  And have you ever been employed by Viant?
25  A.  I have.

---

Page 9

1  Q.  Okay.  When was that?
2  A.  From 1998 until we were acquired by MultiPlan in 2010.
3  Q.  I know you've been deposed before.  About how many
4    times have you been deposed before?
5  A.  I think three or four.
6  Q.  Since I deposed you last, have you been deposed in any
7    other matters?
8  A.  No.
9  Q.  Do you have an understanding that you are here as a
10    corporate witness for MultiPlan today?
11  A.  I do.
12  Q.  And what is your understanding of what a corporate
13    witness is?
14  A.  That I'm providing feedback on behalf of MultiPlan.
15  Q.  Do you understand that your testimony today is stating
16    the position on behalf of MultiPlan as to your answers
17    to my questions?
18  A.  I do.
19  Q.  What did you do to prepare for your deposition today?
20  A.  I spoke to Mr. King.
21  Q.  How many times did you speak with Mr. King?
22  A.  I had a brief conversation with him, I believe it was
23    last week, just in alining on date and kind of more
24    logistics, and then we had a meeting yesterday.
25  Q.  Is Mr. King there with you today?

---

3 (Pages 6 - 9)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 10

1  A.  He is.
2  Q.  And how long did you meet with Mr. King yesterday?
3  A.  Maybe five or six hours.
4  Q.  Did you look at any documents with Mr. King?
5  A.  I did.
6  Q.  What kind of documents did you look at?
7  A.  The Deposition Notice, the Complaint, the response, my
8      prior deposition, and then a few miscellaneous
9      documents.
10  Q.  Were those miscellaneous documents emails?
11  A.  They were.
12  Q.  Do you remember what those emails were discussing?
13  A.  Just referred to some email documents that were from
14      history -- historical.
15  Q.  What did they -- were they discussing appeals, were
16      they discussing specific codes, do you remember?
17  A.  No.  It was -- I don't remember.  They were just
18      miscellaneous emails.
19  Q.  Were you on any of those emails?
20  A.  I was.
21  Q.  Okay.  And you can't remember what they were
22      discussing?
23  A.  No, they were -- they were very old.
24  Q.  Did you -- when you say "old," what years were they
25      from?

Page 11

1  A.  I don't recall.
2  Q.  Do you -- did you look at any other documents besides
3      emails --
4  A.  No.
5  Q.  -- and the pleadings that you had mentioned?
6  A.  Correct.
7  Q.  All right.  I'm going to go through some topics, and I
8      want you to tell me if these are topics that you are
9      prepared to testify on today, okay?
10  A.  Okay.
11  Q.  First one is, "Plaintiffs' allegations contained in
12      the Operative Complaint."  Are you prepared to testify
13      on that today.
14  A.  Can I reference the Deposition Notice?
15  Q.  Absolutely.  Sure.  Just tell me what you are looking
16      at.
17  A.  The --
18  Q.  We could bring it up, if you'd like.  Would that make
19      it easier for you?
20  A.  Yeah, I just want to make sure we're speaking to the
21      areas that I was designated.
22  Q.  Sure.
23          MR. KING:  She brought the Corporate
24      Deposition Notice with her to the deposition.
25          MR. LAVIN:  Okay.  Can we bring up Tab 1?

Page 12

1  BY MR. LAVIN:
2  Q.  So let's -- are you set up for Exhibit Share,
3      Ms. Praxmarer?
4  A.  I am.
5  Q.  You know how it goes; you have to refresh it
6      sometimes.
7          MR. LAVIN:  All right.  It's not showing up
8      for me yet.  Do you have it up, Nicole?  Okay.
9          MS. WEMHOFF:  Are we in the Marked -- in
10      the time-stamped folder?
11          MR. LAVIN:  That's where I am, yeah.  You
12      can go to the other one, if you'd like.
13          THE WITNESS:  I'll move it over.  There's
14      Marked Exhibits.
15          MR. KING:  Click on number 1.
16          THE WITNESS:  There we go.
17          MR. KING:  That may not be it.  Put it up.
18      Make it bigger.
19          THE WITNESS:  No.
20          MR. KING:  Matt, she's not seeing the
21      exhibits for today.  She's only seeing the exhibits
22      from the United deposition for some reason.
23          MR. LAVIN:  Yeah, and Nicole -- let's go
24      off the record for a second.
25          MR. KING:  Yeah, let's do that.  Because

Page 13

1      the concierge hooked her up earlier today with
2      Exhibit Share.
3          THE VIDEOGRAPHER:  Off the record.
4          (Off the record at 9:46 a.m.)
5          (Back on the record at 10:19 a.m.)
6          THE VIDEOGRAPHER:  On the record, 10:19.
7          MARKED FOR IDENTIFICATION:
8          DEPOSITION EXHIBIT 1
9          Amended Notice of Deposition
10         10:19 a.m. CST
11  BY MR. LAVIN:
12  Q.  So taking a look at Exhibit 1, which is the Amended
13      Notice of Deposition, are you able to look through
14      this and identify for me the topics on which you are
15      prepared to testify as a corporate witness for
16      MultiPlan today?
17  A.  Sure.  So number 7, number 8, 19, 20 -- and then 23,
18      25, and 27.
19  Q.  What about, can we look at Topic 21 which is, "The
20      policies and procedures put in place by MultiPlan
21      relating to the health benefit plans of Cigna members
22      whose out-of-network mental health claims were priced
23      using MultiPlan's Viant product from January 1st,
24      2015, to present."
25          Are you prepared to testify on that topic

4 (Pages 10 - 13)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 14

1   today?
2   A.   No, I'm not.
3   Q.   Okay.   Let's look back at 20, "The policies and
4        procedures put in place by MultiPlan relating to
5        balance bills received by Cigna members for
6        out-of-network mental health claims that use
7        MultiPlan's Viant product from January 1st, 2015, to
8        the present."
9             What did you do to prepare for that
10       particular topic today?
11  A.   I just -- I reviewed the current policies or
12       procedures.
13  Q.   So do you have a policies or procedures manual that
14       you reviewed?
15  A.   There's not a manual.   We just have various documents
16       that are in place on an internal shared site.
17  Q.   Okay.   What is that shared site called?
18  A.   Multiverse.
19  Q.   And on the Multiverse, what are the names of the
20       policies or procedures manual -- documents that you
21       looked at?
22  A.   Oh, there's various documents.   I can give you names
23       of a couple; provider inquiry, member balance billing,
24       customer service, or patient advocacy handling.
25  Q.   Any others that you can remember?

Page 15

1   A.   Those are just the quick ones that come to mind.
2   Q.   Are those general policy documents, not specific to
3        Cigna, but you know, they relate to all MultiPlan
4        customers?
5   A.   Correct.
6   Q.   Are they memos?   Are they Word documents?   What kind
7        of format are those documents in?
8   A.   They could be a PDF.   We have some that are in what's
9        called a "wiki" format.   It's an internal, kind of
10       just, procedural format.
11  Q.   So a wiki format is a procedural format?   How does
12       that, can you describe that a little bit for me?
13  A.   Sure.   So the wiki format really kind of takes the
14       historic PDF version and puts it in kind of bite-sized
15       chunks with hyperlinks.   So if there's a relevant
16       section, instead of having to scroll the entire PDF,
17       you will see the sections with the hyperlink that
18       allows you to forward to that section.
19  Q.   Okay.   So we're going to request production of any
20       documents that you looked at today to prepare yourself
21       to testify to that topic.
22            Anything else that you looked at for that
23       particular topic?
24  A.   No.
25  Q.   Is there a policy or procedure manual that -- well,

Page 16

1        strike that.
2             What is your current title at MultiPlan?
3   A.   Vice President, Out-of-Network Solutions.
4   Q.   And how long have you had that particular title?
5   A.   Since 2019.
6   Q.   How would you describe your duties and
7        responsibilities with that title?
8   A.   Sure.   I have responsibilities for the out-of-network
9        services that are within the MultiPlan umbrella.
10  Q.   When you say "services," are you referring to the
11       actual pricing of claims or -- or something else?
12  A.   It would be the areas that I oversee such as
13       negotiation services, the Viant operational team.
14       Those would be two examples.
15  Q.   Does it also include DataiSight?
16  A.   Sure, DataiSight operational team would be included as
17       well.
18  Q.   Who is on the Viant operational team?
19  A.   I have a director, I have a manager of the appeal
20       negotiations.
21  Q.   Can you -- and -- and not to cut you off, but you say
22       there's a director.   Can you identify who those people
23       are and their title who are on the Viant operations
24       team.
25            So there's a director.   Is that JR Moss?

Page 17

1   A.   Yes.   JR Moss is the director.
2   Q.   Okay.   Who else?
3   A.   Reeder Bramwell who is a manager over the appeal
4        negotiation area.   Cindy Carlson who is a manager over
5        the patient advocacy or intake for service area.   And
6        then they have direct reports under them as well.
7   Q.   So negotiations, is that a call center team?
8   A.   No.   The -- I would -- I would phrase a call center
9        team as you're receiving inbound calls for a variety
10       of individuals, so that would not be what I would
11       reference as a negotiation area.
12  Q.   Okay.   How would you, is there a title for the call
13       center team?   Is there --
14  A.   They're customer service representatives.
15  Q.   Okay.   Do you have responsibility for that as well for
16       Viant?
17  A.   That's under Cindy Carlson.
18  Q.   How many customer service representatives work for
19       Viant?
20  A.   I would say about four.
21  Q.   And how does their role differ -- differ from the
22       negotiations team?
23  A.   So they're receiving inbound calls for inquiries from
24       a member or the provider or in response to a client.
25            And they're kind of triaging that intake or responding

5 (Pages 14 - 17)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

---

Page 18

1    to inquiries or questions that are posed at the time
2    of original intake.
3    Q.   And do they then just route the call to where it needs
4       to go?
5    A.   Correct.  If the call needs to be referred, then they
6       would open a ticket in our system and then they would
7       refer that for handling.
8    Q.   Is there a separate customer service team for
9       DataiSight?
10   A.   There is.
11   Q.   How many people are on the DataiSight customer service
12      team?
13   A.   Matt, honestly, I would be guessing.
14          MR. KING:  Don't guess.
15   A.   I don't know that particular number.
16   BY MR. LAVIN:
17   Q.   What's your best answer on that?
18          MR. KING:  Objection; asked and answered.
19   A.   Thirty.
20   BY MR. LAVIN:
21   Q.   Okay.  Significantly more than on the Viant customer
22      service team?
23   A.   Sure.
24   Q.   Do the four or so individuals on the customer service
25      team have a policy and procedures manual that they use

Page 19

1    in the course of their duties?
2    A.   Similar to my response earlier, it's not a manual.
3       They would refer to policy and procedure documents or
4       wikis on Multiverse.
5    Q.   When was the last time you hired and trained a new
6       customer services rep for the Viant team?
7    A.   Since my tenure with Viant, we have not hired anybody
8       new.
9    Q.   And that goes back about how many years?
10   A.   Since 2019.
11   Q.   What about between 2015 and 2019, are you aware of any
12      new service, any new customer service reps on the
13      Viant team?
14   A.   I wouldn't know that.
15   Q.   Who would know that?
16   A.   Likely Cindy Carlson.
17   Q.   Is there a training manual or an orientation manual
18      that new employees for Viant or new customer service
19      employees are asked to look at?
20   A.   They would refer to the same documents that I
21      referenced previously.
22   Q.   The people on the negotiations team, do they have a
23      training manual that they use?
24   A.   It's the same type of documents I just referenced,
25      either the wikis or the policy and procedure

Page 20

1    documents.
2    Q.   What about for the DataiSight customer service
3       individuals, do they have a policy and procedures
4       manual or training documents that they use?
5          MR. KING:  Object to form.  You can answer.
6    A.   It's the same context, either wikis or policy and
7       procedure documents.
8    BY MR. LAVIN:
9    Q.   In the course of your duties, do you draft policy and
10      procedure documents for Viant?
11   A.   I don't draft them.
12   Q.   Who does draft them?
13   A.   Usually the lower level management teams.
14   Q.   Where are the customer service representatives for
15      Viant located?
16   A.   They could be national.  I don't -- I don't know their
17      particular location because we are primarily a
18      work-at-home company right now.
19   Q.   Since the pandemic, is that what you mean?
20   A.   Correct.
21   Q.   Prior to that, were they located in Salt Lake City?
22   A.   Yes, they were.
23   Q.   How would you describe the role of the negotiations
24      team members?  What are they supposed to do?
25   A.   So they are speaking with facilities to discuss an

Page 21

1    inquiry or an appeal that was received and giving a
2    high-level overview of the recommended allowable and
3    then, if applicable, looking to come to a resolution
4    to avoid the continued balance bill of the member.
5    Q.   Is that also referred to as "educating the provider"?
6          MR. KING:  Objection to form.  You can
7       answer.
8    A.   That can be a portion, sure.
9    BY MR. LAVIN:
10   Q.   Do you know if there's healthcare providers that have
11      contracts with Viant?
12   A.   No.
13   Q.   And why are you sure of that?
14          MR. KING:  Objection; outside the scope.
15   A.   We -- we don't generally contract within the Viant
16      product.
17   BY MR. LAVIN:
18   Q.   Is the Viant product considered distinct from
19      MultiPlan?
20          MR. KING:  Objection; vague.  You can
21      answer.
22   A.   Can you rephrase that?
23   BY MR. LAVIN:
24   Q.   Sure.  MultiPlan has contracts with healthcare
25      providers, correct?

6 (Pages 18 - 21)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 22

1          MR. KING:  Objection; outside the scope.
2     You can answer.
3  A.  Yes.  Correct.
4  BY MR. LAVIN:
5  Q.  And are Viant's services considered to be under
6     MultiPlan's contracts with healthcare providers?
7          MR. KING:  Objection; outside the scope.
8  A.  They are not.
9  BY MR. LAVIN:
10  Q.  Is Viant a separate company from MultiPlan?
11  A.  Yes, it is.
12  Q.  Is Viant wholly-owned by MultiPlan?
13  A.  Yes.
14  Q.  Do your -- do the customer services reps for the
15     negotiations team receive paychecks from MultiPlan or
16     from Viant?
17          MR. KING:  Objection; foundation, outside
18     the scope.  You can answer.
19  A.  I believe that that would be Viant's under the, kind
20     of, MultiPlan ownership.
21  BY MR. LAVIN:
22  Q.  Are they considered Viant employees or MultiPlan
23     employee -- employees?
24          MR. KING:  Foundation.
25  A.  They are Viant's employees.

Page 23

1  BY MR. LAVIN:
2  Q.  And who is your employer?
3  A.  MultiPlan.
4  Q.  At one time were you employed by Viant?
5          MR. KING:  Objection; asked and answered.
6  A.  Yes.
7  BY MR. LAVIN:
8  Q.  And you're -- you considered yourself a MultiPlan
9     employee and not a Viant employee at the time Viant
10     was acquired by MultiPlan?
11          MR. KING:  Objection; vague.  You can
12     answer.
13  A.  Correct.  We're all under the MultiPlan umbrella.
14  BY MR. LAVIN:
15  Q.  So that includes the customer service representatives,
16     right?
17  A.  They are employed by Viant under the MultiPlan
18     umbrella.
19  Q.  And who do you report to in your position?
20  A.  Derek Reis-Larson.
21  Q.  What is his role?
22  A.  He's the Senior Vice President of Repricing, Claim
23     Repricing, I believe is his title.
24  Q.  And who does Mr. Reis-Larson report to?
25  A.  Dale White.

Page 24

1  Q.  What is Dale White's title?
2  A.  I should know that.  I'm drawing a blank, Matt.
3  Q.  Is he the CEO?
4  A.  President.
5  Q.  Okay.  The President.
6  A.  Can I have just two seconds, just for my -- I just
7     want to --
8          MR. LAVIN:  Off the record.
9          THE WITNESS:  Thank you.
10          THE VIDEOGRAPHER:  Off the record, 10:35.
11          (Off the record at 10:35 a.m.)
12          (Back on the record at 10:35 a.m.)
13          THE VIDEOGRAPHER:  On the record, 10:35.
14  BY MR. LAVIN:
15  Q.  Have you ever seen an organization chart related to
16     Viant?
17          MR. KING:  Objection; outside the scope.
18  A.  Yes.
19  BY MR. LAVIN:
20  Q.  Okay.  And where is that kept?
21  A.  There may be a copy on Multiverse.
22  Q.  Have you seen an organization chart for MultiPlan?
23  A.  Yes.
24  Q.  Where do you recall seeing that?
25  A.  On Multiverse.

Page 25

1  Q.  When was the last time you saw that?
2  A.  It would have been a while ago.  I don't -- I don't
3     generally go out and look at the org charts.
4  Q.  Okay.  So the next topic, 23, is "Communications
5     between MultiPlan and Cigna plan members related to
6     out-of-network savings, discounts, discount amounts,
7     and discount type allegedly obtained by Cigna for
8     members related to MultiPlan's Viant OPR or
9     similarly-termed programs from January 1st, 2015, to
10     the present."
11          And what did you do to specifically prepare
12     on that topic?
13  A.  I reviewed various copies of the patient advocacy
14     letter.
15  Q.  Is that also called a PAD letter?
16  A.  It is.
17  Q.  How many PAD letters did you review?
18  A.  I think two or three.
19  Q.  Who sends out PAD letters?
20  A.  Currently, I have a vendor that is doing that on our
21     behalf.
22  Q.  When you say "our behalf," you mean MultiPlan's
23     behalf?
24  A.  For this purpose, it would be for Viant.
25  Q.  Does that same vendor send out PAD letters for

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 26

1   DataiSight?
2  A.  Yes.
3  Q.  What's that name of that vendor?
4  A.  RR Donnelly.
5  Q.  How long have you worked with them for?
6  A.  We implemented in August.
7  Q.  Prior to August, how did PAD letters issue for Viant?
8  A.  We had a mailroom where we produced those and sent
9     those out from the Salt Lake City office.
10  Q.  And that mailroom was wound down and you went with an
11     outside vendor in August?
12  A.  Correct.
13  Q.  How many Viant PAD letters go out a month?
14  A.  I would say on average about 150,000.
15  Q.  How many PAD letters go out a month for Cigna claims?
16       MS. INCLEDON:  Object to the question; it
17     calls for speculation.
18       MR. KING:  Join.
19  A.  I don't know that number.
20  BY MR. LAVIN:
21  Q.  Do you have any involvement in the drafting of
22     language for PAD letters?
23  A.  We would have an initial recommendation, but beyond
24     that it is the client's responsibility to analyze the
25     language.

Page 27

1  Q.  But Viant suggests language, right?
2  A.  There is an initial -- initial version --
3       MS. INCLEDON:  Sorry, Kathy, objection that
4     it calls for speculation, objection to the form.
5  BY MR. LAVIN:
6  Q.  Can you walk me through the process of how a PAD
7     letter issues?
8       MR. KING:  What time frame are we talking
9     about?
10  BY MR. LAVIN:
11  Q.  Let's talk about before August, right?  Because now
12     there's an outside vendor.
13       MR. KING:  Okay --
14  BY MR. LAVIN:
15  Q.  Did the process -- was the process very different
16     between 2015 and the summer of 2022 for a PAD letter
17     to issue?
18  A.  There were -- there were likely other technical
19     approaches, again, because I was involved as of 2019,
20     I don't have detail on, kind of, the generation, but I
21     can just give you an overview from 2019 to current.
22  Q.  That would be great.
23  A.  So when -- so there's two, kind of two different
24     forks; one is -- so it's based on client election for
25     the PAD letter.  It would be --

Page 28

1  Q.  So you mean client election of the PAD letter
2     template?
3  A.  Of the template and -- and the generation, correct,
4     that is a service that we offer as part of Viant.
5     That -- once the recommended allowable is -- is
6     identified on a claim, we, if it generates that PAD
7     letter, it is system generated.
8           Prior to RR Donnelley, we had an internal
9     service where it would go to a file folder for a -- a
10     generation.  Then there would be varying processes
11     from that that includes folding and use of an
12     envelope, there's a lot of different equipment there.
13     And then it is mailed out.
14           The distinction today with RR Donnelley
15     compared to previously is that we just kind of
16     interrupted our internal approach to managing that to
17     instead sending it through a vendor.
18  Q.  So prior to this summer, and maybe it's still like
19     this, a PAD letter is generated any time a suggested
20     price is generated for a claim.
21  A.  A PAD letter is generated based on the client's
22     election.
23  Q.  Okay.  So assuming a client has elected -- and would
24     that be called the Patient Advocacy Program?
25  A.  Correct.

Page 29

1  Q.  So assuming the client has elected the Patient
2     Advocacy Program, and a client is being priced
3     successfully -- or -- excuse me, a claim is being
4     priced successfully through Viant, is the PAD letter
5     generated at the same time as the recommended
6     allowable is generated?
7  A.  So upon concluding, so at the time of closing that
8     claim with the recommendation, that's when the PAD
9     letter generation starts.
10  Q.  What do you mean by "closing the claim"?
11  A.  Means the -- the recommendation has been finalized and
12     it -- it shows as closed in our system.
13  Q.  All right.  So how do you know a recommendation has
14     been finalized?
15  A.  It's all system driven.
16  Q.  So where do you get that information from?  Does
17     MultiPlan's system indicate that a recommended amount,
18     allowed amount has been finalized, now it's time to
19     generate a PAD letter?
20  A.  Correct.
21  Q.  And does it recognize it as finalized when the
22     recommended allowed amount is transmitted back to the
23     client, in this case, Cigna?
24  A.  It would be --
25       MS. INCLEDON:  Object to the form.

8 (Pages 26 - 29)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 30

1  A.  It would be based on closure within our system.  So
2      once the claim closes in our system, which is
3      generally the same day that it would return, that's
4      when the PAD letter would generate.
5  BY MR. LAVIN:
6  Q.  And about how long between generation until the time
7      when it's actually sent out the door from Viant or the
8      vendor?
9          MR. KING:  Objection.  By "it," you mean
10     the PAD letter, right?
11         MR. LAVIN:  Right.  The PAD letter.
12 A.  Under 48 hours.
13 BY MR. LAVIN:
14 Q.  Excuse me.  Is that generally true for Cigna, true,
15     and all customers?
16         MS. INCLEDON:  Object to the form.
17 A.  That's a consistent process across patient advocacy
18     generation.
19 BY MR. LAVIN:
20 Q.  Do you know if PAD letters today generated for Cigna
21     instruct -- sorry.  I'm getting phone calls.
22         Do you know if PAD letters today generated
23     by Viant for Cigna claims instruct Cigna members to
24     call Viant or to call Cigna?
25         MS. INCLEDON:  Object to the form and

Page 31

1      object; lack of foundation.
2          MR. KING:  Join.
3  A.  I would need to see the particular PAD letter that
4      generated for the claim to identify that for you.
5  BY MR. LAVIN:
6  Q.  Are there various PAD letters for Viant that Cigna
7      uses?
8          MS. INCLEDON:  Object to the form and
9      object, lack of foundation.
10 A.  There could be various forms, correct.
11 BY MR. LAVIN:
12 Q.  Do you know why there would be different forms and not
13     just one form?
14         MR. KING:  Objection.
15 A.  Because we have various, what I would term as "Cigna
16     affiliates" under kind of a Cigna umbrella, I don't
17     know definitively that they were all the same.
18 BY MR. LAVIN:
19 Q.  Can you give me some examples of Cigna affiliates?
20 A.  Sure.
21         MS. INCLEDON:  Object -- sorry, Kathy.
22     Object to the form and object, lack of foundation.
23         MR. KING:  Join.  You can answer.
24 A.  Sure, we have, like, one called Cigna SAR, we have
25     Cigna East, we have Cigna Facets, as various examples

Page 32

1      of what I would refer to as the affiliates.
2  BY MR. LAVIN:
3  Q.  Okay.  Are you familiar with what kind of PAD letter
4      Cigna East uses?
5          MR. KING:  Object to form and foundation.
6  A.  I would -- I would have to see that based on a Cigna
7      East claim.
8  BY MR. LAVIN:
9  Q.  Did you review any Cigna East claim PAD letters in
10     preparation for this deposition?
11 A.  I don't know definitively which entity or which
12     affiliate would have been reviewed, Matt.
13 Q.  Are you aware of whether Cigna East PAD letters direct
14     members or Cigna customers to call Viant or to call
15     Cigna?
16 A.  I don't -- I don't.
17 Q.  Have you ever seen a PAD letter for a Cigna claim
18     instructing the Cigna customer to call Cigna instead
19     of Viant?
20         MS. INCLEDON:  Object to the form.  Object;
21     asked and answered.  And also, can we just have a
22     stipulation that an objection by one is an objection
23     for all?  Just so we don't have to talk over each
24     other?
25         MR. KING:  That works.  Matt, by

Page 33

1      "customer," you mean "member," right?
2          MR. LAVIN:  So, yeah, when I say -- yeah, I
3      guess I can call them "members."
4  BY MR. LAVIN:
5  Q.  For purposes of this deposition, if I say "member,"
6      that will be the Cigna plan member; do you understand
7      what I mean by that?
8  A.  Yes.
9  Q.  Okay.  I believe Cigna calls them "customers," but
10     MultiPlan also has customers, so it might be
11     confusing.
12         MR. KING:  MultiPlan does not have
13     customers.  We have clients, but not customers.  We
14     don't have members.
15         MR. LAVIN:  Okay.  I don't remember what
16     the question was.  Madam Reporter, can you please read
17     the question.
18         (The following record was read by the
19         reporter at 11:49 a.m.
20         "Have you ever seen a PAD letter for a
21         Cigna claim instructing the Cigna customer
22         to call Cigna instead of Viant?")
23         MS. INCLEDON:  Same objections.
24 A.  Yes, I have.
25 BY MR. LAVIN:

9 (Pages 30 - 33)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

---

Page 34

1 Q. How recently have you seen that?

2 A. I -- I don't know the date of the timing on that, to

3    be honest.

4 Q. Did you see one in preparation for today's deposition?

5 A. I did. It was one of the -- one of the legacy

6    versions, but I saw it, yes.

7 Q. When you say "legacy version," what are you referring

8    to?

9 A. It was -- it was an older, dated version.

10 Q. Do you know what Cigna claims platform that was a PAD

11    letter for?

12         MR. KING: Object to foundation.

13 A. I do not.

14 BY MR. LAVIN:

15 Q. Do you ever yourself personally have any

16    communications with Cigna?

17 A. I do. It's rare.

18 Q. Do you remember what the last communications you had

19    with Cigna directly were?

20 A. Yes. In November, a new individual within the Cigna

21    team had joined and we met with him in November just

22    to give kind of a general orientation of MultiPlan and

23    our services.

24 Q. And what was the name of that individual?

25 A. Zig, Z-I-G, and I don't know how to pronounce his last

---

Page 35

1    name or say his last name.

2 Q. And he's a Cigna employee?

3 A. Correct.

4 Q. And he was going to be working with Kevin Williams or

5    Monica Armstrong, other MultiPlan Cigna reps?

6 A. Correct. They coordinated the meeting.

7 Q. Have you ever met with Terri Cothron of Cigna?

8 A. I have.

9 Q. Do you know when the last time you met with Terri

10    Cothron was?

11 A. I would say at the end of 2021. She -- she and I were

12    in a similar meeting -- or in the same meeting.

13 Q. What did that meeting concern?

14 A. The No Surprises Act.

15 Q. Prior to that, did you ever have any meetings with

16    her?

17 A. The only others that I can recall is just an audit

18    process that we have with Cigna where they come in and

19    audit the work that MultiPlan performs.

20 Q. How often does Cigna perform that kind of audit as

21    MultiPlan's work?

22         MS. INCLEDON: Object to the form and

23    object, lack of foundation.

24 A. It's usually annually.

25 BY MR. LAVIN:

---

Page 36

1 Q. Is it the same time of year every year?

2 A. It is.

3         MS. INCLEDON: Same objection.

4 BY MR. LAVIN:

5 Q. What month is that?

6 A. It's usually in the fall.

7 Q. And does Cigna come on site to Naperville for that

8    audit?

9 A. It can be at various locations.

10 Q. Various MultiPlan locations?

11 A. Correct.

12 Q. Was there an audit this year in 2022?

13 A. There was. I did not attend.

14 Q. Is it a multi-day affair?

15 A. I believe it was scheduled for multiple days, yes.

16 Q. And where did that take place?

17 A. In Texas.

18 Q. Do you know who from Cigna attended that audit?

19         MS. INCLEDON: Object to the form. Object;

20    lack of foundation.

21 A. I don't know everyone who attended, no.

22 BY MR. LAVIN:

23 Q. What sort of things happened at the audit? What is

24    being audited?

25         MR. KING: Objection; outside the scope of

---

Page 37

1    the deposition.

2         MS. INCLEDON: And lack of foundation.

3 A. It -- it's just a random sampling of the claims to

4    show MultiPlan's processes and where they aligned with

5    what Cigna was expecting.

6 BY MR. LAVIN:

7 Q. When was the last time you attended one of those

8    audits?

9         MR. KING: Same objection.

10 A. Pre-2018 would be my guess.

11 BY MR. LAVIN:

12 Q. For this year's audit -- for this year's audit, did

13    you have to prepare anything?

14 A. I did not.

15 Q. Do you know if it's also an audit of IPR/OPR services?

16         MR. KING: Same objection.

17 A. Yes, it is.

18 BY MR. LAVIN:

19 Q. So I'm just trying to get an idea of what happens at

20    the audit, if you know. How would Cigna, at the

21    audit, review IPR/OPR services from Viant?

22         MR. KING: Objection.

23         MS. INCLEDON: Objection.

24         MR. KING: Foundation.

25 A. As I mentioned, there's a random sampling of claims.

---

10 (Pages 34 - 37)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 38

1    A Viant, or whatever entity, employee of our
2    organization would review that random sampling to
3    prepare and then participate with Cigna to review what
4    was done on that particular claim.
5 BY MR. LAVIN:
6 Q.   Who chooses the random sample, MultiPlan or Cigna?
7         MR. KING:  Same objection.
8 A.   Cigna.
9 BY MR. LAVIN:
10 Q.  Okay.  So on Topic -- going back to Topic 23, besides
11    PAD letters, is there anything else that you reviewed
12    to prepare for that topic?
13 A.  No, just the PAD letters.
14 Q.  All right.  Topic 25, which is "Communications between
15    MultiPlan and healthcare providers that provided
16    services to Cigna's members as to out-of-network
17    savings, discounts, discount amounts, and discount
18    type related to MultiPlan's Viant OPR or
19    similarly-termed programs from January 1st, 2015, to
20    the present."
21         What did you do to prepare for that topic
22    today?
23 A.  Outside of reviewing the policies and procedures I
24    previously mentioned, there was no additional review
25    for this topic.

Page 39

1 Q.  And then the last one, 27, "The organizational
2    structure of MultiPlan's departments that are involved
3    with or relate to Viant OPR or other similarly-termed
4    programs from January 1st, 2015, to the present," did
5    you need to review anything for that topic?
6 A.  I didn't.
7 Q.  Does Karen Beckstead work for you?
8 A.  No, she does not.
9 Q.  Who does she work for?
10 A.  She works within Sean Crandall's organization.
11 Q.  Healthcare Economics?
12 A.  Correct.
13 Q.  Did you talk to Karen Beckstead before today's
14    deposition to prepare for today's deposition?
15         MR. KING:  Objection; asked and answered.
16 A.  I did not.
17 BY MR. LAVIN:
18 Q.  What about JR Moss?
19         MR. KING:  Objection.
20 A.  No, I did not.
21 BY MR. LAVIN:
22 Q.  How does JR Moss's role as director differ from your
23    role?
24 A.  JR would kind of oversee the management team and the
25    day-to-day operations of the negotiation side, so the

Page 40

1    claim resolutions specialists.
2 Q.  And claims resolution specialists, that's the term for
3    people on the negotiations team?
4 A.  Correct.
5 Q.  I thought that was a team that was also under your
6    authority at Viant?
7 A.  They are.  They are indirect reports.
8 Q.  Okay.  But they work day-to-day more with JR Moss than
9    yourself, correct?
10 A.  Correct.  With Reeder Bramwell first, and then it
11    would be JR, and then it would be myself.
12 Q.  Okay.  Where is JR Moss located?  Is he in Naperville
13    also?
14 A.  He's not.  He's in Utah.
15 Q.  How many years have you worked with JR Moss?
16 A.  In this capacity, since 2019, but I have known JR
17    from, we both worked at Viant historically before our
18    acquisition.
19 Q.  What about Mike Schill, what does he do?
20 A.  Mike also works in the Healthcare Economics team under
21    Sean Crandall.
22         MR. LAVIN:  Let's go to Tab 5, Nicole.
23         MS. INCLEDON:  That will be Exhibit 2.
24         MARKED FOR IDENTIFICATION:
25         DEPOSITION EXHIBIT 2

Page 41

1         MultiPlan Inc.'s Answer to Plaintiff's
2         First Amended Class Action Complaint;
3         Demand For Jury Trial
4         10:59 a.m. CST
5         MR. LAVIN:  Yes.  I'm going to call out tab
6    numbers, that's because we have stacks of documents.
7    If you hear me skipping a bunch of tabs, that's a good
8    sign.  So the tabs will not always line up with the
9    exhibit numbers, right, but when an exhibit comes up,
10    I will read it into the record, what it is.
11         So Exhibit 2 is MultiPlan's Answer to
12    Plaintiff's First Amended Class Action Complaint,
13    Demand For Jury Trial.
14 BY MR. LAVIN:
15 Q.  Is this something you reviewed in preparation for
16    today?
17 A.  It is.
18 Q.  Okay.  Let's skip to -- one of the things you've been
19    designated on is this document as well as the
20    affirmative defenses in the back.  Do you know what an
21    affirmative defense is?
22 A.  I do.
23 Q.  What is an affirmative defense, if you know?
24 A.  It is the -- the response that's provided.
25 Q.  Okay.  Why don't we skip to page 42 of the document.

11 (Pages 38 - 41)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

---

Page 42

1    You can go through the whole thing obviously.  Any
2    document that I show you today, I will generally
3    direct you where I would like to go in it, but you
4    can, of course, take your time to look through
5    whatever you need to look through.
6  A.  Okay.  I'm on page 42.
7  Q.  Okay.  So let's scroll down -- I'm just going to
8    scroll down there through to the end.  And my question
9    to you is:  Are you prepared to offer any specific
10    testimony today on any of those affirmative defenses,
11    and if so, could you identify which ones?
12        MR. KING:  Note my objection.  It might --
13    it would be much easier, Matt, if you just asked her
14    about her affirmative defense.
15        MR. LAVIN:  If I -- well, I don't want to
16    go through every single one if she's not able to
17    testify.
18        So my question for her is if there's any of
19    these affirmative defenses that she's aware of that
20    she's here to specifically testify on today?
21  A.  I have reviewed these.  What question are you asking?
22  BY MR. LAVIN:
23  Q.  Yeah.  A lot of these are legal defenses, right?  You
24    may not, what I mean is that they are based upon, you
25    know, legal theories and the law and whatnot.  But are

---

Page 43

1    any of these affirmative defenses ones that you are
2    specifically prepared to give testimony on today?
3        MR. KING:  Objection; asked and answered.
4    She already said she's reviewed them all.
5  A.  I've reviewed them.
6  BY MR. LAVIN:
7  Q.  I mean, we can go to -- I'll just pick some, if
8    you want.  We can go to 44, page 44.
9        MR. KING:  Do you mean page 44?
10        MR. LAVIN:  Yes.
11  BY MR. LAVIN:
12  Q.  We can go to the seventh affirmative defense which
13    says, "No Fiduciary Duty."  Do you see that?
14  A.  Hang on.  I had gone back up to page 1 for some reason
15    here.  Okay.  Page 44 and which -- which one?
16  Q.  The seventh affirmative defense, the fiduciary duty
17    one.
18  A.  I see that.
19  Q.  Is that one that you are prepared to testify about
20    facts to support that affirmative defense?
21        MR. KING:  I'm going to object saying it's
22    a legal affirmative defense.
23  A.  Again, I've reviewed these.  I am not a lawyer.  They
24    were not, you know, our legal team prepared these so I
25    can, I'm not exactly sure what it is that you are

---

Page 44

1    asking me to respond to.
2  BY MR. LAVIN:
3  Q.  Well, I'm asking you what facts that you're aware of
4    support that affirmative defense?
5        MR. KING:  Same objection.
6  A.  Our legal team prepared this -- this document.
7  BY MR. LAVIN:
8  Q.  Okay.  Is that going to be your answer for every
9    affirmative defense on here?
10        MR. KING:  Same objection.
11  A.  Yes, they did.
12  BY MR. LAVIN:
13  Q.  But what I'm asking is, is that going to be the same
14    answer for every affirmative defense all --
15  A.  I don't know what your specific question will be in
16    each one to give that answer.
17  BY MR. LAVIN:
18  Q.  So you've been identified --
19        MR. KING:  Let her finish her answer.
20  BY MR. LAVIN:
21  Q.  I'm sorry.  I didn't mean to cut you off.
22  A.  Sure.  But I'm not a lawyer.  I can speak to, you
23    know, operational questions that may be related, but I
24    would not speak to any of the legal response to this
25    document.

---

Page 45

1  Q.  Okay.  So if we go down to, I'm just trying to
2    establish whether or not you are prepared to give
3    fact-based testimony today or offer any facts to
4    support MultiPlan's affirmative defenses.
5        MR. KING:  She's already answered that.
6    She says she's reviewed every affirmative defense, and
7    if you ask her a question, then -- then we'll cross
8    that bridge.
9        MR. LAVIN:  Okay.
10  BY MR. LAVIN:
11  Q.  Let's go down -- let's go to the thirteenth
12    affirmative defense on page 45.  It says, "No
13    Exhaustion."  It says, "Plaintiffs' claims and the
14    claims of the putative class members are barred, in
15    whole or in part, to the extent they failed to exhaust
16    any applicable administrative and/or contractual
17    appeals processes before pursuing their -- their
18    claims through this litigation."
19        And are you in charge of the dispute and
20    appeals processes for Viant?
21        MR. KING:  Objection; vague, outside the
22    scope of the deposition, and foundation.
23  A.  Yes.  Disputes, inquiries, and appeals would fall
24    under my umbrella.
25  BY MR. LAVIN:

---

12 (Pages 42 - 45)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 46

1 Q.  All right.  Do you have any facts that you could offer
2     under MultiPlan today to support that affirmative
3     defense?
4          MR. KING:  This is a legal affirmative
5     defense, but you can answer.
6 BY MR. LAVIN:
7 Q.  Yeah.
8 A.  I am unsure of your question as to how I would answer
9     that.
10 Q.  Okay.  So, well, I would disagree with your counsel.
11     I believe that it's a fact-based inquiry, whether
12     there's exhaustion of appeals or not.  And it's okay
13     if you don't understand the question.  I'm not trying
14     to trap you.  I'm just trying to ask you if you are
15     here to testify today to any facts specifically
16     supporting any of these affirmative defenses?
17          MR. KING:  Objection --
18 BY MR. LAVIN:
19 Q.  I understand that they were prepared by counsel.  And
20     I was just trying to move things along, and that is
21     all.  I was tossing a softball to you.
22          MR. KING:  Same objection, but you can
23     answer.
24 A.  You asked me questions related to the operational
25     workflow and the areas that I was identified for in

Page 47

1     the Deposition Notice.  I am prepared to answer those.
2     I am unsure what question you are asking here and how
3     to answer that.
4 BY MR. LAVIN:
5 Q.  Okay.  Well, so one of the topics you are des -- you
6     are designated for is "MultiPlan's answers and
7     affirmative defenses asserted in response to
8     Plaintiffs' Operative Complaint."  And these are those
9     affirmative defenses.
10     So I'm asking if you are able to offer any
11     fact-based testimony supporting any of them.  And it
12     doesn't sound like you are.  And that's okay.  But I
13     just wanted to kind of move through that document if
14     you are not prepared to testify specifically about any
15     facts supporting any of the affirmative defenses.
16          MR. KING:  Same objections and
17     mischaracterizes the testimony.
18 A.  So same answer I gave.  I think if you are -- if you
19     have specific questions that I can ask -- or that I
20     can answer, I'm happy to do that.
21 BY MR. LAVIN:
22 Q.  Well, I'm asking a question about the thirteenth
23     affirmative defense and whether you are aware of any
24     facts that would support the defense that states that
25     the putative class members are barred because they

Page 48

1     failed to exhaust administrative and contractual
2     appeal processes for the claims at issue in this case.
3          MR. KING:  Same objections.
4 A.  That is our legal team's response.  I don't have more
5     detail to lend to that.
6 BY MR. LAVIN:
7 Q.  Okay.  That is fair.
8     You prepared a declaration in another case.
9     And the fact that you prepared the declaration is not
10     under seal, in the LD versus United case.  Do you
11     remember that?
12 A.  Vaguely.
13 Q.  It was just a couple of months ago, but...
14     Do you have any intention to prepare a
15     declaration supporting an opposition to a class
16     certification motion in this case?
17 A.  Any responses that I would give would be in response
18     to my legal team's request.
19 Q.  Have you been asked to prepare a declaration for this
20     case?
21 A.  I have not.
22 Q.  Have you performed an analysis of the putative class
23     claims list in this case?
24          MR. KING:  Outside the scope.
25 A.  No.

Page 49

1 BY MR. LAVIN:
2 Q.  Have you performed any sort of analysis of appeals or
3     inquiries -- inquiries related to the claims on the
4     putative -- putative class claims list in this case?
5 A.  I have not.
6 Q.  Have you reviewed at all or even seen the putative
7     class claims list in this case?
8          MR. KING:  Same objection.
9          MS. INCLEDON:  And objection form.
10 A.  I have not.
11 BY MR. LAVIN:
12 Q.  Do you have an idea of how many claims are on
13     MultiPlan's putative class claims list in this case?
14          MR. KING:  Outside the scope, objection;
15     outside the scope of the deposition.
16          MS. INCLEDON:  And objection to the extent
17     it calls for a legal conclusion.
18 A.  I do not.
19 BY MR. LAVIN:
20 Q.  Have you reviewed claims for the class representatives
21     in this case?
22          MR. KING:  Same objection; outside the
23     scope.
24 A.  I have not.
25 BY MR. LAVIN:

13 (Pages 46 - 49)

Case 5:20-cv-02255-EJD    Document 224-9    Filed 02/09/24    Page 15 of 61
AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 50

1 Q.  Do you know the difference between a class
2     representative and a putative class member; has your
3     counsel described that to you?
4         MR. KING:  Objection; outside the scope.
5 A.  Not something we discussed.
6 BY MR. LAVIN:
7 Q.  Okay.  Did you review any appeals related to Summit
8     Estate in preparation for your deposition today?
9 A.  I did not.
10 Q.  Do you know the identity of the individual identified
11    as "DS" in the Complaint in this action?
12 A.  I do not.
13 Q.  Do you know the true identity of the individual
14    identified as "SJ" in this case?
15 A.  I do not.
16 Q.  How about the individual identified in the Operative
17    Complaint as "RJ"?
18 A.  I do not.
19 Q.  Have you run any reports or anything related to either
20    RJ, SJ, or DS in preparation for today's deposition?
21        MR. KING:  The scope.
22 A.  I would not be able to do that if I didn't know the
23    names.
24        THE REPORTER:  Mr. King, did I miss an
25    objection?  I just heard kind of a blip.

Page 51

1         MR. KING:  Sorry about that.  I said,
2     "Objection; outside the scope."
3         THE REPORTER:  Oh, wow.  Okay.  All I heard
4     was "scope."  Thanks.
5         MR. LAVIN:  He's objecting in shorthand.
6         MR. KING:  I wish I was that talented,
7     Matt.
8 BY MR. LAVIN:
9 Q.  Do customer service representatives have any training
10    on interpreting plan language for Cigna?
11        MS. INCLEDON:  Objection; form.
12        MR. KING:  You can answer.
13 A.  We don't receive plan language nor interpret plan
14    language.
15 BY MR. LAVIN:
16 Q.  Have you ever had any training on interpreting plan
17    language or ERISA or anything like that?
18        MR. KING:  Objection; outside the scope.
19 A.  No.  No plan language details are part of our normal
20    course of business.
21 BY MR. LAVIN:
22 Q.  When you say "we," are you talking about Viant or
23    MultiPlan or both?
24 A.  Any area within my organization, plan benefit language
25    does not -- does not come into play.

Page 52

1 Q.  When Viant prices claims for Cigna; does it have to do
2     so in accordance with plan language?
3         MS. INCLEDON:  Objection -- sorry, early, I
4     cut you off, go ahead.
5         MR. KING:  Objection; outside the scope.
6         MS. INCLEDON:  And objection to the extent
7     it calls for a legal conclusion.
8 A.  Viant will reprice and it is the client's
9     responsibility to determine if it's within the plan
10    language.
11 BY MR. LAVIN:
12 Q.  And so the client in this case is Cigna, right?
13    Correct?
14 A.  Yes.
15 Q.  Okay.  If a Cigna customer service representative or
16    somebody in the negotiations department, a claims
17    specialist, wanted to look up plan language for a
18    Cigna member, is there any way that they would be able
19    to do so?
20        MR. KING:  Objection; asked and answered,
21    vague.
22        MS. INCLEDON:  Incomplete hypothetical.
23 A.  I want to verify your question because you said a
24    Cigna client service representative.  Are you
25    referring to Viant, a Viant employee.

Page 53

1 BY MR. LAVIN:
2 Q.  Right.  A Viant employee working on a Cigna claim?
3 A.  We do not receive nor review plan benefit language.
4 Q.  So your understanding is that Viant is instructed to
5     price claims based on the clients, or in this case,
6     Cigna's direction, not specifically on any plan
7     language, right?
8         MR. KING:  Objection; outside the scope.
9         MS. INCLEDON:  Objection; lack of
10    foundation and object to form and objection to the
11    extent it mischaracterizes the witness's prior
12    testimony.
13        MR. KING:  And asked and answered already.
14 A.  Sorry, can you repeat that question?
15 BY MR. LAVIN:
16 Q.  Yeah.  As far as you know, I'm going to rephrase it.
17    As far as you know, when Viant prices a claim for
18    Cigna, it has to comply with the client's directions,
19    in this case, Cigna's directions, and isn't
20    necessarily going off any plan language, right?
21        MR. KING:  Same objections.
22 A.  It is the client's responsibility, Cigna's
23    responsibility for plan language adherence, not
24    Viant's.
25 BY MR. LAVIN:

14 (Pages 50 - 53)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

---

Page 54

1  Q.  Do you know if, well, strike that.  Do you know if
2      Viant has an obligation to price claims in accordance
3      with plan language?
4          MR. KING:  Calls for a legal conclusion,
5      outside the scope, foundation.
6  A.  Within our implementation, we are -- we are guiding a
7      client that the Viant service is in compliance with
8      plan benefit language.
9  BY MR. LAVIN:
10 Q.  Is it -- can you explain that answer because I didn't
11     really understand it.
12 A.  We -- the -- the client has the responsibility to
13     adhere to plan benefit language.
14 Q.  So the client has the responsibility, not Viant?
15 A.  Yeah.
16 Q.  So you have no way of knowing one way or the another
17     at Viant whether a particular pricing of a claim
18     adheres to plan language or not, is that correct?
19         MR. KING:  Objection, it's outside the
20     scope, asked and answered probably four or five times
21     now.
22 A.  We did not receive plan benefit language on a claim.
23 BY MR. LAVIN:
24 Q.  Well, that wasn't my question.
25         My question was:  So Viant has no way of

---

Page 55

1      knowing whether pricing on a claim adheres to plan
2      language or not, isn't that correct?
3          MR. KING:  Same objections and speculation,
4      asked and answered, outside the scope.
5  A.  We do not have plan benefit language, no.
6  BY MR. LAVIN:
7  Q.  So you don't know whether pricing adheres to plan
8      benefit language, right?
9          MR. KING:  Objection; calls for a legal
10     conclusion as well.
11         MS. INCLEDON:  Objection; incomplete
12     hypothetical, lack of foundation.
13 A.  It is the client's responsibility.  It would be
14     Cigna's responsibility in that instance.
15 BY MR. LAVIN:
16 Q.  Right.  Because Viant doesn't know one way the
17     another, right?
18         MS. INCLEDON:  Objection; asked and
19     answered.  Incomplete hypothetical, lack of
20     foundation.
21 A.  Yes, we are not receiving plan benefit information on
22     the claim that we are receiving.
23 BY MR. LAVIN:
24 Q.  Okay.  So my question is:  So you don't know whether
25     the pricing complies with plan language or not because

---

Page 56

1      that's Cigna's problem, correct?
2          MR. KING:  Matt, the witness has not been
3      designated to discuss plan language of Cigna.  So this
4      is well outside the scope of the topics she's been
5      designated for.  I am not going to instruct her not to
6      answer, but what I am going to do at the end of this
7      deposition is count up the objections of "outside the
8      scope" and consider whether to bring the issue to the
9      Magistrate that you are, in fact, taking a fact
10     deposition at this time which would exceed the number
11     of depositions that the Magistrate has allowed
12     plaintiffs in the case, and thus, possibly be in
13     violation of the Magistrate's order.
14         So I just want to put that out there
15     because I'm not going to sit here all day and object
16     "outside the scope" without it having some sort of
17     ramification.
18         MR. LAVIN:  That's a wonderful speech,
19     Errol, I really appreciated that.  And I'm glad you
20     got it on the record.
21         Unfortunately, your objections don't mean
22     anything.  Your objections are just your objections.
23     They haven't been ruled on.  It's certainly not
24     outside the scope.  She is head of operations for
25     Viant and I'm asking a question about Viant

---

Page 57

1      operations, namely, what MultiPlan's position is on
2      that for Viant operations; namely, whether Viant has
3      any opinion whatever on whether, when they price
4      claims, it has to adhere to plan language or not.
5          So I completely disagree.  You can do all
6      the counting of objections you want, you can object
7      all you want, right?  But I don't like coaching of the
8      witnesses.  I don't like eating up time on the record
9      with long speeches about what you are going to do with
10     the Magistrate, and -- all right?
11         And let's just keep going forward because
12     we completely disagree with your characterization as
13     "outside the scope."  Saying "outside the scope" isn't
14     some magic bullet that somehow resolves the matter
15     when a question's been asked, all right?
16         MR. KING:  All right.  I was not trying to
17     coach the witness.  I was trying to coach you, Matt,
18     on how to take a corporate deposition.
19         MR. LAVIN:  And I'm asking this witness
20     questions.  And if she gives me an answer, we can move
21     on.
22         MR. KING:  She has.  She's asked -- she's
23     answered the question.
24         MR. LAVIN:  Her answer over and over again
25     is "we don't have any plan language," right?  And

---

15 (Pages 54 - 57)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 58

1    that's not answering my question.
2            MR. KING:  Matt, that's her answer and
3    she's going to give her answer.
4    BY MR. LAVIN:
5    Q.  Okay.  When Viant prices a claim, does it believe that
6    that claim pricing has to comply with plan language or
7    not.
8            MR. KING:  Objection; asked and answered,
9    foundation, outside the scope, calls for speculation.
10   You can answer.
11           MS. INCLEDON:  Incomplete hypothetical as
12   well.
13   A.  When we are receiving a claim for the product based on
14   Cigna's recommendation, we're returning the
15   recommendation back to Cigna and then Cigna is
16   determining their -- their payment based on their plan
17   language.
18   BY MR. LAVIN:
19   Q.  And that is MultiPlan's understanding of the process?
20   A.  Yes.
21   Q.  Is there anybody at MultiPlan that is qualified, in
22   your opinion, to review plan language for Cigna?
23           MS. INCLEDON:  Outside the scope --
24           MR. KING:  -- of the deposition, calls for
25   speculation, lack of foundation.

Page 59

1    A.  I would say no, plan language is typically a
2    confidential -- plan language is typically
3    confidential.  There would not be a need for MultiPlan
4    to receive and review that.
5    BY MR. LAVIN:
6    Q.  What do you mean by "confidential"?  How is plan
7    language confidential?
8            MS. INCLEDON:  Object to the form, object
9    to the extent it mischaracterizes the witness' prior
10   testimony.
11   A.  Plan language is not something that is freely shared
12   to an entity that doesn't need or require that
13   information.
14   BY MR. LAVIN:
15   Q.  So I'm trying to understand your testimony.
16          Is your testimony that MultiPlan feels that
17   it's not entitled to view plan language for Cigna
18   members?
19          MR. KING:  Objection; mischaracterizes her
20   testimony, outside the scope.
21   A.  You asked the question if anyone -- if I felt that
22   anyone within MultiPlan was trained to review the plan
23   language.  And the answer is --
24   BY MR. LAVIN:
25   Q.  Correct.

Page 60

1    A.  -- no.
2    Q.  Okay.  Do you know if MultiPlan is ever consulted by
3    its client such as Cigna on plan language?
4            MR. KING:  Same objections, outside the
5    scope.
6    BY MR. LAVIN:
7    Q.  What's the answer?
8    A.  No, I don't know.
9    Q.  Does MultiPlan have any opinion on whether Viant
10   pricing and Viant operations comply with Cigna's plan
11   language for claims priced for Cigna by Viant?
12           MR. KING:  Objection; outside the scope.
13   The witness is not speaking to this question as the
14   designated -- designated witness of MultiPlan.  She's
15   speaking in a factual capacity.
16           MS. INCLEDON:  Also object to the form and
17   lack of foundation.
18           MR. KING:  You can answer.
19   A.  And can you rephrase that, Matt, I wasn't sure of your
20   question.
21           MR. LAVIN:  Sure.  Can you read the
22   question, Lori?
23           (The following record was read by the
24   reporter at 12:25 p.m.
25           "Does MultiPlan have any opinion on whether

Page 61

1            Viant pricing and Viant operations comply
2            with Cigna's plan language for claims
3            priced for Cigna by Viant?")
4            MR. KING:  Same objections.
5    A.  I'm sorry, it's such a long question that I'm trying
6    to -- to understand the -- can you state that one more
7    time?
8            (The following record was read by the
9            reporter at 12:25 p.m.
10           "Does MultiPlan have any opinion on whether
11           Viant pricing and Viant operations comply
12           with Cigna's plan language for claims
13           priced for Cigna by Viant?")
14           MR. KING:  Same objections.
15           MS. INCLEDON:  And objection to the extent
16   it calls for a legal conclusion.
17   A.  The -- I just don't know how to answer that question,
18   to be honest.  I'm struggling with the question.
19   BY MR. LAVIN:
20   Q.  Sure.  Does MultiPlan have any opinion on whether
21   Viant pricing complies with Cigna plan language?
22           MR. KING:  Same objection.
23           MS. INCLEDON:  Objection to the extent it
24   calls for a legal conclusion.
25   A.  No.  It -- no.

16 (Pages 58 - 61)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 62

1  BY MR. LAVIN:
2  Q.  Are the Viant claims specialists, do they operate
3      under any sort of quota as far as savings retention?
4          MR. KING:  Objection; vague.
5  A.  One of the metrics is related to savings retention.
6  BY MR. LAVIN:
7  Q.  Can you describe that a little bit?
8  A.  They have a variety of metrics that they are measured
9      on and one of them is retaining savings.
10 Q.  So each of them individually is, is evaluated based on
11     the savings that they are able to retain?
12 A.  That is a -- one of their metrics.
13 Q.  Is there a -- a bottom, like, it can never be below
14     this percentage?
15         MS. INCLEDON:  Object to the form; object
16     to lack of foundation.
17 A.  They are given a range in which the -- the measurement
18     is applied to.
19 BY MR. LAVIN:
20 Q.  And what is that range?
21 A.  I don't know that range off the top of my head.
22 Q.  Who would know that range?
23 A.  I can access that.  I just don't have it here.
24 Q.  Can you access it at a break today?
25         MR. KING:  Request is noted.

Page 63

1          MR. LAVIN:  Thanks.
2  BY MR. LAVIN:
3  Q.  Are Viant operations personnel operating under any
4      sort of quota for daily savings?
5  A.  They do not.
6  Q.  Do you know if they ever operate under a quota for
7      daily savings?
8  A.  Not that I'm aware of.
9  Q.  Do you, do Viant's customer service representatives
10     have any sort of quota for retained savings that they
11     operate under?
12 A.  They do not.
13 Q.  So we talked about the claims specialists and appeals
14     for Viant.  Are there other call center-type employees
15     at Viant?
16 A.  No.
17 Q.  And the, I'm going to guess that the customer service,
18     or excuse me, claims specialists and appeals people
19     kind of work all over the country, right?
20 A.  Yeah, similar to my answer before, we are nationally
21     now since the pandemic.
22 Q.  Okay.  I think I asked about the customer service
23     people, but has anybody, to your knowledge, started on
24     the -- as a claims specialist since 2019, anybody new
25     to the team?

Page 64

1  A.  There is not.
2  Q.  How many claims specialist are there all together?
3  A.  Within Viant, there's, I believe, five.
4  Q.  Do you have group trainings for the claims
5      specialists?
6  A.  Every employee within my organization would have
7      training that occurs.
8  Q.  Does -- does it occur on a regular basis?
9  A.  It does.
10 Q.  How often does it occur?
11 A.  Really depends on the need for updated training,
12     whether the, you know, a technical enhancement, a new
13     change to an application, change to policy and
14     procedure, so it's really as needed.
15 Q.  Do you remember when the last training was?
16 A.  I wouldn't know that.  My teams would oversee that, so
17     I don't...
18 Q.  I'm sorry?
19 A.  I -- I can say that I know we had a system-related
20     release last month so that would -- that would be an
21     example of something that resulted in a training to
22     the staff.
23 Q.  Who arranges or sets up the training for the staff?
24 A.  It would -- it would generally be the -- a member of
25     the management team.

Page 65

1  Q.  So -- aren't you on the management team?
2  A.  I am on the management team.
3  Q.  When is the last time you set up a training for the
4      claims specialists?
5  A.  I don't generally set up training sessions.
6  Q.  Who would for the claims specialists?
7  A.  Usually, it would be Reeder, if not Reeder, JR.
8  Q.  Do you record phone conversations with the claims
9      specialists?
10 A.  We -- we do -- for quality training purposes.
11 Q.  Do you record all phone calls?
12 A.  We do.
13 Q.  How long do you keep those for?
14 A.  I believe six months.
15 Q.  Do you know who is in charge of maintaining those
16     records?
17         MR. KING:  Objection; outside the scope.
18 A.  It's in our technical area.  I don't know the name.
19 Q.  Are you sure they are kept for six months or are you
20     just guessing they are kept for six months?
21         MR. KING:  Objection; argumentative,
22     foundation.
23 A.  I would need to look back to verify that.
24 BY MR. LAVIN:
25 Q.  Is it possible they are kept forever?

17 (Pages 62 - 65)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 66

1  A.  It is not possible they are kept forever, they are --
2      they are limited.
3  Q.  Why are you sure of that?
4  A.  Because we imposed a limitation for space and server
5      requirement purposes, so I -- I know that
6      definitively.  And the quality that -- the quality
7      analysis that is conducted is done in a short period
8      of time so there is not a need to reference those for
9      long term.
10 Q.  Is it safe to say that the claims specialists are all
11     long-term employees of Viant?
12         MR. KING:  Objection; outside the scope.
13     You can answer.
14 A.  It would be at least three years or longer since
15     they've not been hired since 2019.
16 BY MR. LAVIN:
17 Q.  What is the longest tenured one that you are aware of?
18 A.  I would -- I don't know that off the top of my head.
19 BY MR. LAVIN:
20 Q.  Are there any people in the claims -- either in
21     appeals as a claims specialist or customer service
22     representative who have been with Viant as long as you
23     have?
24         MR. KING:  Same objection.
25

Page 67

1  A.  I don't know that, Matt.  Again, I don't have the
2      detail.  Again, I have 550 employees.  I don't know
3      all their tenure.
4  BY MR. LAVIN:
5  Q.  How many employees does MultiPlan have?
6          MR. KING:  Objection; outside the scope.
7  A.  Over 2,000.
8  BY MR. LAVIN:
9  Q.  Are people who work on DataiSight, are they considered
10     employees of DataiSight?
11         MR. KING:  Objection; outside the scope.
12     Where is that in the topics she's been designated for,
13     Matt?  DataiSight is not even involved in this case.
14 BY MR. LAVIN:
15 Q.  Do you know?
16         MR. KING:  Same objection.  You can answer.
17 A.  They are employees of NCN.
18 BY MR. LAVIN:
19 Q.  Do you know how many NCN employees there are?
20         MR. KING:  Same objections.
21 A.  I would have to look.  I don't know that off the top
22     of my head.
23 BY MR. LAVIN:
24 Q.  So I'm curious, if MultiPlan has 2,000 employees, 550
25     are Viant employees --

Page 68

1  A.  I said over 2,000.
2  Q.  Over 2,000.  I'm just trying to see how that's kind of
3      broken up, you know, a quarter of all MultiPlan
4      employees are Viant employees, is that right?
5          MR. KING:  Same objections.
6  A.  No, that's not correct.
7  BY MR. LAVIN:
8  Q.  Okay.  About what percentage do you think?
9  A.  I don't know because I don't know the number of total
10     MultiPlan employees to give you that count.
11 Q.  All right.  Well, I mean, like, you seem to dismiss
12     that out of hand.  I was just going off you said there
13     was 550 Viant employees?
14 A.  No, I said I had 550 employees in my organization.
15 Q.  When you refer to your organization, what are you
16     referring to?
17         MR. KING:  Same objections.
18 A.  All of the employees under my leadership, which would
19     include Viant, but not inclusive of only Viant.
20 BY MR. LAVIN:
21 Q.  Okay.  Would it include NCN also?
22         MR. KING:  Same objections.
23 A.  Correct.
24 BY MR. LAVIN:
25 Q.  Any other subsidiaries?

Page 69

1          MR. KING:  Same objections.
2  A.  I have MultiPlan negotiation services and I also have
3      clinical negotiations under the MARS umbrella.
4  BY MR. LAVIN:
5  Q.  Can you tell me about the MultiPlan negotiation
6      services and what are those?
7  A.  It's a team of individuals that supports and/or
8      negotiates out-of-network claims.
9  Q.  How does that differ from the Viant claims
10     specialists?
11 A.  The Viant claims specialists work on a
12     post-adjudication or post-payment basis when an
13     inquiry or appeal is received.
14 Q.  And the negotiation specialists work on a prepayment
15     basis?
16         MR. KING:  Objection; outside the scope.
17 A.  In the negotiation services team, yes, most employees
18     are working on a pre -- prepayment basis.
19 BY MR. LAVIN:
20 Q.  Is that sometimes referred to as FNX?
21 A.  FNX is the application.
22 Q.  Application of?
23 A.  Negotiation services.
24 Q.  Okay.  And MARS, M-A-R-S, is that claims editing?
25     What is that?

18 (Pages 66 - 69)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

---

Page 70

1         THE REPORTER: I didn't hear that.
2  A.  Medical Audit and Review Solutions.  It is another
3     organization under the MultiPlan umbrella.
4         THE REPORTER: I didn't hear that
5     objection, Mr. King.
6         MR. KING: Objection to --
7         THE REPORTER: I can't hear you.  Say it
8     again.
9         MR. KING: I haven't moved at all.  I don't
10    know why you can't hear me all of a sudden.
11        MR. LAVIN: It is.  You're very faint --
12        THE REPORTER: Yeah.
13        MR. LAVIN: -- when you're doing that.
14    It's hard to hear you.
15        MR. KING: Outside the scope.
16        THE REPORTER: Thank you.
17        THE WITNESS: When we come to an
18    appropriate time.  I would love a five-minute break.
19        MR. LAVIN: Now's probably a good time
20    because we're going to switch gears, so let's go off
21    the record for a minute.
22        THE VIDEOGRAPHER: Off the record, 11:38.
23        (Off the record at 11:38 a.m.)
24        (Back on the record at 11:48 a.m.)
25        THE VIDEOGRAPHER: On the record, 11:48.

Page 71

1  BY MR. LAVIN:
2  Q.  Before we get started looking at some documents, I
3     wanted to ask you about some names that have come up
4     and not names that I'm familiar with, so...
5         Have you ever heard of a Greg Tackett?
6         MR. KING: Objection; outside the scope.
7  A.  Yes.
8  BY MR. LAVIN:
9  Q.  Who is Greg Tackett?
10        MR. KING: Same objection.
11 A.  He was a prior individual within our sales
12    organization.
13 BY MR. LAVIN:
14 Q.  Okay.  Have you ever heard of Kijuana Young?
15        MR. KING: Same objection.
16 A.  I believe that may have been a prior negotiator, but I
17    don't know that definitively.  The name sounds
18    familiar.
19 BY MR. LAVIN:
20 Q.  For Viant?
21        MR. KING: Same objection.
22 A.  I don't believe so.
23 BY MR. LAVIN:
24 Q.  Are any of those people employed by MultiPlan today?
25        MR. KING: Same objection.

Page 72

1  A.  Greg is not.  I don't know the second name.
2  BY MR. LAVIN:
3  Q.  Okay.  Kiwana Young is the second one.
4  A.  Yeah, I --
5         MR. KING: Same okay.
6  A.  I don't -- I don't know.
7  BY MR. LAVIN:
8  Q.  Okay.  And when did Greg leave MultiPlan?
9         MR. KING: Same objection.
10 A.  I don't know.
11 BY MR. LAVIN:
12 Q.  Did he work for Viant?
13        MR. KING: Same objection.
14 A.  He -- yes.
15 BY MR. LAVIN:
16 Q.  And what did he do for Viant?
17        MR. KING: Same objection.
18 A.  I believe also in sales, but I don't recall.
19 BY MR. LAVIN:
20 Q.  Did he work for you?
21        MR. KING: Outside the scope, same
22    objection.
23 A.  He did not.
24 BY MR. LAVIN:
25 Q.  When you say "sales," what -- what are you referring

Page 73

1     to?
2  A.  Within the sales and account management team.
3  Q.  So meaning selling Viant services to payors, right?
4         MR. KING: Objection.
5  A.  Yes.
6  BY MR. LAVIN:
7  Q.  Does Cigna have any claims -- strike that.
8         Does Cigna have any appeals parameters for
9     Viant claims?
10        MS. INCLEDON: Object to the form and
11    objection; lack of foundation.
12 A.  I -- I did not review Cigna's specific appeal
13    parameters.
14 BY MR. LAVIN:
15 Q.  Do you know if they have any specific appeal
16    parameters in your experience?
17        MS. INCLEDON: Objection; form and
18    objection; lack of foundation.
19 A.  Sorry.  I didn't, I just didn't review that specific
20    detail.
21 BY MR. LAVIN:
22 Q.  But are you aware of any?
23        MS. INCLEDON: Same objection.
24 A.  I don't know.  I -- I would have to look at the
25    documentation to look at that.

19 (Pages 70 - 73)

AEO 30(b)(6) Kathy Praxmarer                                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 74

1 BY MR. LAVIN:
2 Q. How would you look that up?
3 A. Within the system, I would be able to see -- see that.
4 Q. What system would you look at?
5 A. Toolbox.
6 Q. Toolbox would list the appeal parameters per claim or
7    would they list them kind of generally for Cigna?
8 A. I don't -- I don't individually work in that, so I
9    would -- I would need to have one of my employees pull
10   that for me.
11 Q. Do Viant customers typically set appeal parameters for
12    claims?
13        MR. KING: Objection; outside the scope.
14 A. Yes. Viant customers can set appeal parameters.
15 BY MR. LAVIN:
16 Q. Are you aware of any customers that haven't set any
17    appeal parameters?
18        MR. KING: Same objection.
19 A. No, not within Viant.
20 BY MR. LAVIN:
21 Q. So it's safe to say Cigna has appeal parameters,
22    correct?
23        MS. INCLEDON: Objection; asked and
24    answered, lack of foundation.
25 A. I did not review that. I don't have that in front of

Page 75

1    me. I don't know what that is.
2 BY MR. LAVIN:
3 Q. Right. But you said you can't think of any that don't
4    have appeal parameters, that would mean that Cigna
5    does have appeal parameters, you just don't know what
6    they are specifically, right?
7        MR. KING: Same objection.
8 A. I don't know them. I'm sorry. I just didn't --
9    didn't look at that level of detail.
10 BY MR. LAVIN:
11 Q. But they exist, you just don't know what they are,
12    right?
13        MR. KING: Same objections.
14 A. I don't know what exists.
15 BY MR. LAVIN:
16 Q. Okay. Are you ever called to weigh in on appeals of
17    specific claims?
18 A. Very rarely.
19        MR. KING: Are you talking about my client
20    or are you talking about claims in general?
21        MR. LAVIN: In general.
22        MR. KING: Objection; outside the scope.
23    You can answer.
24 A. Very rarely.
25 BY MR. LAVIN:

Page 76

1 Q. Were you ever called to weigh in on any of the claims
2    that are at issue in this lawsuit?
3 A. I was not.
4 Q. Have you ever been called to weigh in on H0015 claims?
5        MR. KING: Objection; scope, outside the
6    scope. You can answer.
7 A. No.
8 BY MR. LAVIN:
9 Q. Do you know what H0015 is a code for?
10 A. No.
11 Q. And you've never heard of H0015 before today?
12 A. I have related to this, but I -- I don't know all of
13    the codes. I would have to Google them, like, it's
14    just not normal course of business for me.
15 Q. Is it -- do you have an understanding whether this
16    case is about any other codes other than H0015?
17        MR. KING: Objection --
18 A. I don't.
19 BY MR. LAVIN:
20 Q. Do you know if this case concerns code H0015?
21        MR. KING: Same objection.
22 A. Yes.
23        THE REPORTER: Mr. King, I apologize, and I
24    don't know if anybody else can back me up on this,
25    it's really hard to hear you. I'm hearing

Page 77

1    "objection," but I'm not even hearing you enough to
2    ask what your objection is. That's all I hear, is the
3    word "objection." So --
4        THE WITNESS: Okay. Let -- let me check my
5    volume. I don't know what's happened.
6        Okay. I have the volume all the way up at
7    a hundred percent.
8        THE REPORTER: Okay.
9        THE WITNESS: So I will move it closer and
10    let us know if that is not --
11        THE REPORTER: You bet. Thank you. And
12    I'm sorry to be a pain, I just don't want to do you a
13    disservice on the record.
14 BY MR. LAVIN:
15 Q. All right. So if -- if I'm understanding your
16    testimony, you didn't do anything for today to review
17    Cigna's claims parameters if they indeed exist, right?
18        MR. KING: Same objection; outside the
19    scope.
20 A. Right. I did not review anything specific to
21    parameters, no.
22 BY MR. LAVIN:
23 Q. Did you review anything specific to Cigna to prepare
24    for today?
25 A. I reviewed the policies and procedures that are within

20 (Pages 74 - 77)

AEO 30(b)(6) Kathy Praxmarer                        December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 78

1    Viant.
2 Q.  Are there policies and procedures that are particular
3     to Cigna?
4          MR. KING:  Objection; it's been asked and
5     answered.
6 A.  No, I reviewed Viant's policies or procedures.
7 BY MR. LAVIN:
8 Q.  Okay.  Did you review anything specific to Viant
9     pricing for H0015 in preparation for today?
10          MR. KING:  Objection; outside the topics
11     she's been designated for.
12 A.  I did not.
13 BY MR. LAVIN:
14 Q.  Do you know how Viant prices 80015 claims?
15          MR. KING:  Objection; outside the scope.
16 A.  No.
17 BY MR. LAVIN:
18 Q.  Do you know if Cigna will negotiate -- or strike that.
19          Do you know if Viant will negotiate with
20     providers who have not balance billed Cigna members?
21          MS. INCLEDON:  Object to the form;
22     objection, lack of foundation.
23 A.  If a provider is indicating an inquiry, with an
24     indication of likely balanced bill, we will discuss if
25     the claim allows for negotiation.

Page 79

1 BY MR. LAVIN:
2 Q.  And how would you determine whether the claim allows
3     for negotiation or not?
4 A.  That would be something that would be in the system.
5 Q.  Can you be more specific and describe for me what that
6     would look like, how would you look that up?
7 A.  The individuals would see that within the Toolbox
8     application to determine what the parameters are.
9 Q.  Would there be some kind of field that's filled out in
10     a dashboard on Toolbox?  I've never seen Toolbox, so I
11     don't know how that looks.  Can you describe it for
12     me?
13 A.  I don't work in Toolbox either so I can't give you
14     the -- the precise details on that, but on a claim
15     level, they can pull the claim that's being questioned
16     and then they can see the appeal parameters.
17 Q.  Who has access to Toolbox?
18          MR. KING:  Objection; outside the scope.
19 A.  It would be the individuals performing the -- the
20     negotiation or those that are answering the customer
21     service questions.
22 BY MR. LAVIN:
23 Q.  Is there anybody else at Viant who has access to
24     Toolbox?
25 A.  I wouldn't know that.

Page 80

1          MR. KING:  Same objection.
2          THE REPORTER:  I didn't hear that.
3          MR. KING:  Same objection.
4          THE REPORTER:  Thank you.
5 A.  I would say everyone within that Viant organization
6     that I referenced would have access to Toolbox.
7 BY MR. LAVIN:
8 Q.  Okay.  So what is the policy and procedure applicable
9     on a Cigna claim for H0015 if a provider calls up to
10     appeal it and says they are going to balance bill the
11     member?
12          MR. KING:  Objection; outside the scope.
13     You can answer.
14          MR. LAVIN:  That's probably the most
15     in-the-scope question I -- I could come up with.
16          MR. KING:  You're not just the lawyer, now
17     you're the judge.
18          MR. LAVIN:  I can't think of anything that
19     could be more in-scope.
20          MS. INCLEDON:  I'm also going to object to
21     form and lack of foundation.
22 BY MR. LAVIN:
23 Q.  So the question is, what is the policy and procedure
24     on a Cigna claim for H0015 where the provider calls in
25     to dispute the Viant pricing, initial pricing, and the

Page 81

1     provider is saying they are going to balance bill the
2     Cigna member?
3          MR. KING:  Same objections.
4 A.  There would not be a procedure or policy specific to a
5     CPT code.  They would see the claim that would appear
6     in the system based on the inquiry or the call that
7     came in and that would give them specified
8     direction on what appeal parameters or inquiry
9     parameters could apply.
10 BY MR. LAVIN:
11 Q.  And you don't know what any of the Cigna appeal or
12     inquiry parameters are, right?
13          MR. KING:  Objection; asked and answered.
14 A.  I don't.
15 BY MR. LAVIN:
16 Q.  Could you find that out today at the lunch break?
17 A.  Sure.
18 Q.  When a -- or strike that.
19          When a PAD letter issues, does MultiPlan
20     also send the communication to the provider or does
21     the PAD letter communication only go to the member?
22 A.  To the member only.
23 Q.  Does Cigna allow Viant to negotiate directly with
24     providers or is it necessary for the member to call
25     in?

21 (Pages 78 - 81)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 82

1          MS. INCLEDON:  Objection; form.  Objection;
2    lack of foundation.  And objection; incomplete
3    hypothetical.
4 A.  Sorry.  Can you just ask that again?
5 BY MR. LAVIN:
6 Q.  Sure.  Does Viant negotiate with providers and
7    members?
8 A.  Viant --
9          MR. KING:  Objection; you -- you can
10    answer.
11 A.  Viant does not negotiate with members.
12 BY MR. LAVIN:
13 Q.  So how does a provider know to call Viant?
14          MS. INCLEDON:  Objection; lack of
15    foundation.
16          MR. KING:  Outside the scope, calls for
17    speculation.
18 A.  When a provider contacts us, it is often because the
19    phone number would have been referenced on the
20    explanation of pricing or the provider remittance
21    document that they received.
22 BY MR. LAVIN:
23 Q.  From the payor?
24 A.  From the payor.
25 Q.  Do you know what target pricing is?

Page 83

1          MR. KING:  Objection; outside the scope.
2 A.  Yes.
3 BY MR. LAVIN:
4 Q.  Does, for Cigna, rather, does Viant utilize target
5    pricing in negotiations with providers?
6          MR. KING:  Same objection.
7 A.  We would receive, if -- if there was a target relevant
8    on a claim, we would receive that and save system, the
9    employee -- the employee that's working that would see
10    that value.
11 BY MR. LAVIN:
12 Q.  So the value for the target would also be in Toolbox?
13 A.  Correct.
14 Q.  Do you know when the last time for Cigna there was a
15    change in the language of PAD letters on Cigna East
16    claims?
17 A.  I don't have that date, no.
18 Q.  Are you notified when there are changes for Cigna and
19    the language used in PAD letters?
20 A.  Yes.  A change request would be submitted for that.
21 Q.  Do you have to approve the change request?
22 A.  I do not.
23 Q.  A change request is just submit -- something submitted
24    by the customer -- or the client, and in this case,
25    Cigna, right?

Page 84

1 A.  It is submitted by, in this case, it would be
2    submitted by our sales team.
3 Q.  Do you know if -- well, strike that.
4          Will Viant negotiate with a provider on a
5    Cigna claim for which the provider has not yet
6    balanced bills?
7          MR. KING:  Objection; asked and answered.
8 A.  If it is allowed by that claim, again, referencing
9    that indicator or that -- that information in the
10    system, if the provider is disputing the repricing or
11    indicating they would be billing, then Viant is able
12    to start discussions with that provider.
13 BY MR. LAVIN:
14 Q.  Do you know for Cigna if Viant requires a provider to
15    actually doc -- you know, send in documentary evidence
16    of a balance bill?
17          MS. INCLEDON:  Object to the form and
18    objection; lack of foundation.
19          MR. KING:  Objection; outside the scope.
20 A.  Again, I would have to look at the Cigna specific.  I
21    don't have those in front of me right now.
22 BY MR. LAVIN:
23 Q.  And can you look those up -- can you look those up on
24    the lunch break?
25 A.  Yes.

Page 85

1 Q.  So as you sit here, you don't know how much authority
2    on a Cigna claim for Viant that the claims specialists
3    have, right, to negotiate the claim, but you're going
4    to look that up?
5          MR. KING:  Objection.
6 A.  Correct.
7          MR. LAVIN:  All right.  Let's bring up
8    Tab 9, Nicole.
9          MARKED FOR IDENTIFICATION:
10          DEPOSITION EXHIBIT 3
11          Email Chain
12          MPI-C0000297-MPI-C0000311
13          12:07 p.m. CST
14 A.  All right.
15 BY MR. LAVIN:
16 Q.  All right.  So this is a long email thread, and with
17    all things, you can take your time and go through it.
18    I usually start at the bottom when I'm reading these
19    things.
20          I think that Viant, I mean, the whole
21    thread, according to this exhibit, was sent to Viant,
22    but Viant individuals, I believe, appear on it around
23    Bates number 302.  This was a document produced by
24    MultiPlan.
25          And Exhibit 3 is Bates numbers MPI-C297

22 (Pages 82 - 85)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 86

1  through MPI-C311.  And let me know when you've had a
2  chance to properly review it.
3  A.  Okay.  It's going to take a little time at 15 pages.
4  Q.  Yeah.  I understand.  There's a lot of signature --
5      I've reviewed this exhibit, and I'd say that
6      three-quarters of it is people's signature blocks.
7  A.  Okay.
8  Q.  All right.  Have you ever seen this email thread
9      before?
10 A.  I have not.
11 Q.  If you look at the top of it, I'm on the very first
12     page, it talks about Reeder Bramwell.
13         And who is Reeder Bramwell?
14         MR. KING:  Asked and answered.
15 A.  He's a manager.
16 BY MR. LAVIN:
17 Q.  And have you, and this is dated, well, the top of it
18     is dated 6-22-2018, references "Vogue Recovery
19     Center."
20         Are you familiar with Vogue Recovery
21     Center?
22 A.  I'm not.
23 Q.  Do you remember this dispute that this email thread
24     references?
25 A.  I would have not been made aware of that one.  It was

Page 87

1  prior to me being a part of the Viant organization
2  based on the 6-22-18 date and this wouldn't be
3  something that would generally be escalated to me.
4  Q.  So prior to 2019, you weren't part of Viant at all?
5  A.  No.  As I mentioned, in 2019 is when I assumed
6      responsibility for this.
7  Q.  Okay.  And what were your -- so -- and I'm sorry
8      because I thought that you were still -- you had just
9      been promoted in 2019.
10         What were you doing prior to 2019 at
11     MultiPlan?
12 A.  Within the negotiations services area, the financial
13     and clinical negotiation services.
14 Q.  Okay.  But you had worked for Viant originally before
15     coming to MultiPlan, before it was acquired by
16     MultiPlan, correct?
17 A.  Correct.
18 Q.  And what did you -- at what point did you go into
19     negotiations and away from Viant?
20 A.  I was in negotiations under Viant at the time that we
21     were acquired.  We, Viant had a negotiation services
22     department.
23 Q.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 88

1  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   [redacted]
19         MR. KING:  Same objection; lack of
20     foundation.
21 A.  Evidence of balance billing would be that the member
22     or patient has received a balance bill and would
23     submit that as confirmation.
24 BY MR. LAVIN:
25 Q.  And how would they submit that, if you know, to

Page 89

1  MultiPlan or Viant?
2         MR. KING:  Same objection.
3  A.  There was an email, there would be an email address, I
4      believe, that they would send that to.
5  BY MR. LAVIN:
6  Q.  Via email?
7  A.  (Nodding.)
8         THE REPORTER:  Ma'am, I'm sorry.  You
9      nodded; you didn't answer verbally.
10         THE WITNESS:  Oh, yeah.
11         THE REPORTER:  Thank you.
12         THE WITNESS:  Yeah.
13         THE REPORTER:  Appreciate it.
14 BY MR. LAVIN:
15 Q  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   [redacted]
21     actually from an Angela Robarge.  Who is Angela
22     Robarge?
23 A.  Angela is an account associate that works on the -- on
24     behalf of Cigna -- the Cigna account.
25 Q.  She's in sales?

23 (Pages 86 - 89)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 90

1  A.  Our sales organization.
2
[redacted]
10           MR. KING:  Objection; lack of foundation.
11  A.  If they would, if we would return it as no savings on
12     the claim.
13  BY MR. LAVIN:
14  Q.  And what does that phrase mean "no savings"?
15           MR. KING:  Same objection.
16  A.  If there is no savings, it would mean that the
17     previous recommendation was not considered.
18  BY MR. LAVIN:
19  Q.  Can you give me an example of that?
20           MR. KING:  Same objection; also calls for
21     speculation, incomplete hypothetical.
22  A.  Sure.  If we had a hundred dollar claim and the
23     savings recommendation was $50, removing the savings
24     would mean the savings would move from fifty to zero.
25  BY MR. LAVIN:

Page 91

1  Q.  Okay.  So when savings is removed, does that mean a
2     claim pays a bill charges?
3           MR. KING:  Same objection.
4  A.  I would not be able to tell you how the claim pay
5     would be, that would be the responsibility of Cigna in
6     this case.
7  BY MR. LAVIN:
8  Q.  But you would return the claim to Cigna with no
9     savings on it, right?
10  A.  Yes.
11           MR. KING:  Same objections.
12  BY MR. LAVIN:
13  Q.  What would happen in that instance?  Would another PAD
14     issue on the claim?
15           MR. KING:  Same objections.
16  A.  I'm trying to think through the process for that.
17     Yes, I believe it would.  Yes.
18  BY MR. LAVIN:
19  Q.  So a PAD issues any time a price is transmitted to
20     Cigna and it is closed on Viant's end, right?
21           MR. KING:  Same objections, adding an
22     objection of asked and answered.
23  A.  If we are attempting negotiation based on a member
24     balance bill, the outcome of that attempted
25     negotiation is returned back with a PAD letter to that

Page 92

1     member.  So we would state we were either successful
2     in negotiating or we were not.
3  BY MR. LAVIN:
4  Q.  And in this case, the original PAD letter would have
5     issued at the time the price was transmitted to Cigna
6     and the claim was closed on Viant's end?
7           MR. KING:  Same objections.
8  A.  I don't know that I would say that that's the
9     terminology, but it would indicate that the claim had
10     been returned to Cigna and they would expect to
11     receive another explanation of benefits based on
12     Cigna's review.
13  BY MR. LAVIN:
14  Q.  Does the PAD letter go out before the explanation of
15     benefits?
16           MR. KING:  Same objections; lack of
17     foundation, outside the scope.
18  A.  I wouldn't be able to tell you the timing of when
19     Cigna would reconsider a claim.
20  BY MR. LAVIN:
21  Q.  What do you mean by "reconsider"?  Are you talking
22     about this situation here where there's an inquiry?
23           MR. KING:  Same objections.
24  A.  So, in that example, you asked about returning the
25     claim of zero savings.

Page 93

1  BY MR. LAVIN:
2  Q.  Yeah.
3  A.  That recommendation would go back to Cigna to state
4     that it was zero savings and then it would be Cigna's
5     responsibility to determine how they were paying the
6     claim from there.
7  Q.  So let's talk about a situation where there is just
8     the initial pricing, there hasn't been an inquiry or
9     an appeal or a dispute or anything.  When the claim is
10     initially priced by Viant and that price is returned
11     to Cigna, and that's when a PAD letter issues from
12     Viant, correct?
13           MR. KING:  Same objections.
14  A.  Yes.  Correct.
15  BY MR. LAVIN:
16  Q.  Do you know if on that initial pricing, if the PAD
17     letter issues before the EOB is sent?
18           MR. KING:  Same objections; asked and
19     answered.
20  A.  Same answer as before.  I wouldn't be able to identify
21     when Cigna would adjudicate a claim or the timing.
22  BY MR. LAVIN:
23  Q.  Okay.  But the issuance of the PAD letter is just an
24     automatic process at Viant, right?
25  A.  Yes.

24 (Pages 90 - 93)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 94

1  Q.  What -- is there a difference between an inquiry and
2       an appeal at Viant?
3  A.  An appeal would be when the provider -- I'm sorry,
4       yes, when the provider has balance billed the member.
5  Q.  What about if the provider is just threatening to
6       balance bill the member?
7  A.  We would handle that as an inquiry.
8  Q.  And that goes across the board for all clients or just
9       for Cigna?
10         MR. KING:  Objection; outside the scope.
11         MS. INCLEDON:  And objection; lack of
12      foundation and form.
13 A.  I have not reviewed all of the client parameters in
14      preparation for this.
15 BY MR. LAVIN:
16 Q.  So are you talking about just for Cigna in your
17      answer?
18         MS. INCLEDON:  Same objection.
19 A.  I was --
20         MR. KING:  Same objection.  You can answer.
21 A.  I was answering not in general, just as a general
22      definition.
23 BY MR. LAVIN:
24 Q.  Do you ever tell providers, we will not consider this
25      an appeal or consider negotiating your claim until you

Page 95

1       balance bill the member?
2          MR. KING:  Objection; outside the scope,
3       lack of foundation.
4  A.  If that is one of the setups, then yes.  I mean, we
5       would do that.
6  BY MR. LAVIN:
7  Q.  You would inform -- I'm sorry, I didn't mean to cut
8       you off.
9  A.  Yes, if -- if that is a suggestion by the client or
10      something that we've outlined as part of them -- their
11      implementation, then that would be adhered to.
12 Q.  So the client can elect to specifically inform
13      providers that they have to balance bill before they
14      can negotiate a higher payment on a claim?
15         MR. KING:  Same objections.
16 A.  We would state that a balance bill notice is required
17      in order to -- to open an appeal, yes.
18 BY MR. LAVIN:
19 Q.  With Cigna, do you know if they ever did that?
20 A.  I don't.
21 Q.  Is that something you can check at lunch?
22 A.  Yes.
23 Q.  Then also, when that was implemented, if it was
24      implemented?
25 A.  That is not something I would be able to pull quickly.

Page 96

1       That would be something that -- Kevin or Monica would
2       have that detail.
3  Q.  Okay.  If we go to the next page, 300, and there's an
4  
13 BY MR. LAVIN:
14 Q.  Do you know if Viant ever enters into global
15      agreements with providers?
16         MR. KING:  Objection; outside the scope.
17 A.  No, not to my knowledge.
18 BY MR. LAVIN:
19 Q.  So, the terminology "inquiry" is just they're calling
20      up to figure out how a claim was priced, right?
21 A.  They can call to see how a claim was priced.  They can
22      indicate that they are likely balance billing so
23      there's many conversations that can occur when a
24      provider would contact as part of an inquiry process.
25 Q.  All right.  And then "appeal" would be generally if

Page 97

1       the provider has shown some evidence that they
2       actually are balance billing, right?
3  A.  Yes.
4  Q.  And what would a "dispute" be?  Is that anything
5       different than either of those two, inquiry or appeal?
6          MR. KING:  Objection.  You can answer.
7  A.  It could be -- it could be both or either.
8  BY MR. LAVIN:
9  Q.  Okay.  Does Viant track inquiries on claims?
10         MR. KING:  Objection; outside the scope.
11 A.  Yes.
12 BY MR. LAVIN:
13 Q.  Are inquiries claims that are -- or, are inquiries,
14      are those disputes that are handled by the customer
15      service reps only?
16         MR. KING:  Same objection.
17 A.  They would receive the intake on an inquiry and handle
18      the intake portion, yes.
19 BY MR. LAVIN:
20 Q.  And then they would send it, even if it's just an
21      inquiry, over to the claims specialists in
22      negotiation, right?
23 A.  No.
24 Q.  Where would it go?
25 A.  If they resolve the inquiry, it's closed.  If the

25 (Pages 94 - 97)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 98

1     provider is, in general, if the provider is indicating
2     balance bill, and the -- yes, that's what's allowed in
3     the claim as part of the setup, that would then be
4     referred to a claim resolution specialist.
5 Q.   So is customer service trained to educate providers on
6     their inquiries and on how pricing was arrived at?
7        MR. KING: Objection.
8 A.   Yes. High level.
9 BY MR. LAVIN:
10 Q.   Do they ever reference plan language on those
11     inquiries?
12        MR. KING: Objection; asked and answered,
13     outside the scope.
14 A.   No.
15 BY MR. LAVIN:
16 Q.   Are customer service representatives evaluated on the
17     amount of claims they are able to close on an inquiry
18     without forwarding to negotiations?
19 A.   No.
20 Q.   Does Viant keep track of how many times a provider
21     calls Viant to dispute a claim?
22        MR. KING: Objection; outside the scope.
23 A.   That can be accessed, yes.
24 BY MR. LAVIN:
25 Q.   Would you look it up by TIN or provider name?

Page 99

1        MR. KING: Same objection.
2 A.   It would be an ad hoc report request that you would
3     generally do by TIN, if you had a TIN.
4 BY MR. LAVIN:
5 Q.   Is there any kind of policy or procedure about how
6     many times a provider needs to call in on a certain
7     claim to be routed to negotiations?
8 A.   No. It follows the parameters I spoke about earlier.
9 Q.   The client's elected parameters?
10 A.   The client-elected parameters as well as the nature of
11     the provider's phone call. Sometimes it's as simple
12     is "who is Viant?" So that, you know, so a range of
13     discussions that can occur.
14 Q.   Do you know how many calls the customer service
15     representatives field in a given month?
16        MR. KING: Objection; outside the scope.
17 A.   I don't know that.
18 BY MR. LAVIN:
19 Q.   Do you know the difference between MRC1 and MRC2
20     pricing at Cigna?
21        MR. KING: Objection; outside the scope,
22     lack of foundation.
23 A.   I know that they are two plans, but I don't have the
24     details on them now.
25 BY MR. LAVIN:

Page 100

6     Cigna.
7 BY MR. LAVIN:
8 Q.   What does the term "standing on the pricing" mean?
9     And I'm looking at page 300.
10        MR. KING: Same objections; lack of
11     foundation, outside the scope.
12 BY MR. LAVIN:
13 Q.   It's about halfway down on the right side.
14 A.   I am not seeing it.
15 Q.   300, so it's the email, it's about halfway down. It's
16     from Brandy Medrano.
17 A.   Okay. "For now I'm assuming we're standing on the
18     pricing..." So that would mean that we are not
19     negotiating or that the negotiation was not within the
20     parameters. I can't tell within this context.
21 Q.   And so if we look up above that, we are looking at
22     this email thread a little bit more with Clearview in
23     it.
24        I'm looking in the second paragraph where
25     it says, "Please explain to the provider that Cigna

Page 101

1     has requested that we reach out to them. Cigna will
2     not be removing the savings on the claims at this
3     time, but we don't want to inform the provider of
4     this. Cigna is hoping the provider will work with us
5     the same as Clearview did."
6        Do you see that?
7 A.   I do.
8 Q.   Do you have an understanding of what they are
9     referring to there?
10        MR. KING: Same objections; lack of
11     foundation, outside the scope.
12        MS. INCLEDON: The document speaks for
13     itself.
14 A.   I think that it's, one, to indicate we were -- we
15     received a request from Cigna to contact you on, you
16     know, the following claims and then it would be to
17     engage the provider in discussion on appropriate next
18     steps.
19 BY MR. LAVIN:
20

25        MR. KING: Lack of foundation, outside the

26 (Pages 98 - 101)

AEO 30(b)(6) Kathy Praxmarer                              December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 102

1    scope, calls for speculation.
2  A.  No.
3  BY MR. LAVIN:
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
10 A.  Mm-hmm.
11 Q.  Do you know what they are referring to there?
12       MR. KING:  Same objections.
13 A.  Well, I would read that as engaging the provider in on
14    the negotiation.
15 BY MR. LAVIN:
16 Q.  For Cigna, does Viant ever disclose to providers the
17    total amount of authority -- of authority they have to
18    negotiate a claim?
19       MR. KING:  Same objections.
20 A.  No.
21 BY MR. LAVIN:
22 Q.  And why not?
23       MR. KING:  Same objections.
24 A.  It negates the negotiation.
25 BY MR. LAVIN:

Page 103

1  Q.  What is the purpose of the negotiation?
2  A.  To review for maximum savings and to come to a mutual
3    agreement.
4  Q.  Is one of the purposes of the negotiation to retain as
5    much of the savings as possible?
6       MR. KING:  Objection; asked and answered.
7  A.  Yes.
8  BY MR. LAVIN:
9  Q.  How does Viant determine when to agree to relinquish
10    some of the savings on a claim?
11       MS. INCLEDON:  Object to the form.
12 A.  One, again, it would be based on the initial
13    parameters that were given on that claim.  And then
14    it's based under the discussion that occurs between
15    the Viant employee and the provider and mutually
16    reviewing the initial repricing, describing, you know,
17    the reason for that as a fair reimbursement.  And
18    then, from there, starting and engaging in a
19    negotiation.
20 BY MR. LAVIN:
21 Q.  And do you rely upon the personal expertise and
22    experience of the claims specialists to handle those
23    negotiations?
24 A.  Yes.
25 Q.  Is MultiPlan paid a fee by Cigna based on how much

Page 104

1    savings Viant can retain on a claim?
2       MR. KING:  Objection; outside the scope,
3    lack of foundation.
4  A.  That would be a question for, again, Cigna or Monica
5    or Kevin.  I don't -- I don't have contracting detail.
6  BY MR. LAVIN:
7  Q.  Do you know generally how Viant is compensated for its
8    services to Cigna?
9       MR. KING:  Same objections.
10 A.  No, I don't.
11 BY MR. LAVIN:
12 Q.  Do you have an idea of how many or what percentage of
13    claims handled by the claims specialists at Viant are
14    eventually paid at the full amount of the negotiation
15    authority given by the payor?
16       MR. KING:  Objection; outside the scope.
17 A.  I don't have a precise number, but it's a -- it's a
18    low number.
19 BY MR. LAVIN:
20 Q.  Is there any kind of metric about how many times a
21    provider has to call in and say they are going to
22    balance bill before Viant will pay the full amount of
23    the authority on a particular claim?
24       MR. KING:  Objection; outside the scope.
25       MS. INCLEDON:  And asked and answered.

Page 105

1  A.  Well, first, I need to just correct, Viant does not
2    pay the claim.  It's never our responsibility or
3    obligation.  But we would follow the -- the parameters
4    on that, on that claim to determine if that claim
5    allows for a negotiation to reverse the savings.
6  BY MR. LAVIN:
7  Q.  Do the claims specialists receive any sort of
8    negotiation or sales training?
9  A.  They would receive some initial training, yes.
10 Q.  Does that training come from a handbook or is there a
11    slide presentation?  What sort of training do they
12    receive?
13       MR. KING:  Objection; outside the scope.
14 A.  Well, again, since there has not been training in a
15    number of years, it -- it would have been, like, a
16    classroom type of training.
17 BY MR. LAVIN:
18 Q.  When they are negotiating with a healthcare provider,
19    do Viant claims specialists have access to information
20    showing what that particular provider may have
21    accepted in the past for a given code?
22       MR. KING:  Outside the scope.
23 A.  They would be able to see that on a prior claim, not
24    particular to a code.
25 BY MR. LAVIN:

27 (Pages 102 - 105)

AEO 30(b)(6) Kathy Praxmarer                                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 106

1  Q.  So they can see what the provider has accepted in the
2      past as pricing in general, but not for a specific
3      code?
4          MR. KING:  Same objection.
5  A.  On a claim, they would see on a claim what that
6      provider has accepted in the past.
7  BY MR. LAVIN:
8  Q.  For that particular type of claim or service?
9          MR. KING:  Same objection.
10 A.  For any type of claim that that provider, any type of
11     claim we have received in Viant for that provider.
12 BY MR. LAVIN:
13 Q.  And would that information also indicate on it the
14     particular code or service where the provider accepted
15     pricing?
16         MR. KING:  Same objection; outside the
17     scope.
18 A.  Yes, they would have to go into every individual claim
19     to see the codes that were billed on that particular
20     claim.
21 BY MR. LAVIN:
22 Q.  Is there any kind of display or information showing,
23     for a particular service, what various negotiation --
24     various negotiators at Viant were able to get a
25     provider to accept, you know, on, like, a daily basis,

Page 107

1      do you understand my question?
2  A.  I don't.
3  Q.  So would, you know, if there's four claims specialists
4      or five claims specialists, do they have any sort of
5      display or anything in Toolbox indicating that, hey,
6      for Cigna today, I was able to get a provider to
7      accept X for this particular service?
8  A.  Only by claim.  They cannot see that by the -- the
9      service in particular.
10 Q.  So and I'm not talking about, could they look it up
11     for Cigna as a whole and not for a provider.  Do you
12     understand my question?
13 A.  They cannot.
14 Q.  Okay.  It has to be provider-specific?
15 A.  Yes.  That's what a negotiator would access.
16 Q.  So if we go to page 298, which is one above it.  Look
17     in the middle of the page.
18         MR. KING:  You said page 290?
19         MR. LAVIN:  298.
20         MR. KING:  Okay.  Thank you.
21         MR. LAVIN:  Working our way through it.
22 BY MR. LAVIN:
23

Page 108

1
2      understanding of what that means?
3          MR. KING:  Objection; outside the scope,
4      lack of foundation.
5  A.  I would translate that to be the target price that we
6      have on that claim.
7          MR. LAVIN:  Okay.  So let's go to Tab 10.
8  BY MR. LAVIN:
9  Q.  And when in 2019 did you come over to Viant, do you
10     remember what time of year when it was?
11 A.  I believe it was around April.
12         MR. LAVIN:  Now, Exhibit 4 is MPI-C14516
13     through MPI-C14526.
14         MARKED FOR IDENTIFICATION:
15         DEPOSITION EXHIBIT 4
16         Email Chain
17         MPI-C14516-MPI-C14526
18         12:51 p.m. CST
19 BY MR. LAVIN:
20 Q.  If you can flip through that.  A bulk of that exhibit
21     is just Excel spreadsheet trying to print.  It doesn't
22     work out, but...
23         Take your time go through it and I want to
24     talk about the actual substance of the email which is
25     on the first two pages.

Page 109

1  A.  Okay.
2  Q.  Have you ever seen this email thread before?
3  A.  I have not.
4  Q.  If you look at the top, it says, there's an email from
5
18 BY MR. LAVIN:
19 Q.  So when a provider is excluded from Viant, what does
20     that mean?  What happens?
21         MR. KING:  Same objections.
22 A.  It would not come through for repricing.
23 BY MR. LAVIN:
24 Q.  So that means the providers' claims don't get repriced
25     by it, right?

28 (Pages 106 - 109)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 110

1         MR. KING:  Same objections.
2  A.  Yeah.
3  BY MR. LAVIN:
4  Q.  Is there a list somewhere of providers who are
5     excluded from Viant?
6         MR. KING:  Same objections; lack -- outside
7     the scope.
8  A.  That would be something that the sales team would be
9     aware of or the client themselves.
10 BY MR. LAVIN:
11 Q.  Is that a common occurrence, the provider is excluded
12    from Viant?
13        MR. KING:  Same objection.
14 A.  Not that I'm aware of.
15 BY MR. LAVIN:
16 Q.  But you are aware of it happening with Cigna, right?
17        MR. KING:  Same objection.
18  ████████████████████████████████████
    █
20 BY MR. LAVIN:
21 Q.  Do you know if that happens because a provider is
22    complaining too much or disputing too much or too many
23    claims?
24        MR. KING:  Same objections; lack of
25     foundation, outside the scope.

Page 111

1  A.  I don't see the reasons for exclusion.
2  BY MR. LAVIN:
3  Q.  You what?
4  A.  I do not see the reasons for exclusion requests.
5  Q.  Do you have to approve the exclusion requests?
6         MR. KING:  Same objections.
7  A.  I do not.  That goes, again, goes through the sales
8     team.
9  Q.  Who would implement an exclusion into the Viant
10    system?
11        MR. KING:  Same objections.
12 A.  There are two approaches that sales can take that
13    could be an exclusion that is done, I will say at EDI,
14    so at the time of intake, or it would be a request
15    that they would send to us, my team, asking for the
16    exclusion to be entered.
17 BY MR. LAVIN:
18 Q.  How would your team enter an exclusion?
19        MR. KING:  Same objections.
20 A.  They would receive a formal request that includes the
21    clients for whom we're requesting -- they're
22    requesting for exclusion and a TIN, a TIN or TIN
23    listing and then that would be entered into the
24    system.

Page 112

1  BY MR. LAVIN:
2  Q.  Who on your team is responsible for entering things
3     like that into the system?
4         MR. KING:  Objection; outside the scope.
5  A.  I don't know who -- who has that responsibility.
6  BY MR. LAVIN:
7  Q.  Is that somebody under JR Moss?
8         MR. KING:  Same objection; lack of
9     foundation, outside the scope.
10 A.  No, it would generally be somebody under Cindy.
11 BY MR. LAVIN:
12 Q.  What is Cindy responsible for?
13 A.  Cindy is overseeing the patient advocacy and the
14    customer service or client support, so in this
15    instance, when a, somebody from sales, as an example
16    an account manager has questions, they would slip
17    through Cindy's organization.
18 Q.  Does Cindy oversee any of the technical or programming
19    aspects of Viant?
20 A.  No, that's all done by our IT organization or HPE from
21    a methodology perspective.
22        MR. KING:  And for the record, my objection
23    to the last question was outside the scope.
24        MR. LAVIN:  Thank you very much.
25 BY MR. LAVIN:

Page 113

1  Q.  Are there ways to exclude a provider from
2     negotiations?  So not exclude them from pricing, but
3     excluding them from being allowed to negotiate, no
4     matter what happens, on clients?
5         MR. KING:  Objection; outside the scope.
6  A.  That would be based, not by provider, that would be
7     based on the setup of the client as a whole.
8  BY MR. LAVIN:
9  Q.  Okay.  So your claims specialists, is there anything
10    ever in Toolbox that says, "For this provider, don't
11    negotiate with them"?
12        MR. KING:  Objection; outside the scope.
13        MS. INCLEDON:  And objection; incomplete
14    hypothetical.
15 A.  No, that is -- that is not specific to a provider.
16 BY MR. LAVIN:
17 Q.  And that's not possible to do, that you're aware of,
18    in Toolbox?
19        MR. KING:  Objection.
20 A.  No, not by provider.  The appeal parameters are set by
21    the claim that is received.
22 BY MR. LAVIN:
23 Q.  Have you ever heard of a provider being excluded from
24    negotiations but still subject to pricing?
25        MR. KING:  Same objection; lack of

29 (Pages 110 - 113)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 114

1    foundation as well.  Not a provider excluded from a
2    negotiation.
3  BY MR. LAVIN:
4  Q.  Have you heard of a provider excluded from appeals?
5          MR. KING:  Objection; outside the scope.
6  A.  If the client can elect the fair reimbursement of the
7    claim as they're allowable, which would be then there
8    is not a negotiation that proceeds on that claim.
9  BY MR. LAVIN:
10  Q.  So they can do that on a per-provider basis if they
11    choose?
12          MR. KING:  Same objection.
13  A.  That is not, as I mentioned, it is not a provider
14    setting.  It is based on the particular client
15    setting.
16  BY MR. LAVIN:
17  Q.  Okay.  But it would apply to all providers, they can't
18    single out a provider and say no appeals, no
19    negotiations for this provider, right?
20          MR. KING:  Same objections.
21  A.  No, I'm not aware of that.
22  BY MR. LAVIN:
23  Q.  Okay.  If we look down on the same exhibit, it says,
24    from JR Moss to Cindy Carlson and Marcel and some
25    ████████████████████████████

Page 115

1    ████████████████████████
2    ████████████████████████████
3    ████████████████████████████
5          Do you know what he's referring to there?
6    Do you know what "Footprints" is?
7          MR. KING:  Same objections; lack of
8    foundation, outside the scope.
9  A.  I know that Footprints is a provider as its mentioned
10    here for whom there is a separate agreement.  That's
11    my only awareness.
12  BY MR. LAVIN:
13  Q.  Are they the only provider that has a separate
14    agreement with Viant?
15  A.  Yes.
16          MR. KING:  Same objection.
17  A.  Yes, that I'm aware of.
18  BY MR. LAVIN:
19  Q.  Is that agreement still in place?
20          MR. KING:  Objection; outside the scope.
21  A.  I don't know.
22  BY MR. LAVIN:
23  ████████████████████████████
    ████████████████████████
    ██████████"

Page 116

1          MR. KING:  Objection; lack of foundation,
2    outside the scope.
3  A.  I don't have the background in that.
4  BY MR. LAVIN:
5  Q.  How are you aware that Footprints -- is, has a global
6    agreement?
7          MR. KING:  Same objections.
8  A.  I just recall as part of my initial orientation or
9    education hearing about that.
10  BY MR. LAVIN:
11  Q.  So when you started in your role, they said, "Here is
12    everything that goes on with Viant and Footprints has
13    a special agreement with Viant"?
14  A.  Yes.
15          MR. KING:  Same objection.
16  BY MR. LAVIN:
17  Q.  In your experience, in your current role, do you have
18    an understanding or any kind of impression of whether
19    Cigna is utilizing DataiSight more often these days
20    for outpatient claims than Viant?
21          MR. KING:  Objection; lack of foundation,
22    outside the scope, calls for speculation.
23  A.  Well, because DataiSight supports HICFA and
24    professional claims in addition to facility, I -- I
25    think you are comparing apples and oranges.

Page 117

1  BY MR. LAVIN:
2  Q.  Did DataiSight price outpatient facility claims?
3          MR. KING:  Objection; how is that relevant
4    to this suit?  I'd like you to explain it to me.
5          MR. LAVIN:  Because I'd like to know if
6    claims are being migrated by Cigna from Viant to
7    DataiSight for facility outpatient.
8          MR. KING:  Why?
9          MR. LAVIN:  Because it's relevant to the
10    case.
11          MR. KING:  No, it's not relevant to the
12    case.  Objection; outside the scope, relevancy, lack
13    of foundation.
14  Q.  Do you have an understanding of whether claims have
15    been migrating from Viant to DataiSight,
16    Ms. Praxmarer?
17          MR. KING:  Same objections.
18  A.  That would be a question for Monica and Kevin or the
19    Cigna team.
20  Q.  Not that you've noticed, though, in the course of your
21    duties?
22  A.  No.
23          MR. KING:  Same objections.

30 (Pages 114 - 117)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 118

1  BY MR. LAVIN:
2  Q.  Can DataiSight price facility outpatient claims?
3  A.  Yes.
4        MR. KING:  Same objections.
5        (Reporter appeal at 2:04 p.m.)
6  BY MR. LAVIN:
7  Q.  That's a paid database system not charge-based like
8  Viant, right?
9        MR. KING:  Objection to the form of the
10  question, outside the scope, vague, mischaracterizes
11  testimony.  You can answer.
12  A.  No, I would not reference a paid.
13  BY MR. LAVIN:
14  Q.  You would not reference a paid -- what's that?
15  A.  Your indication of paid would not be the terminology I
16  would use, no.
17  Q.  What terminology would you use to describe DataiSight?
18        MR. KING:  Same objections.
19  A.  It is either a cost-based or a median repricing.
20  BY MR. LAVIN:
21  Q.  Do you know if claims volume by Cigna to Viant OPR has
22  decreased between 2019 and the present?
23        MR. KING:  Same objections; outside the
24  scope, lack of foundation, speculation.
25  A.  I -- I did not review that in preparation for this.

Page 119

1  BY MR. LAVIN:
2  Q.  Are you familiar with a provider named Riverbend?
3        MR. KING:  Objection; outside the scope.
4  A.  I am not.
5        MR. LAVIN:  All right.  Let's go to Tab 12,
6  Nicole.
7        MARKED FOR IDENTIFICATION:
8        DEPOSITION EXHIBIT 5
9        Email Chain
10       MPI-C0014935-MPI-C0014938
11       1:06 p.m. CST
12       MR. LAVIN:  Exhibit 5 is Bates MPI-C0014935
13  through MPI-C14938.
14  A.  Okay.
15  BY MR. LAVIN:
16  Q.  All right.  Do you remember this email exchange?
17  A.  I was not on the email.
18  Q.  Do you remember hearing about it?
19  A.  No.
20  Q.  All right.  I want to talk to you about the batching
21  of claims for appeals and the policies and procedures
22  related to those at Viant, all right?
23        Is there a way for providers to batch and
24  appeal large quantities of claims?
25        MR. KING:  Objection; lack -- outside the

Page 120

1  scope.
2  A.  When a provider calls as part of their inquiry
3  process, they would reference which claims that they
4  are calling about.
5  BY MR. LAVIN:
6  Q.  Is there a maximum number of claims that they can
7  appeal at any one time?
8        MR. KING:  Same objection.
9  A.  Not that I'm aware of.
10  BY MR. LAVIN:
11  Q.  Well, you read through this email.  And the reason I'm
12  asking you this is if you go to -- if you look through
13  the whole thing, and I can bring you to particular
14  portions, would you agree with me that it's discussing
15  difficulties in processing large amounts of claims at
16  one time from a single provider?
17        MS. INCLEDON:  Object to the form.  The
18  document speaks for itself.
19        MR. KING:  My objections; lack of
20  foundation, outside the scope.
21  A.  I didn't -- I didn't interpret that from the email.
22  BY MR. LAVIN:
23  Q.  Okay.  So is it MultiPlan's position that there is no
24  limit on how many claims a provider can batch and
25  submit for appeal to Viant at one time?

Page 121

1        MR. KING:  Objection; outside the scope,
2  lack of foundation, object to the witness answering on
3  behalf of MultiPlan.
4  A.  I am not familiar with the particular parameter within
5  Viant.
6  BY MR. LAVIN:
7  Q.  Okay.  So if we go to page ending in 937, and I'm
8  looking down -- at the top of it, there's an email
9  from Terri Cothron.
10  

17  A.  I do.
18  Q.  Is there a process in place for Cigna to be notified
19  if there are large batch requests or inquiries from
20  providers?
21        MR. KING:  Same objections, outside the
22  scope, lack of foundation.
23  A.  I'm not aware of one.
24  BY MR. LAVIN:
25  Q.  We looked -- now looking at the page 936 and I'm

31 (Pages 118 - 121)

AEO 30(b)(6) Kathy Praxmarer                                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 122

1   looking at the top email, which is from the JR Moss to
2   Kevin Williams, Marcel Mujica.
3   [redacted]

Page 123

1         Do you have any understanding about a
2   policy regarding large batch submissions from
3   providers to MultiPlan for Cigna claims?
4         MR. KING:  Objection; outside the scope,
5   lack of foundation.
6   A.  No, I'm not aware of them.
7   BY MR. LAVIN:
8   Q.  So the first you are hearing about it is reading this
9   email?
10  A.  Yes.
11        MR. KING:  Objection.
12  BY MR. LAVIN:
13  [redacted]
16        Have you ever heard of that before?
17        MR. KING:  Same objections.
18  A.  I have.
19  BY MR. LAVIN:
20  Q.  Okay.  And what's the purpose of doing that?
21        MR. KING:  Same objections.
22  A.  As I understand, it was more just an administrative
23  workflow process.
24  BY MR. LAVIN:
25  Q.  Because there was just so many claims, there was just

Page 124

1   so many people to work on them, you mean?
2         MR. KING:  Same objections.
3   A.  Correct.
4   BY MR. LAVIN:
5   Q.  How many claims can a claims specialist negotiate in a
6   day?  Is there an average?
7         MR. KING:  Objection; outside the scope,
8   speculation, lack of foundation.  You can answer.
9   A.  I don't have a particular number as far as how many
10  they would negotiate in a day.
11  BY MR. LAVIN:
12  Q.  Does every submitted claim need to be negotiated
13  individually with Viant?
14        MR. KING:  Objection; calls for
15  speculation.  You can answer.
16  A.  Every individual claim is received for an appeal and
17  if we -- or an inquiry.  And we could speak to a
18  provider about a group of claims that they are, again,
19  questioning or appealing --
20  BY MR. LAVIN:
21  Q.  And if there was --
22  A.  I'm sorry -- so it could be one phone call where they
23  are speaking about more than one claim.
24  Q.  Okay.  And when those claims, if those claims are
25  repriced or adjusted in some way, by Viant, does that

Page 125

1   then have to be entered on a claim-by-claim basis into
2   Toolbox?
3         MR. KING:  Objection; outside the scope.
4   A.  I'm not sure I'm understanding your question.
5   BY MR. LAVIN:
6   Q.  Yes.  So say there was a batch of 20 claims, providers
7   calling up, dispute pricing on them, all the same
8   service, they talk about them, and the providers
9   balance billed and there is an agreement to adjust the
10  claims or adjust the pricing somewhat, are you
11  following?
12  A.  An agreement between the Viant --
13        MR. KING:  Same objections.
14  BY MR. LAVIN:
15  Q.  Between Viant and the provider.
16  A.  Okay.  Yes.
17  Q.  And the provider signs the Viant negotiation form or
18  agreement form, are those claims then adjusted by that
19  negotiator in Toolbox?
20        MR. KING:  Same objections.
21  A.  The claim is adjusted to reflect the revised agreement
22  that the provider and Viant came to.
23  BY MR. LAVIN:
24  Q.  Who makes that adjustment?  Does the claim specialist
25  make the adjustment themselves into Toolbox?

32 (Pages 122 - 125)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 126

1           MR. KING:  Objection; outside the scope.
2  A.  It's based on the amount that is listed on the letter
3     of terms that that provider has signed.
4  BY MR. LAVIN:
5  Q.  Yeah, I got it, but like, who takes that and data
6     inputs that change into Toolbox or wherever it needs
7     to go?
8           MR. KING:  Same objection.
9  A.  So, in -- in today's world, there's two different
10     processes, so if a provider has agreed to that through
11     our portal, the provider portal, and they digitally
12     signed and accepted that, it's all system -- and
13     automated.  We are able to link that information and
14     see the value that they have agreed to.  If it is done
15     via fax -- I'm not a hundred percent sure which
16     individual actually manages that fax.  I just don't
17     know that off the top of my head.
18  BY MR. LAVIN:
19  Q.  Do you know if that fax goes back to the original
20     claims specialist who may have spoken on the phone to
21     the provider?
22           MR. KING:  Same objection.
23  A.  I just don't know the particular processes within
24     Viant.  I don't know that.
25  BY MR. LAVIN:

Page 127

1  Q.  On the portal, the provider portal?
2  A.  Mm-hmm.
3  Q.  When the provider goes in, let's say they balance
4     billed, they are about to balance bill, are they going
5     to negotiate with an individual or is it an automated
6     negotiation?
7  A.  No, they are -- they are receiving a letter of terms
8     through the provider portal based on that inquiry --
9  Q.  I see.
10  A.  -- having already been received, and that's just a
11     communication mechanism for us to get the letter of
12     terms in the hands of the provider.
13  Q.  It's just an encrypted portal for them to go in and
14     communicate on?
15  A.  It is.  It just -- it just eliminates a fact
16     mechanism.
17  Q.  Is there any other way for a provider to dispute a
18     pricing or appeal one other than making a phone call?
19           MS. INCLEDON:  Objection; lack of
20     foundation.
21  A.  Well, they could make a phone call to us.  They could
22     make a phone call or contact Cigna.
23  BY MR. LAVIN:
24  Q.  What would happen if they contacted Cigna?  Would
25     Cigna route them to Viant?

Page 128

1           MR. KING:  Objection; speculation, lack of
2     foundation, outside the scope.
3  BY MR. LAVIN:
4  Q.  What's the policy on that?
5           MR. KING:  Same -- same objections.
6  A.  You would have to ask Cigna for that.  I don't know
7     Cigna's policy.
8  BY MR. LAVIN:
9  Q.  Do providers ever call in and say Cigna told me to
10     call Viant?
11           MR. KING:  Objections.
12  A.  I don't know that.
13  BY MR. LAVIN:
14  Q.  But other than the -- picking up the phone and dialing
15     numbers, is there any other way, say, email,
16     electronic portal, that they can access, a dashboard,
17     a chat bot, anything else other than a phone call to
18     kick off an inquiry or an appeal?
19           MR. KING:  Same objections.
20  A.  There is -- so in response to the portal, the, I don't
21     even know what else you said, I'm not aware of those.
22     I would think that we probably could receive something
23     via email.  Email is a standard form of communication,
24     so if they had an email from the past, they may use
25     that, but that is not the standard operating

Page 129

1     procedure.
2  BY MR. LAVIN:
3  Q.  All right.  So there's no way or no portal available
4     for a provider to say, I've got a new dispute, I've
5     got these Viant price claims, I don't have time to
6     call right now, or it's after hours or something,
7     is -- there's no portal that they can go into or
8     dashboard and say, "I'm hereby disputing these
9     claims," do you know what I'm saying?
10           MR. KING:  Objection; outside the scope,
11     speculation.
12           MS. INCLEDON:  Object to the form as well.
13  A.  No, they -- they don't do that.
14           THE VIDEOGRAPHER:  Can we go off the record
15     for one second, please.
16           MR. LAVIN:  Yes.
17           THE VIDEOGRAPHER:  Going off the record
18     1:27.
19           (Off the record at 1:27 p.m.)
20           (Back on the record at 1:50 p.m.)
21           THE VIDEOGRAPHER:  On the record, 1:50.
22  BY MR. LAVIN:
23  Q.  Ms. Praxmarer, were you able to find out about the
24     Cigna negotiation parameters on the break?
25           MR. KING:  Matt, this is Errol.  Any

33 (Pages 126 - 129)

AEO 30(b)(6) Kathy Praxmarer                                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 130

1    request for additional information or documents, I'd
2    like you to put those in writing to counsel. And then
3    we'll consider them.
4        MR. LAVIN: All right. I mean, they're
5    covered under the Notice, is our opinion on that, but
6    we can do that, too.
7        MR. KING: Yeah, there were no document
8    requests with the Notice, and even if they were, they
9    would have been out of time.
10       MR. LAVIN: I don't know.
11       MR. KING: But put it in writing and we'll
12   look at it.
13       MR. LAVIN: I'm just asking for testimony
14   on it. I'm just asking her what the Cigna, it seems
15   pretty relevant, what the Cigna negotiation parameters
16   are.
17       MR. KING: Did you ask Cigna for that?
18       MR. LAVIN: I mean, I've got Ms. Praxmarer
19   here for Viant so I'm asking her.
20       MR. KING: Well, you made a number of
21   different requests, actually, so again, put those in
22   writing so we can consider them, please.
23       MR. LAVIN: All right. But we have the
24   witness here, I don't really want to call witnesses
25   back, and I'm sure you don't either.

Page 131

1        MR. KING: Just put the request in writing
2    to us and we'll take a look.
3    BY MR. LAVIN:
4    Q.  All right. Ms. Praxmarer, do you know anything about
5        the Cigna appeal parameters since the last time we
6        discussed it today?
7        MR. KING: Objection; asked and answered.
8    A.  No, I don't.
9    BY MR. LAVIN:
10   Q.  Okay. So you mentioned that the only way that a
11       provider can dispute or appeal a claim is to call up.
12       Has Viant ever considered creating, like, an
13       electronic portal or another way for providers to
14       dispute pricing on claims?
15       MR. KING: Objection; lack -- outside the
16       scope, lack of foundation, calls for speculation.
17   A.  Yes. We have considered that.
18   BY MR. LAVIN:
19   Q.  And what do those discussions look like? What did you
20       guys consider?
21       MR. KING: Same objections.
22   A.  Similarly to provide a portal enhancement which allows
23       a provider to initiate via the portal.
24   BY MR. LAVIN:
25   Q.  What was the final decision on that?

Page 132

1        MR. KING: Same objections.
2    A.  I just don't have technical resources that can work on
3        that right now.
4    BY MR. LAVIN:
5    Q.  So when did you have those conversations?
6        MR. KING: Same objections.
7    A.  Oh, it probably was a couple of years ago. It's just
8        in our backlog.
9    BY MR. LAVIN:
10   Q.  And you haven't revisited it in the past couple of
11       years?
12       MR. KING: Same objections.
13   A.  It is in our backlog which means any technical
14       enhancement that sits there we -- we kind of reconvene
15       to determine prioritization and resource availability.
16   BY MR. LAVIN:
17   Q.  When is the last time that you reconvened on that
18       issue to determine if there was another way besides
19       phone calls for providers to submit disputes to
20       MultiPlan?
21       MR. KING: Objection; outside the scope.
22   A.  I don't know.
23   BY MR. LAVIN:
24   Q.  What is the average length of time that a claims
25       specialist spends on the phone with a provider?

Page 133

1        MS. INCLEDON: Objection; lack of
2    foundation.
3    BY MR. LAVIN:
4    Q.  Do you know what the length of the average phone call
5        is?
6        MR. KING: Objection; speculation, lack of
7    foundation.
8    A.  I don't know that for Viant.
9    BY MR. LAVIN:
10   Q.  Do you know it for DataiSight?
11       MR. KING: Objection; outside the scope,
12       lack of foundation, speculation.
13   A.  I don't know that off the top of my head, I don't.
14   BY MR. LAVIN:
15   Q.  Are the figures tracked anywhere for Viant?
16   A.  I'm sure that we can get to that. I don't know off
17       the top of my head where that would be available, my
18       leadership team might have that detail.
19   Q.  Did Viant use call matrix software to track length of
20       calls?
21       MR. KING: Objection; outside the scope.
22   A.  I don't -- I don't know a lot about the call system
23       that the Viant team uses, so I don't have a lot of
24       detail on that.
25   BY MR. LAVIN:

34 (Pages 130 - 133)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 134

1  Q.  When you -- well, strike that.
2       Do you perform annual reviews on the claims
3    specialists?
4       MR. KING:  Objection; outside the scope.
5  A.  My leadership does that, yes.
6  BY MR. LAVIN:
7  Q.  Is -- do you sit down, do you talk about, you know,
8    "Your average time on call was X" during those
9    evaluations?
10      MR. KING:  Objection; outside the scope,
11   lack of foundation.
12  A.  I -- I am not, I don't perform those.  So that -- I
13   don't know that.
14  BY MR. LAVIN:
15  Q.  Do you know how many calls per day a claims specialist
16   typically handles a day?
17      MR. KING:  Objection; outside the scope,
18   lack of foundation, asked and answered.
19  A.  I don't -- I don't -- I don't have the matrix, no.
20  BY MR. LAVIN:
21  Q.  Does Viant use Salesforce?
22      MR. KING:  Objection; outside the scope.
23  A.  I believe the answer to that is yes.
24  BY MR. LAVIN:
25  Q.  And what do you use Salesforce for?

Page 135

1       MR. KING:  Objection; outside the scope,
2    mischaracterizes her testimony.
3  A.  Toolbox is the primary application for initiating a
4    inquiry, appeal, et cetera, but if a -- something
5    needs to be directed to the Viant service team that is
6    not something that originated via Toolbox, then they
7    would receive that through Salesforce as kind of a
8    tracking tool.
9  BY MR. LAVIN:
10  Q.  Do the claims specialists receive notifications of
11   calls in Salesforce?
12  A.  They do not.
13      MR. KING:  Objection; outside the scope.
14  BY MR. LAVIN:
15  Q.  Do they have a queue that they are working from of
16   incoming calls?
17      MR. KING:  Objection; outside the scope.
18  A.  I'm sorry, I just don't know the details of that phone
19   system.
20  BY MR. LAVIN:
21  Q.  Do they get notifications of new calls from
22   Salesforce?
23      MR. KING:  Same objection.
24  A.  No.  Salesforce is not tied to the phone system.
25  BY MR. LAVIN:

Page 136

1  Q.  Does every inquiry get an entry in Salesforce?
2       MR. KING:  Same objections.
3  A.  Every inquiry gets a tracking in Toolbox.
4  BY MR. LAVIN:
5  Q.  Do only certain inquiries get a tracking in
6    Salesforce?
7       MR. KING:  Same objections; outside the
8    scope.
9  A.  Yes.  As I referenced, if it's not initiated in
10   Toolbox, that would be something, as an example, that
11   is through Salesforce.
12  BY MR. LAVIN:
13  Q.  Can you give me an example of a claim that would not
14   be initiated in Toolbox?
15      MR. KING:  Same objection.
16  A.  Could be that a client may have initiated an inquiry
17   and that would come through the portal and be tracked
18   in Salesforce as an inquiry received.  That's an
19   example.  I don't know if -- if Cigna does that in
20   particular, but there are clients who would do that.
21  BY MR. LAVIN:
22  Q.  So a client inquiry might come through Salesforce
23   where a provider inquiry would come through Toolbox,
24   right?
25      MR. KING:  Same objection; outside the

Page 137

1    scope of this witness's deposition.
2  A.  A provider inquiry would come in primarily via phone
3    call.  Our customer service rep would track that and
4    notate that within Toolbox.
5  BY MR. LAVIN:
6  Q.  Do providers mail in a dispute on a claim?
7       MR. KING:  Objection; outside the scope.
8  A.  That is not standard operating procedure.  I can't say
9    that they would never do that.  I'm just not familiar
10   with it.
11  BY MR. LAVIN:
12  Q.  Could they begin an inquiry with a fax to Viant?
13      MR. KING:  Objection; asked and answered,
14   outside the scope.
15  A.  That is also not what they're directed.  Again,
16   they're generally directed via the remark code which
17   lists the phone number.  So any of those would be
18   outside of the standard operating procedure that are
19   truly exceptions, I just couldn't talk to if those
20   exceptions are received.
21  BY MR. LAVIN:
22  Q.  When you say "remark code," are you referring to the
23   payor's explanation of benefits or explanation of
24   payment?
25  A.  Correct.

35 (Pages 134 - 137)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 138

1          MR. KING: Objection; outside the scope.
2 BY MR. LAVIN:
3 Q.   Is it your understanding that all MultiPlan clients
4      who use Viant, that their explanations of payment
5      reference the Viant phone number?
6          MR. KING:  Same objection; outside the
7      scope.
8          MS. INCLEDON:  Lack of foundation.
9 A.   I can't tell you if all do, no.
10 BY MR. LAVIN:
11 Q.   Do Cigna's?
12         MR. KING:  Same objection.
13         MS. INCLEDON:  Lack of foundation.
14 A.   I am aware that there are some that do reference a
15      number.  I don't know if a hundred percent do.  I -- I
16      don't know that definitively.
17 BY MR. LAVIN:
18 Q.   How many phone numbers does -- does Viant have?
19         MR. KING:  Objection; outside the scope,
20      calls for speculation, lack of foundation.
21 A.   Matt, I don't know that.  There may be, you know,
22      historical phone numbers that are -- that are tied in
23      so I don't, I just don't know that number.
24         MR. LAVIN:  Let's go to -- let's go to
25      Tab 11.  Exhibit 6 is Bates number MPI-C13506 through

Page 139

1      MPI-C13516.
2          MARKED FOR IDENTIFICATION:
3          DEPOSITION EXHIBIT 6
4          Email Chain
5          MPI-C13506-MPI-C13516
6          2:03 p.m. CST
7 BY MR. LAVIN:
8 Q.   Did you, in preparation for this deposition, look
9      through any correspondence for the healthcare provider
10      Summit State?
11 A.   No.
12 Q.   Do you remember, if you look at the top here, there
13      is, it says, "Attachment," and there's a name there,
14      it says, "Claim adjustments, BB," do you see that?
15 A.   Under the -- yeah.  "Attachment" and then a name, BB.
16 Q.   That's right.
17 A.   Correct.
18 Q.   Have you ever seen that name before preparing for
19      today's deposition?
20         MR. KING:  Objection; lack of foundation.
21 A.   I haven't seen that name before you put this on the
22      screen.
23 BY MR. LAVIN:
24 Q.   Okay.  When a target price is sent -- well, strike
25      that.

Page 140

1          On Viant price claims for Cigna, who
2      calculates the target amount?
3          MS. INCLEDON:  Objection; form.  Objection;
4      lack of foundation.
5          MR. KING:  Objection; outside the scope.
6 A.   Target direction is provided by Cigna.
7 BY MR. LAVIN:
8 Q.   Is that included for MRC1 and MRC2?
9          MR. KING:  Objection; outside the scope,
10      lack of foundation.
11 A.   As I mentioned previously, I wouldn't know the -- the,
12      if it was MRC1 or 2, but if we have a target on a
13      claim, we would see that.
14 BY MR. LAVIN:
15 Q.   Do you know if Cigna uses Viant to calculate targets
16      for MRC1?
17         MR. KING:  Same objections; lack of
18      foundation, outside the scope.
19         MS. INCLEDON:  And object to the form.
20 A.   I don't know.
21 BY MR. LAVIN:
22 Q.   So can you look through the first two-and-a-half pages
23      of this document, you can flip through the whole thing
24      if you want, but if you look through the first two
25      pages of this document, and that's the Viant

Page 141

1      correspondence on it.
2 A.   Okay.  I've read it.
3 Q.   Let's look down at the bottom, the last, first page,
4      the last email thread on the first page from Reeder
5      Bramwell to Cindy Carlson and others.
6

14         Do you see that?
15 A.   Mm-hmm.
16 Q.   How would Reeder Bramwell have looked up that
17      information?  How would he know this particular
18      provider was typically requesting 85 percent of bill
19      charges to settle?
20         MR. KING:  Objection; outside the scope,
21      lack of foundation.
22 A.   He would look into a box under the -- the tax ID
23      number and he could review claim examples for the
24      history or the notes on the case based on the
25      discussion with the provider.

36 (Pages 138 - 141)

Page 142

1  BY MR. LAVIN:
2  Q.  So there's also information Toolbox for the claims
3      specialist to enter notes about the call and
4      information about the call?
5          MR. KING:  Objection; outside the scope.
6  A.  Yes, that's correct.
7  BY MR. LAVIN:
8  Q.  If we look up above that, the email from Angela
9      Robarge back to Mr. Bramwell, and I'm looking at the
10     [redacted]

25         MR. KING:  Same objections.

Page 143

1  A.  I believe that's true for Cigna.
2  BY MR. LAVIN:
3  Q.  Do you know if for Cigna MRC1 targets are calculated
4      based on the Viant data set?
5          MR. KING:  Same objections.
6  A.  I had already answered, I'm not aware of that.
7          MR. LAVIN:  Let's go to Tab 15, Nicole.
8          MARKED FOR IDENTIFICATION:
9          DEPOSITION EXHIBIT 7
10         7/31/2017 Correspondence - MPI-C16189
11         2:12 p.m. CST
12 BY MR. LAVIN:
13 Q.  Exhibit 7, MPIC16189.  Do you recognize what this
14     document is?
15 A.  Patient advocacy letter.
16 Q.  Is there anything on this letter that allows you to
17     determine what claims platform at Cigna this claim
18     came from?
19         MS. INCLEDON:  Objection; lack of
20     foundation.
21 A.  No, that's not something I would be able to tell.
22 BY MR. LAVIN:
23 Q.  Okay.  And it says, if you look in the third
24     paragraph -- I note that this is dated 7/31/2017
25     before you were at Viant.

Page 144

1          It says, "If this happens, do not pay any
2  more than the co-payment required under your benefit
3  plan and immediately call Viant toll-free," and it
4  gives a number.
5          And is this the PAD letter that was in
6  place for all Cigna platforms in 2017?
7          MS. INCLEDON:  Objection; lack of
8  foundation.  Objection to form.
9          MR. KING:  And speculation.
10 A.  I would not be able to identify that.  I can tell you
11     it was the one in place on 7-17-2017 for this claim.
12 BY MR. LAVIN:
13 Q.  Okay.  But you, as you sit here today, as a 30(b)(6)
14     witness for MultiPlan, you're not able to tell me what
15     PAD letter language were used for different platforms
16     of Cigna and what years, right?
17         MR. KING:  Objection; outside the scope,
18     lack of foundation.
19 A.  No, I can't tell you that information.
20 BY MR. LAVIN:
21 Q.  Okay.
22         MR. KING:  It doesn't say anything about
23     Cigna platforms in the Deposition Notice.
24         MR. LAVIN:  It says a lot about
25     communications with members in the Deposition Notice.

Page 145

1  BY MR. LAVIN:
2  Q.  And my question is whether the communications were all
3      the same or not the same.  If they were different, how
4      were they different?
5          MR. KING:  That was not the question you
6      asked.  You asked about Cigna platforms tied to
7      this -- this PAD letter.
8          MR. LAVIN:  Well, my understanding is that
9      there is a difference based on her earlier testimony
10     today would be because of the platform the claims were
11     on.
12         MR. KING:  My objection stands.  Outside of
13     the scope.
14 A.  And I believe I indicated that it was be based on what
15     I had referred to as "the affiliate" because that's
16     how we have them listed in our system.
17 BY MR. LAVIN:
18 Q.  So on this Exhibit 7, do you know what affiliates used
19     that particular PAD letter in 2017?
20         MR. KING:  Same objection; outside the
21     scope.
22 A.  No.
23 BY MR. LAVIN:
24 Q.  When you say -- are you familiar with the term
25     "Cigna East"?

37 (Pages 142 - 145)

AEO 30(b)(6) Kathy Praxmarer                                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 146

1  A.  Yes.
2          MR. KING:  Same objection.
3  BY MR. LAVIN:
4  Q.  All right.  Do you know if Cigna East used this PAD
5      letter in 2017?
6          MR. KING:  Same objection; lack of
7      foundation, outside the scope.
8  A.  I would not be able to tell you if this was the
9      version for Cigna East, no.
10 BY MR. LAVIN:
11 Q.  And this PAD letter would have generated at the time
12     the suggested price was transmitted to Cigna for this
13     claim, correct?
14 A.  Yes.  Correct.
15         MR. LAVIN:  Let's go to Tab 16, Nicole.
16         MARKED FOR IDENTIFICATION:
17         DEPOSITION EXHIBIT 8
18         6/5/2014 Correspondence - MPI-C0000902
19         2:16 p.m. CST
20 BY MR. LAVIN:
21 Q.  This is a slightly different letter.  Exhibit 8 is
22     Bates MPI-C902.  And if you could take a minute to
23     look at it.
24 A.  Okay.
25 Q.  Do you know what this letter is?  Do you recognize

Page 147

1      this letter?
2  A.  I don't recognize this letter, but I can -- I would
3      state that it's likely something that was done in a
4      test system.
5  Q.  So is this a letter format that was ever actually
6      implemented at Viant?
7          MR. KING:  Objection; lack of foundation.
8  A.  I -- I don't know.
9  BY MR. LAVIN:
10 Q.  You'll agree this letter looks like it is directed to
11     a patient who has contacted Viant, right?
12         MR. KING:  Same objection; lack of
13     foundation.
14 A.  No, because it says "no saving" and that would tell me
15     that it's likely in a test system.
16 BY MR. LAVIN:
17 Q.  Okay.  The template of this letter would indicate that
18     it was intended to be used in a situation where a
19     member has contacted Viant after receiving an EOB,
20     right?
21         MR. KING:  Objection; lack of foundation,
22     calls for speculation.
23 A.  I'm really not comfortable saying that I do because I
24     don't know what this is or where this came from.  So
25     I'm not, just not familiar with it.

Page 148

1  BY MR. LAVIN:
2  Q.  Have you ever -- well, this was produced by MultiPlan
3      in this case.
4          It says "Dear No Saving, you recently
5      contacted Viant because you received a bill from
6      Provider Jones for more than the amount labelled 'What
7      I Owe' in your Explanation of Benefits," right?
8  A.  Mm-hmm.
9  Q.  Have you ever seen a letter of this type in use at
10     Viant?
11         MR. KING:  Same objection; lack of
12     foundation.
13 A.  We had various letters.  I couldn't tell you in
14     particular if this was in production or not.
15 BY MR. LAVIN:
16 Q.  Does Viant have a letter that it sends to patients
17     after they receive a balance bill?
18         MR. KING:  Are you talking about Cigna
19     patients?
20         MR. LAVIN:  Yeah.
21         MS. INCLEDON:  Objection; lack of
22     foundation.
23 A.  No, there's not a letter sent after they receive a
24     balance bill.
25 BY MR. LAVIN:

Page 149

1  Q.  Is there a --
2  A.  Not a patient advocacy letter.
3  Q.  Is there any kind of patient advocacy letter -- well,
4      first of all, would you characterize this template
5      letter as a patient advocacy letter?
6          MR. KING:  Objection; asked and answered
7      and object to foundation.
8          MS. INCLEDON:  And object to the form.
9  A.  I just don't know what this is to be able to tell you.
10 BY MR. LAVIN:
11 Q.  Is there a letter for Cigna members that's generated
12     to them in the situation if they were to call up and
13     say, call up Viant and say, I have been balance billed
14     by my provider?
15         MR. KING:  Objection; lack of foundation,
16     calls for speculation.
17 A.  No, not that I'm aware of.
18 BY MR. LAVIN:
19 Q.  Does Viant keep track of how many phone calls it
20     receives from members versus providers?
21         MR. KING:  Objection; outside the scope,
22     calls for speculation, lack of foundation.
23 A.  I don't know if the phone system that they used would
24     track that but we would be able to identify that
25     through the inquiry type and Toolbox?

38 (Pages 146 - 149)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 150

1 BY MR. LAVIN:
2 Q.  So when a call comes in, the customer service
3    representative can put in an indicator for whether
4    it's a provider or whether it's a member calling in?
5         MR. KING:  Same objections.
6 A.  Correct.
7 BY MR. LAVIN:
8 Q.  Do you ever run those numbers and compare them?
9 A.  No, I don't.
10 Q.  Do you have any idea how many provider calls Viant
11    receives versus member calls?
12         MR. KING:  Objection; asked and answered.
13    Lack of foundation.  Outside the scope.
14 A.  No, I don't.
15 BY MR. LAVIN:
16 Q.  If a member calls and says, "I've got a balance bill,"
17    what generally happens when Viant takes that phone
18    call?
19         MR. KING:  Objection; calls for
20    speculation.  Improper hypothetical.
21         MS. INCLEDON:  And asked and answered.
22 A.  So they would first validate who they are speaking to
23    is the appropriate party and go through kind of a -- a
24    couple of questions to ensure that there's, from a PHI
25    perspective, they are speaking to the right person.

Page 151

1    They would ask information such as what information
2    they are referring to to validate that it is a balance
3    bill and not other -- some other form of
4    documentation.
5         Sometimes it's just the letter that they've
6    received, it could be just an EOP, so validation would
7    take place through that process as well.
8 Q.  And then what happens?
9         MR. KING:  Same objection.
10 A.  I believe that they request a copy of the balance
11    bill, but I would need to validate that.
12 BY MR. LAVIN:
13 Q.  And if a member sends in a copy of a balance bill,
14    what would happen next?
15         MR. KING:  Same objections.
16 A.  Then they would review the parameters that we have
17    based on that particular claim to determine if we can
18    proceed with negotiation.  And if we can, then it is
19    assigned to a claim resolution specialist for
20    contacting the provider.
21 BY MR. LAVIN:
22 Q.  So it would go to a claims resolution specialist who
23    would then reach out to the provider, is that correct?
24 A.  Correct.
25 Q.  What if a Cigna member calls in and says, "I've

Page 152

1    received an EOB, and a PAD letter, and I don't like
2    how low you are paying claims to my provider."  What
3    would happen in that instance?
4         MR. KING:  Objection; calls for
5    speculation, hypothetical.
6         MS. INCLEDON:  Yeah, incomplete
7    hypothetical.
8 A.  First, I can't imagine that would ever happen because
9    they're -- they're speaking on behalf of their claim.
10    But if they are not calling about a balance bill, then
11    we would indicate that if they were being balance
12    billed, to call us back.  And they would just educate
13    them on the documents that they received.
14 BY MR. LAVIN:
15 Q.  So no balance bill in this scenario.  Somebody -- a
16    member has received an EOB that states that their
17    provider was paid $130 on a $2,000 claim.
18         What would happen in that instance if they
19    called in to Viant?
20         MR. KING:  Same objections.
21 A.  Same answer; they are not being balance billed, so
22    they would -- they would educate, if education was
23    needed, and then indicate to call us if a balance bill
24    was received.
25 BY MR. LAVIN:

Page 153

1 Q.  So, in that instance, it would not be referred to the
2    claims specialists and appeals, right?
3 A.  Correct.
4 Q.  Does Viant receive calls from members asking "who is
5    Viant?"
6 A.  They may.
7 Q.  Are you aware that some calls do occur -- do occur
8    like that?
9         MR. KING:  We're talking about Cigna
10    members, correct?
11         MR. LAVIN:  Sure.
12 A.  I'm speaking in general.  I don't take the calls nor
13    listen to them so I can't say in particular the
14    conversations that may occur.
15 BY MR. LAVIN:
16 Q.  All right.  In general, do they get calls that say
17    "who is Viant?"
18         MR. KING:  Objection; asked and answered.
19 A.  I don't know if they do.  I said they could.  But I
20    don't know if they do.
21 BY MR. LAVIN:
22 Q.  So what is the purpose of sending a PAD letter to a
23    patient?  Is it just to notify them in the very
24    specific situation where if they get a balance bill,
25    and that -- and only in that situation they should

39 (Pages 150 - 153)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 154

1  call into Viant?
2         MS. INCLEDON: Objection; form. Objection;
3  lack of foundation.
4  A.  Yes. The letter indicates if they are being balance
5  billed, to contact Viant.
6  BY MR. LAVIN:
7  Q.  Okay. If we -- let's go back and look at what we
8  just, the previous exhibit, which was Exhibit 7, I
9  want to just look at the top of it. You'll see it has
10  the Viant logo on it, right?
11  A.  Yes.
12         MR. LAVIN: So let's go to Tab 17, Nicole.
13  Exhibit 9 is Bates MPI-C12522 through MPI-C12531.
14         MARKED FOR IDENTIFICATION:
15         DEPOSITION EXHIBIT 9
16         Email Chain
17         MPI-C12522-MPI-C12531
18         2:28 p.m. CST
19  BY MR. LAVIN:
20  Q.  And you can go through, I'm not going to go through it
21  line by line, but you can take your time, go through
22  it, familiarize yourself with it. And my question is
23  going to be about the logo change and if there was a
24  logo change on the PAD letters, this is to refresh
25  your recollection.

Page 155

1  A.  Okay. I've reviewed it.
2  Q.  All right. At some point, did Viant replace its logo
3  on PAD letters with Cigna's logo?
4         MR. KING: Objection; lack of foundation.
5  A.  That is what I read here is that they were having the
6  Cigna logo.
7  BY MR. LAVIN:
8  Q.  Do you know if all PAD letters for Cigna that go out
9  now all have the Cigna logo on them?
10         MS. INCLEDON: Objection; lack of
11  foundation.
12  A.  I would need to review every one to confirm that.
13  BY MR. LAVIN:
14  Q.  So you can't say one way or the other?
15         MR. KING: Objection; asked and answered.
16  A.  No.
17  BY MR. LAVIN:
18  Q.  Okay. Is there ever confusion, in your experience,
19  from Cigna members about why they are getting a letter
20  from Cigna, apparently, with Cigna's logo on it,
21  instructing them to call Viant?
22         MS. INCLEDON: Objection; lack of
23  foundation and objection to the extent it
24  mischaracterizes the witness's prior testimony.
25  A.  I don't -- I don't know.

Page 156

1  BY MR. LAVIN:
2  Q.  On the return envelope -- on the envelope that goes
3  out with the PAD letters, does the envelope contain
4  the Cigna logo also?
5         MR. KING: Objection; lack of foundation,
6  calls for speculation.
7  A.  No, it does not.
8  BY MR. LAVIN:
9  Q.  Does it contain a logo on it?
10  A.  I don't believe it does, no.
11  Q.  Are the letters that go out with the Cigna logo made
12  to look like they are coming from Cigna?
13         MS. INCLEDON: Objection to the form.
14  Objection; lack of foundation.
15  A.  No, it is signed "Viant."
16  BY MR. LAVIN:
17  Q.  Okay. But the letterhead on it is Cigna, correct?
18         MR. LAVIN: Argumentative, same objections.
19         MS. INCLEDON: Asked and answered.
20  A.  Again, it depends the version that we were looking at,
21  so I would have to see the version, but it explains
22  who Viant is in the body of the letter and it is
23  signed by Viant.
24  BY MR. LAVIN:
25  Q.  Does MultiPlan have an understanding of why it's, or

Page 157

1  why Cigna wants to have its letterhead on letters
2  being sent out by Viant?
3         MR. KING: Objection; outside the scope,
4  lack of foundation.
5         MS. INCLEDON: Objection to the extent it
6  calls for speculation.
7  A.  I -- I wasn't in the department at that time, nor
8  would I have that detail. That would be a sales
9  question.
10  BY MR. LAVIN:
11  Q.  I'm asking you as the corporate representative of
12  MultiPlan. Does MultiPlan have an understanding of
13  why Cigna wants its logo on the letterhead of PAD
14  letters and not Viant's logo?
15         MR. KING: Objection; the question is
16  outside the scope of the topics the witness has been
17  designated for. As she's indicated, that was a
18  question for the sales corporate representative who is
19  Monica Armstrong.
20         MR. LAVIN: This witness has been
21  designated on communications to members by Viant.
22  This is a communication by Viant to members.
23         MR. KING: Thank you, Judge Lavin. My
24  objection stands.
25         MS. INCLEDON: And I think there is still a

40 (Pages 154 - 157)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 158

1    pending question, so I will also have an objection to
2    lack of foundation.
3            MR. LAVIN:  All right.  Both of your
4    objections are overruled.
5    BY MR. LAVIN:
6    Q.  Can you answer the question, does MultiPlan have an
7        understanding of that?
8    A.  I do not know.
9    Q.  Okay.  Do other MultiPlan clients have the Viant logo
10       taken off of the PAD letters?
11           MR. KING:  Objection; outside the scope.
12   MultiPlan and other clients are not in the topics.
13   You can answer.
14   A.  I would have to review the letters that each client
15       uses.
16   BY MR. LAVIN:
17   Q.  Yeah.  So I just want to be really clear, because this
18       is a deposition topic, you have no understanding of
19       why Cigna wants its logo on MultiPlan's Viant PAD
20       letters, right?
21           MR. KING:  My same objection; outside the
22   scope and -- for this witness and Ms. Armstrong are
23   made.
24           MS. INCLEDON:  And same objection to lack
25   of foundation.

Page 159

1    A.  No, I was not involved in any discussion on that to be
2        able to provide any details, so I do not know.
3    BY MR. LAVIN:
4    Q.  Let's go to -- hold on.  Before we do that.  At the
5        top of that email, it says "CDM should do that
6        update."
7            What is CDM?
8            MR. KING:  Objection; lack of foundation.
9    You can answer.
10   A.  CDM is Client Data Management.
11   BY MR. LAVIN:
12   Q.  And what does that mean?
13   A.  It is a department within MultiPlan that manages any
14       client requests that are originating from our sales
15       team.
16   Q.  Do you know if at some point Cigna requested its
17       number go on PAD number -- PAD letters rather than
18       Viant's number?
19           MR. KING:  Objection; lack of foundation,
20   calls for speculation, outside the scope.
21   A.  No, I don't know that.
22   BY MR. LAVIN:
23   Q.  Do you know if Cigna's number appears on any PAD
24       letters, whatsoever?
25           MR. KING:  Same objections.

Page 160

1    A.  I do not.
2    BY MR. LAVIN:
3    Q.  What's that?
4    A.  Sorry, I thought Caroline was talking.
5            MS. INCLEDON:  I just said I joined Errol's
6    objection.
7    A.  No, I do not know.
8            MR. LAVIN:  Let's go to Tab 19.  Tab 19 is
9    Exhibit 10, Bates number MPI-C16258.
10           THE WITNESS:  Okay.
11           MARKED FOR IDENTIFICATION:
12           DEPOSITION EXHIBIT 10
13           9/16/2020 Correspondence - MPI-C16258
14           2:21 p.m. CST
15   BY MR. LAVIN:
16   Q.  Do you recognize what this is?
17   A.  Patient advocacy letter.
18   Q.  Do you know what Cigna affiliate used this version of
19       the patient advocacy letter on September of 2020?
20           MS. INCLEDON:  Objection; lack of
21   foundation.  Object to the form.
22   A.  No, I just see Cigna referenced.  I'm not able to tell
23   that.
24   BY MR. LAVIN:
25   Q.  Is this a letter that would have been sent out by

Page 161

1        Viant?
2    A.  Yes, it appears so based on the address listed.
3    Q.  All right.  But if you look at the top, you see the
4        Cigna logo at the top?
5    A.  Mm-hmm.
6    Q.  If you look at the very bottom of the signature, it
7        says, "Sincerely Cigna Customer Service."  Do you see
8        that?
9    A.  Mm-hmm.
10   Q.  And then underneath it says, "Cigna and the Tree of
11       Life logo, registered service marks of Cigna
12       Intellectual Property Corp," right?
13   A.  Mm-hmm.
14   Q.  But this is a letter sent by Viant, right?
15           MR. KING:  Objection; argumentative, asked
16   and answered.
17           MS. INCLEDON:  Object to the form.
18   A.  Yes.
19   BY MR. LAVIN:
20   Q.  Do you think it may be confusing receiving this Cigna
21       letter instructing it to call Viant when it's signed
22       by Cigna and has the Cigna letterhead at the top?
23           MR. KING:  Objection; lack of foundation,
24   calls for speculation.
25           MS. INCLEDON:  Object to the form.

41 (Pages 158 - 161)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 162

1  A.  No, because in the body it states that Cigna has
2     contracted with an outside vendor Viant and describes
3     the relationship and what Viant has done on this
4     claim.
5  BY MR. LAVIN:
6  Q.  Earlier you testified that you didn't think it was
7     confusing because Viant signs the letters, do you
8     remember that?
9  A.  Yes.
10        (Reporter appeal at 3:43 p.m.)
11  Q.  And so, now what you are testifying to is that
12     customers or -- excuse me, Cigna members shouldn't be
13     confused about who is sending this letter because it
14     mentions Viant in the body of the letter, is that
15     right?
16        MR. KING:  Objection --
17        MS. INCLEDON:  Objection to the extent that
18     it mischaracterizes the witness's prior testimony and
19     objection; lack of foundation.
20        MR. KING:  And objection; argumentative.
21  A.  I don't feel that it's confusing because the body of
22     the letter gives an ample description of Cigna versus
23     Viant.
24  BY MR. LAVIN:
25  Q.  Would a Cigna member have any way of knowing that this

Page 163

1     letter was sent by Viant and not by Cigna?
2        MR. KING:  Objection; calls for
3     speculation, lack of foundation.
4  A.  They could ask that question.
5  BY MR. LAVIN:
6  Q.  Is the letter intended to appear as if it's being sent
7     by Cigna?
8        MS. INCLEDON:  Objection to form.
9     Objection to lack of foundation.
10  A.  It's intended to explain the relationship between
11     Viant and Cigna to introduce who Viant is so that the
12     member understands that and why they are contacting
13     Viant for their balance bill.
14  BY MR. LAVIN:
15  Q.  So what you're -- your testimony, if I understand it,
16     it makes no representation about who is sending the
17     letter, is that correct?
18        MR. KING:  Objection to the extent it
19     mischaracterizes her testimony.
20  A.  No, I mean it -- it references both companies within
21     the letter.
22  BY MR. LAVIN:
23  Q.  Right.  But it's signed by -- I'm sorry, I didn't mean
24     to cut you off.
25  A.  I was just going to say I'm not sure what your

Page 164

1     question is.
2  Q.  So my question is, are you stating that there is,
3     there isn't supposed to be any indication about who is
4     sending this letter in this letter?
5        MR. KING:  Objection -- same objections,
6     lack of foundation, calls for speculation, outside the
7     scope.
8  A.  No, that's not what I stated.
9  BY MR. LAVIN:
10  Q.  Okay.  If you -- if somebody had seen this letter, who
11     do you think they would think had sent them that
12     letter?
13        MR. KING:  Objection; calls for
14     speculation, lack of foundation.
15        MS. INCLEDON:  Incomplete hypothetical.
16  A.  This one is signed by Cigna customer service.
17  BY MR. LAVIN:
18  Q.  But it wasn't sent by Cigna customer service, right?
19        MR. KING:  Objection; asked and answered,
20     argumentative.
21  A.  It was sent by Viant on a Cigna claim.
22  BY MR. LAVIN:
23  Q.  So where it says, you know, "Sincerely, Cigna customer
24     service," that's not actually true.  It was actually
25     sent by Viant, correct?

Page 165

1        MS. INCLEDON:  Objection; form.  Objection;
2     lack of foundation.  Objection; asked and answered.
3  A.  Yes, this letter is sent by Viant.
4  BY MR. LAVIN:
5  Q.  All right.  So why does it say, "Cigna customer
6     service," when it's not actually sent by Cigna
7     customer service?
8        MR. KING:  Objection; argumentative, lack
9     of foundation, calls for speculation, outside the
10     scope.
11  A.  I don't have the history on that.
12  BY MR. LAVIN:
13  Q.  Is it your testimony that this letter was in place and
14     in effect before you started at Viant in April of
15     2019?
16        MR. KING:  Objection to prior testimony
17     being mischaracterized.
18  A.  I would not know when this letter particularly went
19     into effect.  A change request would be submitted
20     whenever a change to a letter is requested.  And
21     that's a fairly standard process with our clients in
22     general.
23  BY MR. LAVIN:
24  Q.  Other than these PAD letters, what other
25     communications does Viant send to Cigna members?

42 (Pages 162 - 165)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 166

1  A.  Viant would only send patient advocacy letters.
2  Q.  Okay.  So in the Deposition Notice where it talks
3      about communications with Cigna members by Viant, is
4      there any other types of communications besides PAD
5      letters that Cigna can point to and say those are
6      communications with Cigna members?
7          MS. INCLEDON:  Objection to the extent that
8      you are asking her about Cigna and what Cigna sends to
9      members.  And objection; lack of foundation.
10          MR. KING:  And by "communications," you're
11     not, the Deposition Notice is not referring solely to
12     document communications, correct?
13          MR. LAVIN:  It's referring to any
14     communications, but I'm, you know, we can break it
15     down.
16  BY MR. LAVIN:
17  Q.  What other written communications does Viant make with
18     Cigna members other than PAD letters?
19  A.  I am just familiar with the PAD, the patient advocacy
20     letters.
21  Q.  Are there any other types of communications,
22     telephonically, electronically, smoke signals, or
23     otherwise, that Viant makes with Cigna members other
24     than these written PAD letters?
25  A.  We had the --

Page 167

1          MS. INCLEDON:  Objection to form and
2      objection; argumentative.
3  A.  We spoke to the other communication earlier as far as
4      phone call inquiries that would come in from a member.
5  BY MR. LAVIN:
6  Q.  So the -- I'm sorry, I'm listening.
7  A.  I'm sorry, I thought your question was about written
8      documentation.
9  BY MR. LAVIN:
10  Q.  Any communications by Viant to members.
11          MR. KING:  Asked and answered.
12  A.  There is the patient advocacy letters and then the
13      phone calls when a member would contact Viant.
14  BY MR. LAVIN:
15  Q.  But as far as Viant initiating contact with a member,
16      the only way is going to be these patient advocacy
17      letters, right?
18          MR. KING:  Objection; argumentative, asked
19      and answered.
20  A.  Viant would initiate just through a patient advocacy
21      letter that was sent on a claim.
22  BY MR. LAVIN:
23  Q.  Okay.  And you're, as you sit here today, looking at
24      this Exhibit number 10, you can't tell me what Cigna
25      affiliates it applies to, whether that, when that

Page 168

1      format of that language was implemented, right?
2          MR. KING:  Objection; asked and answered,
3      outside the scope.
4  A.  That's correct.
5  BY MR. LAVIN:
6  Q.  Even though this is --
7  A.  And I can tell you it's dated 9-16-2020, that does not
8      tell me what affiliate it is nor the claim in which
9      this went in, so I don't have that detail.
10  Q.  Right.  Because you are the corporate representative
11      of MultiPlan in this case.  It's literally the topic
12      of the deposition today, one of the main topics.
13          MR. KING:  Matt, Matt --
14  BY MR. LAVIN:
15  Q.  So if you're --
16          MR. LAVIN:  I'm still talking, Errol.
17  BY MR. LAVIN:
18  Q.  So if your testimony is that you have no idea what
19      this letter, what, you know, Cigna affiliate or claim
20      platform went into effect is, I would consider your
21      testimony today non-responsive.  That's worrisome for
22      me because I don't want to take this deposition again.
23          MR. KING:  Are you done?
24          MR. LAVIN:  I am now, yeah.
25          MR. KING:  Matt, we've designated multiple

Page 169

1  corporate representatives, as you darned well know.
2  To us, what you are asking her now, is part of the
3  business relationship between Cigna and MultiPlan.
4  Monica Armstrong was designated for that topic --
5          MR. LAVIN:  Monica Armstrong could not
6  answer that question --
7          MR. KING:  No, no no.  I'm talking now,
8  buddy.  I'm talking now.
9          MR. LAVIN:  Listen, pal.  All right, buddy.
10  Listen -- listen up, pal.  This is my deposition and I
11  am taking this deposition.
12          MR. KING:  You are outside the scope of
13  this witness's designated topic.
14          MR. LAVIN:  It is not outside the scope.
15  It is well within the scope.  And Monica Armstrong was
16  not able to answer that question.  So you have not
17  provided a witness on that testimony.  You have not.
18  And you know what?  We're going to recall witnesses.
19  And it's too bad because it's unnecessary because you
20  could have easily prepared a witness for that
21  question.  Easily.  It's not -- it's not rocket
22  science, but you have not provided a witness nor any
23  documents on that topic.
24          MR. KING:  We have provided all the
25  documents that are responsive, Matt, so quit with your

43 (Pages 166 - 169)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 170

1  dialogue here on the record. Act like a professional.
2          MR. LAVIN: You know something? Why don't
3  you produce a witness who can actually be responsive
4  to the topics and the issues in the case.
5          MR. KING: We have.
6          MR. LAVIN: It's your failure to prepare a
7  witness when these are key central important topics
8  and issues for this case, and that's what it is.
9          MR. KING: We have to -- we have to agree
10 to disagree.
11         MR. LAVIN: Yeah.
12         MR. KING: Move on.
13         MR. LAVIN: We will be compelling a witness
14 on those topics because you haven't had one yet.
15         MR. KING: Matt, you can do whatever you
16 want to do.
17         MR. LAVIN: I'm trying to avoid bringing
18 people back.
19         MR. KING: Then quit arguing and move on.
20         MS. INCLEDON: I will just state for the
21 record as well, I firmly disagree with
22 Mr. Lavin characterization of Ms. Praxmarer's --
23         MR. LAVIN: All right. All right. All
24 right.
25         MS. INCLEDON: Not --

Page 171

1 BY MR. LAVIN:
2 Q. Let's go down on this letter.
3         MR. KING: No. No. No. You can't cut her
4  off like that.
5         MS. INCLEDON: You do this every time. You
6  are bullying people on the record. You made a whole
7  scene about how you were allowed to get your speech
8  out and then you just talked over Errol for five
9  minutes and now you just talked over the one thing I
10 had to say.
11        MR. LAVIN: Caroline, I'd love to hear what
12 you have to say. What do you have to say?
13        MS. INCLEDON: I already said it. I
14 finished. You probably missed it when you were
15 talking over me.
16 BY MR. LAVIN:
17 Q. All right. Let's go back to this exhibit and let's
18 look down at the bottom where it says, "Questions or
19 Concerns. Please call Viant toll free." And it gives
20 the Viant phone number, correct?
21 A. Yes.
22 Q. So this is yet another letter that does not have a
23 Cigna phone number on it, correct?
24        MR. KING: Objection; the letter speaks for
25 itself and a lack of foundation.

Page 172

1 A. This is Viant's number, correct.
2         MR. LAVIN: All right. Let's go to Tab 20,
3 Exhibit 11, Bates MPI-C16274.
4         MARKED FOR IDENTIFICATION:
5         DEPOSITION EXHIBIT 11
6         7/26/2021 Correspondence - MPI-C16274
7         2:53 p.m. CST
8 BY MR. LAVIN:
9 Q. Please take a look at that.
10 A. Yes.
11 Q. And what is this we are looking at here?
12 A. This is a patient advocacy letter sent to a Cigna
13    member.
14 Q. And it is dated 7-26-21, correct?
15 A. Yes.
16 Q. Do you have any idea what Cigna affiliate this PAD
17    letter is associated with?
18        MR. KING: Same objection; outside the
19    scope.
20 A. No.
21 BY MR. LAVIN:
22 Q. Do you know if at any time in 2015 through the present
23    different Cigna affiliates have used different PAD
24    letters?
25        MR. KING: Objection; outside the scope,

Page 173

1    lack of foundation.
2 A. As I mentioned earlier, each affiliate could have a
3    distinct letter. I don't know the details on those.
4    I would not have.
5 BY MR. LAVIN:
6 Q. Do you know if they do have a distinct letter or is it
7    just that they could have a distinct letter?
8        MR. KING: Objection; asked and answered,
9    outside the scope, lack of foundation.
10 A. They could. I do not know if they do.
11 BY MR. LAVIN:
12 Q. If you look down on this again, you see at the top it
13    has the Cigna logo and it's got an address underneath.
14    Is that Cigna's address underneath?
15        MR. KING: Objection; outside the scope,
16    foundation, asked and answered.
17 A. That's Viant's address.
18 BY MR. LAVIN:
19 Q. Over on the right, there is a QR code. Do you know
20    what that QR code is?
21        MR. KING: Objection; lack of foundation,
22    outside the scope.
23 A. It's just a way that they would generate that through
24    the system.
25 BY MR. LAVIN:

44 (Pages 170 - 173)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 174

1 Q.  All right.  If we look down, who signed this letter?
2 A.  Cigna.
3 Q.  Cigna.  But this letter was sent by Viant, correct?
4        MR. KING:  Objection to the form, lack of
5     foundation, you can answer, outside the scope.
6 A.  Yes, we mailed the letter.
7 BY MR. LAVIN:
8 Q.  Does MultiPlan -- strike that.  What is MultiPlan's
9     position on why Cigna's name is on the top of this
10    letter and why their signature is on the bottom of
11    this PAD letter?
12        MR. KING:  Objection; outside the scope,
13    lack of foundation.
14        MS. INCLEDON:  And objection; asked and
15    answered.
16 A.  As I mentioned, I don't have the history on that
17    change.
18 BY MR. LAVIN:
19 Q.  Do you know what Cigna's position is on why that logo
20    appears on the top and that signature at the bottom?
21        MR. KING:  Same objections.
22 A.  No.
23 BY MR. LAVIN:
24 Q.  Do you know if this letter is the same for all Cigna
25    affiliates in 2021?

Page 175

1        MR. KING:  Same objections.
2 A.  They are not.
3 BY MR. LAVIN:
4 Q.  Do you know when the last time there was a material
5     change to the language and PAD letters for Cigna
6     members was?
7 A.  No, I wouldn't have that date.
8 Q.  Would it have been before 2019?
9 A.  I just said I don't -- I wouldn't have that date.  I
10    don't know the date.
11        MR. KING:  Same objections, outside the
12    scope.
13        MR. LAVIN:  Let's go to Tab 22.
14    MARKED FOR IDENTIFICATION:
15    DEPOSITION EXHIBIT 12
16    MPI-C14939-MPI-C14940
17    2:59 p.m. CST
18        MR. LAVIN:  Exhibit 11, Bates MPI-C16274.
19 A.  Can you -- can you say that again?  I'm not sure that
20    I have --
21        MR. LAVIN:  I'm sorry, I looked at the
22    wrong document.  I'm sorry, I apologize.
23        MR. KING:  I was going to say the same
24    thing.
25        MR. LAVIN:  Yeah.  Exhibit 12, sorry, is

Page 176

1     MPI-C14939 through MPI-C14940.
2        THE WITNESS:  Yes.
3 BY MR. LAVIN:
4 Q.  And what is this?  Can you tell me what we are looking
5     at?
6 A.  It is a cover sheet and a letter of term that is
7     signed by a provider.
8 Q.  And what is the purpose of this form?  I'm looking
9     particularly at page 2.  The first page appears to be
10    a fax cover sheet.
11 A.  It is to suggest in -- a reduced amount based on a
12    claim, so in this case it was 9-26 to 9-27-2018,
13    ████████████████████████████████████
14    Karol King.
15 Q.  And then it also has some language under it.  It says,
16    "Provider agrees not to balance bill patient or
17    patient's family.  Provider agrees to accept the
18    above.  We tried to conduct an -- our payor waives
19    their right to conduct an on-site audit of the bill
20    charges."
21        What does that mean?  What does that refer
22    to?
23        MR. KING:  Objection; lack of foundation.
24 A.  That the provider will not perform an on-site audit of
25    this claim.

Page 177

1 BY MR. LAVIN:
2 Q.  What does that mean?  Do payors typically conduct
3     on-site audits of individual claims in your
4     experience?
5        MR. KING:  Objection; calls for
6     speculation, lack of foundation, outside the scope.
7 A.  I don't know what payors typically do, but this is to
8     state that they would not audit this particular claim.
9 BY MR. LAVIN:
10 Q.  Do you know if the language in this document is the
11    same language that is used today?
12 A.  It is not.
13 Q.  And how is it different today?
14 A.  We just, I know that we've made changes throughout the
15    years, just like we change policies and procedures or
16    update policies and procedures, this would have been
17    updated as well.
18 Q.  And who makes those changes?
19 A.  We -- we would initiate and then it would be a
20    technical change in our system.
21 Q.  Let's go to the first page of this.  There is a
22    starred part under "Additional Comments" that says,
23    "MRC2 best offer due 10-29 at noon."  Do you see that?
24 A.  Mm-hmm.  Yes, I do.
25 Q.  And what is that supposed to mean?

45 (Pages 174 - 177)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp



Page 178

1    MR. KING:  Objection; lack of foundation.
2    You can answer.
3    ████████████████████████████████
     ████████████████████████████████
     ██████████████████████
7    And then this "due 10-29 at noon" would be
8    requesting the provider to give us a response so that
9    we have a response based on the timing we are
10   requesting, or that this person is requesting.
11   BY MR. LAVIN:
12   ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████

Page 179

1    ████████████████████████
3    BY MR. LAVIN:
4 Q. If it's a reflection, it's MR -- so you are saying in
5    Toolbox or somewhere in the MultiPlan system, you are
6    saying it would indicate that is an MRC2 plan,
7    correct?
8        MR. KING:  Objection; mischaracterizes her
9    testimony.  You can answer.
10 A. Through the target that's received, we would have an
11   indication.  I don't know definitively how that's
12   reflected in Toolbox.
13 BY MR. LAVIN:
14   ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
21 BY MR. LAVIN:
22 Q. Is that -- is that plan language?
23       MR. KING:  Same objections.  We've objected
24   to plan language.  She -- this witness is not
25   testifying as to Cigna plan language.

Page 180

1 A.  This is information we would receive through the sales
2    team from Cigna.
3 BY MR. LAVIN:
4    ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
17       MR. KING:  Objection; she's already said it
18   came from Cigna.
19       MS. INCLEDON:  Objection to the form.
20 A.  Correct, we would have received that information from
21   Cigna.
22 BY MR. LAVIN:
23 Q.  Do MRC2 plans sometimes pay at higher percentages of
24   Medicare?
25       MR. KING:  Objection; outside the scope.

Page 181

1    Lack of foundation.
2 A.  I don't know payment information.  You'd have to ask
3    that information from Cigna.
4 BY MR. LAVIN:
5 Q.  Have you ever seen one of those cover letters that
6    had, like, a higher percentage of Medicare as the
7    possible payment amount on a claim?
8        MR. KING:  Objection; lack of foundation.
9 A.  Are you referring to our cover letter, the Viant cover
10   letter?
11       MR. LAVIN:  Yes.  Yes.
12   ████████████████████████████████
     ████████████████████████████████
     ████████████████████████████████
16 BY MR. LAVIN:
17 Q.  So any time it's an MRC2, it's going to have that
18   statement on there?
19       MR. KING:  Objection; mischaracterizes
20   testimony.
21       MS. INCLEDON:  And lack of foundation.
22 A.  It could have that on there, yes.
23 BY MR. LAVIN:
24 Q.  Why does it say above it, "best offer due at 10-12 --
25   10-29 at noon"?

46 (Pages 178 - 181)

AEO 30(b)(6) Kathy Praxmarer                                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 182

1  A.  10-29 at noon is when the, when Carmen McBride is
2      requesting response from the provider.
3  Q.  What happens if you don't -- if the provider doesn't
4      get back to them by 10-29 at noon?
5          MR. KING:  Objection; calls for
6      speculation.  You can answer.
7  A.  It would depend on if this claim was due back by that
8      time.  I can't tell you in context of -- this was an
9      appeal or if it was just an individual negotiation.
10 BY MR. LAVIN:
11 Q.  I think this is related to an email we saw earlier,
12     Riverbend was the provider and Positive Sobriety
13     Institute.  Do you remember that exhibit, it's not
14     real relevant to hold them up to each other, but I
15     think this might have been submitted with a batch of
16     claims, but in any event, do offers from negotiations
17     expire at a certain point or is that just a
18     negotiation tactic to say, "Get back to us by a
19     certain time"?
20 A.  There are indeed --
21         MR. KING:  Object to the form.  You can
22     answer.
23 A.  There are indeed offers that we have a specific time
24     frame in which we need to respond.
25 BY MR. LAVIN:

Page 183

1  Q.  And why would you have a specific time frame?
2  A.  It would be based on a setup from the client so that
3      they requested a specific time frame in which we
4      complete the negotiation.
5  Q.  Okay.  Do you know if that happens with Cigna?
6  A.  It does happen on an individual negotiation.  I don't
7      know specifically on the appeal.
8          MR. LAVIN:  So let's go to -- let's go to
9      Tab 18, Nicole.
10         MARKED FOR IDENTIFICATION:
11         DEPOSITION EXHIBIT 13
12         MPI-C16381-MPIC-16383
13         3:09 p.m. CST
14 BY MR. LAVIN:
15 Q.  And if we're looking here and still hanging on to
16     Exhibit 12, it says "Carmen."
17         Does Carmen still work as a claims
18     specialist at Viant?
19 A.  Yes, I believe so.
20         MR. LAVIN:  Exhibit 13, Bates MPI-C16381
21     through MPI-C16383.
22 BY MR. LAVIN:
23 Q.  Okay.  All right.  Do you recognize what this is?
24 A.  A cover sheet and an agreement.
25 Q.  Okay.

Page 184

1  A.  The letter of terms.
2  Q.  And if you look at the language on this, it appears to
3      be exactly the same as the one we saw previously, the
4      second page, the last page -- page 3?
5  A.  I would have to review each one verbatim to say yes to
6      that.  I can't tell you that just by glancing at it.
7  Q.  All right.  Let's look at the top page on this, page
8      ending in 81.  It says, "The allowable is lower" -- it
9      says, "Best offer for settlement."  Do you see that?
10 A.  Yeah.
11         MR. KING:  Can you repeat that?  It says
12     what?
13         MR. LAVIN:  "Best offer for settlement."
14 A.  Oh, yes, I see.
15 BY MR. LAVIN:
16 Q.  It says, "The allowable is lower on this claim than
17     the other claims that were priced at a higher rate in
18     2018.  This is the best offer I can extend on this
19     claim.  If the offered adjusted amount is declined or
20     changed I will need to close with no settlement.
21     Please don't hesitate to contact me with any
22     questions.  If we do not resolve this case, no
23     additional payment will be made.  If applicable,
24     follow ERISA guidelines or contact the payor.  Thanks,
25     Jill."  Do you see that?

Page 185

1  A.  I do.
2  Q.  What ERISA guidelines is Jill referring to there?
3          MR. KING:  Objection; outside the scope and
4      lack of foundation, calls for speculation.
5  A.  I don't know what's her -- what's -- or what that
6      reflects.
7  BY MR. LAVIN:
8  Q.  Okay.  I believe you testified earlier about this.
9          Do claims resolutions specialists have any
10     training in ERISA at all that you are aware of?
11 A.  I -- I don't know.
12 Q.  Okay.  Is that just a negotiation tactic when she is
13     saying, "if applicable follow ERISA guidelines or
14     contact the payor"?
15         MR. KING:  Object as to form.
16 A.  I don't feel it's a tactic.  To me this is stating if
17     we are not able to resolve it there is nothing that
18     Viant can further do on this claim.  So it needs to be
19     taken up with the -- the payor.
20 BY MR. LAVIN:
21 Q.  How does Jill know that this particular claim is
22     subject to ERISA?
23         MR. KING:  Objection; calls for
24     speculation, lack of foundation.
25 A.  I don't know that she --

47 (Pages 182 - 185)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 186

1          MS. INCLEDON:  Sorry, Kathy.  Object, too,
2     that it calls for a legal conclusion.
3  A.  I don't know that she knows it follows ERISA.  It
4     says, "follow ERISA or contact the payor."
5  BY MR. LAVIN:
6  Q.  Do you know if all claims priced through Viant are
7     subject to ERISA or not?
8          MR. KING:  Objection; outside the scope,
9     lack of foundation, calls for speculation.
10  A.  No.
11  BY MR. LAVIN:
12  Q.  If we go to the next-to-the-last page here, is Jill
13     still with Viant?
14  A.  I don't know.
15  Q.  Jill Petrie, you haven't heard that name before?
16  A.  I, again, I don't know, Matt.  I referenced before, I
17     have -- I have over 500 employees.  I don't know the
18     name of every one of my employees.
19  Q.  I think you testified that you only had four claims
20     resolution specialists, right?
21  A.  There are five under Viant.  About five under Viant.
22  Q.  Is one of them named Jill Petrie?
23  A.  Sorry, I just don't know that.
24  Q.  Could you name the other claims resolution
25     specialists?

Page 187

1  A.  No.
2          MR. KING:  Objection; asked and answered.
3  BY MR. LAVIN:
4  Q.  Could you name the individuals who are answering the
5     phones for customer services?
6  A.  No, I could not.  I could not do that in any of my
7     departments.
8  Q.  Okay.
9  A.  Too many people for me to know.
10  Q.  But some of those you've worked with for many, many
11     years, decades, right, in customer service?
12          MR. KING:  Objection; argumentative.
13  A.  No, I have not worked with them for many, many
14     decades.  If I am working directly with an individual,
15     I will know their name.  But if they are reporting
16     through supervisors or managers within my
17     organization, I'm not going to know all of the names
18     of the employees in my department.
19  BY MR. LAVIN:
20  Q.  Okay.  Is there less people in the customer service
21     department today than two years ago?
22          MR. KING:  Objection; outside the scope.
23     You can answer.
24  A.  There are.
25  BY MR. LAVIN:

Page 188

1  Q.  And why is that?
2  A.  Our appeal rate has gone down.
3  Q.  So you laid people off?
4          MR. KING:  Objection; outside the scope,
5     lack of foundation.  You can answer.
6  A.  I have not laid anybody off in two years.
7  BY MR. LAVIN:
8  Q.  So why is there less people in the customer services
9     department now than there were two years ago?
10          MR. KING:  Objection; asked and answered.
11  A.  As I mentioned, our appeal rate has gone down so any
12     department I'm looking at, you know, my teams are
13     looking at productivity and intake and if we find that
14     we are under or overstaffed in an area, they will
15     adjust accordingly.
16  BY MR. LAVIN:
17  Q.  What does that mean?  What do you mean "adjust
18     accordingly"?
19  A.  They would assess, do you need 20 people, do you need
20     three people?  And how many people do you have?  And
21     then determine do we have other positions that that
22     individual can be cross-trained on or, you know, other
23     areas of the organization that they would be better
24     suited.
25  Q.  So were people moved out of the customer resources, or

Page 189

1     customer service department and transferred into other
2     jobs at Viant because you don't have as many appeals?
3  A.  I can't say in particular in customer service, but
4     when that is happening, we are looking within the
5     MultiPlan umbrella, not in particular to Viant.
6     Because if the appeals are declining, each of the
7     areas in Viant are seeing that same decline.
8  Q.  So I mean, I'm just trying to understand, did you lay
9     anybody off?
10  A.  No, I said --
11          MR. KING:  Asked and answered.
12  BY MR. LAVIN:
13  Q.  Okay.
14  A.  I already said I laid nobody off in the last two
15     years.
16  Q.  But you can't explain where they went?  They just --
17     less appeals, people go away?
18  A.  That's not what I said.
19          MR. KING:  Let me do my objections, Matt,
20     for crying out loud.  Objection; argumentative.  You
21     are mischaracterizing her testimony.
22  A.  I said we will cross-train them on other roles and
23     responsibilities within MultiPlan.  They would, if
24     they are not, if there is no longer a role available
25     within Viant we will determine are there other roles

48 (Pages 186 - 189)

AEO 30(b)(6) Kathy Praxmarer                                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 190

1    for which they will be qualified, they have skill sets
2    for qualification, and transition them to another
3    role.
4  BY MR. LAVIN:
5  Q.   Is that what happened?
6           MR. KING:  Objection; asked and answered.
7  A.   Yes, that's what I believe would have happened.
8  BY MR. LAVIN:
9  Q.   What about claims resolution specialists, are there
10   less today than there were two years ago?
11 A.   Yes.
12 Q.   And by how much?  What's the difference?  What's the
13   delta on that?
14 A.   I wouldn't know that.  I don't know.
15          (Reporter appeal at 4:18 p.m.)
16          MR. KING:  Object to the form of the
17   question.
18 BY MR. LAVIN:
19 Q.   Is it one or two people?
20          MR. KING:  Objection; asked and answered.
21 A.   I don't know.  I would have to look at my staff
22   structure in the daytime prior compared to today.
23 BY MR. LAVIN:
24 Q.   All right.  So let's go, on the last page of this, we
25   have MPI-C16383 on the last page there.  Do you see

Page 191

1    that?
2           And it says, "Provider's List Price."  What
3    does that mean?  What's a list price?  It sounds like
4    buying a car or something like that.
5           MR. KING:  Object to the form of the
6    question.
7  A.   That would be the total charge on the claim.
8  BY MR. LAVIN:
9  Q.   So like a car dealer's list price?
10          MR. KING:  Same objection.
11 A.   Total charge on the claim.
12 BY MR. LAVIN:
13 Q.   So the provider's charge?
14          MR. KING:  Objection; asked and answered.
15 A.   Yes.
16 BY MR. LAVIN:
17 ████████████████████████████████t
18   indicate?
19 A.   That's the amount that we're suggesting back to the
20   provider for acceptance on the date of service 10-27.
21 Q.   Okay.  How did Jill arrive at that $150 number?
22 A.   I would -- I don't have the claim in front of me to
23   able to respond to that, but I, we would have a
24   target, we may have a target price.  I, again, don't
25   know if this was an appeal or if it was an individual

Page 192

1    negotiation, so it's -- it's hard for me to speculate,
2    but it could be, you know, that we have a target
3    price.  It could be that it was, you know, repriced
4    originally at close to that value.
5  Q.   What do you mean, it was originally repriced close to
6    that value?  Isn't this supposed to be a negotiation
7    for more than the claim was originally priced at?
8  A.   Yes, that's why I said "close to."
9  Q.   I'm listening, sorry.
10 A.   So if we have suggested an initial example value of
11   $100, and then maybe the -- the next negotiation was
12   at 150, without having the claim, I just don't know
13   that level of detail because I'm only seeing a
14   document in front of me.
15 Q.   So is -- are the proposals and the offers and the
16   counteroffers, are those automated within Viant or are
17   the claims resolution specialists just spitballing,
18   going by feel?
19          MR. KING:  Object to the form of the
20   question.  What do you mean by "spitballing"?
21 BY MR. LAVIN:
22 Q.   Do you understand my question?
23 A.   I would -- I could understand from my terminology and
24   I would disagree with both statements.
25 Q.   So I'm just asking for clarity.  I don't know that

Page 193

1    that's how it is.  I'm asking how do they come up with
2    the numbers?  Are they allowed on their own to come up
3    with whatever, you know, counteroffer they feel is
4    appropriate?
5           MR. KING:  Objection; asked and answered.
6  A.   Yeah, I believe I mentioned previously that they have
7    discretion.  So without seeing if this is an
8    individual negotiation or an appeal, I can't
9    adequately respond as to how she came up with this
10   ████████████████████████████████████████████
11   an appeal, as an example, that she would start an
12   initial negotiation based on the original repricing
13   amount using the example I gave of $100.  Because we
14   have already suggested or recommended repricing at
15   what we feel is a fair reimbursement.
16 BY MR. LAVIN:
17 Q.   So her next offer might be a hundred dollars more than
18   that, right?
19          MR. KING:  Objection; speculation.
20 A.   It could be.  It would depend on if we also had a
21   target or client parameters provided on a particular
22   claim.
23 BY MR. LAVIN:
24 Q.   Would you look at that provider before negotiating
25   with them to figure out what they accepted in the

49 (Pages 190 - 193)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 194

1    past?
2  A.  Yes, they --
3          MR. KING:  Objection; outside the scope.
4    You can answer.
5  A.  Yes, they would see the information from that provider
6    historically.
7  BY MR. LAVIN:
8  Q.  How many back-and-forths are your claims resolution
9    specialists allowed to get into with providers, is
10    there a limit on that per claim?
11         MR. KING:  Objection; asked and answered.
12  A.  There is no limit.  It's part of the mutual exchange
13    between us and the provider.
14  BY MR. LAVIN:
15  Q.  Looking at this, where it's a Cigna claim, and they
16  ████████████████████████████████████████████████
██  ████████████████████████████████████████████████
18    this indicate to you this provider had balance billed?
19         MR. KING:  Objection; calls for
20    speculation, the document speaks for itself.
21         MS. INCLEDON:  Objection; lack of
22    foundation.
23  A.  No, as I mentioned, I don't know if this is a
24    individual negotiation or if it is based on an appeal.
25  BY MR. LAVIN:

Page 195

1  Q.  And you don't know if at this time in 2018 Viant was
2    allowed to negotiate with providers who had a balance
3    bill or not, right?
4          MR. KING:  Objection; asked and answered.
5  A.  Correct.  I did not have those Cigna detail
6    parameters.
7  BY MR. LAVIN:
8  Q.  All right.  Well, Topic 20, which you did not mention
9    in the topics you were prepared on, you have been
10    identified by MultiPlan, by MultiPlan's attorneys as
11    the corporate designee on that topic.  And that topic
12    is, "The policies and procedures put in place by
13    MultiPlan relating to balance bills received by
14    Cigna's members for out-of-network mental health
15    claims that used Multi-Plan's Viant product from
16    January 1, 2015 to present."  And I would submit that
17    this is intensely related to that, so...
18         MR. KING:  Is that a question?
19         MR. LAVIN:  I'm stating on the record for
20    the objection at the end for a non-responsive witness.
21    We're going to have to call somebody back.
22         MR. KING:  Well, we object to your
23    declaration and statement when we think it's -- widely
24    mischaracterizes the situation.
25         MR. LAVIN:  Do you agree that you've

Page 196

1    designated this witness on Topic 20?
2          MR. KING:  That's what we -- yeah, that's
3    what we did, Matt.  You know that.
4          MR. KING:  Well, she did not in the
5    beginning mention that topic as a topic she was
6    prepared, I believe, to testify on.
7          MR. KING:  That's not true.  I'm quite
8    certain she did.  Quite certain.  She brought her
9    Deposition Notice with her to the deposition and that
10    is one of the topics she has highlighted.
11         THE VIDEOGRAPHER:  May we go off the record
12    for a moment, please?
13         MR. KING:  Yes.
14         THE VIDEOGRAPHER:  Going off the record,
15    3:26.
16         (Off the record at 3:26 p.m.)
17         (Back on the record at 3:40 p.m.)
18         THE VIDEOGRAPHER:  On the record, 3:40.
19         MR. LAVIN:  All right.  We're going to play
20    a recording for the next exhibit.  Exhibit 14 will
21    be -- what's the Bates number, Nicole?
22         MS. WEMHOFF:  PCI Confidential 1270 (sic).
23    And I'm going to share my screen.
24         MARKED FOR IDENTIFICATION:
25         DEPOSITION EXHIBIT 14A

Page 197

1          PCI Confidential 1272
2          Audio Recording
3          3:41 p.m. CST
4          (Whereupon video recording is played at
5          3:41 p.m. CST)
6          MS. INCLEDON:  So just before we get into
7    any questions on this, I just want to lodge an
8    objection to questions relating to that voice
9    recording at all.
10         So this is background, Cigna-subpoenaed,
11    non-party provider PCI.  And they produced documents
12    several months ago which were produced to plaintiffs.
13         And, you know, at 2:00 in the morning last
14    night, I received some additional recordings.
15    Obviously, with this deposition today, I have not had
16    time to review them or produce them to plaintiffs, but
17    somehow it seems that they have gotten a hold of them
18    anyway.
19         So I find that timeline interesting given
20    that we haven't heard from PCI in months.  And then,
21    you know, the eve of this deposition they produced a
22    host of calls that Mr. Lavin appears to have already
23    reviewed and cued up for this deposition.  So
24    that's -- that's my objection.
25         MR. LAVIN:  I don't really understand what

50 (Pages 194 - 197)

Case 5:20-cv-02255-EJD    Document 224-9    Filed 02/09/24    Page 52 of 61
AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 198

1  that objection is, but...
2      MR. KING:  I understand the objection and I
3  join in it.
4      I also object to the usage of this
5  recording in this deposition as it is outside the
6  scope of the topics.  It is not in Topic number 20 nor
7  is it in Topic number 25.  This recording appears to
8  be between Viant and a provider, PCI, regarding
9  balance billing.  And that is not in any of the topics
10  as written out by the plaintiff's counsel.
11      MS. INCLEDON:  And just so we have an
12  understanding of any possible conflicts, Matt, do you
13  represent PCI?
14      MR. LAVIN:  No, I do not, and you know
15  that.
16      MS. INCLEDON:  I -- I don't know that
17  actually.
18      MR. LAVIN:  Well, now you do, Caroline.
19      MR. KING:  I didn't know that either.
20      MR. LAVIN:  I've never represented -- I
21  don't represent them in this action and I've never
22  represented them in this action.
23      MR. KING:  Then how did you get the
24  recording?
25      MS. INCLEDON:  I wasn't talking about -- I

Page 199

1  wasn't talking about this action.
2      MR. LAVIN:  Their attorney produced them to
3  us.
4      MS. INCLEDON:  Before he produced them to
5  the party that subpoenaed them.
6      MR. LAVIN:  I don't know what to tell you.
7  You can talk to him.  We got them last night, too.
8  We'd never seen them before last night either.
9      MS. INCLEDON:  You received them at 1:37
10  a.m.?
11      MR. LAVIN:  That's right.  Exactly.  Yep.
12      MS. INCLEDON:  Okay.
13      MR. LAVIN:  We received them -- in fact, I
14  didn't even hear these recordings until about an hour
15  before this deposition, so that's right.
16      MR. KING:  Were they recordings produced
17  under the Protective Order?
18      MR. LAVIN:  I have no idea.  I'm sure they
19  probably were.  It says "confidential" in the Bates
20  number, so...
21      MR. KING:  I just was thinking out loud
22  about a HIPAA violation.
23      MR. LAVIN:  Okay.  You can talk to their
24  attorney.  I think they are uploaded into a secure
25  portal and produced to you.

Page 200

1      MR. KING:  Matt, I don't know.  I haven't
2  seen any of this.  Nothing -- nothing --
3      MS. INCLEDON:  Well, and obviously, there's
4  concerns with us, you know, us not having a full and fair
5  opportunity to review them.
6      MR. LAVIN:  Really?  Because it's not your
7  witness, Caroline, so...
8      All right.  Listen.
9      MR. KING:  Well, same objection.
10      MR. LAVIN:  All right.  Great.
11  BY MR. LAVIN:
12  Q.  So we just listened to that recording.  Do you know
13      who that person is, ██████████
14  A.  I don't.
15  Q.  Have you ever heard that name before?
16  A.  I would need a last name to validate.  I don't -- I
17      don't know.
18  Q.  Was that a claims resolution specialist?
19      MR. KING:  Note my objection to asked and
20      answered.  She said she doesn't know who she is.
21  A.  I can only tell you that she said she was Viant, so I
22      can't tell you what area she was from.
23  BY MR. LAVIN:
24  Q.  Okay.  So you are not able -- let me ask you this, do
25      claims resolution specialists or other individuals at

Page 201

1      Viant use pseudonyms when they make phone calls to
2      healthcare providers?
3      MR. KING:  Objection to form.
4  A.  No.
5  BY MR. LAVIN:
6  Q.  So ██████████, unless she's lying, works somewhere at
7      Viant, correct?
8  A.  That's what she stated on the call, yes.
9  Q.  Right.  And you are not able to tell me, is there
10      another department besides claims resolution that
11      would call providers?
12  A.  It sounded like that was back in 2017 or dates of
13      service 2017, so it could have been that somebody in
14      support or the customer service rep was following up
15      to get that.  I don't know that definitively.
16  Q.  Do you know -- I will also represent, as far as we're
17      aware looking at the claims list, those claims were
18      never repriced or adjusted at different rate after
19      that healthcare provider had informed Viant that they
20      were balance billing the member of those claims.
21      Do you have any information as to why that
22      Viant representative only seemed concerned with the
23      amount of the total balance bill and not of the dates
24      of service for those claims?
25      MR. KING:  Object to your testimony on the

AEO 30(b)(6) Kathy Praxmarer                        December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 202

1    record.  Object to your question as outside the scope.
2 A.  No, I wouldn't have detail on those.
3 BY MR. LAVIN:
4 Q.  Do you know why that Viant representative was making
5     what appears to be an unsolicited call to a healthcare
6     provider to discuss Viant price claims?
7         MR. KING:  Objection; outside the scope of
8     the deposition, lack of foundation; calls for
9     speculation.
10 A.  In that context, I couldn't -- I couldn't identify any
11    of those answers.  I wouldn't know how it was
12    originated or what her -- her phone call derived from.
13 BY MR. LAVIN:
14 Q.  Does Viant ever make or originate or instigate its own
15    phone calls to providers post-payment of a Viant price
16    claim?
17        MR. KING:  Object to the, outside the scope
18    of the deposition, you can answer.
19 A.  No, we would receive from client member or provider to
20    originate any of those communications.
21 BY MR. LAVIN:
22 Q.  When ████████ receives the information from the
23    provider, the provider has balance billed a Cigna
24    member, what would ████████ or another Viant
25    representative do with that information?

Page 203

1         MR. KING:  Objection; outside the scope,
2     calls for speculation, hypothetical.
3 A.  As I mentioned previously, it would have to be based
4     on the information they have in the claim to identify
5     what the next steps are.
6 BY MR. LAVIN:
7 Q.  Okay.  Why is Viant concerned with the total amount
8     that Cigna members have been balance billed?
9         MR. KING:  Note my objection, outside the
10    scope of the deposition, lack of foundation.
11 A.  Again, I don't have context to any of the details on
12    that.  It seemed as though she was looking for balance
13    on the claims in particular and then the conversation
14    evolved.  So I -- I couldn't answer that.
15 BY MR. LAVIN:
16 Q.  All right.  I think we've got another recording here.
17        MS. INCLEDON:  Is there a Bates stamp for
18    this one?
19        MR. KING:  I agree with Caroline.  I don't
20    think it's fair to use documents or recordings that
21    have not been produced to all of the parties in the
22    case and they have not had an opportunity, Matt, to
23    review them in advance of any deposition.
24        MR. LAVIN:  Well, you've had the same
25    opportunity I have.

Page 204

1         MR. KING:  No, Matt.  I have, for the last
2     time, I don't have any recordings.  My team has not
3     received recordings either from PCI or anyone, okay?
4     So no, I have not had a chance to review these.  This
5     is a -- this is a deposition by ambush.
6         MS. INCLEDON:  Also, Matt, you did
7     represent PCI in the -- in the provider class action,
8     so your representation before that you've never had an
9     attorney-client relationship with them is false.
10        MR. LAVIN:  Oh, Caroline, that's not what I
11    said.  You asked me if I represent -- you asked me if
12    I represent them and I said I don't.  And I don't
13    represent them in this action.
14        MS. INCLEDON:  You know that isn't what I
15    was asking.
16        MR. LAVIN:  That is exactly what you were
17    asking.  That's the way that I understood your
18    question.  It's no secret that I represented them in a
19    case that doesn't exist anymore.
20        MS. WEMHOFF:  The Bates number is
21    PCI Confidential 1272.
22        MR. KING:  My objection's all-spanned.  And
23    again, it's not fair to MultiPlan, to the witness, or
24    to myself to use documents, recordings, anything that
25    has not been produced to us prior to the deposition.

Page 205

1     I've never seen that happen before.
2         I -- I would ask that you re-think using
3     this recording, Matt.  I don't know what the recording
4     is about, but I just would ask that you re-think this
5     out of fairness.
6         MR. LAVIN:  The recording is about
7     communications by Viant with healthcare providers.
8         MR. KING:  I know, Matt.  Are you not
9     hearing what I'm saying?  We have not had an
10    opportunity to review this prior to you being able to
11    ask questions under oath.
12        MR. LAVIN:  I've never heard this recording
13    either.  We're going to all hear it for the first time
14    right now.  I just got them in the middle of the
15    night.
16        MR. KING:  It doesn't matter.
17        MR. LAVIN:  Let's find out what they say.
18    I have not had a chance to prepare on it either, so...
19        MR. KING:  It doesn't matter about you.
20    You are not under oath being questioned.
21        MR. LAVIN:  Well, we've got the witness
22    here.  We can call the witness back if you want.
23        MR. KING:  You've made that threat already.
24    Matt, look --
25        MR. LAVIN:  It's not a threat.  I don't

52 (Pages 202 - 205)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 206

1  want to do it.  Do you know how many depositions we've
2  taken in this case?  I'm not looking to do it.
3        MR. KING:  Would you please --
4        MR. LAVIN:  But when a witness shows up and
5  they are unprepared on the topics.
6        MR. KING:  She is not unprepared.
7        MR. LAVIN:  And you are lodging objections
8  just so you can have a word count on "outside the
9  scope" with no other purpose, improper objections.
10        MR. KING:  You're taking an improper
11  deposition.
12        MR. LAVIN:  Okay.  Sure.
13        MR. KING:  You're interrupting me.  Listen,
14  my objection stands.  It's based on fairness.  It's
15  based on this not being produced to us.  It doesn't
16  matter whether, you are not under oath, you are not
17  being asked the questions, Matt.  You are asking the
18  questions.  It's just a fairness issue.  I would think
19  as a professional courtesy you would understand that
20  and we could just move on because this is just not
21  fair.
22        MR. LAVIN:  Well, you may be in luck
23  because it looks like there's a technical difficulty
24  with us getting it uploaded.  So...
25        MR. KING:  The technical gods have shined

Page 207

1  upon --
2        MR. LAVIN:  Have smiled upon you.
3  BY MR. LAVIN:
4  Q.  Let's see.
5        MR. LAVIN:  Do you -- so we're not going to
6  play the next recording, but not because I don't want
7  to.
8        Let's go to Tab 24 if we can, Nicole.
9        MR. KING:  Is that Exhibit 14?
10        MR. LAVIN:  It should be.  And, you know,
11  Exhibit 14 is Bates MPI-C1803 through MPI-C1832.
12        MARKED FOR IDENTIFICATION:
13        DEPOSITION EXHIBIT 14B
14        MultiPlan Update for Cigna
15        2017 in Review
16        February 28, 2018
17        MPI-C0001803-MPI-C0001832
18        4:07 p.m. CST
19  BY MR. LAVIN:
20  Q.  Do you recognize what this document is?
21  A.  I don't recognize it, no.
22  Q.  Okay.  Do you have any involvement in the preparation
23  of MultiPlan's quarterly updates for Cigna?
24  A.  If -- if the marketing team or the sales team is
25  looking for information, I would provide information

Page 208

1  if they need it, but I -- I don't prepare this.
2  Q.  What kind of information might you provide if
3  requested?
4        MR. KING:  Note my objection; outside the
5  scope.
6  A.  It would be a specific response to a request that they
7  have, so they may -- they may come to me for a
8  specific request.  I don't have an example.
9  BY MR. LAVIN:
10  Q.  Would it have to do with appeals?
11        MR. KING:  Objection; outside the scope.
12  Quarterly updates to Cigna are not in the topics she's
13  been designated for.  You can answer.
14        And I'm not just making the objection to
15  make a count here, Matt.
16  A.  No, I don't -- I don't have any recollection of a
17  particular request.  I was stating in general if they
18  had a request they would come to me, but I don't
19  prepare this.  I don't see this.
20  BY MR. LAVIN:
21  Q.  I want to ask you for some names at MultiPlan if you
22  can identify them for me.
23  A.  Related to this presentation?
24  Q.  No.
25  A.  Or I'm not looking at this any longer?

Page 209

1  Q.  We're moving on.
2  A.  Okay.
3  Q.  Who is Adrienne Cromwell?
4        MR. KING:  Objection; outside the scope.
5  A.  Adrienne is an individual on our marketing team.
6  BY MR. LAVIN:
7  Q.  Okay.  Who is Lori Cook?
8        MR. KING:  Same objection; outside the
9  scope.
10  A.  I believe she's also in marketing.
11  BY MR. LAVIN:
12  Q.  Are you familiar with Linda Gordon-Cohen?
13        MR. KING:  What was the last name, please?
14        MR. LAVIN:  Gordon-Cohen.
15        MR. KING:  Same objection.
16  A.  Yes, she's a project manager in our IT organization.
17  BY MR. LAVIN:
18  Q.  How about Susan Dominy?
19  A.  She's a --
20        MR. KING:  Same objection.
21  A.  She's a former MultiPlan employee.
22  BY MR. LAVIN:
23  Q.  She's no longer with the company?
24  A.  Correct.
25  Q.  Was she focused on DataiSight or Viant?

53 (Pages 206 - 209)

AEO 30(b)(6) Kathy Praxmarer                December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 210

1        MR. KING:  Same objection, outside the
2    scope.
3 A.   She was initially DataiSight.  She had a short tenure
4    with Viant.
5 BY MR. LAVIN:
6 Q.   Do you know what years that tenure was?
7        MR. KING:  Same objection.
8 A.   I don't.
9 BY MR. LAVIN:
10 Q.   How about David Murtagh?
11        MR. KING:  Same objection.
12 A.   He's a Vice President in Operations.
13 BY MR. LAVIN:
14 Q.   Is he still with the company?
15        MR. KING:  Same objections.
16 A.   He is.
17 BY MR. LAVIN:
18 Q.   Does he have any oversight over Viant?
19        MR. KING:  Same objection.
20 A.   He does not.
21 BY MR. LAVIN:
22 Q.   Laura Moore?
23 A.   She's in sales.
24 Q.   Do you know if she works in Cigna sales?
25 A.   She does not.

Page 211

1        MR. KING:  Same objection.
2 BY MR. LAVIN:
3 Q.   Do you know -- okay.  Sherri Norback, do you know who
4    that is?
5        MR. KING:  Same objection.
6 A.   Yeah.  She's in our legal and regulatory team.
7        MR. LAVIN:  Let's bring up Tab 4.
8        MR. KING:  While we're waiting for that, I
9    have a question.  Where did you get all those names?
10        MR. LAVIN:  They are on the privilege log.
11        MR. KING:  Okay.  Thank you.
12 BY MR. LAVIN:
13 Q.   So I note it's not marked confidential.
14 A.   And I'm sorry, what exhibit are you referring to here?
15 Q.   Oh, it will be the next one.
16 A.   Okay.
17        MARKED FOR IDENTIFICATION:
18        DEPOSITION EXHIBIT 15
19        First Amended Class Action Complaint
20        4:12 p.m. CST
21 BY MR. LAVIN:
22 Q.   Exhibit 15 is the First Amended Class Action Complaint
23    in this manner.  And you've been designated under
24    Topic 7 to talk about "Plaintiffs' allegations
25    contained in the Operative Complaint."

Page 212

1        Have you reviewed the Complaint?
2 A.   I have.
3 Q.   Have you read the whole thing?
4 A.   I have kind of scanned through it, yes.
5 Q.   Okay.  Are there any sections of the Complaint or
6    allegations that you feel are inaccurate?
7        MR. KING:  Note my objection.  Can you be
8    more specific?  It's a -- it's a 300-page complaint,
9    right?
10        MR. LAVIN:  Oh, I know.
11        MR. KING:  You wrote it.
12        MR. LAVIN:  I wrote it.  I was there for
13    it.
14        MR. KING:  I mean --
15        MR. LAVIN:  Well, on the topics, I just,
16    you know, she said she reviewed it in preparation for
17    the deposition.  I don't expect her to know,
18    obviously, the Complaint back-and-forth.
19        MR. KING:  We can short-circuit this.  What
20    I would propose to do, Matt, is after the deposition,
21    send you, I can have her send you what topics she
22    thinks are not accurate.
23        MR. LAVIN:  I don't need that.  And you
24    know, I just want to get her testimony here today,
25    we're not looking for written testimony for her --

Page 213

1    from her.  We're not trying to elicit that.
2 BY MR. LAVIN:
3 Q.   Let's go to page 52 of this Complaint.
4        You will see there's a PAD letter, a
5    picture of a PAD letter there.
6 A.   Okay.
7 Q.   All right.  So this PAD letter is dated 5-21-2019, and
8    it has two logos on it, right?  It's got Viant's logo
9    and Cigna's logo.  Do you see that?
10 A.   I see that.
11 Q.   And that's a little different from PAD letters we saw
12    earlier that only have a Cigna logo on some of them or
13    only the Viant logo on some of them, right?
14 A.   Mm-hmm.  Yes.
15 Q.   What?
16 A.   Yes.
17        MR. LAVIN:  Okay.  I thought Errol said
18    something.
19        MR. KING:  I -- I just asked her to, to
20    speak her answer out loud.  She just said, "mm-hmm."
21        MR. LAVIN:  Okay.
22        MR. KING:  Just reminding the witness that
23    she needs to state her responses.
24 BY MR. LAVIN:
25 Q.   And for how many years has Cigna -- or strike that.

54 (Pages 210 - 213)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 214

1        For how many years has MultiPlan and Viant
2    sent PAD letters on behalf of Cigna?
3 A.   I -- I don't even know that answer.
4 Q.   When you were at Viant, was Cigna a client of Viant's,
5    before Viant was acquired by MultiPlan?
6        MR. KING:  Objection; outside the scope.
7    You can answer.
8 A.   Yes, they were.
9 BY MR. LAVIN:
10 Q.   Did -- at that time, did Viant also offer patient
11    advocacy services to its clients, including Cigna?
12        MR. KING:  Objection; outside the relevant
13    time period, outside the scope.
14 A.   I didn't work in that department, so I can't speak
15    definitively.
16        MR. KING:  Lack of foundation.
17 BY MR. LAVIN:
18 Q.   Are these letters sent to Cigna members across the
19    country?
20        MR. KING:  When -- what time frame are you
21    talking about?
22        MR. LAVIN:  2015 to the present.
23        MR. KING:  Throughout the country...
24 A.   These letters would be sent on claims for which a
25    Viant recommendation was submitted to Cigna.

Page 215

1 BY MR. LAVIN:
2 Q.   Anywhere in the nation?
3 A.   If the claim was received and we submitted a
4    recommendation, it would be relevant to submit a
5    letter.
6 Q.   To anywhere in the nation that it needs to go, right?
7        MS. INCLEDON:  Objection; lack of
8    foundation.
9 A.   Based on the members' address on the claim that we
10    received, we would generate a letter, yes.
11 BY MR. LAVIN:
12 Q.   Okay.  Where are the letters sent from?
13        MR. KING:  Objection, asked and answered.
14 A.   Today -- meaning physical location?
15 BY MR. LAVIN:
16 Q.   Mm-hmm.  Yes.
17 A.   Historically, they were sent from Salt Lake City.
18    Today, they are sent from New Jersey.  Mailed, I
19    should say mailed from.
20 Q.   And today they are mailed to Cigna members who are not
21    in New Jersey, right?
22 A.   I --
23        MR. KING:  Objection; asked and answered.
24 A.   If the claim was received, and Viant submitted a
25    recommendation for a member in New Jersey, the letter

Page 216

1    would be sent to a member in New Jersey.
2 BY MR. LAVIN:
3 Q.   Okay.  Do you know why, looking at this letter on page
4    52, why it has both logos on it, but is signed by the
5    Cigna customer service team?
6 A.   No.  Again, you would have to refer to Cigna or Monica
7    and Kevin based on the change orders that were
8    submitted.
9        MR. KING:  Yeah.  My objection to your last
10    question was outside the scope, too.
11 BY MR. LAVIN:
12 Q.   Does Cigna ever request changes to the PAD letters
13    that aren't implemented by MultiPlan?
14        MR. KING:  Objection; outside the scope.
15        MS. INCLEDON:  And objection; lack of
16    foundation.
17 A.   I don't -- I don't have knowledge of that.
18 BY MR. LAVIN:
19 Q.   To your knowledge; all changes requested by Cigna PAD
20    letters to PAD letters have been implemented into PAD
21    letters?
22        MR. KING:  Objection; outside the scope,
23    lack of foundation.  You can go ahead.
24 A.   Again, I don't have knowledge of that.  Kevin and
25    Monica would receive a request from Cigna and would be

Page 217

1    the, kind of, conduit or exchange between Cigna and
2    MultiPlan on the requests that were submitted.
3 BY MR. LAVIN:
4 Q.   Is there a person at Viant who is the point person and
5    responsible for all PAD letters?
6        MR. KING:  Note my objection to the form.
7    You can answer.
8 A.   Can you clarify when you say "responsible," what you
9    are asking?
10 BY MR. LAVIN:
11 Q.   Yes.  Who is the person at Viant ultimately
12    responsible for PAD letters?
13        MR. KING:  Objection; outside the scope.
14 BY MR. LAVIN:
15 Q.   For the mailing of PAD letters?
16 A.   For the mailing of PAD letters, for the structure of
17    PAD letters, for the wording on -- of PAD letters.  Is
18    there one person who is kind of at the end of the
19    funnel for PAD letter directions.
20        MR. KING:  Objection; outside of the scope,
21    object to the form.
22 A.   There would be different individuals based on the
23    particulars that you are asking.
24 BY MR. LAVIN:
25 Q.   What would -- what is JR Moss's responsibility when it

55 (Pages 214 - 217)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 218

1    comes to PAD letters?
2            MR. KING: Objection; asked and answered,
3    outside the scope.
4 A.  His historic responsibility is different than it is
5    today, but in -- historically, he -- a couple of years
6    ago, he had overseen the PAD mailroom that mailed all
7    of the letters. And he would receive anything that
8    would require review, but final review is completed by
9    our Legal Department as well as sent back to Cigna for
10   review on their end.
11 BY MR. LAVIN:
12 Q.  And I believe you testified PAD letters go out within
13   48 hours of the pricing being sent to the client,
14   correct?
15 A.  No.  I stated that --
16           MR. KING: Objection; mischaracterizes
17   testimony.  You can answer.
18 A.  I stated within 48 hours of closure within our system.
19 BY MR. LAVIN:
20 Q.  Okay.  And closure happens upon the transmittal of the
21   pricing to the client?
22           MR. KING: Objection; asked and answered.
23 A.  No, it happens when we complete the repricing within
24   our system, that's what generates the, or triggers the
25   PAD letter.

Page 219

1 BY MR. LAVIN:
2 Q.  Theoretically, what do -- a PAD letter might go out
3    before the EOB goes out, correct?
4            MR. KING: Note my objection; outside the
5    scope.
6 A.  It could.  Again, I don't have any indication of -- of
7    when Cigna would adjudicate a claim and sent an EOB,
8    or EOP.
9 BY MR. LAVIN:
10 Q.  Does -- do you recall any instances of members
11   receiving PAD letters when they haven't received an
12   EOB on a claim?
13           MR. KING: My objection, outside the scope,
14   lack of foundation, speculation.
15 A.  Not that I've been made aware.
16 Q.  Where does -- or have you -- are you aware of any
17   instances where a Cigna member has received a PAD
18   letter but the information on it is different than
19   what's on the EOB they received?
20           MR. KING: Same objections.
21 A.  No, I don't know that.
22 BY MR. LAVIN:
23 Q.  Have you ever heard of that situation happening?
24           MR. KING: Same objections.
25 A.  I --

Page 220

1            MR. KING: Objection; asked and answered.
2    Same objections.
3 A.  I have not.
4 BY MR. LAVIN:
5 Q.  Where does Viant come up with the address of the Cigna
6    member?
7 A.  Through the submission of the claim from Cigna.
8 Q.  Does Viant confirm that an EOB has been issued before
9    it sends out a PAD letter?
10           MR. KING: Objection; outside the scope,
11   lack of foundation.
12 A.  No.
13 BY MR. LAVIN:
14 Q.  Are you aware of any changes to PAD letters in the
15   last year?
16 A.  I -- I don't know, no.
17           MR. LAVIN: I'm going to bring up one more
18   document.  Let's do Tab 8, Nicole.
19           MR. KING: Is this the last document?
20           MR. LAVIN: I hope.  My wife is trying to
21   go out somewhere tonight, so let's see.
22           MR. KING: I wouldn't know anything about
23   that, Matt.
24           MR. LAVIN: Not with me, though.
25           Exhibit 16 is Bates MPI-C216 through

Page 221

1    MPI-C224.
2            MARKED FOR IDENTIFICATION:
3            DEPOSITION EXHIBIT 16
4            Viant Facility U&C Review
5            MPI-C000216-MPI-C000224
6            4:25 p.m. CST
7            MR. LAVIN: And document entitled Viant
8    Facility U&C Review.
9 BY MR. LAVIN:
10 Q.  Do you recognize this document?
11 A.  I do.
12 Q.  And what is it?
13 A.  It is a document that is prepared by Healthcare
14   Economics Team --
15 Q.  Do you understand this -- I'm sorry.  I didn't mean to
16   cut you off.  What was your --
17 A.  To explain the methodology.
18 Q.  Do you have any role in the preparation of this
19   document?
20 A.  I do not.
21 Q.  Do you use or refer to this document in the course of
22   your daily duties at Viant?
23 A.  I do not.
24 Q.  Would you understand this document if you were to read
25   it?

56 (Pages 218 - 221)

Page 222

1      MR. KING: Object to -- object to being
2  outside the scope. You can answer.
3  A. I do.
4  BY MR. LAVIN:
5  Q. Do you understand, the front page, it says, "Viant
6  Facility U&C Review." Do you know what "U&C" refers
7  to?
8      MR. KING: Objection; outside the scope.
9  You can answer.
10  A. Usual and customary.
11  BY MR. LAVIN:
12  Q. And what does "usual and customary" mean?
13      MR. KING: Same objection.
14      MS. INCLEDON: Same objection to the extent
15  that it calls for a legal conclusion.
16  A. I would say that it's a fair reimbursement for a
17  geographic area.
18  BY MR. LAVIN:
19  Q. Do you know if Viant, since you've worked with it for
20  20 years or so, do you know if it's always been
21  referred to as a U&C or a usual and customary
22  methodology?
23      MR. KING: Same objection; outside the
24  scope.
25  A. I want to clarify. I have been -- I have worked under

Page 223

1  the Viant company for that time frame. As I
2  mentioned, I have not worked for this particular area
3  of Viant until 2019.
4  BY MR. LAVIN:
5  Q. I understand.
6  A. Well, that was just different than what you stated, so
7  I wanted to clarify that. I -- I don't have -- I
8  don't know what, what it was 20 years ago.
9  Q. Was "U&C" a term that you heard 20 years ago working
10  with Viant?
11      MR. KING: Same objection.
12  A. U&C is a familiar term, yes.
13      MR. LAVIN: All right. I don't have any
14  more questions.
15      MR. KING: Caroline, do you have any
16  questions?
17      MS. INCLEDON: I do not. Nothing from
18  Cigna.
19      MR. KING: And I have no questions as well.
20      MR. LAVIN: Should we get our lengthy
21  objections to each other on the record?
22      MR. KING: I think they already are on the
23  record, Matt. I would like to mark this transcript as
24  attorney eyes only under the Protective Order subject
25  to it being redesignated in the future.

Page 224

1      MR. LAVIN: Okay. I mean, I will just say
2  that we object to this witness as non-responsive on
3  certain topics, particularly of concern to us are, you
4  know, she didn't have knowledge of what Cigna's appeal
5  parameters are and also wasn't able to answer
6  questions about the PAD letter communications to
7  members and which PAD letter versions were used for
8  which Cigna affiliates and which years. And I think
9  that's it.
10      MR. KING: And the witness was not
11  designated for anything related to Cigna's parameters.
12  That is not in any of the topics that you, in the
13  corporate notice that you drafted.
14      MR. LAVIN: Okay.
15      MR. KING: Are we done?
16      MR. LAVIN: Yeah. I mean, we would say
17  that that is responsive to particularly Topic 19, "To
18  the policies and procedures put in place by MultiPlan
19  for inquiries and/or appeals relating to
20  out-of-network mental health claims that used
21  MultiPlan's Viant product."
22      MR. KING: Understand. But those are
23  policies and procedures of MultiPlan, not Cigna.
24      MR. LAVIN: Yeah.
25      MR. KING: Are we done?

Page 225

1      MR. LAVIN: We are all done. Have a good
2  night, Ms. Praxmarer.
3      THE WITNESS: Thank you.
4      MR. KING: I will take a rough copy and a
5  condensed version. This is Mr. King.
6      MR. LAVIN: We'll take a rough and we will
7  take -- what's the turnaround time for a condensed and
8  finals?
9      THE REPORTER: Can we go off the record?
10      THE VIDEOGRAPHER: Yes. Going off the
11  record at 4:29.
12      (The Zoom Videoconferenced/Video Recorded
13  deposition was concluded at 4:29 p.m. CST
14  Signature of the witness was not requested by
15  counsel for the respective parties hereto.)

57 (Pages 222 - 225)

AEO 30(b)(6) Kathy Praxmarer                    December 8, 2022
RJ, et al. v. Cigna Health and Life Insurance Comp

Page 226

```
 1                    CERTIFICATE
 2
 3  STATE OF MICHIGAN
 4  COUNTY OF OAKLAND
 5          LORI ANN BALDWIN, a Notary Public in and
 6    for the above county and state, do hereby certify that
 7    this deposition was taken before me, via Zoom
 8    Videoconference/Video Recording, at the time and place
 9    hereinbefore set forth; that the witness was by me
10    first duly sworn, via Zoom Videoconference, to testify
11    to the truth; that this is a true, full and correct
12    transcript of my stenographic notes so taken to the
13    best of my skill and ability; and that I am not
14    related, nor of counsel to either party, nor
15    interested in the event of this cause.
16
17
18
19
20        Lori Baldwin
21        Lori Ann Baldwin, CSR-5207, RPR, CRR
22        Notary Public
23        Oakland County, Michigan
24        My commission expires:  December 21, 2025
25
```

58 (Page 226)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

### VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.