1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5                          SAN JOSE DIVISION

6

7   RJ, et al.,                          Case No.   5:20-cv-02255-EJD

8              Plaintiffs,               **ORDER DENYING CLASS
                                         CERTIFICATION AND GRANTING
9        v.                              MOTION TO EXCLUDE EXPERT
                                         OPINIONS**
10  CIGNA HEALTH AND LIFE
    INSURANCE COMPANY, et al.,           Re: ECF Nos. 148, 165, 185, 186, 202
11             Defendants.

12          This putative class action involves Defendant Cigna Health and Life Insurance Company's

13  ("Cigna") alleged failure to reimburse covered mental health provider claims at usual, customary,

14  and reasonable ("UCR") rates.  Plaintiff "RJ" as the representative of her beneficiary son and

15  Plaintiff "DS" (collectively with RJ, "Plaintiffs") are participants in employee benefits plans that

16  are administered by Cigna and subject to the Employee Retirement Income Security Act of 1974

17  ("ERISA").  Plaintiffs further allege that Cigna's failures resulted from Defendant MultiPlan,

18  Inc.'s ("MultiPlan") (collectively with Cigna, "Defendants") flawed methodology for pricing

19  certain claims.  The First Amended Class Complaint ("FACC") asserts claims under ERISA and

20  the Racketeer Influenced and Corrupt Organizations Act ("RICO").

21          After two rounds of Rule 12 motions, Plaintiffs now move to certify a proposed class

22  under Rule 23.  Mot. Class Certification ("CC Mot."), ECF No. 148.  Cigna and MultiPlan filed a

23  joint opposition, as well as a Motion to Exclude the Expert Opinions and Declaration of Plaintiffs'

24  expert, Professor Alexandra D. Lahav ("*Daubert* Mot.").  On July 27, 2023, the Court heard oral

25  arguments from the parties on both the Class Certification Motion and the *Daubert* Motion.

26          Based on the parties' briefs, evidence, and oral arguments, the Court GRANTS

27  Defendants' *Daubert* Motion and DENIES Plaintiffs' motion for class certification.

28  Case No.: 5:20-cv-02255-EJD
    ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                      1

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

# I.    BACKGROUND

## A.    Parties

Defendant Cigna insures and administers health plan benefits for employers and individuals, which includes paying claims for behavioral services submitted by individuals covered under one of the health plans it sponsors or administers.  FACC ¶ 42.

Defendant MultiPlan is characterized in the FACC as a private "cost-management" company that partners with insurers and plan administrators to reduce and reprice claims billed by certain providers of behavioral services.  FACC ¶¶ 10, 43.  MultiPlan is the parent company of Viant, Inc., the company that developed the allegedly fraudulent repricing methodology employed by Cigna.  FACC ¶¶ 43, 84–85.

Plaintiff RJ is a participant in an ERISA benefits plan sponsored and funded by third-party Inuit, Inc.  RJ's adult beneficiary son, SJ, is a behavioral health patient.  FACC ¶¶ 38, 270–273.  SJ was enrolled in a Cigna preferred provider organization ("PPO") health plan that offered out-of-network ("OON") benefits for behavioral health services, including intensive outpatient program ("IOP") treatment for mental health and/or substance use disorders.  *Id.* ¶ 274.

Plaintiff DS is a participant in an ERISA benefits plan sponsored and funded by third-party Impossible Foods, Inc. and administered by Cigna.  FACC ¶ 40.  DS was enrolled in the Cigna Open Access Plan, which offered OON benefits for behavioral health services, including substance use disorder IOP treatment.  *Id.* ¶ 337.

## B.    OON Claims Processing

The FACC alleges that all Plaintiffs sought medically necessary treatment for behavioral health disorders from Summit Estate, a behavioral health provider in Los Gatos, California, that was out-of-network for them.  FACC ¶¶ 54–55, 62, 275, 338.  Summit Estate's billing department submits claims for reimbursement by completing standardized UB-04 forms with standard charges, codes, and patient demographics that are then sent electronically to Cigna.  *Id.* ¶¶ 204–05.

After it receives the claims from providers, Cigna processes them, approves them for payment, determines the payment amount, and then pays the claim with accompanying notes

Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
2

United States District Court
Northern District of California

1  about how much the patient owed and Cigna paid.  *Id.* ¶ 207.  Under its own drafted health plan

2  language, Cigna was obligated to reimburse members' OON treatment expenses but only up to a

3  cap, which their plans refer to as the Maximum Reimbursable Charge ("MRC").  FACC ¶¶ 60, 64;

4  Defs.' Opp'n Mot. Class Certification ("CC Opp.") 6.  However, about 30% of the claims within

5  the putative class arose under a plan that was not drafted by Cigna but rather Cigna's client, the

6  plan sponsor.  *See* Decl. Warren Haskel ("Haskel Decl.") Ex. 8 ("May Report") ¶ 117, fig. 15,

7  ECF No. 166-9.  The plans contained language generally providing that OON expenses would be

8  reimbursed at a usual, customary, and reasonable ("UCR") or a roughly similarly phrased rate.

9  FACC ¶¶ 60, 64; *see also* CC Mot. 3–4; CC Opp. 11–12.  Plaintiffs contend that the UCR rate is

10  widely understood as a rate derived from prevailing charges of similar health care providers of

11  similar services in the same geographic area, though Defendants dispute the uniformity of this

12  understanding.  *See* CC Mot. 4; CC Opp. 11–12.

13          Cigna's plans also consisted of two types of MRC limitations for OON expenses: MRC

14  Option 1 ("MRC1") and MRC Option 2 ("MRC2").  CC Opp. 6.  For plans capped by MRC1,

15  Cigna's reimbursement cap is calculated "based on a percentile of charges by providers of the

16  same or similar service in the geographic area where the service was provided."  CC Opp. 10.

17  Cigna will select the database from which the percentile values will be determined, and plan

18  sponsors will select the percentile of provider charges (typically between 70th and 90th

19  percentiles) for the maximum the plan would reimburse.  *Id.*  For plans capped by MRC2, Cigna

20  will typically cap claim payments using a methodology based on a percentage of Medicare's fee

21  schedule (usually between 110% to 300%) if Medicare covers the service.  If Medicare does not

22  contain enough data on the service, Cigna may "gapfill" or "crosswalk" the missing service with

23  the fees for a similar type of service that Medicare *does* cover.  CC Opp. 13.

24          Throughout the course of processing OON claims, Cigna communicates with both patients

25  and providers alike to convey plan and claim information.  Early in the process, OON providers

26  may call Cigna for verification of benefits ("VOB") for preauthorization before rendering services.

27  *See* CC Mot. 5–6; CC Opp. 14–15.  Cigna also sends several written communications in the form

28  Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION

of explanations of benefits ("EOBs") and Patient Advocacy Department ("PAD") letters to plan members, as well as explanations of payment ("EOPs") to providers.  CC Opp. 8–9.  These written communications will often contain the prices that Viant calculated through its OPR pricing.  *See infra* Section I.C.

C.     **Viant Outpatient Review ("Viant OPR")**

After Cigna has approved an OON claim for payment, it asks MultiPlan to calculate what a UCR rate should be and how much Cigna should pay for the claimed OON services.  FACC ¶¶ 208–214.  Although MultiPlan offers several tools to price claims, Plaintiffs only challenge the Viant OPR methodology used to price claims.  *Id.* ¶ 218.

The Viant OPR method calculates prices based on claims data drawn from a Standard Analytical File ("SAF"), which is a collection of claims data from Medicare providers for services rendered to Medicare beneficiaries by the Centers for Medicaid and Medicaid Services ("CMS").  *Id.* ¶¶ 185, 221–22.  However, Medicare does not cover or reimburse providers for the IOP treatments at issue here, specifically those billed under HCPCS codes H0015 or H2036,[1] and consequently, the SAF contained limited data about the prices that providers charged for IOP or similar treatments.  *Id.* ¶¶ 187–89, 220, 223; *see also* Modiano Decl. Ex. 10 ("Ralston Decl.") ¶ 12.  As a result, the unadjusted national price for several thousand H0015 claims that Viant OPR calculated for Cigna and MultiPlan was derived from the SAF's limited set of H0015 data.  CC Mot. 7–8; *see also* Modiano Decl. Ex. 22 ("Crandell Dep.") 149:10–16; Modiano Decl. Ex. 8 ("Beckstead Dep.") 34:21–35:24; 59:10–60:20.

After September 2018 and through the remainder of the Class Period, MultiPlan changed the data source that Viant OPR relied on to determine H0015 claim prices.  Whereas Medicare did not cover HCPCS code H0015, Medicare *did* cover services under APC code 5823, which meant that the SAF also contained price data from APC 5823 claims.  CC Mot. 8; CC Opp. 17–18.

---

[1] Code H0015 is for "Alcohol and/or drug services; intensive outpatient (treatment program that operates at least 3 hours/day and at least 3 days/week and is based on an individualized treatment plan), including assessment, counseling; crisis intervention, and activity therapies or education."  Code H2036 is for "Alcohol and/or other drug treatment program, per diem."  FACC ¶ 189.

United States District Court
Northern District of California

### D.      Procedural History

Plaintiffs filed the original complaint on April 2, 2020, asserting eight claims for violations of RICO and ERISA.  ECF No. 1.  Plaintiffs filed the FACC on April 30, 2021 (ECF No. 63), in response to the Court's first order on Defendants' Rule 12 motions (ECF No. 60).  The Court's order on Defendants' second round of Rule 12 motions resulted only in the dismissals of Plaintiff LW's claims, as well as the RICO claims to the extent they were based on money laundering. ECF No. 116.  Defendants answered the FACC on September 16, 2022.  ECF Nos. 120, 121.

On January 17, 2023, Plaintiffs filed the instant Motion for Class Certification.  ECF No. 148.  Specifically, Plaintiffs seek to certify a class defined as follows:

> Any member of a health benefit plan administered or issued by Cigna and governed by ERISA, where the member's plan utilized Cigna's "Maximum Reimbursable Charge" program for out-of-network benefits and whose claim(s) for intensive outpatient services billed with HCPCS H0015 and/or revenue code 0906 were priced by MultiPlan's Viant methodology, during the class period January 1, 2015 to the present.

CC Mot. 1–2.

On March 27, 2023, Defendants filed a joint opposition to class certification, as well as a motion to exclude the expert opinions of Professor Alexandra D. Lahav.  ECF Nos. 165, 166. Plaintiffs filed their reply in support of class certification on May 16, 2023.  ECF No. 179.

On May 23, 2023, Defendants filed objections, seeking to strike supplemental expert reports and declarations submitted with Plaintiffs' reply.  ECF No. 183.  On May 30, 2023, Plaintiffs moved to strike or in the alternative for leave to file a response to Defendants' objections.  ECF No. 185.  Defendants also moved for leave to file a sur-reply to address new arguments raised in Plaintiffs' reply.  ECF No. 186.

On August 1, 2023, after the Court heard the parties' oral arguments and taken the motions under submission, Plaintiffs filed an administrative motion for judicial notice of Cigna's former webpage that had since been taken down.  ECF No. 202.

## II.      LEGAL STANDARD

### A.      Class Certification

Federal Rule of Civil Procedure 23 sets forth the two-step process for certifying class

Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
5

United States District Court
Northern District of California

actions.  First, plaintiffs must establish that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).

Second, plaintiffs must separately show that the proposed class fits into one of the three categories of Rule 23(b).  Under Rule 23(b)(1), a class action may be maintained if:

> [P]rosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1).  "Rule 23(b)(1)(A) considers possible prejudice to a defendant, while 23(b)(1)(B) looks to prejudice to the putative class members."  *Kanawi v. Bechtel Corp.*, 254 F.R.D. 102, 111 (N.D. Cal. 2008).  Under Rule 23(b)(2), a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  And finally, to certify a class under Rule 23(b)(3), the Court must find that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

To meet their obligations under Rule 23, plaintiffs "must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23" by a preponderance of the evidence.  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) ("The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b).").  Courts must

Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION

1   conduct a "rigorous" analysis of the Rule 23 factors that will often "entail some overlap with the

2   merits of the plaintiff's underlying claim." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980

3   (9th Cir. 2011) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)).  However,

4   "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification

5   stage.  Merits questions may be considered to the extent—but only to the extent—that they are

6   relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."

7   *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

8   **B.    Expert Opinions**

9   Courts act as the gatekeeper of expert testimony to ensure that such testimony is reliable

10  and relevant under Federal Rule of Evidence 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137,

11  147 (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The proponent

12  of expert testimony has the burden of proving admissibility.  *In re Korean Ramen Antitrust Litig.*,

13  281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted).  Before an expert can offer her

14  opinions, she must be qualified by "knowledge, skill, experience, training, or education."  Fed. R.

15  Evid. 702.  Once she is qualified, Rule 702 permits her to testify as long as "(a) the expert's

16  scientific, technical, or other specialized knowledge will help the trier of fact to understand the

17  evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

18  the testimony is the product of reliable principles and methods; and (d) the expert has reliably

19  applied the principles and methods to the facts of the case."  *Id.*  This multifactor inquiry is

20  flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring admission."  *Wendell v.*

21  *GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations omitted).

22  Although courts must screen expert testimony for reliability, what they assess "is not the

23  correctness of the expert's conclusions but the soundness of [her] methodology."  *City of Pomona*

24  *v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th

25  Cir. 2010)).  In other words, *Daubert* is not a "guarantee[] of correctness."  *i4i Ltd. P'ship v.*

26  *Microsoft Corp.*, 598 F.3d 831, 855 (Fed. Cir. 2010).

27

28  Case No.: 5:20-cv-02255-EJD
    ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION

United States District Court
Northern District of California

1 | III.    **DISCUSSION**

2       The Court will first address Defendants' motion to exclude Plaintiffs' expert testimony

3 | before turning to Plaintiffs' motion for class certification.

4       **A.       Expert Report – Professor Alexandra D. Lahav**

5       Defendants move to exclude the expert opinions and declaration of Professor Alexandra

6 | Lahav, who Plaintiffs retained to provide her "expert opinion on whether a class should be

7 | certified in this case."  Decl. Professor Alexandra D. Lahav ("Lahav Report") ¶ 1, ECF No. 153-9.

8 | Defendants do not appear to dispute Professor Lahav's qualifications; rather, they move to exclude

9 | her opinions on certifiability as improperly invading the province of the Court.  Mot. Exclude

10 | Expert Opinions Decl. Professor Alexandra D. Lahav ("*Daubert* Mot.") 5, ECF No. 165.

11       Federal Rule of Evidence 702 permits expert testimony if "the expert's scientific,

12 | technical, or other specialized knowledge will help the trier of fact to understand the evidence or

13 | to determine a fact in issue."  Fed. R. Evid. 702(a).  Here, Professor Lahav's opinions are, as

14 | follows: (1) "a class action under Federal Rule 23(b)(1)(A) is appropriate for the ERISA claims in

15 | this class action"; (2) this Court is "legally permitted to draw inferences as to the similarity of the

16 | plaintiff class"; and (3) "as a matter of public policy this is the type of case that the class action

17 | device was intended to promote."  Lahav Report ¶¶ 2–4.

18       Professor Lahav's first two opinions are plainly and impermissibly opining on "questions

19 | which are matters of law for the court." *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d

20 | 964, 971 (N.D. Cal. 2019).  Far from merely "embrac[ing] an ultimate issue to be decided by the

21 | trier of fact," *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir.

22 | 2008), these opinions and their corresponding analyses extensively cite case law and apply legal

23 | reasoning akin to legal briefs.  *See generally* Lahav Report ¶¶ 24–56.  As Judge Gonzalez Rogers

24 | recently remarked about Professor Lahav's opinions in another certification motion involving

25 | ERISA UCR allegations, these opinions present a "thinly disguised attempt to submit what is

26 | essentially an amicus brief as an expert report." *LD v. United Behav. Health*, 2023 WL 2806323,

27 | at *3 (N.D. Cal. Mar. 31, 2023).  The Court agrees with Judge Gonzalez Rogers's reasoning and

28 | Case No.: 5:20-cv-02255-EJD

United States District Court
Northern District of California

United States District Court
Northern District of California

finds that the opinions advanced by Professor Lahav in this case should likewise be excluded for the same reasons, namely that "they invade on the province of the Court." *Id.* To the extent that Professor Lahav is offering her opinion on whether class certification is appropriate in this case or the permissible inferences the Court may draw, such opinions do not assist the Court in understanding the evidence or determining a fact in issue.

Although Professor Lahav purports to also advance opinions of the class action public policy considerations in this case, the Court is unable to disentangle any standalone public policy opinion from the legal arguments in the Lahav Report. Moreover, even if Professor Lahav is offering public policy opinions (if any) on the matters expressly enumerated under Rule 23(b)(3)(A)–(D), the Lahav Report does not cite any empirical research, facts, or data that would permit the Court to evaluate its propriety under Federal Rule of Evidence 702.

Accordingly, Defendants' Motion to Exclude the Expert Opinions and Declaration of Professor Alexandra D. Lahav is GRANTED. The Court will not and does not consider Professor Lahav's report in its discussion of class certification.

## B. Class Certification

Following two rounds of Rule 12 motions, the remaining claims in the FACC are two RICO claims alleging mail and wire fraud and three ERISA claims, asserting a § 502(a)(1)(B) claim for underpaid benefits, a second § 502(a)(1)(B) claim for plan breach, and one § 502(a)(3) claim for fiduciary breach. Plaintiffs seek to certify the following class:

> Any member of a health benefit plan administered or issued by Cigna and governed by ERISA, where the member's plan utilized Cigna's "Maximum Reimbursable Charge" program for out-of-network benefits and whose claim(s) for intensive outpatient services billed with HCPCS H0015 and/or revenue code 0906 were priced by MultiPlan's Viant methodology, during the class period January 1, 2015 to the present.

CC Mot. 1–2. Defendants do not dispute that the Class meets the numerosity requirements but otherwise challenge Plaintiffs' showings under all other Rule 23(a) and (b) requirements. The Court begins (and ends) with the Rule 23(a)(2) requirement for commonality.

To satisfy the commonality requirement, the claims of the proposed class "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which

1    means that determination of its truth or falsity will resolve an issue that is central to the validity of

2    each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

3    Even a "single significant question of law or fact" will satisfy the commonality requirement.

4    *Stockwell v. City & Cnty. of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014).  Commonality

5    requires the plaintiff to demonstrate that the class members "have suffered the same injury," but

6    "does not mean merely that they have all suffered a violation of the same provision of law."

7    *Dukes*, 564 U.S. at 349–50.  Merely raising common questions, however, will not satisfy

8    commonality, which demands that plaintiffs demonstrate that the class action is capable of

9    generating "common answers apt to drive the resolution of the litigation." *Id.* at 351.

         **1.    ERISA Claims**

11        To begin, Plaintiffs' briefing does not present a clearly delineated or consistent common

12    issue for the Court to review.  Instead, the opening brief frequently refers to the "system-wide

13    practices and policies in Cigna's MRC program [] and the Defendants use [sic] of the Viant OPR

14    methodology."  CC Mot. 11.  At times, Plaintiffs refer to the common question as "whether the

15    pricing of Plaintiffs' and the putative Class' claims priced through Viant OPR produced a valid

16    UCR."  CC Mot. 13–14.  In their reply and oral arguments, however, Plaintiffs omit any reference

17    to "UCR" and stress that their contention is "whether, under any plan, Viant can price IOP claims

18    based on source data that has nothing to do with IOP Claims."  Pls.' Reply Br. ("CC Reply") 2–3,

19    6; Hr'g Tr. 5:2–4 ("[T]here's one common question that applies to the entire class, and that is

20    whether the database the Defendants used to price H0015 was appropriate to price those claims.").

21        To determine whether Plaintiffs' contention is one that would "resolve an issue that is

22    central to the validity" of an ERISA § 502(a)(1)(B) action and thereby "drive the resolution of the

23    litigation," the Court must begin by examining the language of the ERISA plan documents.  The

24    central relevance of the ERISA plans' specific terms and language is not one that this Court can

25    lightly disregard in evaluating commonality, as this directive is enshrined in the express language

26    of § 502(a)(1)(B) and has been repeatedly highlighted by the U.S. Supreme Court.  *See, e.g.*,

27    *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 108 (2013) ("ERISA § 502(a)(1)(B)

28    Case No.: 5:20-cv-02255-EJD
      ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                        10

United States District Court
Northern District of California

1   authorizes a plan participant to bring suit 'to recover benefits due to him *under the terms of his*

2   *plan*, to enforce his rights *under the terms of the plan*, or to clarify his rights to future benefits

3   *under the terms of the plan*' . . . .  For that reason, we have recognized the particular importance of

4   enforcing plan terms as written in § 502(a)(1)(B) claims.") (emphasis in original); *Kennedy v. Plan*

5   *Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009) ("[The ERISA] claim therefore

6   stands or falls by 'the terms of the plan.'") (quoting 29 U.S.C. § 1132(a)(1)(B)).  The Court,

7   therefore, begins by reviewing how the various health plans describe what a UCR rate should be.

8                          **a.      Overview of UCR Terms**

9               The Court will preface its review with the remark that—although the parties have

10  consistently used the phrase "UCR" to refer generally to the standard for calculating members'

11  out-of-network expenses as a function of other similar services—several plans within the putative

12  class employ various different labels for this standard.[2]  *See* CC Opp. 11–12.  Some refer to the

13  standard as "maximum reimbursable charge"; others may use the acronym "R&C" for "reasonable

14  and customary."  The Court does not find that such differences in labeling alone would suffice to

15  defeat commonality; rather, the Court must look underneath those labels to examine *how* the

16  individual plans define or describe this benchmark as a term of the plan.

17              A close examination of these plans' definitions reveals that there are several divergent

18  species of "UCR."  For example, some plans attempt to affix UCR to a specific percentile, while

19  others do not:

20          •   Intuit's 2018 Open Access Plus plan defines "Maximum Reimbursable Charge," in

21              part, as "a policyholder-selected percentile of charges" (Haskel Decl. Ex. 4);

22          •   FedEx's 2018 Summary Plan Description caps out-of-area charges at the "90th

23              percentile" and may reimburse OON benefits at either "110% of the Medicare

24

25  _____

26  [2] Although many plans do use Cigna-drafted plans that provide a relatively consistent MRC
    definition, nearly 76,000 claims (or 30% of the claims in the putative class) arise under a client-
    drafted plan that use different language to define what constitutes a UCR or MRC rate.  *See* May
27  Report ¶ 117, fig. 15; *see also* CC Opp. 11.  Defendants' expert reported at least 219 such client-
    drafted health plans.  May Report ¶117.

28

rates" or "a percentile of what other doctors . . . typically charge" (*id.* Ex. 36); and

- Impossible Foods' 2019 Open Access Plus plan indicates that "Maximum Reimbursable charge" could be the "110th percentile" of a Cigna-developed Medicare-based fee schedule or "80th percentile" of charges made by providers in the area (*id.* Ex. 44).

Some plans also specify the source of data from which the percentile or UCR rate should be determined, while others do not.  *See, e.g.*, Haskel Decl. Ex. 4 ("a database selected by Cigna"); Ex. 17 ("available data resources of competitive fees"); Ex. 36 ("information from an independent third-party database"); Ex. 44 ("database for similar services").

Nearly all exhibited exemplar plans use different qualitative terms to describe how similar a comparator provider must be or limit what type of comparators are considered.  For instance, these plans may base their UCR rate on any of the following:

- The "*competitive* fees" in the area (Haskel Decl. Ex. 4);
- The "fee *usually* charged for *that* service by *qualified* providers" (*id.* Ex. 34);
- The "*average* claims data" (*id.* Ex. 35);
- What providers "*typically* charge for the *same* service" (*id.* Ex. 36);
- The "range of *usual* fees for *comparable* services" (*id.* Exs. 37, 40);
- The "*prevailing* charge" (*id.* Ex. 39);
- The "fee *most commonly* charged" (*id.* Ex. 42); or
- "[E]*stimates* of the *typical* charges for *similar*" services (*id.* Ex. 43).

Additionally, many plans—though again not all—specifically defer certain decisions or determinations to Cigna and the plan administrator.  *See, e.g.*, Haskel Decl. Exs. 4, 44 ("a database selected by Cigna"); Ex. 34 ("as determined by Cigna"); Ex. 35 ("These charges . . . are determined by your health care company to be appropriate fees"); Ex. 36 ("the fee schedule developed by the Claims Paying Administrator"); *see also id.* Exs. 37, 38, 39, 42.  Indeed, one of these plans delegated the entire determination for OON reimbursements to the Claims Administrator.  *See id.* Ex. 38 ("Allowable Charges for services or supplies received out of

1    network may be determined by the Claims Administrator.").

2         Finally, at least one health plan has expressly set forth a multi-factor determination for

3    expenses that are "unusual, not often provided in the area or provided by only a small number of

4    providers in the area," Haskel Decl. Ex. 39, which would appear to apply to the IOP services at

5    issue here.  These factors include, "The complexity of the service; The degree of skill needed; The

6    provider's specialty; and The range of services or supplies provided by a facility and the

7    prevailing charge in other areas."  *Id.*

8              **b.      Analysis**

9         At the end of its winding recount of the various plans' terms, the Court is left to find

10   whether there is a common answer to the question of whether Viant OPR failed to produce a valid

11   UCR under every plan's terms.  The Court must answer this question in the negative and finds that

12   there is no one definition of a "UCR" rate that would generate a class-wide common answer.

13        The dissimilarities across the various plans' UCR language are largely self-evident.  Some

14   plans consider a UCR rate to be one that is "competitive"; others look to the "usual," "typical," or

15   "prevailing" rate.  Some plans want the fee "most commonly charged," which is distinguishable

16   from the "average" claims data.  Some plans only want to compare the OON service received with

17   fees for the "same" service or only those from "qualified" providers, while others may be satisfied

18   with comparing "similar" or "comparable" services.  To generate a common answer to Plaintiffs'

19   proposed inquiry would require a finding that Viant OPR's UCR rate would either breach every

20   one of these UCR terms or be permissible under all of these terms.  Such a sweeping "one stroke"

21   determination is not possible without reviewing or at least consulting the UCR language used in

22   the several hundred client-drafted health plans.

23        Additionally, where a plan has delegated the choice of database or the entire OON

24   reimbursement determination to Cigna, the UCR inquiry would be further complicated by a

25   different standard of review, *i.e.*, whether Cigna abused its discretion and was unreasonable in

26   selecting Viant OPR as the data source.  *See Wit v. United Behav. Health*, 79 F.4th 1068, 1087

27   (9th Cir. 2023) ("Where the benefit plan gives the administrator or fiduciary discretionary

28   Case No.: 5:20-cv-02255-EJD
     ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                          13

authority to determine eligibility for benefits or to construe the terms of the plan, we ordinarily review the plan administrator's decisions for an abuse of discretion.").  For other plans that did not unambiguously delegate such discretion to Cigna, the standard of review is *de novo*.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Plaintiffs do not dispute that this case may require the application of different standards of review and deference.  CC Reply 13.  Instead, they argue that there are only two different standards of review, which would not overcome a "common factual core."  *Id.*  However, just because there are only two buckets that the plans may fall into does not mean that the Court need only make two inquiries.  Instead, the Court must conduct an individualized determination for every health care plan within the class to determine which bucket a plan falls into, *i.e.*, whether it has delegated the determination to Cigna.[3]

With respect to the available case law, neither party—nor the Court for that matter—has identified a single court that has certified an ERISA class arising out of UCR obligations.  *See* Hr'g Tr. 29:23–30:8, 33:10–20.  To the contrary, every court asked to certify a class based on alleged ERISA § 502(a)(1)(B) violations of UCR obligations has consistently denied certification, citing the overwhelming individual inquiries that would spring from the variations in UCR plan terms.  *See, e.g.*, *Franco v. Connecticut Gen. Life Ins. Co.* ("*Franco I*"), 289 F.R.D. 121, 135 (D.N.J. 2013) (denying certification on predominance grounds where the "record before the Court is sparse on proof that Cigna either formally adopted a 'standard' definition of UCR or in practice used the same or substantially similar language across plans"); *Franco v. Connecticut Gen. Life Ins. Co.* ("*Franco II*"), 299 F.R.D. 417, 427 (D.N.J. 2014), *aff'd*, 647 F. App'x 76 (3d Cir. 2016) ("The UCR language is accompanied by significant qualifiers. . . . This creates a fractured landscape for the ERISA claims of the putative class."); *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 2014 WL 6888549, at *7 (C.D. Cal. Sept. 3, 2014) ("Whatever the reason, there

---

[3] Plaintiffs' citation to *Des Roches* is also unavailing.  CC Reply 13 (citing *Des Roches v. California Physicians' Serv.*, 320 F.R.D. 486, 502 (N.D. Cal. 2017)).  In *Des Roches*, the line between which standard of review applied to which plans was clearly and manageably delineated; all "Blue Shield of California plans contain[ed] enforceable language establishing an abuse of discretion standard," while "all Blue Shield Life plans must be reviewed *de novo*."  *Id.*  Plaintiffs have provided evidence of no such manageable delineation for the plans in their putative class.

Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
14

are significant differences across [defendant's] sample ERISA plans.  In light of those differences, the Court is not persuaded that [defendant's] UCR obligations can be determined on a classwide basis."); *In re Aetna UCR Litig.*, 2018 WL 10419839, at *19 (D.N.J. June 30, 2018) ("[T]he plethora of diverse contractual standards involved in this case drives the Court into highly individualized inquiries.  This prevents the analysis from ever reaching the issue of whether Ingenix was a flawed database, and keeps this putative class action from ever getting resolved in 'one stroke.'").

The Court notes that these issues have been raised in other ERISA actions brought under Rule 23.  The *Franco* line of cases found that the common question of "whether the Ingenix data was significantly inaccurate or faulty" was sufficient to satisfy Rule 23(a) commonality (though not predominance).  289 F.R.D. at 131; CC Reply 6 (referring to common question as "whether it is appropriate to price IOP claims based on data that has nothing to do with IOP").  Subsequent UCR certification decisions, however, departed from *Franco*, finding that "faulty database" contentions did not satisfy commonality.  *See In re Aetna*, 2018 WL 10419839, at *19 (finding that the variety of UCR terms "prevents the analysis from ever reaching the issue of whether Ingenix was a flawed database, and keeps this putative class action from ever getting resolved in 'one stroke'"); *cf. WellPoint*, 2014 WL 6888549 (denying certification on commonality grounds).  Having reviewed and compared these UCR opinions in some detail, this Court agrees with Judge Hayden's analysis in *Aetna* and respectfully disagrees with *Franco I*'s determination on commonality.  As discussed in further detail below, the Court believes that the question of "whether [] data was *significantly* inaccurate or faulty" (as formulated in *Franco I*) cannot be answered class-wide without individualized examinations to determine what "significantly" means under each set of UCR terms.  Just as the employment discrimination class in *Dukes* could not "produce a common answer to the crucial question *why was I disfavored*," 564 U.S. at 352, the ERISA class here cannot produce a common answer to the crucial question, "Did the use of Viant OPR breach *my* plan's UCR obligations?"

In summary, the Court finds that, given the variety of UCR terms across a significant

United States District Court
Northern District of California

1   proportion of the class, Plaintiffs have not demonstrated that there exists a question that will

2   generate a common answer for every plan and member in the putative class.

3                           **c.      Plaintiffs' Arguments**

4         Unsurprisingly, Plaintiffs marshal a considerable number of responses to deflect

5   Defendants' arguments on commonality.  None of them, however, permit the Court to look past

6   the variances between the individual plans' UCR terms and language to certify the ERISA class.

7         First, Plaintiffs attempt to paper over the differences in the plans' UCR language,

8   contending that "whatever the language, the substance remains the same."  CC Reply 4.  The

9   plaintiffs in *WellPoint* had raised a near duplicate argument, which the court found to "miss[] the

10  point . . . .  Even if the different terms WellPoint has used to describe its reimbursement obligations

11  all amount to a UCR rate, the Court must determine what that rate *is*, under the specific terms of

12  each plan."  2014 WL 6888549, at *10 (emphasis in original).  The Court finds this reasoning

13  applicable here.  Even if the "substance remains the same" such that the plans' different UCR

14  iterations are functionally putting forth a general obligation to reimburse at a usual, customary,

15  and reasonable rate—an assumption that is not supported by common evidence—the Court must

16  nonetheless determine what the rate is before it can determine whether it was breached by the rate

17  calculated by Viant OPR.

18        In any event, Plaintiffs' reply only states without analyzing that the various plan terms are

19  "substantially similar."  CC Reply 3.  Plaintiffs do not make any effort to substantively reconcile

20  the differences Defendants identified across the various plans' UCR terms or argue how those

21  terms can nonetheless be construed in "one stroke."  *See* CC Reply 3–7.  Likewise, Plaintiffs'

22  expert offers only his personal interpretations of the plans' UCR variations, summarily remarking

23  that "these variations are inconsequential; instead, these plans are simply choosing different

24  phrasing to describe the same basic UCR methodology, rather than specifying a different method."

25  Modiano Reply Decl. Ex. 4 ("Hall Suppl. Report"), at 3–5.  However, neither Plaintiffs nor their

26  expert have presented any evidence that the different UCR phrasing nonetheless function as the

27  "same basic UCR methodology."  *Id.*  "Plaintiffs cannot exclude as 'irrelevant' the evidence

28  Case No.: 5:20-cv-02255-EJD
    ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                        16

United States District Court
Northern District of California

1    needed to answer the common question by insisting upon a myopic view of what is required to do

2    so."  *Neufeld v. Cigna Health & Life Ins. Co.*, 2023 WL 4366137, at *7 (D. Conn. July 6, 2023)

3    (denying certification and finding that "[w]hile the resolution of Plaintiffs' claims may involve a

4    common question as to each proposed class member. . . there can be no answer, and therefore no

5    'common answer,' without resorting to an individualized assessment of the particular plans").  The

6    Court cannot simply accept the word of Plaintiffs and their expert that explicitly different UCR

7    terms actually impose "substantially similar" obligations on Defendants.

8            Plaintiffs cite two cases to support their proposition that "the Court need not consider . . .

9    the specific wording each plan uses to describe UCR."  CC Reply 5.  However, the first of these

10   decisions is not an order on class certification but rather an order approving class *settlement*.  *Id.*

11   (citing *Downey Surgical Clinic, Inc. v. Optuminsight, Inc.*, 2016 WL 5938722 (C.D. Cal. May 16,

12   2016)).  And even in *Downey*, the settling plaintiffs acknowledged that "there [was] still a

13   significant risk that the Court may not certify the claims for class treatment," and cited *In re*

14   *Wellpoint* as a "case [that] could pose obstacles to certification."  2016 WL 5938722, at *6.  The

15   second case Plaintiffs cite for the proposition that a "uniform policy creates common question" is

16   *Med. Soc'y of New York v. UnitedHealth Grp. Inc.*, 2019 WL 6888613 (S.D.N.Y. Dec. 18, 2019),

17   an opinion denying reconsideration of a certification order.  This case too is readily

18   distinguishable, as the court there was only reviewing whether claim assignment defeated

19   commonality and did not analyze the "specific wording each plan uses to describe" the term at

20   issue.  CC Reply 5.

21           To Plaintiffs' credit, perhaps a few of the different UCR terms the Court reviewed could be

22   sufficiently similar to each other such that their corresponding UCR obligations can be interpreted

23   in tandem.  However, the Court cannot find—as Rule 23(a)(2) and *Dukes* demand—that a *single*

24   interpretation of UCR obligations can apply to *all* of these plans "in one stroke."  This distinction

25   was succinctly explained recently by Judge Meyer in *Negron v. Cigna Health & Life Ins. Co.*:

26

27

28   Case No.: 5:20-cv-02255-EJD
     ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                                    17

United States District Court
Northern District of California

1

2

3

4

> What troubles me about these back-and-forth exchanges between Cigna and plaintiffs is that plaintiffs repeatedly put forth rationalizations about why a purported variation is not really a variation or at least is not a material one.  Plaintiffs very well may be correct about some of these interpretations and about how to read certain plan-specific variant terms to be equivalent to the "charges made by a Pharmacy" Class language.  **But the issue here is exactly that: plaintiffs' responses to these variations in language require interpretations of countless individual plans to explain why this-or-that variation is or is not consistent with the Class language**.

5    2021 WL 2010788, at *21 (D. Conn. May 20, 2021) (emphasis added).  Nor can the Court be

6    called upon to review every plan's UCR term and determine whether it falls into one bucket of

7    similar UCR terms as opposed to another bucket of less similar UCR terms.  *See Negron*, 2021

8    WL 2010788, at *18 (noting that, although "contract interpretation is a task that courts routinely

9    undertake. . . [t]he variations or ambiguities a court could resolve in one or three or even ten plans

10   could become infeasible once the court is asked to consider thousands of plans").  Accordingly,

11   the Court finds that Plaintiffs have not presented sufficient evidence that the different terms of the

12   plans are so "substantially similar" that they may generate a common answer per Rule 23(a)(2).

13         Second, Plaintiffs argue that, regardless of what the individual plan terms required of

14   Cigna, commonality exists because Cigna priced the OON claims the same way, *i.e.*, using the

15   Viant OPR method.  CC Mot. 11–12.  This was an argument raised and rejected by other courts in

16   declining to certify an ERISA UCR class.  *See, e.g.*, *In re Wellpoint*, 2014 WL 6888549, at *10

17   ("As a fallback argument, Plaintiffs contend that any differences in plan terms are immaterial,

18   because [defendant] itself treated all plans similarly. . . . This argument, like Plaintiffs' other

19   merits arguments, simply ignores the fact that any analysis of [defendant's] obligations must begin

20   with the text of its ERISA plans.").  The reasoning from *In re Wellpoint* applies with full force

21   here.  The question of whether Cigna's conduct was uniform across several ERISA plans does not

22   on its own generate a "common answer[] apt to drive the resolution of the litigation," *Dukes*, 564

23   U.S. at 351, which here involves the class members' "benefits due to [them] *under the terms of*

24   [their] *plan*" and their "rights *under the terms of the plan*."  29 U.S.C. § 1132(a)(1)(B) (emphasis

25   added).  As the statutory language § 502(a)(1(B) and the Supreme Court teach, the Court must

26   understand Cigna's obligations *under the terms of the plans* before it can make sense of Cigna's

27   alleged common conduct.

28   Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Third, in their reply and oral arguments, Plaintiffs attempt to reformulate their common

2 contention to avoid referencing "UCR" or the putative class members' plans.  Specifically, they

3 present the common question as, "whether, under any plan, Viant can price IOP claims based on

4 source data that has nothing to do with IOP Claims," CC Reply 2–3, 6, or as "whether the database

5 the Defendants used to price H0015 was appropriate to price those claims."[4]  Hr'g Tr. 5:2–4; see

6 also CC Reply 10 ("The core common issue in this case—Defendants' use of inappropriate data to

7 price claims through Viant—does not turn on any of the phone calls at issue.").  However, even so

8 conceived, Plaintiffs' contention is ultimately still tethered to Defendants' obligations under the

9 various ERISA plans.  The question of "whether, under any plan, Viant *can* price IOP claims . . ."

10 contemplates what Defendants *can* do, which is determined and circumscribed by the terms of the

11 individual plans.  Similarly, the question of "whether the database the Defendants used to price

12 H0015 was *appropriate*" begs the follow-up question as to what is appropriate, yet another line

13 that is drawn by the specific terms of the class members' various plans.

14    A near identical argument was recently dismantled by Judge Hayden in *Aetna*, who

15 characterized such a contention as "turn[ing] the commonality question inside out."  2018 WL

16 10419839, at *16.  In *Aetna*, the plaintiffs had also argued that it was "the use of the Ingenix

17 Database to make UCR determinations that was a violation of ERISA, not which percentile was

18 used."  In rejecting this argument, the court reasoned,

> The plaintiffs are asking the Court to assume that the commonality prong is met
> because of their contention that the Ingenix database was flawed, and that common
> evidence could prove that is flawed.  **But that approach skips the preliminary
> inquiry of whether class members were underpaid at all,** as well as its necessary
> corollary:  underpaid from what hypothetically flawless/market-rate/statistically
> reliable number?  The Court cannot begin to answer these prerequisite questions
> without engaging in a plan-by-plan analysis.

---

[4] The fact that Plaintiffs can reduce their common contention to a binary yes-or-no question does not remedy its commonality problems.  *See* CC Reply 6.  This argument is nearly identical to the one rejected in *Lipstein v. UnitedHealth Grp.*, 296 F.R.D. 279 (D.N.J. 2013), where the plaintiffs argued that "whether [defendant] may estimate what Medicare would have paid by applying [defendant's allegedly impermissible] allowed amount is susceptible to a common answer: yes or no."  *Id.* at 289 (internal quotation marks omitted).  Similarly here, the Court cannot answer "yes" or "no" to Plaintiffs' question regarding Viant OPR without addressing what Defendants can or cannot do under the terms of the putative class members' plans.

1    *Id.* (internal citation omitted) (emphasis added).  Ultimately, Judge Hayden held that "the plethora

2    of diverse contractual standards involved in this case . . . prevents the analysis from ever reaching

3    the issue of whether Ingenix was a flawed database, and keeps this putative class action from ever

4    getting resolved in 'one stroke.'"  *Id.* at *19.  Plaintiffs' briefs contain no response to *Aetna*'s

5    direct repudiation of their main theory of commonality, and the Court does not see why Judge

6    Hayden's analysis should not also inform the resolution in this case.

7             It is perhaps unsurprising that gerrymandering a common ERISA contention that entirely

8    avoids the ERISA plan's language is a difficult—if not impossible—prospect.  As the Court noted

9    from the outset, the primacy of the specific plan terms is one that has been established by §

10   502(a)(1)(B) and the Supreme Court.  *See, e.g.*, *Heimeshoff*, 571 U.S. at 108; *Kennedy*, 555 U.S. at

11   300.  Furthermore, other courts considering motions to certify an ERISA class have consistently

12   rejected plaintiffs' invitations to gloss over differences in plan language and have enforced a

13   fidelity to the specific plan terms.  *See, e.g.*, *Lipstein*, 296 F.R.D. at 290 ("Contrary to Plaintiffs'

14   argument, the Court cannot ignore the specific plan language . . . because Defendants' policy is

15   only impermissible if it conflicts with the language of the particular plan or if it is otherwise

16   arbitrary and capricious."); *Franco II*, 299 F.R.D. at 425 (rejecting "arguments [that] run counter

17   to the settled jurisprudence that ERISA rights and responsibilities are dictated by the plan

18   language"); *In re Wellpoint*, 2014 WL 6888549, at *10 (rejecting an "argument, like Plaintiffs'

19   other merits arguments, [that] simply ignores the fact that any analysis of [defendant's] obligations

20   must begin with the text of its ERISA plans"); *In re Aetna*, 2018 WL 10419839, at *17 (rejecting

21   argument "that plan language was irrelevant" and finding evidence insufficient "for the Court to

22   depart from ERISA's well-settled practice of focusing on plan language").

23            To the extent Plaintiffs broadly insinuate that commonality is met simply because all their

24   claims were priced using the same Viant OPR method, the Supreme Court in *Dukes* expressly

25   cautioned district courts against such artfully crafted "common questions" that actually "give[] no

26   cause to believe that all their claims can productively be litigated at once."  564 U.S. at 350.  For

27   an employment discrimination case as in *Dukes*, the Supreme Court provided the following

28   Case No.: 5:20-cv-02255-EJD
     ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION

United States District Court
Northern District of California

1    examples of common questions that do not satisfy commonality: "Do all of us plaintiffs indeed

2    work for Wal–Mart?  Do our managers have discretion over pay?  Is that an unlawful employment

3    practice?  What remedies should we get?"  *Id.* at 349–50 ("Reciting these questions is not

4    sufficient to obtain class certification.").  Likewise, to the extent Plaintiffs are in effect presenting

5    the common contentions as "Were all of our IOP claims priced by Viant OPR?" or "Did Viant

6    OPR use data from the SAF for all of our claims?", those questions would fall into the same

7    category as the questions identified in *Dukes*.  Between *Dukes*' directive that common contentions

8    must "drive the resolution of the litigation" and the well-established understanding that an ERISA

9    claim "stands or falls by 'the terms of the plan,'" *Kennedy*, 555 U.S. at 300, there is no daylight in

10   this case for a common contention that avoids the language of the class members' plans, despite

11   Plaintiffs' creative attempts to do so.

12          In short, the Court is doubtful that there is any iteration of Plaintiffs' theory of the case that

13   circumvents the various plans' UCR terms that govern Defendants' obligations.

14          Fourth, to the extent Plaintiffs argue that the Viant OPR method could *never* result in a

15   UCR rate and would "categorically" fail any UCR requirement (Hr'g Tr. 17:12–18; *see also* CC

16   Reply 6 ("Defendants are using bad data that make their payment calculations categorically

17   incorrect.")), the variety and differences among UCR terms does not support such a sweeping

18   finding.  Plaintiffs' suggestion that Viant OPR is an objectively and "categorically incorrect"

19   source of data resembles yet another argument made and rejected in *Aetna*.  There, Judge Hayden

20   found that "despite plaintiffs' suggestions to the contrary, none of the plan exemplars mandate[d]

21   the use of a database that is 'statistically reliable' or 'statistically valid'; none require[d] the use of

22   a correct 'market rate.'"  *In re Aetna*, 2018 WL 10419839, at *16.  Here as well, there is no

23   uniform requirement among the various plans' UCR language that demands an objective threshold

24   of reliability, validity, or propriety, such that Viant OPR could be found categorically incorrect

25   across the board.  For instance, although many plans indicated that UCR would be based off of the

26   relevant geographic area, some plans simply required the "*available* data resources" (Haskel Decl.

27   Ex. 17) or plainly did not include a geographic limitation (*id.* Ex. 38).  And again, many plans also

United States District Court
Northern District of California

28   Case No.: 5:20-cv-02255-EJD

1   expressly delegated the selection of a database to Cigna and the claims administrator.  *See, e.g.*,

2   Haskel Decl. Exs. 4, 44 ("a database selected by Cigna"); Ex. 34 ("as determined by Cigna"); Ex.

3   36 ("the fee schedule developed by the Claims Paying Administrator"); *see also id.* Exs. 37, 38,

4   39, 42.  Moreover, to the extent Plaintiffs are asking this Court to find that—regardless of the

5   variations in the plans' UCR obligations—Viant OPR would fail any and all of them in reality,

6   such a request would invite the type of "free-ranging merits inquiries" that is inadvisable on class

7   certification, especially where such merits inquiries are not necessary to the Court's commonality

8   inquiry.  *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).  As a

9   result, the Court cannot find that Viant OPR represents some "categorically incorrect" method that

10   would breach every variety of UCR term in the putative class.

11        Fifth, Plaintiffs also contend that their case is distinguishable from other UCR cases

12   because, here, they only seek to certify a class involving IOP claims, whereas the other UCR cases

13   involved other claims.  CC Mot. 12; CC Reply 12; Hr'g Tr. 5:23–6:5.  However, this is a

14   distinction without a difference.  The courts in *Franco*, *Wellpoint*, and *Aetna* did not deny

15   certification because the putative classes had included claims for different OON services; they

16   denied certification because the classes were comprised of different health plans with different

17   UCR obligations.  *See Franco I*, 289 F.R.D. at 136–37 ("The Court cannot even begin an analysis

18   of whether a benefits determination was made in abuse of Cigna's discretion under the plan

19   *without evidence demonstrating what criteria factored into calculating an allowed amount*.")

20   (emphasis added); *In re WellPoint*, 2014 WL 6888549, at *12 ("In conclusion, the Court cannot

21   find that the issue of 'whether WellPoint's use of the Ingenix Database and Non–Ingenix

22   Methodologies artificially deflated the UCR for ONS' is common across the proposed ERISA

23   Classes, *because Plaintiffs have not shown that WellPoint's UCR obligations under its ERISA

24   plans are common across those plans*.") (emphasis added); *In re Aetna*, 2018 WL 10419839, at

25   *14 ("After careful review of the 47 plan exemplars, the Court agrees with Aetna that the varied

26   nature of the terms poses insurmountable odds against class certification.").

27        Finally, the smorgasbord of cases that Plaintiffs cite do not supply the necessary law to

United States District Court
Northern District of California

1    warrant a finding of commonality in their favor.  As an initial matter, Plaintiffs begin by reciting

2    the incorrect Rule 23(a) commonality standard.  *See* CC Mot. 10 (quoting *Dukes v. Wal-Mart*

3    *Stores, Inc.*, 603 F.3d 571, 594 (9th Cir. 2010), *rev'd*, 564 U.S. 338 (2011)); *compare Dukes v.*

4    *Wal-Mart*, 603 F.3d at 594 (9th Cir. 2010) ("[W]hat must be satisfied for the commonality inquiry

5    under Rule 23(a)(2) is that plaintiffs establish common *questions* of law and fact, and answering

6    those questions is the purpose of the merits inquiry.") (emphasis in original) *with Wal-Mart*

7    *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("What matters to class certification is not the

8    raising of common 'questions'—even in droves—but rather, the capacity of a class-wide

9    proceeding to generate common *answers* apt to drive the resolution of the litigation.") (emphasis

10   in original) (ellipses omitted).  Plaintiffs also repeatedly cite to certification cases that predate the

11   Supreme Court's *Dukes* decision, many of which did not even involve an ERISA class or claim.

12   *See, e.g.*, CC Mot. 10–11, 12; CC Reply 3, 6.

13          Furthermore, to the extent Plaintiffs rely on *Armstrong v. Davis*, 275 F.3d 849, 868 (9th

14   Cir. 2001), for the proposition that commonality may be satisfied where a lawsuit "challenges a

15   system-wide practice or policy that affects all of the putative class members," CC Mot. 11, the

16   Court is not persuaded that such a showing is sufficient to certify an ERISA class.  *Armstrong*

17   expressly limited its "system-wide practice or policy" remark to "civil-rights suit[s]," and the

18   Court has not located a single instance where an ERISA class was certified based on *Armstrong*'s

19   "practice or policy" language.

20          One of the primary substantive decisions that Plaintiffs cite throughout their briefs is *Wit v.*

21   *United Behav. Health*, 317 F.R.D. 106, 128 (N.D. Cal. 2016), *aff'd in part, rev'd in part and*

22   *remanded*, 79 F.4th 1068 (9th Cir. 2023).  *See* CC Mot. 12–13 (citing *Wit*, 317 F.R.D. at 128).

23   However, the diversity of UCR terms across the various plans distinguishes the present case from

24   the class claims asserted in *Wit*.  There, Judge Spero certified an ERISA class, in part, by

25   distinguishing *In re Wellpoint* because the *Wit* plaintiffs had demonstrated the various plans were

26   substantially the same in a key respect, "namely, that they require as a condition of coverage

27   adherence to generally accepted standards and/or state law."  *Id.*  However, Plaintiffs in the

28   Case No.: 5:20-cv-02255-EJD
     ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                         23

present case cannot make such a showing because the "common" term at issue—*i.e.*, that OON benefits are to be reimbursed at a UCR rate—is *not* substantially the same across the plans, as the Court has outlined in detail.

Plaintiffs' citation to *Peters v. Aetna Inc.*, 2 F.4th 199, 243 (4th Cir. 2021), is similarly unavailing. CC Mot. 13. Plaintiffs' *Peters* quotation omits the contention that the Fourth Circuit was reviewing for commonality: "While these distinctions among proposed class members may affect the dollar amount or scope of the available remedies, they do not reflexively defeat class certification when the underlying harm derives from the same common contention—*that Appellees' fee-shifting scheme breached the terms of the applicable Plan and constituted a breach of fiduciary duty*." 2 F.4th at 243 (emphasis added). Accordingly, *Peters* does not stand for the proposition that courts may look past variances among the implicated plan terms in the process of determining commonality; it only addresses the circumstances where a common contention has *already* been established.

Plaintiffs also submit that courts "often find commonality in similar situations" to the case at bar, citing a string of cases. CC Reply 6. However, three out of the four string cited cases were expressly considered and distinguished by *WellPoint* for involving different factual findings and underpinnings from the plaintiffs' UCR varied contentions. *See In re WellPoint*, 2014 WL 6888549, at *11 (listing and distinguishing cases). And the remaining fourth case—*Smith v. United HealthCare Servs.*, CC Reply 6—was addressed and firmly rejected in *Negron*, 2021 WL 2010788, at *20 (distinguishing *Smith*'s finding of plan uniformity on the basis that "the plan language at issue in *Smith* that provided the same limit . . . was quite clear"). These cases do not counsel a different determination in the present case.

                                                    * * *

In summary, the Court finds that Plaintiffs' purported common ERISA contentions do not satisfy commonality under Rule 23(a)(2). Any contention relating to whether Defendants' use of Viant OPR is appropriate must necessarily involve an examination of the class members' ERISA plans, specifically those plans' UCR terms. Although Plaintiffs present an impressive number of

United States District Court
Northern District of California

1    arguments that commonality exists notwithstanding the plans' varying UCR terms, the Court finds

2    their claims similar to UCR-based ERISA class claims raised before other courts, which have

3    unanimously denied class certification.  Having reviewed the exemplar plans submitted in this

4    case, the Court finds that the dissimilarities between the plans' UCR terms impede any class-wide

5    common answer relating to Defendants' UCR obligations, defeating commonality as to the ERISA

6    class definition that Plaintiffs have set forth.

7                            **2.    RICO Claims**

8         Establishing liability under § 1962(c) of RICO "requires (1) conduct (2) of an enterprise

9    (3) through a pattern (4) of racketeering activity."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

10   496 (1985).  The alleged racketeering activity in this case is mail and wire fraud (FACC ¶ 432),

11   the elements of which are: "(1) a scheme to defraud, (2) the use of either the mail or wire, radio, or

12   television to further the scheme, and (3) the specific intent to defraud."  *United States v. Brugnara*,

13   856 F.3d 1198, 1207 (9th Cir. 2017).

14        Plaintiffs do not seek a separate class definition for their RICO claims.  Accordingly, to the

15   extent that Plaintiffs assert the same common contentions in support of their RICO claims as for

16   their ERISA claims (*i.e.*, that Viant OPR failed to produce a UCR rate under the class members'

17   health plans), CC Mot. 13–14, those contentions also do not satisfy commonality for their RICO

18   claims.  Plaintiffs, however, submit that they can establish an additional common issue unique to

19   their RICO claims, which is whether the OON providers were "promised something other than the

20   database that the Defendants actually used to price these claims" in Defendants' "false 'UCR'

21   representations."  Hr'g Tr. 5:6–9; *see also id.* 19:22–24 ("And the common question is going to be

22   did Cigna promise to pay a UCR rate or a[n] MRC rate on these phone calls with providers?"); *see*

23   *also* CC Reply 16 (referencing a "common course of conduct by representing to providers in

24   phone calls that the claims at issue would be priced at UCR when Defendants knew otherwise").

25        As a general matter, the Court is doubtful that Plaintiffs can submit a common RICO

26   contention avoiding the identified variances in the plans' UCR terms when they could not do so

27   for their ERISA claims.  Where courts have denied certifying an ERISA class because of variances

28   Case No.: 5:20-cv-02255-EJD
     ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
                                          25

in the members' plans, they have also correspondingly denied the accompanying RICO claims on the same basis, reasoning that "the lawfulness of the alleged underpayment scheme—that is, the predicate acts of mail and wire fraud—cannot be evaluated without reference to Cigna's obligations according to plan terms." *Franco I*, 289 F.R.D. at 144; *see also Negron*, 2021 WL 2010788, at *22 ("[F]or the same reason I cannot resolve the ERISA Class and Subclass claims, I also cannot resolve the RICO Class and Subclass claims, as I cannot determine whether the allegedly uniform misrepresentations are actually uniform—or even misrepresentations—without reference to the individual plans."). Plaintiffs' common RICO contention in this case—that Cigna made common verbal promises to reimburse providers at a UCR rate—similarly cannot be evaluated without reference to what the particular member's plan requires for a UCR rater. And as the Court has repeatedly stated, Plaintiffs have not established a common definition of a "UCR rate," meaning that a factfinder cannot even fully apprehend the question of "whether Cigna promised to pay *a UCR rate*," much less provide a one-stroke common answer across the entire class. Plaintiffs' proposed RICO contention fails commonality on this basis alone.

Moreover, after reviewing Plaintiffs' submitted evidence, the Court also finds that the record evidence does not support the contention that Cigna uniformly promised to pay a "UCR rate." For instance, although Plaintiffs cast the Cigna representatives' VOB responses as uniformly promising a UCR rate, the sample VOB transcript excerpts indicate that the representatives often consulted the member's specific plan information before providing the reimbursement information. *See* Modiano Decl. Ex. 27; Modiano Decl. Ex. 15 ("Murphy Dep.") 179:5–15. To the extent the Cigna representatives simply recited the specific UCR obligations in a particular member's plan, the variances in the specific UCR terms would also preclude a finding that Cigna made uniform and common UCR representations over the VOB calls. Plaintiffs also assert that Cigna representatives were given a "script" for how they should respond to providers on VOB calls. CC Mot. 5, 20. However, the Cigna internal documents that Plaintiffs cite for this proposition do not show that Cigna representatives were instructed to promise "UCR" rates to any OON providers calling for VOB. To the contrary, the documents expressly flag certain categories

Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION

1  of information that *should not* be shared with providers.  Modiano Decl. Exs. 11, 13, 14.  At most,

2  the internal documents appear to provide flowcharts for what Cigna representatives should be

3  doing *internally* when a provider calls for VOB, such as how to use Cigna's computer systems to

4  look up benefits.  But the fact that Cigna had a standardized or uniform *internal* process to price

5  OON claims does not substantiate RICO contention Plaintiffs have advanced, which is that

6  Cigna's *external* representations and promises are also standardized or uniform.  In summary, the

7  Court finds that the evidence does not indicate that Plaintiffs' additional common RICO

8  contention can produce a common answer for every VOB call, every individual claim, and

9  individual health plan in the putative class.

10      Accordingly, the Court finds that Plaintiffs have also failed to establish commonality with

11  respect to their RICO claims.

12                                        * * *

13      To summarize, the Court finds that Plaintiffs have not demonstrated by a preponderance of

14  the evidence that their proposed class definition exhibit a common contention "of such a nature

15  that it is capable of classwide resolution—which means that determination of its truth or falsity

16  will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*,

17  564 U.S. at 350.  Because Plaintiffs and their proposed class definition have not satisfied the

18  commonality prerequisite of Rule 23(a)(2), the Court does not proceed to analyze whether

19  Plaintiffs have satisfied the other Rule 23(a) requirements or any of the Rule 23(b) categories.

20  Accordingly, the Court DENIES Plaintiffs' motion to certify the proposed class as defined in their

21  opening class certification brief.

22      **C.    Evidentiary Objections and Requests**

23      In addition to Plaintiffs' class certification motion and Defendants' *Daubert* motion, the

24  parties have also filed a smattering of other evidentiary motions and requests, which the Court

25  turns to next.

26      First, Defendants filed objections to additional expert reports and third-party declarations

27  that Plaintiffs had submitted with their reply brief.  ECF No. 183.  Defendants requested that the

28

1   Court strike the newly filed materials or allow them an opportunity to respond.

2          To the extent Defendants take issue with the new damages models presented in Plaintiffs'

3   supplemental expert reports, the Court does not reach the Rule 23(b) analysis in this Order and,

4   therefore, does not consider whether Plaintiffs' damages model complied with *Comcast Corp. v.*

5   *Behrend*, 569 U.S. 27 (2013).  The Court does not approve of Plaintiffs' eleventh-hour damages

6   submissions; however, because the Court does not need to consider Plaintiffs' damages theories or

7   Defendants' corresponding responses, the Court will OVERRULE Defendants' objections to the

8   new damages models as MOOT and WITHOUT PREJUDICE to any future objections.[5]  To the

9   extent that the supplemental expert reports provided proper rebuttal opinions in response to

10  evidence and opinions presented in Defendants' opposition, the Court OVERRULES Defendants'

11  objections on the merits and will decline to strike the supplemental expert reports.

12         Second, Plaintiffs filed a motion to strike Defendants' objections or, in the alternative,

13  allow leave to respond to those objections.  ECF No. 185.  The Court GRANTS the alternative

14  relief requested in Plaintiff's motion and has considered Plaintiffs' responses in overruling

15  Defendants' objections.  ECF No. 185-1.

16         Third, Defendants filed a motion for leave to file a sur-reply in further opposition of class

17  certification.  ECF No. 186.  Similar to the Court's resolution of Defendants' reply objections,

18  most of Defendants' sur-reply responses relate to arguments that the Court does not reach in this

19  Order.  However, the Court finds that Plaintiffs did indeed present new arguments and evidence in

20  their reply brief and, therefore, GRANTS Defendants' request for their sur-reply.

21         Fourth, Plaintiffs seek judicial notice of an archived version of a webpage on Cigna's

22  website.  ECF No. 202.  Plaintiffs filed their request for judicial notice on August 1, 2023, which

23  is after the Court heard oral arguments and taken the motion under submission, as well as over

24  three months after Plaintiffs had filed their reply brief on May 10, 2023.  Per Civil Local Rule 7-

25

26  ――――――――――――――――

27  [5] Similarly, the Court will OVERRULE as moot Defendants' objections to the third-party
    declarations submitted in Plaintiffs' reply, which were in response to an argument from
    Defendants that the Court also did not reach in this Order.

28

United States District Court
Northern District of California

3(d), "[o]nce a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval."  Accordingly, Plaintiffs' untimely request for judicial notice is DENIED.

## IV.      CONCLUSION

Based on the foregoing, the Court GRANTS Defendants' motion to exclude Professor Lahav's opinions (ECF No. 165) and DENIES Plaintiffs' motion for class certification (ECF No. 148).  Additionally, the Court GRANTS Plaintiffs' leave to respond to Defendants' reply evidentiary objections (ECF No. 185), GRANTS Defendants' request for leave to file a sur-reply (ECF No. 186), and DENIES Plaintiffs' request for judicial notice (ECF No. 202).

**IT IS SO ORDERED.**

Dated: February 12, 2024

EDWARD J. DAVILA
United States District Judge

United States District Court
Northern District of California

Case No.: 5:20-cv-02255-EJD
ORDER DENYING CLASS CERTIFICATION AND GRANTING *DAUBERT* MOTION
29